IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REMY, INC., UNIT PARTS COMPANY, and WORLDWIDE AUTOMOTIVE, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 06-785-*** |
| v. | ) ) | |
| CIF LICENSING, LLC, D/B/A GE LICENSING, WELLS MANUFACTURING CORP., TADITEL US, INC., and WETHERILL ASSOCIATES, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |
| ———————————————————— | ) ) | |
| WELLS MANUFACTURING CORP., | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) ) | |
| REMY, INC., | ) ) | |
| Counterdefendant. | ) ) | |
| ———————————————————— | ) ) | |
| WELLS MANUFACTURING CORP., | ) ) | |
| Third-Party Plaintiff, | ) ) | |
| v. | ) ) ) | |
| STMICROELECTRONICS, INC., | ) ) | |
| Third-Party Defendant. | ) ) | |
| ———————————————————— | ) | |

**COMPENDIUM OF UNREPORTED DECISIONS CITED IN
THIRD-PARTY DEFENDANT STMICROELECTRONICS, INC.'S
<u>OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS OR STAY</u>**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
John W. Shaw (No. 3362)
Adam W. Poff (No. 3990)
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
apoff@ycst.com
msquire@ycst.com

*Attorneys for Third-Party Defendant,*
*STMicroelectronics, Inc.*

Dated:  June 20, 2007

# INDEX

*Cases*                                                                                          *Tab*

*Acierno v. Haggerty,*
   No. 04-1376 (KAJ), 2005 U.S. Dist. LEXIS 30353
   (Nov. 23, 2005) ............................................................................................................. 1

*Benninghoff v. Tolson,*
   No. 94-CV-2903, 1994 U.S. Dist. LEXIS 13428
   (E.D. Pa. Sept. 22, 1994) ............................................................................................... 2

*Enex Resources Corp. v. Texas Crude, Inc.,*
   No. 05-94-00641-CV, 1994 Tex. App. LEXIS 4112
   (Tex. App. Dec. 30, 1994) .............................................................................................. 3

*Green v. Burlington Northern Santa Fe Railway Company,*
   Civil Action No. 3:05-CV-1596-L, 2006 U.S. Dist. LEXIS 2143
   (N.D. Tex. Jan. 19, 2006) ............................................................................................... 4

*In re: Peregrine Sys., Inc.,*
   C.A. No. 03-815-KAJ, 2004 U.S. Dist. LEXIS 13467
   (D. Del. July 12, 2004) ................................................................................................... 5

*Malhan v. Anthony Robbins Cos.,*
   No. 05-CV-05951 (WJM), 2006 U.S. Dist. LEXIS 20558
   (D.N.J. Mar. 24, 2006) ................................................................................................... 6

*Moore v. John S. Tilley Ladders Co.,*
   No. 92-5902, 1993 U.S. Dist. LEXIS 2300
   (E.D. Pa. Feb. 23, 1993) ................................................................................................. 7

*Oatway v. Am. Int'l Group, Inc.,*
   C.A. No. 01-033-GMS, 2002 U.S. Dist. LEXIS 1771
   (D. Del. Feb. 5, 2002) .................................................................................................... 8

*Pursuit Athletic Footwear, Inc. v. Save Power Ltd.,*
   C.A. No. 96-40 MMS, 1996 U.S. Dist. LEXIS 8158
   (D. Del. June 7, 1996) .................................................................................................... 9

# TAB 1

LEXSEE



Analysis
As of: Jun 20, 2007

**FRANK E. ACIERNO, CHRISTIANA TOWN CENTER, LLC, a Delaware limited liability company, 395 ASSOCIATES, LLC, a Delaware limited liability company, ESTATE HOMES, INC., a Delaware corporation, Plaintiffs, v. GEORGE O. HAGGERTY, individually and in his official capacity as Assistant General Manager of the New Castle County Department of Land Use, TIMOTHY P. MULLANEY, individually and in his capacity as New Castle County Attorney, CHARLES L. BAKER, individually and in hi capacity as General Manager of the New Castle County Department of Land Use, JAMES H. EDWARDS, individually and in his capacity as Inspections Manager and Licensing Division Manager of the New Castle County Department of Land Use, and SHERRY L. FREEBERY, in her individual capacity as Chief Administrative Office of New Castle County and NEW CASTLE COUNTY, a political subdivision of the State of Delaware, Defendants.**

Civil Action No. 04-1376-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 30353

November 23, 2005, Decided

**PRIOR HISTORY:** nullSterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65 (Del. Ch., May 6, 2004)
Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 576 (Del., Dec. 16, 2004)
Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 26 (Del., Jan. 16, 2004)
New Castle County v. Sterling Properties, Inc., 379 A.2d 1125, 1977 Del. LEXIS 528 (Del., 1977)
Acierno v. Mitchell, 6 F.3d 970, 1993 U.S. App. LEXIS 25126 (3d Cir. Del., 1993)

**CORE TERMS:** abstention, state law, constitutional rights, stop work, judicata, collateral estoppel, developer, notice, writ of certiorari, res judicata, preclusion, litigated, weighs, moot, administrative agencies, judicial notice, motion to dismiss, final judgment, jurisdictional, issue preclusion, claim preclusion, subject matter jurisdiction, writ of mandamus, currently pending, litigating, abstain, privity, administrative remedies, prior

adjudication, preclusive effect

**COUNSEL:** [*1] Richard L. Abbott, Esq., Abbott Law Firm, LLC, Hockessin, DE, Counsel for Plaintiffs.

Dennis J. Siebold, Esq., New Castle County Department of Law, New Castle, Delaware, Counsel for Defendant New Castle County, Of Counsel; Hamilton P. Fox, III, Esq., Gregory S. Smith, Esq., Carter L. Williams, Esq., Sutherland Asbill & Brennan LLP, Washington, D.C.

Collins J. Seitz, Jr., Esq., Matthew F. Boyer, Esq., Max B. Walton, Esq., Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware, Counsel for Defendant Scott G. Wilcox.

Michael P. Kelly, Esq., Paul A. Bradley, Esq., McCarter & English, Wilmington, Delaware, Counsel for Defendant Charles L. Baker.

Claire M. DeMatteis, Esq., Stradley, Ronon, Stevens & Young, LLP, Wilmington, Delaware, Counsel for Defendant Sherry L. Freebery, Of Counsel: C. Clark Hodgson, Jr., Esq., Sean R. Adams, Esq., Stradley, Ronon, Stevens & Young, LLP, Philadelphia, Pennsylvania.

Joseph R. Biden, III, Esq., Ian Connor Bifferato, Esq., Joseph K. Koury, Esq., Bifferato, Gentilotti Biden & Balick P.A., Wilmington, Delaware, Counsel for Defendant Timothy P. Mullaney.

David A. Felice, Esq., Cozen O'Connor, Chase Manhattan Center, Wilmington, Delaware, [*2] Counsel for Defendants George O. Haggerty and James H. Edwards, Of Counsel: Jeffery I. Pasek, Esq., Cozen O'Connor, Philadelphia, Pennsylvania.

**JUDGES:** Kent Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent Jordan

**OPINION:**

### MEMORANDUM OPINION

**JORDAN, District Judge**

### I. INTRODUCTION

The Amended Complaint (Docket Item ["D.I."] 9) filed in this case by plaintiffs Frank E. Acierno, Christiana Town Center, LLC ("CTC"), 395 Associates, LLC ("395"), and Estate Homes, Inc. ("EHI") (collectively, "Acierno") alleges that the defendants violated Acierno's constitutional rights and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et. seq. ("RICO"), through various actions affecting the commercial development of Acierno's land. (D.I. 9 at PP51-71.) Acierno also alleges state law claims denominated as "civil conspiracy" and "tortious aiding and abetting." (Id. at PP72-82.)

Before me now is a Motion to Dismiss the Amended Complaint (D.I. 37) filed by defendant New Castle County (the "County"). Also before me is a Motion to Dismiss the Amended Complaint or Stay the Proceedings (D.I. 40) filed by defendants George O. Haggerty [*3] ("Haggerty"), Scott G. Wilcox ("Wilcox"), Timothy P. Mullaney ("Mullaney"), Charles L. Baker ("Baker"),

James H. Edwards ("Edwards") and Sherry L. Freebery ("Freebery") (collectively, the "Individual Defendants"). In addition to those motions, I also have before me a Motion for Leave to File a Second Amended Complaint (D.I. 50), filed by Acierno. The County and the Individual Defendants (collectively, "Defendants") countered with a jointly submitted Motion for Briefing Schedule on Plaintiffs' Motion for Leave to File a Second Amended Complaint. (D.I. 61.)

Jurisdiction over this case exists under 28 U.S.C. § 1331 and § 1367. For the reasons that follow, the Motions to Dismiss filed by the County and the Individual Defendants will be granted to the extent that the Amended Complaint will be dismissed without prejudice. Acierno's Motion for Leave to Amend and the joint Motion for Briefing Schedule on the Motion for Leave to Amend will be denied as moot.

### II. BACKGROUND n1

> n1 The following information is drawn from the parties' submissions and is viewed in the light most favorable to the plaintiffs. Materials beyond the pleadings are being considered in accordance with my determination that I may take judicial notice of prior judicial and administrative proceedings. See infra at 11-12.

[*4]

Frank E. Acierno owns CTC, 395, and EHI. (D.I. 9 at PP2-4.) Acierno alleges that starting in 2002, defendants Freebery, Haggerty, and Wilcox, n2 acting in their positions in the government of New Castle County, "decided to act in concert to plan and carry out a scheme and conspiracy to deny Acierno his legal right to use and develop properties owned by him" in New Castle County. (Id. at P19.) In his Complaint, Acierno sets out seven different land development disputes between Acierno and the County, disputes which have led to numerous proceedings in the Delaware state courts and local administrative agencies. (Id. at PP20-49.) Acierno also alleges additional wrongs beyond those seven disputes, which have also led to proceedings in Delaware state courts. (Id.)

> n2 Freebery served as Chief Administrative Officer of New Castle County in the

administration of County Executive Thomas P. Gordon (Mr. Gordon individually is referred to as "Gordon," and his administration as the "Gordon Administration"). (D.I. 9 at P10.) Haggerty was employed by the Gordon Administration as the Assistant General Manager of the New Castle County Department of Land Use. (*Id.* at P5.) Wilcox acted during the time in question either as First Assistant County Attorney or as private counsel on behalf of the County in dealing with legal issues between the County and Acierno. (*Id.* at P6.)

[*5]

1. Dispute over Red Lion Village by Sterling Properties

Acierno alleges that on December 31, 2002, Haggerty and Wilcox n3 cancelled a pre-construction meeting regarding a property known as Red Lion Village, which was owned by another Acierno company, Sterling Property Holdings, Inc. (D.I. 9 at P20.) Wilcox sent letters to Acierno on December 31, 2002 and January 2, 2003, stating that the County could not grant any application to Acierno because he was not in good standing with the County based on unresolved violations at other sites. (*Id.* at P21, D.I. 42 at A377, A379.) On February 4, 2003, Baker n4 sent a letter on behalf of the New Castle County Department of Land Use (the "Department of Land Use" or the "Department") to Acierno stating that, because Acierno had not started building on Red Lion Village within five years of adoption of the Unified Development Code (the "Sunsetting Provision"), his plan had to be resubmitted before he would be permitted to begin building. (D.I. 42 at A387.)

n3 Acierno alleges that Baker and Mullaney, as supervisors of Haggerty and Wilcox, respectively, are liable for violations of Acierno's rights committed by their subordinates. (D.I. 9 at PP44-45.) Furthermore, Acierno claims that Freebery, as supervisor of Baker and Mullaney, is liable both for her failure to supervise and for directing the "unconstitutional actions . . . taken against Acierno." (*Id.* at P46.)

[*6]

n4 Baker was employed as the General Manager of the New Castle County Department of Land Use, and was Haggerty's direct supervisor. (D.I. 9 at P8.)

Acierno appealed the February 4th decision to the New Castle County Planning Board (the "Planning Board"), which affirmed the decision of the Department of Land Use in cancelling the meeting, finding that the Department had properly interpreted the provisions at issue. (D.I. 42 at A436-38.) Acierno, through Sterling, filed a Complaint in the Delaware Court of Chancery, No. 20408NC, against the County, the Department of Land Use, and the Planning Board. (D.I. 42 at A361-75.) The Court of Chancery granted judgment on the pleadings to the County as to the challenge to the legality of the Sunsetting Provision, but allegations as to the unconstitutional conduct of the Individual Defendants in cancelling the December 31 meeting are still pending in the Court of Chancery. *Sterling Prop. Holdings, Inc. v. New Castle County,* 2004 Del. Ch. LEXIS 65, C.A. No. 20408, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004).

2. Drainage Violation Notice to Christiana Town [*7] Center

Acierno next alleges that on January 15, 2003, Haggerty and Wilcox issued a Violation Notice under the County Drainage Code to CTC. (D.I. 9 at P23.) Acierno claims that certain Plaintiffs were given less that 24 hours notice of the hearing, which was scheduled by Haggerty and Wilcox. (*Id.*) Acierno alleges that at the hearing, Haggerty and Wilcox found CTC to be in violation of "numerous non-existent provisions of the County Drainage Code." (*Id.*) CTC appealed this decision to the County Board of License Inspection & Review (the "Review Board"), which affirmed on April 17, 2003 the decision made at the hearing. (D.I. 42 at A109-10.) CTC filed a petition for a writ of certiorari in the Superior Court; that court denied the writ and dismissed the action, noting that CTC had waived normal service by failing to object to the timing at the hearing. *Christiana Town Ctr. v. New Castle County,* 2004 Del. Super. LEXIS 209, C.A. 03A-07-008 (RSG), 2004 WL 1551457, at *1-4 (Del. Super. Ct. July 7, 2004). Acierno and CTC appealed to the Delaware Supreme Court, which affirmed the judgment. *Christiana Town Ctr., LLC v. New Castle County,* 2004 Del. LEXIS 576, C.A. No. 3342004, 2004 WL 2921830 [*8] (Del. Dec. 16, 2004).

### 3. Christiana Town Center Buildings 4 and 5

Acierno next alleges that Defendants issued a "factually incorrect and legally unsupported Violation Notice [to CTC] regarding the alleged failure to obtain a Certificate of Occupancy for Building Nos. 4 and 5." (D.I. 9 at P24.) Acierno alleges that CTC had Certificates of Occupancy for the occupied buildings, and was in full compliance with the County Code. (*Id.*) After a decision against him at a Rule to Show Cause hearing before the Department of Land Use, Acierno appealed to the Review Board, which affirmed the decision below. (D.I. 42 at A286-87; A104-06.) Acierno again filed a petition for a writ of certiorari in the Superior Court (D.I. 42 at A95-103), and that court entered a stipulation of dismissal on March 8, 2004. (D.I. 44 at A942.)

### 4. Christiana Town Center Bertucci's

Acierno alleges that Haggerty and Wilcox next deprived him of his constitutional rights "by improperly and unlawfully denying Christiana and one of its tenants, Bertucci's Restaurant Corp., the ability to obtain building permits." (D.I. 9 at P25.) Acierno asserts that Wilcox acted outside his role as First Assistant County [*9] Attorney and acted as an administrative decision maker. (*Id.*) Acierno filed an action in the Court of Chancery contesting the denial, but that court found that Acierno had an adequate remedy at law and had failed to exhaust all administrative remedies. *Christiana Town Ctr. LLC v. New Castle County,* 2003 Del. Ch. LEXIS 60, C.A. No. 20214, 2003 WL 21314499, at *4 (Del. Ch. June 6, 2003). After the Supreme Court affirmed the decision of the Court of Chancery, 2004 Del. LEXIS 26, No. 3182003, 2004 WL 77868 (Del. Jan. 16, 2004), Acierno filed a complaint in the Superior Court on the same issues. (D.I. 42 at A251-58.) A stipulation of dismissal was entered in that action on February 20, 2004. (D.I. 44 at A941.)

### 5. Home Warranties

Acierno next claims that Haggerty and Wilcox deprived him of his constitutional rights by refusing to issue Letters of Compliance after Acierno had submitted documentation showing that he had cured prior home warranty violations. (D.I. 9 at P27.) Acierno filed an action in the Delaware Superior Court for New Castle County seeking a writ of mandamus to force the issuance of the Letters of Compliance. (*Id.*) When that court indicated that it would likely issue the [*10] writ, the Letters of Compliance were issued. (*Id.* at P28.)

### 6. Christiana Town Center Drainage Code Violation

According to Acierno, on June 11, 2003, Wilcox and Haggerty issued "a Violation Notice . . . regarding certain bogus charges under the County Drainage Code" to CTC. (D.I. 9 at P29.) A Rule to Show Cause Hearing was held on July 8, 2003, during which, Acierno alleges, Haggerty and Wilcox committed "half a dozen or more violations of Acierno's Constitutional Due Process Rights" at a "'kangaroo court' session." (*Id.* at P30.) After a decision against him at the hearing, and after Acierno's petition for a writ of certiorari in the Superior Court was dismissed as premature, 2003 Del. Super. LEXIS 318, Civ. A. No. 03A-08-007 (RSG), 2003 WL 22120857, at *1 (Del. Super. Ct. Sept. 10, 2003), CTC appealed to the Review Board, which affirmed the decision made at the hearing. (D.I. 44 at A878-83.) Acierno then filed another action in the Delaware Superior Court, challenging the actions of the Department of Land Use and the Review Board, and alleging that CTC's due process rights were violated by the failure to provide sufficient notice of the violations. (D.I. 44 at A822-34.) That action [*11] is currently pending.

### 7. Denial of Phase 4 Building Permit at Christiana Town Center

Acierno also alleges that Haggerty and Wilcox, in August 2003, ordered County personnel not to issue a building permit for Phase Four of CTC. (D.I. 9 at P33.) Acierno alleges that one of the reasons cited by Haggerty and Wilcox for denying the permit, namely the failure to receive a letter from DelDOT regarding road improvements, was impossible to comply with because "DelDOT had refused to permit the road work and had dubbed it unnecessary in June of 2002." (*Id.*) Acierno further alleges that all of the other reasons cited for denying the permit were either not required by the County Building Code or were manufactured by Haggerty and Wilcox. (*Id.*)

Acierno sought a writ of mandamus in the Delaware Superior Court to overturn the action of the Department of Land Use. (D.I. 43 at A463-70.) The Superior Court denied relief, finding that a writ of mandamus was not appropriate based on the facts presented. *Christiana Town Ctr. v. New Castle County,* 2004 Del. Super. LEXIS 302, No. Civ. A. 03M-08-072 (RSG), 2004 WL 2088032, at *1 (Del. Super. 2004). Acierno then filed a

Complaint in the Delaware Court [*12] of Chancery based on the same dispute. (D.I. 44 at A969-77.) That case is still pending.

8. Other Alleged Wrongs n5

n5 The Individual Defendants allege that these remaining allegations relate to five separate proceedings arising out of a dispute over so-called "stop work" orders issued to address violations at CTC. With respect to the first stop work order, the proceedings include a petition for a writ of certiorari to the Delaware Superior Court filed by Acierno that was dismissed for failure to appeal to the Review Board, *Christiana Town Center, LLC v. New Castle County*, 2003 Del. Super. LEXIS 318, 2003 WL 22120857 (Del. Super. Sept. 10, 2003), and a complaint filed by the County in the Court of Chancery that was dismissed by stipulation without prejudice (D.I. 44 at A943). A second stop work order was issued, and three proceedings followed: an appeal to the Review Board by Acierno, in which the Board upheld the stop work order (D.I. 44 at A929-33); a suit filed by the County in the Court of Chancery, in which the County alleged that CTC had violated the stop work order (D.I. 43 at A510-32) and Acierno claimed that the Code provisions at issue were unconstitutional (*id.* at A897-99); and a petition for a writ of certiorari filed by Acierno alleging that the stop work order violated his federal and state due process rights. (D.I. 44 at A902-08.) The latter two actions remain pending.

[*13]

In addition to the seven disputes outlined above, Acierno also alleges various additional wrongs committed against him by the County and the Individual Defendants. Acierno alleges that in 2003 and 2004, Freebery used County resources to "issue multiple inaccurate press releases or written statements[,] falsely painting Acierno as a lawbreaking developer." (D.I. 9 at P34.) Furthermore, Acierno alleges that, through "uneven and selective application of the law," the Individual Defendants treated him differently than other developers who were similarly situated. (*Id.* at P35.) Acierno alleges that this unequal treatment is evidenced by Baker's personal visits to two development projects owned by another developer, which projects were then placed on

the public hearing agenda despite having been "submitted late and/or incomplete." (*Id.* at PP36-37.) Acierno also notes that "Freebery for County Executive" signs were displayed on the property at those two projects. (*Id.* at P37.) Acierno claims that Gordon and Freebery gave preferential treatment to developer Verino Pettinaro, in return for favorable business deals for Gordon and Freebery. (*Id.* at PP40-41.) Furthermore, Acierno [*14] claims that developer Louis Capano has also received preferential treatment from the Individual Defendants. (*Id.* at P42.)

Acierno further alleges that he was treated unfairly by Edwards. He alleges that Edwards held a Rule to Show Cause hearing, which was improperly convened, and that Edwards issued a decision adverse to Acierno six months after the hearing. (D.I. 9 at P38.) Acierno claims that when dealing with another developer on another project, Edwards found the developer in violation but fined him only $ 200 and refused to require him to fix the problem that led to the fine. (*Id.* at P39.)

## III. STANDARD OF REVIEW

A. Motion to Dismiss for Lack of Subject Matter Jurisdiction Under 12(b)(1)

Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000). Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially, based on the legal sufficiency of the claim, or factually, based on the sufficiency of jurisdictional facts. *See* 2 James W. Moore, Moore's Federal Practice § 12.30 [*15] [4] (3d ed. 1997). Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408-1409 (3d Cir. 1991) (*quoting Bell v. Hood*, 327 U.S. 678, 682, 66 S. Ct. 773, 90 L. Ed. 939 (1946)).

Under a factual attack, however, the court is not "confined to allegations in the . . . complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha v. United States*, 115 F.3d 176, 179, 36 V.I. 392 (3d Cir. 1997). *See*

also *Mortensen v. First Fed. Sav. & Loan Ass'n.* 549 F.2d 884, 891-892 (3d Cir. 1977). In such a situation, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Carpet Group.* 227 F.3d at 69 [*16] (quoting *Mortensen.* 549 F.2d at 891). Although the court should determine subject matter jurisdiction at the outset of a case, "the truth of jurisdictional allegations need not always be determined with finality at the threshold of litigation." *Moore at §* 12.30[1]. Rather, a party may first establish jurisdiction "by means of a nonfrivolous assertion of jurisdictional elements and any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure before a judge alone (as distinct from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection)." *Jerome B. Grubart. Inc. v. Great Lakes Dredge & Dock Co..* 513 U.S. 527, 537-38, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995) (citations omitted).

B. Motion to Dismiss Under 12(b)(6)

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts. Inc. v. Mirage Resorts. Inc..* 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should [*17] be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages. Inc. v. Fidelcor. Inc..* 926 F.2d 1406, 1409 (3d Cir. 1991).

IV. DISCUSSION

As a threshold issue, Acierno and Defendants dispute what material may be considered in deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b). Along with their motion to dismiss, the Individual Defendants submitted extensive appendices containing violation notices, decisions of County administrative boards, Delaware state court complaints and attachments, answers to those complaints, decisions of Delaware state courts, and stipulations of dismissal of Delaware state court actions. (D.I. 42, 43, and 44.) Acierno claims that these materials cannot be considered at this stage because only the pleadings and materials attached to the Complaint may be considered in the context of a 12(b) motion to dismiss. [*18] n6 (D.I. 53 at 15.) The Defendants, on the other hand, contend that I can take judicial notice of prior proceedings and public records when considering a 12(b) motion. (D.I. 59 at 2.)

> n6 Acierno correctly cites the law stating that different materials can be considered in a facial and a factual attack on subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (D.I. 53 at 16.) However, because I determine here that the materials submitted by the Individual Defendants fall within the categories of information of which I may take judicial notice, that distinction is irrelevant here.

In the Third Circuit, "on a motion . . . to dismiss pursuant to Rule 12(b), the Court is not strictly limited to the facts addressed in the pleadings; the Court may take judicial notice of additional facts where appropriate." *Southmark Prime Plus. L.P. v. Falzone.* 776 F. Supp. 888, 892 (D. Del. 1991) (finding that a court could take judicial notice of proceedings [*19] in other courts, and the contents of court records); *see also In re NAHC Sec. Litig..* 306 F.3d 1314, 1331 (3d Cir. 2002) (taking judicial notice of SEC filings).

Therefore, to the extent that the documents submitted by the Individual Defendants are public documents or the decisions of other courts, I take judicial notice of those documents and will consider them here in deciding this motion to dismiss. Contrary to Acierno's assertions, this does not turn the pending motions into ones for summary judgment.

A. The Rooker-Feldman Doctrine

Defendants first argue that the Rooker-Feldman doctrine prevents this court from hearing this action and, therefore, that this action should be dismissed under Federal Rule of Civil Procedure 12(b)(1). Until recently, the Rooker-Feldman doctrine had been given a relatively expansive reading. *See, e.g., Exxon Mobil Corp. v. Saudi Basic Industries Corp..* 364 F.3d 102 (3d Cir. 2004), *rev'd,* 544 U.S. 280, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005). However, a recent decision of the Supreme Court limited the Rooker-Feldman doctrine, stating that it is

"confined to . . . cases brought by state-court [*20] losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp., 125 S. Ct. at 1521-22.* The court went on to add that a federal court is not precluded by Rooker-Feldman from exercising subject matter jurisdiction "simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id. at 1527.* "If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id. at 1527* (internal quotations and citations omitted).

Here, several state court decisions reviewed administrative board decisions and decided issues of county zoning and land use law. *See, e.g., Sterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65, C.A. No. 20408, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004); Christiana Town Ctr. v. New Castle County, 2004 Del. Super. LEXIS 209, C. [*21] A. 03A-07-008 (RSG), 2004 WL 1551457, at *1-4 (Del. Super. Ct. July 7, 2004); Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 26, C.A. No. 3342004, 2004 WL 2921830 (Del. Dec. 16, 2004).* Acierno challenges not the state court decisions themselves but the behavior of county officials in allegedly treating him unfairly and violating various constitutional rights. (D.I. 9 at PP21-49.) This case therefore does not fit within the paradigm of *Rooker* and *Feldman,* as explained by the Supreme Court. Accordingly, Defendants' challenge to subject matter jurisdiction fails, and principles of preclusion under Delaware state law will apply to determine whether this court can hear this action under *12(b)(6).*

B. Claim Preclusion and Issue Preclusion

Defendants argue that this court lacks jurisdiction to hear this case because prior litigation in state court and in administrative agencies must result in claim preclusion or issue preclusion. (D.I. 41 at 19-25.) Again, as a preliminary matter, principles of preclusion may operate to bar a claim or issue from being relitigated, but they do not deprive the court of jurisdiction. *See Exxon, 125 S. Ct. at 1527* [*22] ("Preclusion, of course, is not a jurisdictional matter."). The question, then, becomes what

preclusive effect, if any, the state cases have on this case.

With respect to both claim and issue preclusion, it is clear that the decisions of state courts are given preclusive effect in later actions in federal court. n7 *See 28 U.S.C. § 1738* ("Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."). Whether a final judgment by a state court precludes federal court adjudication under either res judicata or collateral estoppel n8 is a question of state law. *Migra v. Warren City School District Board of Education, 465 U.S. 75, 81, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984).*

n7 Although there are many decisions by administrative agencies on the disputes that Acierno attempts to litigate here, only the decisions of state courts are given preclusive effect here.

[*23]

n8 "Res judicata" is simply another name for the doctrine of claim preclusion; similarly, "collateral estoppel" is synonymous with issue preclusion. BLACK'S LAW DICTIONARY 1312, 256 (7th Ed. 1999).

When a state court has entered final judgment in a proceeding, res judicata operates to bar a federal claim that could have been brought in that state court proceeding. *Migra, 465 U.S. at 84-85.* Under Delaware law, a party claiming preclusion under res judicata must show:

(1) the court making the prior adjudication had jurisdiction, (2) the parties in the present action are either the same parties or in privity with the parties from the prior adjudication, (3) the cause of action must be the same in both cases or the issues decided in the prior action must be the same as those raised in the present case, (4) the issues in the prior action must be

decided adversely to the plaintiff's contentions in the instant case, and (5) the prior adjudication must be final

*Bailey v. City of Wilmington,* 766 A.2d 477, 481 (Del. 2001). n9 The determination of whether [*24] claim preclusion operates to bar a claim is "based on the underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily a transaction gives rise to only one claim regardless of the number of ways that the claim can be asserted." *Maldonado v. Flynn,* 417 A.2d 378, 381 (Del. Ch. 1980).

n9 In neither his complaint nor his briefs does Acierno challenge the jurisdiction of the Delaware courts or local administrative agencies that decided the relevant disputes before them. (D.I. 9, 52, 53). Furthermore, it is clear that the County, a party in all of the state court and administrative actions, is in privity with the Individual Defendants, as the Individual Defendants were employees of the County and acting within the scope of their employment in committing the alleged violations. They are therefore bound by any prior judgments against the County for actions taken in their official capacities. *See, e.g. Fox v. Christina Square Assoc. L.P.,* 1994 Del. Super. LEXIS 267, 1994 WL 146023, at *3 (Del.Super. 1994) ("The concept of privity pertains to the relationship between a party to a suit and a person who was not a party but whose interest in the action was such that he or she will be bound by the final judgment as if he or she were a party.")

[*25]

Collateral estoppel, or issue preclusion, operates to bar parties from relitigating the factual issues litigated in a prior case. *Columbia Cas. Co. v. Playtex FP, Inc.,* 584 A.2d 1214, 1216 (Del. 1991) ("where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action"). A party alleging that a particular issue is barred by collateral estoppel must show that "(1) a question of fact essential to the judgment, (2) [was] litigated and (3) determined (4) by a valid and final judgment." *Messick v. Star Enterprise,* 655 A.2d 1209, 1211 (Del. 1995) (internal citations and quotations omitted).

Here, Acierno has essentially attempted to repackage the same claims that he has already pursued in state courts and before local administrative agencies. He seeks, in short, a second bite at the apple. Actually, given the number of lawsuits he has brought on these disputes, that metaphor significantly understates the apple's risk. Under the factors outlined above, it is clear that many of Acierno's claims are barred [*26] by res judicata and collateral estoppel, as those claims spring from disputes that have already been finally resolved in state courts.

First, with respect to the dispute over Red Lion Village by Sterling Properties, the New Castle County Planning Board found that the pre-construction meeting on that property had been properly cancelled. (D.I. 42 at A436-38.) Acierno attempts to assert here, again, that this cancellation was improper. (D.I. 9 at PP19-22.) Although the Planning Board decided the same issues that are presented here, and its decision was adverse to Acierno, its decision was not final. (D.I. 42 at A436-38.) Acierno brought a case in the Court of Chancery challenging those same actions by the County. (D.I. 42 at A361-75.) The Court of Chancery granted judgment on the pleadings to the County as to the legality of the Sunsetting Provision. *Sterling Prop. Holdings, Inc. v. New Castle County,* 2004 Del. Ch. LEXIS 65, C.A. No. 20408, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004). That decision precludes Acierno, under principles of collateral estoppel, from challenging the legality of the Sunsetting Provision here. However, the case in the Court of Chancery is still pending regarding [*27] constitutional claims brought by Acierno against the County, and those claims are not precluded.

Second, with respect to the dispute over the drainage violation notice to CTC, Acierno's claims against the County and the Individual Defendants are barred by the doctrine of res judicata. In his complaint, Acierno claims that he was denied procedural due process through improper notice of the Rule to Show Cause hearing regarding that violation. (D.I. 9 at P23.) However, the Supreme Court of Delaware found that "the record shows that Christiana voluntarily, knowing and intelligently waived its due process rights to adequate notice of the RTC [Rule to Show Cause] hearing by failing to object to the inadequate notice at the actual hearing." *Christiana*

*Town Ctr., LLC v. New Castle County*, 2004 Del. LEXIS 576, No. 3342004, 2004 WL 2921830, at *3 (Del. Dec. 16, 2004). That judicial decision was final and adverse to Acierno, and therefore the claims involving those facts are precluded.

Third, Acierno brings claims against the County and the Individual Defendants based on a dispute over a violation notice issued to CTC for failure to obtain a Certificate of Occupancy for Buildings 4 and 5. (D. [*28] I. 9 at P24.) Acierno's claims based on this dispute are also precluded by res judicata. Acierno challenged the decision of the Review Board, affirming a decision of the Department of Land Use against Acierno, by filing a petition for a writ of certiorari in the Superior Court. (D.I. 42 at A95-103.) The Review Board's decision found that CTC was not in compliance with the County Code at the time that the Violation Notice was issued. (D.I. 42 at A104-06.) The Superior Court entered a stipulation of dismissal with prejudice in that action on March 8, 2004. (D.I. 44 at A942.) That final resolution by the Delaware Superior Court precludes Acierno from bringing this claim here.

Fourth, Acierno makes claims based on the denial of building permits to CTC and its tenant, Bertucci's Restaurant Corp. (D.I. 9 at P25.) The Delaware Court of Chancery previously dismissed a case over that dispute, based partially on a finding that CTC had not exhausted all of its administrative remedies. *Christiana Town Ctr. LLC v. New Castle County*, 2003 Del. Ch. LEXIS 60, C.A. No. 20214, 2003 WL 21314499, at *4 (Del.Ch. 2003) ("appeals to a court of law cannot occur until after the Planning Board has rendered a decision. [*29] Therefore, a statutory remedy at law exists by which Christiana can appeal the County's decision to deny its application to the Planning Board, and thereafter, to a court of law.") That decision was affirmed by the Delaware Supreme Court. *Christiana Town Ctr. LLC v. New Castle County*, 841 A.2d 307, 2004 WL 77868, at *1 (Del. 2004). Acierno then filed a complaint in the Superior Court on the same issues (D.I. 42 at A251-58), but a stipulation of dismissal with prejudice of that case was entered on February 20, 2004. (D.I. 44 at A941.) As a result, Acierno cannot now assert these claims, as the final rulings of the Delaware courts requiring Acierno to exhaust his administrative remedies bar his bringing them.

Fifth, Acierno filed an action in the Delaware Superior Court, seeking a writ of mandamus that would force the County to issue Letters of Compliance in connection with home warranty violations. (D.I. 9 at P27.) Those letters were ultimately issued by the County. (*Id.* at P28.) Acierno now asserts claims for attorneys' fees and litigation costs, as well as losses based on the loss of use of his land. (*Id.*) However, as was stated above, res judicata bars [*30] not only claims that were brought in prior proceedings, but also claims that could have been brought. *See, e.g., Migra*, 465 U.S. at 84-85. Acierno's claims of violations of his constitutional rights, as well as his claims for attorney's fees, costs, and losses could have been brought in front of the Delaware Superior Court in connection with his motion for a writ of mandamus. *See, e.g, New Castle County v. Sterling Properties, Inc.*, 379 A.2d 1125, 1129 (Del. 1977) ("The County is barred, in our opinion, by rules of privity and res judicata from litigating in this action an issue which the members of the County Council could have litigated on behalf of the County in the mandamus action."). Therefore, these claims are now barred by principles of claim preclusion.

Sixth, Acierno alleges that the County and the Individual Defendants violated his constitutional rights by issuing a "bogus" violation notice of charges under the County Drainage Code. (D.I. 9 at P29.) An action regarding this violation is currently pending in the Superior Court, and there has yet to be a final decision. (D.I. 44 at A822-34.) Therefore, the principles of res judicata and collateral [*31] estoppel do not apply to this dispute.

Seventh, Acierno claims that the County and the Individual Defendants violated his rights by refusing to issue a building permit for Phase 4 of CTC. (D.I. 9 at P33.) Acierno has brought suit alleging this violation in the Court of Chancery, but there has not been a final decision. (D.I. 44 at A969-77.) Therefore, this claim too is not precluded.

Finally, two cases, one in the Court of Chancery and one in the Superior Court, remain pending based on two separate stop work orders issued to CTC by the County. Acierno bases his claims here in part on the issuance of these stop work orders. (D.I. 9 at P35.) Because there is no final decision in the pending state cases, the underlying disputes are not barred by principles of res judicata or collateral estoppel.

C. Abstention

As was described earlier, there are five pending state court proceedings that arise out of the same factual scenarios that Acierno alleges here. Four of those were filed by Acierno, and in them he has alleged violations of his constitutional rights. (See, e.g., D.I. 42 at A373, PP50-51; D.I. 44 at A824, P9; D.I. 44 at A972, P14; D.I. 44 at A904, P12). In the fifth proceeding, [*32] which was filed by the County in the Court of Chancery, (D.I. 43 at A510-32), Acierno alleged constitutional violations in his counterclaim and answer. (D.I. 44 at A897-98, PP111-112.) Where an action in federal court essentially duplicates an action currently pending in state court, the federal court may abstain from exercising jurisdiction, as explained in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976). While the Supreme Court held in *Colorado River* that abstention is warranted only in exceptional, limited circumstances, *id. at 813*, such circumstances exist here.

When determining whether to abstain under *Colorado River*, a court should consider six factors: "(1) which court first assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties." n10 *Spring City Corp. v. American Bldgs. Co.*, 193 F.3d 165, 171 (3d Cir. 1999). Here, as to the first [*33] factor, although no specific piece of property is at issue, Acierno is litigating his right to use and develop land in New Castle County in five separate proceedings in the Delaware courts. Even though this does not perfectly fit into the first *Colorado River* factor, it is clear that the Delaware state courts and local administrative agencies are the desired fora for addressing land use rights. *Acierno v. Mitchell*, 6 F.3d 970, 975 (3d Cir. 1993) ("land-use regulation generally affects a broad spectrum of persons and social interests, and ... local political bodies are better able than federal courts to assess the benefits and burdens of such legislation") (citation omitted). Therefore, because the state courts in Delaware first assumed jurisdiction over Acierno's land use disputes, the first factor of *Colorado River* weighs in favor of abstention.

n10 The Supreme Court originally delineated only the first four factors. *Colorado River Water Conservation Dist. v. U.S.* 424 U.S. 800, 818, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976) ("the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts . . . [and] may also consider such factors as the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums") (internal citations omitted). The final two factors were articulated by the Supreme Court in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.* 460 U.S. 1, 23, 26, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983) ("Besides the four factors expressly discussed in Colorado River, there is another that emerges . . . the fact that federal law provides the rule of decision on the merits"; "an important reason against allowing a stay is the probable inadequacy of the state-court proceeding to protect Mercury's rights").

[*34]

The second factor of *Colorado River* weighs against abstention; the state court is no more convenient than the federal court, as the two courts are located just blocks from one another. However, the third factor, avoiding piecemeal litigation, weighs heavily in favor of abstention. As has been stated several times, Acierno already has five different suits pending in Delaware courts. (See, e.g., D.I. 42 at A361-75; D.I. 44 at A822-34; D.I. 44 at A902-08; D.I. 44 at A969-77; D.I. 43 at A510-32.) All five of these suits contain claims that the actions of the Individual Defendants and the County violated his constitutional rights. (See D.I. 42 at A373, PP50-51; D.I. 44 at A824, P9; D.I. 44 at A972, P14; D.I. 44 at A904, P12; D.I. 44 at A897-98, PP111-112.) Adding a sixth case would only further fragment the dispute resolution processes that are underway.

The fourth *Colorado River* factor also weighs in favor of abstention. The five state court proceedings that are currently pending are at different stages of completion. The present case was filed on October 21, 2004. Four of the five state court proceedings were filed in 2003, and the fifth was filed by Acierno in early [*35] October of 2004. (See D.I. 42 at A361-75; D.I. 44 at A822-34; D.I. 44 at A902-08; D.I. 44 at A969-77; D.I. 43 at A510-32.) Moreover, each of those state court cases is based on administrative proceedings that began long before this case was filed. Therefore, under the fourth

*Colorado River* factor, this court should abstain and allow cases first filed in the state courts to run their course.

The next factor to be considered, whether federal or state law controls, weighs somewhat in favor of abstention. Acierno here attempts to assert claims under § 1983 and RICO, both of which are vehicles for vindicating federal rights. (D.I. 9 at PP51-71.) However, the outcome of those claims depends in large measure on the determination of whether the County and the Individual Defendants properly followed state law and regulations in their dealings with Acierno.

The final factor, whether the state court will adequately protect the interests of the parties, clearly weighs in favor of abstention. Each of the pending state proceedings presents one or more of the constitutional claims presented here. (*See* D.I. 42 at A361-75; D.I. 44 at A822-34; D.I. 44 at A902-08; D.I. 44 at A969-77; D. [*36] I. 44 at A897-899.) Because the Delaware courts are fully capable of addressing those claims, abstention under *Colorado River* is appropriate.

Having determined that abstention is appropriate, the next question is whether this case should be stayed or dismissed. The United States Courts of Appeal for the First, Second, Seventh, and Ninth Circuits have found that a plaintiff's decision to file overlapping suits in both state and federal court is a relevant factor to consider when determining whether a district court should dismiss the federal case. *See, e.g., American Int'l Underwriters (Philippines), Inc. v. Continental Ins. Co., 843 F.2d 1253, 1260-61 (9th Cir. 1988); Villa Marina Yacht Sales, Inc. v. Hatteras Yachts, 915 F.2d 7, (1st Cir. 1990); LaDuke v. Burlington Northern R.R. Co., 879 F.2d 1556, 1561 (7th Cir. 1989); Telesco v. Telesco Fuel and Masons, 765 F.2d 356, 363 (2d Cir. 1985).* As the Ninth Circuit stated, "it is clear that the rationale that prohibits plaintiffs from removing cases to federal court under 28 U.S.C. § 1441 also bars [a plaintiff] from bringing . . . [a] repetitive [*37] lawsuit in federal court." *American Int'l Underwriters, 843 F.2d at 1260.* "The district court was justified in dismissing [the plaintiff's] complaint for this reason as well as for abstention reasons." *Id. at 1261.*

Acierno has filed four of the five Delaware state suits that overlap this suit. He now recasts his state court claims in an attempt to get this court to examine what he has already litigated or is already litigating elsewhere. Acierno's claims will be dismissed without prejudice as opposed to being stayed, because the claims he brings here overlap totally with factual scenarios that he is litigating in Delaware state courts, such that, after the state cases are finally decided, it is unlikely that there will be issues left to litigate. n11 *See, e.g., Lui v. Comm'n on Adult Entm't Establishments, 369 F.3d 319, 327 (3d Cir. 2004)* ("where 'a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; [then] the state court's judgment on the issue would be res judicata ... [and the] stay order amounts to a dismissal of the suit.'" (quoting *Moses H. Cone Mem. Hosp., 460 U.S. at 10*)). [*38] However, in the unlikely event that some claims remain, the dismissal is without prejudice, so that Acierno may refile claims if appropriate at a later time.

> n11 Whether or not state law would provide a remedy for Acierno's alleged state law claims, denominated as "civil conspiracy" and "tortious aiding and abetting," they too are subject to res judicata and abstention. As was stated above, "ordinarily a transaction gives rise to only one claim regardless of the number of ways that the claim can be asserted." *Maldonado v. Flynn, 417 A.2d 378, 381 (Del. Ch. 1980).* Therefore, Acierno's state law claims are subject to the same preclusion as his constitutional claims and claims under RICO. Furthermore, as to those disputes which have not yet been resolved in the Delaware courts, it appears that they will turn on questions of state law, and that is yet another reason for this court to abstain. *Spring City Corp., 193 F.3d at 171 (3d Cir. 1999)* (stating that the fifth factor under the Colorado River analysis is "whether federal or state law controls").

[*39]

D. Motion for Leave to Amend

Because I have here determined that all of the claims at issue are either barred by res judicata and collateral estoppel, or should be dismissed on grounds of abstention, I decline to reach any of the other arguments made by the parties. The current motion for leave to file a Second Amended Complaint (D.I. 50) will be denied as moot, and the joint motion filed by the County and the Individual Defendants for a Briefing Schedule on Plaintiffs' Motion for Leave to File a Second Amended Complaint (D.I. 61) will also be denied as moot.

## V. CONCLUSION

Accordingly, the County's Motion to Dismiss the Amended Complaint (D.I. 37) and the Individual Defendants' Motion to Dismiss the Amended Complaint or Stay the Proceedings (D.I. 40) are granted to the extent that this case is dismissed without prejudice. Acierno's Motion for Leave to File a Second Amended Complaint (D.I. 50) and Defendants' Motion for a Briefing Schedule on the Motion for Leave to File a Second Amended Compliant (D.I. 61) are denied as moot. An appropriate order will follow.

### ORDER

For the reasons set forth in the Memorandum Opinion of today's date in this matter,

IT IS HEREBY [*40] ORDERED that Motions to Dismiss the Amended Complaint filed by the County (Docket Item ["D.I."] 37), and by defendants George O. Haggerty, Scott G. Wilcox, Timothy P. Mullaney, Charles L. Baker, James H. Edwards, and Sherry L. Freebery (D.I. 40) are GRANTED to the extent that the Amended Complaint is dismissed without prejudice. Acierno's Motion for Leave to Amend the Complaint (D.I. 50) is DENIED as moot. Furthermore, the collective Defendants' Motion for Briefing Schedule on Plaintiffs' Motion for Leave to File a Second Amended Complaint (D.I. 61) is DENIED as moot.

Kent Jordan

UNITED STATES DISTRICT JUDGE

November 23, 2005
Wilmington, Delaware

# **TAB 2**

LEXSEE



Positive
As of: Jun 20, 2007

HERMAN O. BENNINGHOFF, II SARA JOAN BENNINGHOFF, and MARTIN
H. SILTON, Plaintiffs, v. JAY H. TOLSON E. JOSEPH HOCHREITER,
Defendants, and FISCHER & PORTER COMPANY, Nominal Defendant on the
Derivative Counts.

CIVIL NO. 94-CV-2903

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

1994 U.S. Dist. LEXIS 13428

September 22, 1994, Decided
September 22, 1994, Filed; September 23, 1994, Entered

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholders sued defendants, corporate officers and company, alleging derivative claims on behalf of the company, ultra vires actions taken by certain officers, and self-dealing by compelling a special committee to approve a stock conversion agreement. Certain officers moved to dismiss the complaint, or in the alternative, to stay the proceedings based on the Colorado River abstention doctrine.

**OVERVIEW:** On October 6, 1993, a separate class action lawsuit was filed in state court against defendants on behalf of the company's minority shareholders . The state action alleged that defendants forced the board of directors to accept the stock conversion agreement; defendants caused ultra vires action, which injured the minority shareholder class; and that defendants engaged in self-dealing. On May 10, 1994, the instant complaint was filed in federal court. The claims in the federal action emanated from the same facts that gave rise to the state action. The officers argued that under the Colorado River doctrine, the court should defer to the concurrent state action. The court found that the federal action and the

state action were parallel because the cases presented the exact same facts, parties, and issues, and because plaintiffs were able to present all legal claims in the state court. The court further found that the Colorado River considerations strongly favored abstention in the federal action. Accordingly, the federal action was dismissed.

**OUTCOME:** The court granted the officers' motion to dismiss the shareholders' federal action, which alleged derivative claims, ultra vires actions, and self-dealing.

**CORE TERMS:** shareholder, federal action, abstention, class action, stock, progress, per share, deference, derivative action, parallelism, weigh, articles of incorporation, ultra vires, self-dealing, derivative, piecemeal, jurisdictional minimum, promissory note, present matter, minimum amount, class member, federal case, state action, diversity-based, amend, shares of common stock, defendants engaged, federal forum, common stock, stock price

**LexisNexis(R) Headnotes**

*Civil Procedure > Federal & State Interrelationships > Abstention*

[HN1] The United States Supreme Court and the Court of Appeals for the Third Circuit have held that district courts may dismiss or stay certain cases to await the outcome of parallel proceedings in state court.

*Civil Procedure > Federal & State Interrelationships > Abstention*

[HN2] In determining whether to dismiss or stay a case, the court should first consider whether the federal and state proceedings are truly parallel. To be parallel, the cases need not be identical in every respect. Rather, actions are parallel if they present substantially the same facts, issues, and parties.

*Civil Procedure > Federal & State Interrelationships > Abstention*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*

[HN3] Even though a state complaint does not contain the derivative claims included in a federal action, the actions may still be parallel. The relevant inquiry is whether the state court is able to address all of the claims raised in the federal action, and not whether the complaints are identical. If the state court has jurisdiction to hear the claims presented in the federal case, this supports a finding of parallelism. This is true even if one party must file or amend state pleadings in order to raise all claims before the state court.

*Civil Procedure > Federal & State Interrelationships > Abstention*

[HN4] The finding of parallelism is merely a threshold determination that makes abstention possible. To decide whether abstention is appropriate, the court must consider and balance a host of factors, including: (1) the order in which the respective courts first obtained jurisdiction (the "priority factor"); (2) whether federal or state law applies; (3) the desirability of avoiding piecemeal litigation; (4) whether the state proceeding would adequately protect the federal plaintiffs' rights; (5) whether the federal forum is inconvenient; and (6) which court first obtained jurisdiction over any property involved. In balancing these factors, the court should consider the need for conservation of judicial resources and comprehensive disposition of litigation that might favor deferring to the state court proceedings.

*Civil Procedure > Federal & State Interrelationships > Abstention*

[HN5] So long as all claims can be fully stated and resolved in state court, then dismissal is in the best interests of justice.

COUNSEL: [*1] FOR HERMAN O. BENNINGHOFF, II, SARA JOAN BENNINGHOFF, MARTIN H. SILTON, PLAINTIFFS: TODD S. COLLINS, BERGER & MONTAGUE, P.C., PHILADELPHIA, PA. IVONIA K. SLADE, SCHNADER, HARRISON, SEGAL & LEWIS, PHILADELPHIA, PA.

FOR JAY H. TOLSON, E. JOSEPH HOCHREITER, DEFENDANTS:    MARC    J.    SONNEFELD, PHILADELPHIA, PA.

FOR FISCHER & PORTER COMPANY, NOMINAL DEFENDANT: DAVID H. PITTINSKY, BALLARD, SPAHR,    ANDREWS    AND    INGERSOLL, PHILADELPHIA, PA. MARC J. SONNEFELD, PHILADELPHIA, PA.

JUDGES: KELLY

OPINION BY: JAMES McGIRR KELLY

OPINION:

MEMORANDUM

J. M. KELLY, J.

Presently before the court is Defendants Jay H. Tolson and E. Joseph Hochreiter ("defendants") Motion to Dismiss, or in the Alternative, to Stay the instant proceedings.

FACTUAL BACKGROUND

The defendants are officers, shareholders and members of the Board of Directors of nominal defendant Fisher and Porter Co. ("Fischer & Porter" or "the Company"), a manufacturing company located in Warminster, Bucks County, Pennsylvania. Prior to September 30, 1993, the defendants and their children owned all shares of Class B stock in the Company. These shares carried super-voting rights of ten (10) votes per share. Accordingly, at all times relevant to this matter, [*2] the defendants controlled fifty-five percent (55%) of the voting power in the Company.

On June 23, 1993, the defendants proposed to the Board of Directors a plan to exchange their Class B shares for common stock plus additional warrants (the "Conversion Agreement"). Under the Conversion Agreement, defendants would exchange their 564,497 shares of Class B stock for 564,497 shares of common stock. Additionally, defendants would receive warrants to purchase 1,128,994 shares of common stock at $ 8.625 per share. In other words, defendants would receive one common share plus two warrants for each share of Class B stock. A Special Committee of Fischer & Porters's Board of Directors approved the Conversion Agreement, and issued the warrants on September 30, 1993.

On that same day the Company publicly announced that it was retaining CS First Boston to advise it on alternatives to enhance the value of Fischer & Porter stock. One of the alternatives was a possible sale of the company. Following the announcement of the possible sale, the Company's stock price soared from $ 8.625 per share to $ 18.125 per share, creating a substantial paper profit for the defendants.

## PROCEDURAL BACKGROUND [*3]

On October 6, 1993, a class action lawsuit against the defendants was filed in the Court of Common Pleas in Bucks County, Pennsylvania (the "Bucks County action"). Roger Copland, the named plaintiff, represents the class of minority shareholders (the "shareholder class"). Count One of the complaint alleged that defendants forced the Board of Directors to accept the Conversion Agreement. The Count averred that Fischer & Porter's articles of incorporation permits only a one-to-one conversion of Class B stock for common stock. Thus, by coercing the board into adopting the Conversion Agreement, defendants caused ultra vires acts that injured the shareholder class.

Count Two maintained that defendants engaged in self-dealing. Specifically, the Count alleged that defendants forced the Committee to accept the Conversion Agreement with knowledge that the impending public announcement of a possible sale would cause the stock price to soar, thereby greatly increasing the value of the warrants. The complaint averred that defendants misused this inside information for their own benefit, and to the detriment of the shareholder class.

On May 10, 1994, the instant complaint was filed in [*4] this court (the "federal action"). The claims in the

federal action emanate from the same facts that gave rise to the Bucks County action. Counts III and IV are class action claims made on behalf of the same shareholder class. They are the exact same claims set forth in Counts I and II of the Bucks County action.

Counts I and II of the federal complaint are derivative claims on behalf of the Company against Tolson and Hochreiter. These Counts set forth the same factual allegations complained of in the class action claims. Count I charged that Tolson and Hochreiter caused the board to commit acts that were ultra vires the articles of incorporation. Count II claims that defendants engaged in self-dealing by compelling the Special Committee to approve the Conversion Agreement, and then immediately announcing the possible sale of the company.

Defendants moved to dismiss, or in the alternative to stay, the federal action. Defendants argue that under the United States Supreme Court case of Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976) and its progeny, this court should [*5] defer to the concurrent Bucks County action.

## DISCUSSION

### 1. The federal and state actions are parallel cases.

[HN1] The United States Supreme Court and the Court of Appeals for the Third Circuit have held that district courts may dismiss or stay certain cases to await the outcome of parallel proceedings in state court. Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 817, 47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976); University of Maryland v. Peat Marwick Main & Co., 923 F.2d 265 (3d Cir. 1991); Trent v. Dial Medical of Florida, Inc., 1994 WL 420286 (3d Cir. 1994).

[HN2] In determining whether to dismiss or stay a case, the court should first consider whether the federal and state proceedings are truly parallel. Trent, supra, at *5. To be parallel, the cases need not be identical in every respect. Fidelity Federal Bank v. Larken Motel Co., 764 F. Supp. 1014, 1017 (E.D.Pa. 1991). Rather, actions are parallel if they present substantially the same facts, issues and parties. Trent v. Dial Medical of Florida, 1992 WL 365625 (E.D.Pa. 1991); [*6] Fidelity Federal, 764 F. Supp. at 1017, n.6.

Under this test, the federal and Bucks County actions are indeed parallel. They pertain to the same set of facts and circumstances. The parties in each case are virtually identical. The defendants in both actions are Tolson and Hochreiter; the true plaintiffs in each matter are the shareholders. Moreover, both actions present exactly the same legal issues: whether defendants engaged in self-dealing, and whether they caused the board to commit acts that were ultra vires the articles of incorporation.

In fact, the only difference between these two actions is how the allegations are legally framed. In the Bucks County action, there are two class action claims. In the federal action, there are two class action claims, two derivative action claims, and a conversion claim. However, [HN3] even though the state complaint does not contain the derivative claims, the actions may still be parallel. The relevant inquiry is whether the state court is able to address all of the claims raised in the federal action, and not whether the complaints are identical. Moore v. John S. Tilley Ladder Company, Inc., 1993 WL 46684, [*7] at *2 (E.D.Pa. 1993); University of Maryland, 923 F.2d at 276, n. 16. If the state court has jurisdiction to hear the claims presented in the federal case, this supports a finding of parallelism. Id. This is true even if one party must file or amend state pleadings in order to raise all claims before the state court. Fidelity Federal, 764 F. Supp. at 1016-19. n1

n1 In Fidelity Federal, the federal plaintiff filed an action to collect on a promissory note. The defendant in the federal case had previously filed a state court action seeking to cancel the same promissory note. The court held that the cases were parallel because they involved the same facts, issues, and there was no impediment to the federal plaintiff raising all of his claims as a counterclaim in the state action. Id. at 1016-1019. Thus, the fact that plaintiffs could raise all claims in state court by simply amending their complaint to include the derivative action supports the finding of parallelism.

[*8]

Here, the Bucks County court is certainly able to address all of the claims. It has jurisdiction over the derivative action and the conversion issue. Moreover, Pennsylvania state courts liberally permit parties to amend their pleadings at any stage of legal proceedings. Robinson Protective Alarm Co. v. Bolger & Picker, 512 Pa. 116, 516 A.2d 299 (1986); Berman v. Herrick, 424 Pa. 490, 227 A.2d 840 (1967). Thus, if the shareholders want to assert their claims within the framework of a derivative lawsuit, they could simply amend the Bucks County complaint. n2

n2 In fact, in a letter dated March 4, 1994, plaintiffs' counsel enclosed a draft amended complaint for the Bucks County case that virtually mirrored the federal complaint.

Accordingly, because these cases present the exact same facts, parties and issues, and because plaintiffs are able to present all legal claims in state court, the cases are parallel.

**2. The Colorado [*9] River factors support deference to the state action.**

The fact that the two cases are parallel does not require deference to the Bucks County action. Rather, [HN4] the finding of parallelism is merely a threshold determination that makes abstention possible. To decide whether abstention is appropriate, the court must consider and balance a host of factors, including:

(1) the order in which the respective courts first obtained jurisdiction (the "priority factor");

(2) whether federal or state law applies;

(3) the desirability of avoiding piecemeal litigation;

(4) whether the state proceeding would adequately protect the federal plaintiffs' rights;

(5) whether the federal forum is

inconvenient; and

(6) which court first obtained jurisdiction over any property involved.

Trent v. Dial Medical College of Florida, Inc., 1994 WL 420286, *6 (3d Cir. 1994); Colorado River, 424 U.S. 800, 47 L. Ed. 2d 483, 96 S. Ct. 1236. In balancing these factors, the court should consider the need for "conservation of judicial resources and comprehensive disposition of litigation" that might favor deferring [*10] to the state court proceedings. Colorado River, 424 U.S. at 817 (1976).

Most of these considerations weigh in favor of abstention. As to the priority factor, courts should consider when the respective complaints were filed, and how much progress has been made in the two actions. Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 21, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983). In the present matter, plaintiffs commenced the Bucks County action six months prior to filing the federal complaint. Additionally, there has been greater progress in the Bucks County case. Plaintiffs deposed five of the defendants' witnesses. The defendants have produced documents and also conducted one deposition. By contrast, there has been no discovery in the federal action. n3

n3 Plaintiffs argue that there has been more progress in the instant case because of the current motion to dismiss. However, the court does not believe this is the type of "progress" the Supreme Court referred to in Moses.

[*11]

Regarding the second and third factors, the court in Trent stated that "the principal reasons to abstain, once abstention has been found to be possible, is to avoid piecemeal litigation and to adjudicate state law issues in state court". Trent at *6. In this case, all of the claims asserted in both complaints are based on Pennsylvania corporate law. There is no federal law involved.

Furthermore, by adjudicating this case in state court,

there is a much greater likelihood of resolving all of the claims in one proceeding. Two of the federal counts are class action claims. Under Zahn v. International Paper, 414 U.S. 291, 38 L. Ed. 2d 511, 94 S. Ct. 505 (1973), a federal court has subject matter jurisdiction over a diversity-based class action suit only if each of the class members satisfies the $ 50,000 minimum amount in controversy. Plaintiffs argue that 28 U.S.C. § 1367 overruled Zahn, and that each class member need not satisfy the jurisdictional minimum.

However, this district recently determined that Zahn is still the proper rule. In Stoumen v. Public Service Mutual [*12] Insurance Co., 1994 WL 111355, *2 (E.D.Pa. 1994), the court explicitly held, "in accordance with Zahn, every class member must satisfy the requirements of § 1332 before a federal court can exercise jurisdiction over a diversity-based class action." Thus, it is clear that this court's jurisdiction is limited to those class members who can satisfy the $ 50,000 jurisdictional minimum.

Plaintiffs concede that some of the class claimants may not be able to meet this standard. See Pl's Resp. to Def. Mot. to Dismiss at 31. However, they suggest that this court should wait until trial to determine which members satisfy the minimum amount in controversy, and then presumably dismiss the other class members. This is hardly a desirable solution, and will undoubtedly lead to the piecemeal and duplicative litigation that Colorado River abstention is designed to prevent. Accordingly, the third factor strongly favors deference to the Bucks County action.

The fourth factor also weighs in favor of deference to the Bucks County action. The Bucks County court is certainly capable of protecting the legal rights and interests of the plaintiff shareholders. In fact, it is the forum that the [*13] named plaintiff Copland chose to litigate these claims in the first place.

The final two factors are neutral in this case. Both forums are equally convenient, and neither court has exercised jurisdiction over any property. But, as the Third Circuit has recently declared, the singular fact that, "the federal forum is not inconvenient . . . cannot justify a decision to exercise federal jurisdiction when the countervailing factors weigh so heavily in favor of abstention". Trent, 1994 Wl 420286, *7; .

Therefore, keeping in mind the need for wise judicial

administration and comprehensive disposition of litigation, this court finds that the Colorado River considerations strongly favor abstention in this matter.

**3. Dismissal of the federal action is appropriate.**

The only remaining issue is whether to dismiss or stay the instant case. In Fidelity Federal, the court held that [HN5] so long as all claims could be fully stated and resolved in state court, then dismissal was in the best interests of justice. 764 F. Supp at 1019; see also Ingersoll-Rand Financial Corporation v. Callison, 844 F.2d 133, 137 (dismissal is proper [*14] if the state court litigation will completely resolve the issues between the parties). In the present matter, this court believes that all of plaintiffs' claims can be fully stated and resolved in the Bucks County action. Accordingly, this case is dismissed.

An appropriate Order follows.

**ORDER**

**J. M. KELLY, J.**

AND NOW, this 22nd day of September, 1994, in consideration of Defendants Jay H. Tolson and E. Joseph Hochreiter ("defendants") Motion to Dismiss, or in the Alternative, to Stay, and all supplemental replies thereto, it is hereby ordered that Defendants' Motion is GRANTED and this case is DISMISSED.

BY THE COURT:

JAMES MCGIRR KELLY, J.

# TAB 3

LEXSEE



Positive
As of: Jun 20, 2007

ENEX RESOURCES CORPORATION AND ENEX PROGRAM I PARTNERS,
L.P., Appellants v. TEXAS CRUDE, INC., Appellee

No. 05-94-00641-CV

COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS

1994 Tex. App. LEXIS 4112

December 30, 1994, Opinion Filed

**NOTICE:** [*1] PURSUANT TO THE TEXAS RULES OF APPELLATE PROCEDURE, UNPUBLISHED OPINIONS SHALL NOT BE CITED AS AUTHORITY BY COUNSEL OR BY A COURT.

**SUBSEQUENT HISTORY:** Petition for Review Denied May 20, 1999.

**PRIOR HISTORY:** On Appeal from the 101st Judicial District Court. Dallas County, Texas. Trial Court Cause No. 89-15431.

**DISPOSITION:** REVERSED and RENDERED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Both appellee oil and gas operator and appellant working interest owners appealed the decision of the 101st Judicial District Court, Dallas County (Texas), that netted out the damage awards to both parties under the jury's verdict and rendered judgment for appellee in a contract dispute with appellants.

**OVERVIEW:** Appellee oil and gas operator sought indemnity from appellant working interest owners. Appellants counterclaimed for funds it claimed were wrongfully withheld by appellee. A jury found both appellants and appellee liable for damages. The trial court

netted out the damage awards under the jury verdict and rendered judgment for appellee. Appellants sought review on multiple grounds, including that appellee was not entitled to indemnity as a matter of law and that the jury question on indemnity contained an impermissible comment on the evidence. Appellee contended in its cross-point that the trial court erred in sustaining appellants' objections to the testimony of appellee's experts. Giving effect to the intentions of the parties as expressed in their contract, the court held that appellee was not entitled to indemnity. Accordingly, the court reversed the judgment of the trial court and rendered judgment for appellants.

**OUTCOME:** The court reversed the judgment of the trial court and rendered judgment that appellee oil and gas operator take nothing on its claim for indemnity. The court also rendered judgment that appellant working interest owners recover from appellee the sum awarded as an offset.

**CORE TERMS:** letter agreement, settlement, withheld, net income, indemnity, working interest, modification, lawsuit, entitled to indemnity, matter of law, fees incurred, litigation expenses, oil, royalty, cross-point, preponderance, accounting, reimburse, complains, withhold, obligate, render judgment, letter of credit, attorney's fees, contingency fund, counterclaim, jury verdict, retain counsel, legal expenses, writ denied

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Conditions & Provisions > Indemnity*
*Contracts Law > Contract Interpretation > General Overview*
[HN1]A contract for indemnity is read as any other contract. Under principles of contract law, courts must ascertain and give effect to the intentions of the parties as expressed in the instrument. When the contract is unambiguous, courts must determine the rights and liabilities of the parties by giving legal effect to the contract as written. Courts may not expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract.

*Contracts Law > Contract Modifications > General Overview*
[HN2]When parties to a contract make a valid modification of their contract and exchange consideration, the terms of the latest contract control.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview*
[HN3]If an appellant is attacking the legal sufficiency of an adverse finding on an issue on which he had the burden of proof, he must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. In reviewing such a "matter of law" challenge, the appellate court first examines the record for evidence that supports the finding, while ignoring all evidence to the contrary. If there is no evidence to support the finding, it will then examine the entire record to determine if the contrary proposition is established as a matter of law.

*Contracts Law > Contract Modifications > Oral Modifications*
*Contracts Law > Statutes of Frauds > Requirements > Performance*
[HN4]Oral modification of a contract does not violate the statute of frauds, Tex. Bus. & Com. Code Ann. § 26.01, if neither the portion of the written contract affected by the subsequent modification, nor the matter encompassed by the modification itself is required to be in writing.

*Contracts Law > Statutes of Frauds > General Overview*
[HN5]Under Tex. Bus. & Com. Code Ann. § 26.01, an operating agreement need not be in writing if it can be performed within one year.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN6]In reviewing a challenge that the jury's failure to give an award is against the great weight and preponderance of the evidence, the appellate court considers and weighs the entire record, and sets aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN7]Appellate courts are not free to substitute their judgment for that of the jury simply because they may disagree with the jury's verdict. When considering great weight points complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of the evidence.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
[HN8]It is the jury's province to reconcile the conflicting or contradictory evidence of the witnesses, or to give a greater degree of credit to one or more of the witnesses.

**JUDGES:** Before Chief Justice McGarry and Justices Thomas and Whitham. [1] Opinion by Chief Justice McGarry

> 1    The Honorable Warren Whitham, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

**OPINION BY:** CHARLES W. McGARRY

**OPINION**

OPINION

Opinion by Chief Justice McGarry

Texas Crude, Inc. ("Texas Crude"), an oil and gas operator, sought indemnity from working interest owners Enex Resources Corporation and Enex Program I

Partners, L.P. (collectively referred to as "Enex"). Enex counterclaimed for funds it alleged were wrongfully withheld by Texas Crude. A jury found both Enex and Texas Crude liable for damages. Based on the jury verdict, the trial court netted out the damage awards and rendered judgment for Texas Crude. In eleven points of error, Enex argues that Texas Crude is not entitled to indemnity as a matter of law. Enex also complains the jury question [*2] on indemnity contained an impermissible comment on the evidence. Regarding its counterclaim, Enex complains that the jury's award should have included additional sums withheld by Texas Crude for in-house personnel fees. Texas Crude contends in a single cross-point that the trial court erred in sustaining Enex's objections to the testimony of certain Texas Crude experts. We agree with Enex that Texas Crude is not entitled to indemnity. Accordingly, we reverse the judgment of the trial court and render judgment for Enex.

## BACKGROUND

Texas Crude is the operator of certain oil and gas properties in Cherokee County, Texas. Enex acquired an ownership interest in the same properties from the Schlensker Drilling Corporation. Schlensker reserved a share of the net proceeds from future production and required Enex to pay Schlensker a "net income payment." Schlensker later assigned the net income payment to BancTexas, which then assigned it to Community Credit Union.

In 1985, Texas Crude filed suit against a gas purchaser, Delhi Gas Pipeline ("Delhi"), alleging breach of contract. Texas Crude sought recovery against Delhi on behalf of all working interest owners. Enex signed a [*3] Letter of Instruction and Authorization that ratified the actions taken by Texas Crude in pursuing the claims against Delhi. The case went to trial, and Texas Crude obtained a judgment against Delhi. While the case was on appeal, Texas Crude and Delhi settled the litigation for approximately $ 33.4 million.

Prior to the settlement between Texas Crude and Delhi, Enex attempted to obtain a release of the net income payment from BancTexas. Because Enex was unable to settle BancTexas' claim to the net income payment, Texas Crude and Delhi required Enex to enter into an agreement ("the letter agreement") in which Enex authorized Texas Crude to withhold $ 1,576,977 (the unpaid balance of the net income payment) out of Enex's

share of the settlement. The letter agreement permitted Enex to later substitute an irrevocable letter of credit for the withheld funds. The letter of credit was to reimburse Texas Crude if it paid a judgment attributable to the net income payment. Enex also agreed to retain counsel to defend Texas Crude in event of a claim and to pay all legal expenses, fees and costs of such counsel.

In 1989, the then owner of the net income payment, Community Credit Union, filed [*4] suit against Enex, Texas Crude, and Delhi. Community Credit Union claimed Enex had breached its contractual obligation to make the net income payment, and that the other defendants had tortiously caused or contributed to Enex's breach. In January 1990, Texas Crude notified Enex it was being sued by Community Credit Union and asked Enex to defend the lawsuit on behalf of Texas Crude. Enex's counsel filed an answer on behalf of Texas Crude. Two months later, Texas Crude claimed the attorney retained by Enex had a conflict of interest, and instructed him to stop all work on behalf of Texas Crude and to relinquish the defense to new counsel.

In November 1991, Texas Crude settled with Community Credit Union for $ 150,000. No judgment was entered against Texas Crude. Following its settlement with Community Credit Union, Texas Crude pursued a cross-action against Enex to indemnify it for the $ 150,000 paid in settlement, plus $ 450,122.78 in attorney's fees incurred after Texas Crude hired its own counsel.

Enex asserted a counterclaim against Texas Crude for money withheld by Texas Crude from Enex's share of the Delhi settlement. Texas Crude had set aside 3.75 percent of the settlement [*5] as a contingency fund for royalty owner claims. After those claims were resolved, Enex's share of the amount remaining in the contingency fund was $ 163,019.15. Texas Crude also withheld $ 145,751 from Enex for the cost of Texas Crude's legal staff and other office employees. These funds were withheld in addition to the $ 1,576,977 withheld pursuant to the letter agreement.

The jury found that Enex owed Texas Crude $ 600,122.78, representing $ 150,000 settlement plus the attorneys' fees incurred by Texas Crude in defending the Community Credit Union lawsuit. The jury also found Texas Crude had improperly withheld $ 163,019.50 (the remainder of the contingency fund) from Enex. After netting out the two amounts, the trial court entered

Page 3

judgment in favor of Texas Crude. [2]

> 2    Texas Crude agreed to a remittitur of $ 22,900.44, for attorney's fees incurred after the settlement with Community Credit Union.

## INDEMNITY

Enex's first two points of error contend that, as a matter of law, Texas Crude is not [*6] entitled to indemnity under either the letter agreement or the operating agreements. We agree.

[HN1]A contract for indemnity is read as any other contract. Safeco Ins. Co. of Am. v. Gaubert, 829 S.W.2d 274, 281 (Tex. App.--Dallas 1992, writ denied). Under principles of contract law, courts must ascertain and give effect to the intentions of the parties as expressed in the instrument. Ideal Lease Serv. v. Amoco Prod. Co., 662 S.W.2d 951, 953 (Tex. 1983). When the contract is unambiguous, we must determine the rights and liabilities of the parties by giving legal effect to the contract as written. Id. We may not expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract. Id.

Texas Crude argues that it may seek indemnity from Enex under either the letter agreement or its operating agreements with the working interest owners. We disagree. Assuming that both the operating agreements and the letter agreement address Texas Crude's indemnity rights, the letter agreement more specifically addresses indemnity for claims by, through or under BancTexas. The letter agreement, being later in time and more specific, constitutes a modification of [*7] the original agreement. Thus, the letter agreement controls. Lake LBJ Mun. Util. Dist. v. Coulson, 839 S.W.2d 880 (Tex. App.--Austin 1992, no writ) ([HN2]When parties to a contract make a valid modification of their contract and exchange consideration, the terms of the latest contract control.)

### Letter Agreement

Texas Crude relies upon the following language in the letter agreement to support its claim for reimbursement of the $ 150,000 paid in settlement to Community Credit Union:

> The letter of credit shall name Texas Crude, Delhi, and TXO Production Corp. as beneficiaries, and shall be available to reimburse Texas Crude, Delhi, and/or TXO Production if they pay, satisfy or respond to a judgment in favor of BancTexas Dallas, or anyone claiming by, through or under them, for any claim attributable to the Net Income Payment describe above.

Texas Crude paid $ 150,000 to settle Community Credit Union's claims. It did not pay, satisfy or respond to a judgment. Community Credit Union's claims were dismissed with prejudice by an order that did not award damages. Under the unambiguous terms of the letter agreement, Texas Crude is not entitled to indemnity for a voluntary settlement. [*8] Texas Crude also argues that the letter agreement, even if insufficient to permit recovery of the $ 150,000 settlement, still entitles Texas Crude to indemnification for the attorney's fees incurred in defending the Community Credit Union lawsuit. The last paragraph of the letter agreement obligates Enex to "provide a defense to Texas Crude, Delhi and/or TXO Production in the event they are named by BancTexas Dallas (or anyone claiming by, through, or under them) as defendants in a lawsuit alleging a claim for money owed pursuant to the Net Income Payment described above."

The letter agreement obligates Enex to retain counsel to defend Texas Crude and pay the fees and costs incurred by such counsel. It does not obligate Enex to pay all legal expenses, fees and costs of counsel retained by Texas Crude. See Ingram Exploration Co. v. Wild Well Control, Inc. 838 S.W.2d 317, 319 (Tex. App.--El Paso 1992, no writ). Enex honored its obligation to Texas Crude. When Texas Crude notified Enex it was being sued by Community Credit Union, Enex's counsel filed an answer on behalf of Texas Crude. Texas Crude then instructed counsel to take no further action on the part of Texas Crude, and [*9] retained different counsel. Enex has no obligation to reimburse Texas Crude for attorney's fees incurred by counsel retained by Texas Crude.

### Joint Operating Agreements

In the alternative, if both the letter agreement and the joint operating agreements provide a basis for indemnification, the joint operating agreement would not be applicable to this indemnity claim. Texas Crude relies upon the following language from the operating agreements concerning royalty burdens:

> Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from

the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor.

This language appears in a section of the operating agreements entitled "Right to Take Production in Kind." That section applies where a working interest owner takes its share of [*10] production in-kind and owes a royalty or production payment on the production taken. The defense of the lawsuit by Community Credit Union against Texas Crude did not involve such a situation. Texas Crude sold Enex's gas and then paid Enex its share. Because Enex was not taking production in-kind, Texas Crude is not entitled to indemnity for the settlement with Community Credit Union or for attorney's fees associated with that lawsuit under the joint operating agreements.

Texas Crude is not entitled to indemnity for the settlement or attorney's fees under either the letter agreement or the joint operating agreements. Points of error one and two are sustained. It is therefore unnecessary to address Enex's points of error three through eight.

## DELHI ATTORNEY FEES

In its counterclaim against Texas Crude, Enex sought recovery of its share of the $ 950,506.15 Texas Crude withheld from the settlement for litigation expenses incurred by Texas Crude during the Delhi lawsuit. Enex's ninth and eleventh points of error contend that it was entitled to additional damages for its share of these expenses as a matter of law.

[HN3]If an appellant is attacking the legal sufficiency of an adverse [*11] finding on an issue on which he had the burden of proof, he must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. *Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).* In reviewing such a "matter of law" challenge, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, we will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* Enex contends that the

$ 950,056.15 (of which Enex's share is $ 145, 751) was withheld in violation of the "Accounting Procedure Joint Operation" section of the Joint Operating Agreements. Enex maintains it did not consent to the $ 950,056.15 in litigation expenses as required by the accounting procedures section. Texas Crude maintains that the operating agreement required the agreement of only a majority of the owners.

Enex claims the approval amounted to an oral modification of the contract barred by the Statute of Frauds. *See* TEX. BUS. & COM. CODE ANN. § 26.01. Thus, Enex contends, the plain language of the [*12] operating agreements should be enforced, and judgment rendered for Enex for the $ 145,751 withheld by Texas Crude for in-house personnel fees.

[HN4]Oral modification of a contract does not violate the Statute of Frauds if neither the portion of the written contract affected by the subsequent modification, nor the matter encompassed by the modification itself is required to be in writing. *See Lone Star Steel Co. v. Scott, 759 S.W.2d 144, 153* (Tex. App.--Texarkana 1988, writ denied). Operating agreements can conceivably be performed within one year in accordance with the agreements. When oil production ceases, the operating agreements cease. [HN5]Under section 26.01, an operating agreement need not be in writing if it can be performed within one year. *Hardin Assoc., Inc. v. Brummett, 613 S.W.2d 4, 7* (Tex. Civ. App.--Texarkana 1980, no writ); *Hondo Oil & Gas Co. v. Texas Crude Operator, Inc., 970 F.2d 1433, 1438 (5th Cir. 1992).* Because the operating agreements could conceivably be performed within one year, a modification to the accounting section need not be in writing.

The jury had before it copies of all the operating agreements relevant to this dispute. The testimony of Helen [*13] Crowder, vice-president of finance for Texas Crude, indicates Texas Crude obtained the consent of a majority of the non-operators to withhold the money for litigation expenses. The record also contains her testimony regarding how the costs were determined. This constitutes some evidence that Texas Crude properly withheld the money for litigation expenses. Thus, our inquiry need go no further. Points of error nine and eleven are overruled.

In point of error ten, Enex attacks the jury's failure to award the $ 145,751 to Enex as being against the great weight and preponderance of the evidence. [HN6]In

reviewing this challenge, we consider and weigh the entire record, and set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cropper v. Caterpillar Tractor Co., 754 S.W.2d 646, 651 (Tex. 1988)*; *Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)* (per curiam).

[HN7]Appellate courts are not free to substitute their judgment for that of the jury simply because they may disagree with the jury's verdict. *Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988)*. When considering great weight points [*14] complaining of a jury's failure to find a fact, courts of appeals should be mindful that a jury was not convinced by a preponderance of the evidence. *Id.*

Enex argues there is no evidence of an oral agreement among the working interest owners to allow Texas Crude to charge for litigation expense. They contend Crowder's testimony is insufficient to prove an oral agreement because she failed to specify the individual working interest owners who agreed to the expenses. The record supports the jury finding. Crowder testified that she obtained the consent of a majority of the working interest owners to withhold the money. [HN8]It is the jury's province to reconcile the conflicting or contradictory evidence of the witnesses, or to give a greater degree of credit to one or more of the witnesses.

*Herbert, 754 S.W.2d at 144* (citing *Jones v. Williams, 41 Tex. 390 (1874)*. The record does not contain evidence to the contrary. Point of error ten is overruled.

## TEXAS CRUDE'S CROSS-POINT

In a single cross-point, Texas Crude complains that the trial court erroneously excluded the testimony of three expert witnesses for failure to properly identify them and the subject of their testimony [*15] in response to interrogatories. However, none of the excluded testimony is material to our disposition of this appeal. The cross-point is therefore overruled. *See City of Corpus Christi v. Corpus Christi Police Officers Ass'n, 557 S.W.2d 182, 186 (Tex. Civ. App.--Corpus Christi 1977, writ ref'd n.r.e.)* (points of error overruled as immaterial to disposition of appeal).

Accordingly, we reverse the judgment of the trial court awarding Texas Crude damages and render judgment that Texas Crude take nothing on its claim for indemnity. We render judgment that Enex have and recover from Texas Crude the sum previously awarded by the trial court as an offset.

CHARLES W. McGARRY

CHIEF JUSTICE

# TAB 4

LEXSEE



Cited
As of: Jun 20, 2007

DRENETTA GREEN, Plaintiff, v. BURLINGTON NORTHERN AND SANTA FE
RAILWAY COMPANY and MONTE ZILLINGER, Defendants.

Civil Action No. 3:05-CV-1596-L

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
TEXAS, DALLAS DIVISION

2006 U.S. Dist. LEXIS 2143

January 19, 2006, Decided
January 19, 2006, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an employment
discrimination case alleging violations of Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C.S. §
2000e et seq., 42 U.S.C.S. § 1981, and the Texas Labor
Code § 21.055, defendant employer and individual
moved to transfer venue pursuant to 28 U.S.C. § 1404(a)
to the United States District Court for the Northern
District of Texas, Fort Worth Division.

**OVERVIEW:** Plaintiff employee was still employed at
the employer's headquarters in Tarrant County, Texas.
There was no question that the events giving rise to the
lawsuit occurred in the United States Northern District of
Texas, which encompasses the Forth Worth and Dallas
Divisions, as well as five other divisions. Venue was
appropriate in the United States Northern District of
Texas. Moreover, the parties did not dispute that the Fort
Worth Division was a division in which the employee's
action or claims could have been brought originally. It
was clear that five of the factors--relative ease of access
to sources of proof; availability of compulsory process to
service the attendance of witnesses; costs of attendance
for willing witnesses, practical problems that make the
trial of the case easy, expeditious and inexpensive; and

local interest in having localized interests decided at
home--favored transfer to the Fort Worth Division. The
three remaining factors were inapplicable, were not
addressed by the parties, or were neutral and did not
weigh in favor of or against a transfer to the Fort Worth
Division.

**OUTCOME:** Defendants' motion to transfer venue was
granted.

**CORE TERMS:** venue, interest of justice, convenience,
transferred, federal courthouse, travel time, choice of
forum, comprise, lawsuit, reside, miles, foreign law,
judicial notice, attendance of witnesses, local interest,
moving party, discriminated, expeditious, inexpensive,
familiarity, retaliated, compulsory, attendance,
congestion, localized, avoidance, resident, complains,
subpoena, flowing

**LexisNexis(R) Headnotes**

·

*Civil Procedure > Venue > Federal Venue Transfers >
Convenience Transfers*
*Civil Procedure > Venue > Motions to Transfer >
Convenience of Parties*

*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
[HN1]With respect to 28 U.S.C.S. § 1404(a), for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought. In applying § 1404(a), a district court is to first determine whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed. Once this initial determination is made, a district court turns to the language of § 1404(a), which speaks to the issue of the convenience of parties and witnesses and to the issue of in the interest of justice.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
[HN2]The determination of convenience in the context of 28 U.S.C.S. § 1404(a) turns on a number of private and public interest factors, none of which is given dispositive weight. The private concerns include: (1) the relative ease of access to sources of proof, (2) the availability of compulsory process to secure the attendance of witnesses, (3) the cost of attendance for willing witnesses, and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. The public concerns include: (1) the administrative difficulties flowing from court congestion, (2) the local interest in having localized interests decided at home, (3) the familiarity of the forum with the law that will govern the case, and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Civil Procedure > Judicial Officers > Judges > Discretion*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN3]Transfer of venue pursuant to 28 U.S.C.S. § 1404(a) is at the discretion of the court, considering all relevant factors to determine whether or not on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum. The moving party bears the burden of demonstrating that a change of venue is warranted.

*Civil Procedure > Venue > Motions to Transfer > Choice of Forum*
[HN4]A plaintiff's choice of forum is entitled to some deference and generally should not be disturbed unless the balance of factors strongly favors the moving party. However, a court may not attribute decisive weight to a plaintiff's choice of forum. A plaintiff's choice of forum is clearly a factor to be considered but in and of itself is neither conclusive nor determinative.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
[HN5]In deciding as 28 U.S.C.S. § 1404(a) motion, there is ordinarily a preference to try an action where the alleged wrong or injury occurred, especially when all the parties and witnesses reside at or in that locality.

**COUNSEL:** [*1] For Drenetta Green, Plaintiff: Raul H Loya, Matthew B Abraham, Loya & Associates, Dallas, TX.

For Burlington Northern and Santa Fe Railway Company, Monte Zillinger, Defendants: Chaya Bail, BNSF Law Dept, Fort Worth, TX; Bryan Patrick Neal, Thompson & Knight -- Dallas, Dallas, TX.

**JUDGES:** Sam A. Lindsay, United States District Judge.

**OPINION BY:** Sam A. Lindsay

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Before the court is Defendant Monte Zillinger's Motion for to Transfer Venue to the Fort Worth Division, filed September 19, 2005. [1] After careful consideration of the motion, record, appendix of Defendant Monte Zillinger, [2] the court **grants** Defendant Monte Zillinger's Motion for to Transfer Venue to the Fort Worth Division.

> 1    On October 4, 2005, Defendant Burlington Northern and Santa Fe Railway Company joined in Defendant Monte Zillinger's motion to transfer.

Page 2

2  Plaintiff Drenetta Green did not file a response to the motion.

## I. Factual Background

Plaintiff Drenetta Green ("Plaintiff" or "Green") [*2] filed this action on August 11, 2005 against Defendants Burlington Northern and Santa Fe Railway Company ("BNSF") and Monte Zillinger ("Zillinger"), collectively referred to as "Defendants." Green contends that Defendants discriminated against her because of her race and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq; 42 U.S.C. § 1981; and the Texas Labor Code, § 21.055. She also contends that Defendants committed the state law torts of negligent supervision and retention, slander and defamation, and intentional infliction of emotional distress.

Defendants seek to have this action transferred to the Fort Worth Division of the Northern District of Texas pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses in this case, and in the interest of justice. Specifically, Defendants request that this action be transferred to the Fort Worth Division because:

> All of the parties and likely witnesses are residents of Tarrant County, Texas; none is [a] resident of any of the counties that [*3] comprise the Dallas Division. All of the relevant documents are located in Tarrant County, Texas; none is located in any of the counties that comprise the Dallas Division. And all of the actions about which Green complains allegedly took place in Tarrant County, Texas where Green works; none allegedly happened in any of the counties that comprise the Dallas Division. In short, this case bears no relationship to the Dallas Division and should be transferred to the Fort Worth Division.

Defendant's Motion to Transfer at 1-2.

Green is a current employee of BNSF. She works at BNSF's headquarters in Tarrant County at 2500 Lou Menk Drive, Fort Worth, Texas. [3] She alleges that BNSF and Zillinger discriminated against her, retaliated against her, and committed certain state torts against her, all in connection with her employment. See Plaintiff's Original Complaint at 2-16. All of the alleged conduct took place in Tarrant County. Likewise, all of the records concerning employment decisions about which Green complains are maintained in Tarrant County, and Green lives in Fort Worth. Zillinger also lives and works in Fort Worth. All of the witnesses who are expected to testify in [*4] this case live in Tarrant County.

> 3  According to Maps.com, this location is 9.5 miles from the federal courthouse in Fort Worth at 500 West Tenth Street, with an approximate travel time of 15 minutes; and it is 35 miles from the federal courthouse in Dallas at 1100 Commerce Street, with a travel time of approximately 41 minutes. Pursuant to Fed. R. Evid. 201, the court takes judicial notice of this information, as it easily satisfies the standard for taking judicial notice as set forth in the rule.

## II. Applicable Standard for a Section 1404(a) Transfer

[HN1]With respect to section 1404(a), "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought." 28 U.S.C. § 1404(a). In applying section 1404(a), a district court is to first determine "whether the judicial district to which transfer is sought would have been a district [*5] in which the claim could have been filed." In re Volkswagen AG, 371 F.3d 201, 203 (5th Cir. 2004) (citing In re Horseshoe Entm't, 337 F.3d 429, 432 (5th Cir.), cert. denied, 540 U.S. 1049, 124 S. Ct. 826, 157 L. Ed. 2d 698 (2003)).

Once this initial determination is made, a district court

> turns to the language of § 1404(a), which speaks to the issue of "the convenience of parties and witnesses" and to the issue of "in the interest of justice." [HN2]The determination of "convenience" turns on a number of private and public interest factors, none of which [is] given dispositive weight. The private concerns include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4)

all other practical problems that make trial of a case easy, expeditious and inexpensive. The public concerns include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary [*6] problems of conflict of laws of the application of foreign law.

*In re Volkswagen AG*, 371 F.3d at 203 (citations omitted).

There is no question that the events giving rise to this lawsuit occurred in the Northern District of Texas, which encompasses the Forth Worth and Dallas Divisions, as well as five other divisions. *See* 28 U.S.C. § 124(a)(1)-(7). It is without cavil that venue is appropriate in *this judicial district*, the Northern District of Texas. Moreover, the parties do not dispute that the Fort Worth Division is a *division* in which Plaintiff's action or claims could have been brought originally; indeed, it would be fatuous to contend otherwise. The question that must be resolved is whether an intradistrict transfer should occur from the Dallas Division to the Fort Worth Division. [4]

> 4  The Dallas Division consists of the counties of Dallas, Ellis, Hunt, Johnson, Kaufman, Navarro, and Rockwall. The Fort Worth Division consists of the counties of Comanche, Erath, Hood, Jack, Palo Pinto, Parker, Tarrant, and Wise. 28 U.S.C. § 124(a)(1), (2).

[*7] [HN3]Transfer of venue pursuant to 28 U.S.C. § 1404(a) is at the discretion of the court, considering "'all relevant factors to determine whether or not on balance the litigation would more conveniently proceed and the interests of justice would be better served by transfer to a different forum.'" *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989) (quoting 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3847 at 370 (1986)). The moving party bears the burden of demonstrating that a change of venue is warranted. *Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966); *Carlile v. Continental Airlines, Inc.*, 953 F.Supp. 169, 170 (S.D. Tex. 1997).

[HN4]A plaintiff's choice of forum is entitled to some deference and generally should not be disturbed

unless the balance of factors strongly favors the moving party, *see* *Houston Trial Reports, Inc. v. LRP Publ'ns, Inc.*, 85 F.Supp.2d 663, 667 (S.D. Tex. 1999); however, a court may not attribute "decisive weight" to a plaintiff's choice of forum. A "plaintiff's choice of forum is clearly a factor to be considered but in and of itself [*8] is neither conclusive nor determinative." [5] *In re Horseshoe Entm't*, 337 F.3d at 434. Having determined that this action could have been originally filed in the Fort Worth Division, the court now considers the eight factors to determine whether it should be transferred to that division.

> 5  In the final analysis, this factor had no impact on the court's determination whether to transfer the action to the Fort Worth Division.

### III. Consideration of the Eight Factors

The court has considered all eight factors, and it is clear to this court that five of the factors -- relative ease of access to sources of proof; availability of compulsory process to service the attendance of witnesses; [6] costs of attendance for willing witnesses; practical problems that make the trial of the case easy, expeditious and inexpensive; and local interest in having localized interests decided at home -- favor transfer to the Fort Worth Division. The parties, witnesses and documents necessary for the trial of [*9] this action are all located in Fort Worth or Tarrant County. Both parties have the same business and work location, 2500 Lou Menk Drive. As a trial would take place during normal business hours while the parties and probable witnesses are at work, all would incur less travel time and expense if the trial were held in Fort Worth instead of Dallas.

> 6  Although all witnesses reside within the Dallas and Fort Worth Divisions of the Northern District of Texas and are within 100 miles of either federal courthouse and therefore equally subject to the subpoena process under Fed. R. Civ. P. 45(b)(2), more costs would be incurred, and time spent, to subpoena the witnesses to appear in trial at Dallas.

Finally, with respect to the factors favoring a transfer to the Fort Worth Division, the court notes that all parties reside in Tarrant County and that the alleged conduct made the basis of the lawsuit occurred in Tarrant County. [HN5]Ordinarily, there is a preference to try an action where [*10] the alleged wrong or injury occurred,

especially when all the parties and witnesses reside at or in that locality. The citizens of Dallas County or the Dallas Division really have little, if any, interest in or relationship to the alleged acts made the basis of his lawsuit. Local interest would thus favor a trial in the Fort Worth Division.

With respect to the other three factors -- administrative difficulties flowing from court congestion, familiarity of the forum with the law that will govern the case, and avoidance of unnecessary problems of conflict of laws of the application of foreign law -- are inapplicable, were not addressed by the parties, or are neutral and do not weigh in favor of or against a transfer to the Fort Worth Division.

## IV. Conclusion

Five factors definitely weigh in favor of a transfer. The other three factors were irrelevant, not addressed by the parties, or either neutral and simply do not affect transfer one way or the other. In any event, the information before the court on these factors was such that it neither weighed in favor of or against a transfer to the Fort Worth Division. Based on these findings, the court determines that Defendant has [*11] met his burden by making a showing sufficient to justify a transfer of this action "for the convenience of the parties, in the interest of justice" to the Fort Worth Division. Accordingly, the court **grants** Defendant Monte Zillinger's Motion to Transfer Venue to the Fort Worth Division, and hereby **transfers** this action to the Fort Worth Division of the Northern District of Texas. The clerk of the court **shall effect** the transfer of this action in accordance with the usual procedure.

**It is so ordered** this 19th day of January, 2006.

Sam A. Lindsay

United States District Judge

# TAB 5

LEXSEE



Analysis
As of: Jun 20, 2007

In re: PEREGRINE SYSTEMS, INC., et al., Debtors. THE COPLEY PRESS, INC.,
Appellant, v. PEREGRINE SYSTEMS, INC., et al., Appellees.

Civil Action No. 03-815-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

311 B.R. 679; 2004 U.S. Dist. LEXIS 13467

July 12, 2004, Decided

**SUBSEQUENT HISTORY:** Stay denied by The Copley
Press, Inc. v. Peregrine Sys. (In re Peregrine Sys.), 312
B.R. 755, 2004 U.S. Dist. LEXIS 16156 (D. Del., 2004)

**PRIOR HISTORY:**          [**1] Bankruptcy Case
02-12740 (JFK).

**DISPOSITION:**    Reversed and remanded. Appellant's
motion to compel denied as moot. Appellees' motion for
judicial notice granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In debtors' bankruptcy
case, the United States Bankruptcy Court for the District
of Delaware struck an investigative report from the
record and denied appellant's motion for reconsideration.
Appellant sought review. Debtors moved for judicial
notice of certain documents.

**OVERVIEW:** The audit committee of debtors' board of
directors retained a firm to investigate possible
accounting irregularities. Debtors asserted that the
resulting report included information that could be
harmful to third parties and contained confidential
business information. After debtors filed for Chapter 11
relief, the committee of unsecured creditors moved for
appointment of a trustee and filed a copy of the report as
an exhibit to the motion. The report was covered under a

blanket sealing order. Appellant intervened, seeking to
unseal documents; in response, the bankruptcy court
struck the report from the record, finding that it should
not have been filed. The appellate court found that the
report, when it was filed as an exhibit, became a judicial
record that was subject to a presumptive right of access.
When appellant moved to unseal the report, the
bankruptcy court was obligated to determine whether any
or all of the report should have remained under seal. The
bankruptcy court lacked discretion to simply strike the
document once the motion to unseal was made. The
appellate court agreed to take judicial notice of certain
matters of public record.

**OUTCOME:** The bankruptcy court's order striking the
report from the record was reversed and remanded for
consideration of whether the report, or any part of it,
should remain under seal. Debtors' motion for judicial
notice was granted.

**CORE TERMS:** right of access, seal, judicial record,
sealing, public access, confidential, judicial notice,
appoint, unseal, redacted, evidentiary, attach, protective
orders, appointment, confidentiality, public record,
privacy, notice, disclosure, moot, admissibility, unsealed,
earnings, limine, common law, good cause,
reconsideration, presumptive, balancing, stricken

**LexisNexis(R) Headnotes**

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 39 of 50

311 B.R. 679, *; 2004 U.S. Dist. LEXIS 13467, **1

*Bankruptcy Law > Practice & Proceedings > Appeals >*
*Standards of Review > Clear Error Review*
*Bankruptcy Law > Practice & Proceedings > Appeals >*
*Standards of Review > De Novo Review*
*Civil Procedure > Appeals > Standards of Review > De*
*Novo Review*
[HN1]On appeal, a district court applies a clearly
erroneous standard to a bankruptcy court's findings of
fact and a plenary standard to that court's legal
conclusions. When reviewing mixed questions of law and
fact, the court must accept the bankruptcy court's finding
of historical or narrative facts unless clearly erroneous,
but exercises plenary review of the bankruptcy court's
choice and interpretation of legal precepts and its
application of those precepts to the historical facts.

*Bankruptcy Law > Practice & Proceedings > General*
*Overview*
*Governments > Courts > Court Records*
[HN2]The public right of access, while not unfettered,
does attach to a document when a party submits it to a
bankruptcy court, and the irrelevancy of the contents of
documents is not alone a basis for denying public access.

*Civil Procedure > Parties > Intervention > Motions to*
*Intervene*
*Governments > Courts > Court Records*
[HN3]The existence of the public's common law right of
access to judicial proceedings and records is beyond
dispute. Access means more than the ability to attend
open court proceedings; it also encompasses the right of
the public to inspect and to copy judicial records. This
right of access applies to substantive motions in judicial
proceedings.

*Governments > Courts > Court Records*
[HN4]The public's exercise of its common law access
right in civil cases promotes public confidence in the
judicial system by enhancing testimonial trustworthiness
and the quality of justice dispensed by the court. As with
other branches of government, the bright light cast upon
the judicial process by public observation diminishes
possibilities for injustice, incompetence, perjury, and
fraud. Furthermore, the very openness of the process
should provide the public with a more complete

understanding of the judicial system and a better
perception of its fairness. In addition, access to civil
proceedings and records promotes public respect for the
judicial process and helps assure that judges perform their
duties in an honest and informed manner.

*Governments > Courts > Court Records*
[HN5]Once a party files a motion, with a document
attached as an exhibit, it becomes a judicial record
subject to a presumptive right of access. It is well
established in the Third Circuit that the filing of a
document with the court renders it a judicial record that is
subject to the right of access. Whether or not a document
or record is subject to the right of access turns on whether
that item is considered to be a "judicial record." The
status of a document as a "judicial record," in turn,
depends on whether a document has been filed with the
court, or otherwise somehow incorporated or integrated
into a district court's adjudicatory proceedings. Filing
clearly establishes such status.

*Contracts Law > Types of Contracts > General*
*Overview*
*Governments > Courts > Clerks of Court*
*Governments > Courts > Court Records*
[HN6]All materials that are the subject of an evidentiary
ruling by a court, whether or not found admissible, are
part of the records for purposes of the public's right to
inspect and copy. The right of public access undoubtedly
attaches to all materials that are filed with the clerk of
court, unless filed under seal pursuant to court order,
because they are so clearly records within the meaning of
the doctrine.

*Governments > Courts > Court Records*
[HN7]Documents not even part of the court file are
accessible under the right of access doctrine where they
were duly submitted to the court and were relevant and
material to the matters sub judice.

*Civil Procedure > Discovery > Protective Orders*
*Governments > Courts > Clerks of Court*
*Governments > Courts > Court Records*
[HN8]Even though the public may not have a right of
access to a sealed document, a document filed under a
blanket sealing order is still a judicial record that is at
least subject to the assertion of a right of access. The

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 40 of 50

311 B.R. 679, *; 2004 U.S. Dist. LEXIS 13467, **1

public has the right to challenge the sealing of a particular document.

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
*Governments > Courts > Court Records*
[HN9]The United States Court of Appeals for the Third Circuit has rejected the argument that a presumption of public access to evidence admitted at trial cannot be applied absent a case-by-case review of the extent to which the evidence formed the basis of any eventual decision.

*Contracts Law > Types of Contracts > Contracts Under Seal*
*Trade Secrets Law > Civil Actions > Discovery*
*Trade Secrets Law > Civil Actions > Sealed Records*
[HN10]Fed. R. Civ. P. 26(c)(7) authorizes a court to make any order which justice requires, and, with regard to commercial information, to enter an order that commercial information not be revealed or be revealed only in a designated way. A court also has the inherent equitable power to grant confidentiality orders, whether or not such orders are specifically authorized by procedural rules.

*Civil Procedure > Discovery > Protective Orders*
[HN11]When parties need to exchange voluminous documents and information, with a substantial likelihood that a large number of documents contain confidential information, because of the benefits of umbrella protective orders in cases involving large scale discovery, the court may construct a broad umbrella protective order upon a threshold showing by the movant of good cause. However, the Federal Rules of Civil Procedure permit members of the public to challenge an overly protective sealing order.

*Civil Procedure > Discovery > Protective Orders*
*Evidence > Inferences & Presumptions > Exceptions > Common Law Presumptions*
*Governments > Courts > Court Records*
[HN12]Where a protective order is challenged on the grounds that it affords inadequate public access to judicial records, the court must balance the strong common law presumption of access against the factors militating against access.

*Civil Procedure > Discovery > Protective Orders*
*Governments > Courts > Court Records*
[HN13]The party seeking the closure of a hearing or the sealing of part of the judicial record bears the burden of showing that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure. As is often the case when there are conflicting interests, a balancing process is contemplated. Good cause must be shown to justify a protective order and good cause is established on a showing that disclosure will work a clearly defined and serious injury the party seeking disclosure. The injury must be shown with specificity. The burden of justifying the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the order.

*Bankruptcy Law > Case Administration > Court Powers*
[HN14]Under 11 U.S.C.S. § 105(a), bankruptcy courts may issue an order, process, or judgment that is necessary or appropriate to carry out the provisions of the title. Section 105 specifically codifies what are traditionally called "inherent powers" to give the bankruptcy courts the necessary ability to manage the cases on their docket. Those powers provide courts with the necessary authority to manage the arguments and conduct of parties to ensure judicial efficiency and to do justice.

*Bankruptcy Law > Case Administration > Court Powers*
*Bankruptcy Law > Case Administration > Notice*
*Governments > Legislation > Initiative & Referendum*
[HN15]Fed. R. Bankr. P. 9018 gives a bankruptcy court the power on motion or on its own initiative, with or without notice to make any order which justice requires to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Bankruptcy Code.

*Civil Procedure > Judicial Officers > Judges > Discretion*
[HN16]Where it appears that a court cannot adequately and efficiently carry out its duties without employing some special device, the court has the inherent power to do so.

*Bankruptcy Law > Case Administration > Court Powers*
*Civil Procedure > Judicial Officers > Judges >*

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 41 of 50

311 B.R. 679, *; 2004 U.S. Dist. LEXIS 13467, **1

**Discretion**

[HN17]A bankruptcy court is appropriately concerned with the privacy interests of third parties who are not before the court, and it is well established that a court has the power and discretion to strike a document in order to protect legitimate interests.

**Civil Procedure > Discovery > Protective Orders**
**Governments > Courts > Court Records**

[HN18]The discretion that exists to balance the factors for and against access to judicial records must be exercised properly because the issuance of a confidentiality order overriding the common law right of access contemplates an analytical process.

**Evidence > Inferences & Presumptions > Exceptions >**
**Common Law Presumptions**

**Governments > Courts > Court Records**

[HN19]Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. Thus, the common law establishes a presumption of public access to court proceedings and records, but the courts may deny access to judicial records, for example, where they are sources of business information that might harm a litigant's competitive standing.

**Evidence > Judicial Notice > General Overview**

[HN20]See Fed. R. Evid. 201.

**Evidence > Judicial Notice > Adjudicative Facts >**
**Public Records**

[HN21]A court may take judicial notice of matters of public record.

**Evidence > Judicial Notice > General Overview**

[HN22]Judicial notice may be taken at any stage during the proceeding, including on appeal as long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority.

**COUNSEL:** David L. Finger, Esquire, Wilmington, Delaware; Counsel for Appellant.

Kimberly E.C. Lawson, Esquire, Reed Smith LLP, Wilmington, Delaware; Counsel for Appellees. Of Counsel: Laura Brill, Esquire, Irell & Manella LLP, New

York, New York.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent A. Jordan

**OPINION**

[*681] **MEMORANDUM OPINION**

Wilmington, Delaware

**JORDAN, District Judge**

**I. Introduction**

Presently before me is an appeal by Copley Press, Inc. ("Copley") from the January 28, 2003 bench ruling of the United States Bankruptcy court for the District of Delaware striking from the record a document known in this case as the "Latham Report" [1], and the June 16, 2003 Order of the bankruptcy court denying Copley's motion for reconsideration of the decision to strike the Latham Report. (Docket Item ["D.I."] 1.). Peregrine Systems, Inc. and Peregrine Remedy, Inc. (collectively [**2] "Peregrine") have filed their opposition. (D.I. 13.) Also before me is a [*682] motion by Copley to compel Peregrine to place the Latham Report into the Appellate record (the "Motion to Compel"; D.I. 7), and a motion by Peregrine "for judicial notice of documents, or in the alternative, request to designate documents as part of the appellate record" (the "Motion for Judicial Notice"; D.I. 19.) I have jurisdiction over this case pursuant to 28 U.S.C. § 158(a). For the reasons set forth below, the appeal will be reversed and remanded, the Motion to Compel will be denied, and the Motion for Judicial Notice will be granted.

1    The "Latham Report" will be described more fully in Section II.

**II. Background**

Peregrine is a provider of "Infrastructure Management" software. [2] (D.I. 13 at 2.) In April 2002, after learning of possible accounting and financial irregularities, the Audit Committee of Peregrine's Board of Directors (the "Audit Committee") commenced an internal investigation. (Id. [**3] ) In that same month, Peregrine terminated Arthur Andersen LLP as Peregrine's

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 42 of 50

311 B.R. 679, *682; 2004 U.S. Dist. LEXIS 13467, **3

auditors, Peregrine's then-Chief Executive Officer and Chief Financial Officer resigned, and the Audit Committee retained Latham & Watkins LLP to investigate the accounting problems. (*Id.* at 2-3.)

> 2    Accordingly to Peregrine, it "develops and markets software that, among other things, enable business customers to be more competitive by reducing infrastructure costs and increasing efficiency." (D.I. 13 at 2.)

According to Peregrine, Latham & Watkins' investigation began in late April 2002 and lasted for approximately four months. Peregrine states that Latham & Watkins reviewed a massive amount of documents and interviewed close to 90 people, including Peregrine's current and former officers, directors and employees, as well as third-party witnesses. (*Id.* at 3.) Peregrine asserts that the final version of the report was nearly 250 pages and contains Latham & Watkins', as well as other outside attorneys', legal analysis and advice [**4] to Pergrine. [3] (*Id.*)

> 3    In addition, Peregrine states that "because of the circumstances under which it was created," the Latham Report contains statements that "would be harmful to potentially innocent third parties." (D.I. 13 at 3.) Moreover, Peregrine says that the Latham Report "contains confidential business information, such as the identities of Peregrine's customers and reseller/partners, and detailed information regarding certain business transactions." (*Id.*)

Ultimately, Peregrine announced that it would restate its earnings for fiscal years 2000, 2001, and 2002. (D.I. 8 at 3.) According to Copley, those restated earnings reduced revenues by hundreds of millions of dollars. (*Id.*) Subsequent to Peregrine's earnings restatement, the Securities and Exchange Commission (the "SEC"). began an investigation, and Peregrine stockholders filed federal securities class action lawsuits accusing Peregrine of fraudulently overstating earnings. (*Id.* at 4.) On or about August 13, 2002, Peregrine provided [**5] the Latham Report to the SEC. (D.I. 13 at 4.)

On September 22, 2002, Peregrine voluntarily filed for protection under Chapter 11 of the United States Bankruptcy Code. (D.I. 8 at 4.) The Official Committee of Unsecured Creditors (the "Committee") was formed on or about October 2, 2002. (*Id.*) Shortly thereafter,

Peregrine and the Committee agreed that certain materials provided by Peregrine to the Committee would be treated as confidential. (D.I. 13 at 4.) According to Peregrine, it then provided a number of confidential documents to the Committee, including the Latham Report. (*Id.* at 4.) On October 22, the bankruptcy court entered an order (the "Sealing Order") that authorized the Committee to file under seal confidential documents that it obtained from Peregrine pursuant [*683] to a confidentiality agreement. [4] (*Id.*)

> 4    Section One of the Sealing Order provides that "The Committee shall be authorized to file Confidential Materials under seal without further order of the Court in accordance with the Court's usual procedures for filing materials under seal." (D.I. 8 at 5.) Section Three of the Sealing Order provides that "Nothing in this Order shall constitute a finding by this Court, or an admission by the Committee, that any Confidential Materials filed under seal are in fact confidential and entitled to remain confidential." (*Id.*)

[**6] On November 13, 2002, the Committee filed a motion under seal to seek the appointment of a Chapter 11 Trustee. (D.I. 13 at 5.) The accompanying exhibits of that motion were also filed under seal, including the Latham Report. (*Id.*) As Peregrine conceded at oral argument (Nov. 6, 2003 transcript at 18-21), the appointment of a Chapter 11 Trustee would have been extraordinary relief and the Latham Report was apparently submitted because the Committee believed it to contain information which would be persuasive evidence justifying that extraordinary appointment. On November 18, the bankruptcy court held an omnibus hearing with the parties, and, at the hearing, Bruce Bennett, counsel for the Committee stated that the Committee "stipulates that everything we filed [under seal] can be opened." (D.I. 3 at Ex. 9, p. 37.) However, the bankruptcy court declined to unseal the documents. (*Id.*) At the same hearing, the bankruptcy court set a litigation schedule on the Committee's motion to appoint a Chapter 11 Trustee. (*Id.* at 7.)

On December 23, 2003, Copley filed a motion to intervene and unseal documents that had been filed under seal, including the Latham Report. (*Id.*) Copley's [**7] motion was heard by the bankruptcy court at an omnibus hearing on January 28, 2003. (D.I. 13 at 7.) At the January 28, 2003 hearing, the Bankruptcy court

Case 1:06-cv-00785-GMS     Document 39     Filed 06/20/2007     Page 43 of 50

311 B.R. 679, *683; 2004 U.S. Dist. LEXIS 13467, **7

expressed doubt that the Committee's filing of the full Latham Report was proper. The bankruptcy court stated:

> I'm not sure that the parties ... who filed these documents had the right to file them in the first place. That's my concern. I have looked at the Latham Report. The Latham report I think has some contentions in it that really could be disruptive and very harmful to certain individuals who are not before this Court, may have no idea that this would be happening to them, have not had any notice that there might be some document that they don't even know about that's now filed and public record in a bankruptcy court. At best it seems to me that some of that report may very well be relevant to the motion to appoint a trustee or other matters that are pending. But that entire document is not relevant and should not have been filed without being redacted.
>
> \*\*\*
>
> So I think the appropriate resolution on the issues that are currently before me today is to have the ... Creditors Committee ... go back and redact the information [**8] to preserve and protect the privacy rights of individuals who have no notice of the fact that this is going on.

(D.I. 8 at Ex. A, p. 82.) Later in the hearing, the bankruptcy court decided, *sua sponte,* to strike the Latham Report from the record and provided that the Committee could file a redacted version at a later time. The bankruptcy court's reasoning for this decision was stated as follows:

> I am permitted to strike irrelevant, harassing, and other types of evidence that cause potential problems to individuals particularly who are not before the Court. The Latham Report contains information [*684] that I believe falls well within my prerogative in striking the document .... This report, as it's currently constituted, I think is a problem. I don't think it's relevant in all its particulars to this

motion. I think it causes some problems under the Rules of Civil Procedure. I don't think it's totally admissible under the Rules of Evidence, and I'm not sure why it's on my docket.

> \*\*\*
>
> The information with respect to the Latham Report, I think I'm going to handle differently. I believe it was improperly filed. I do not think at this point it's relevant to anything. [**9] If it is relevant to something it will be admitted into evidence in relevant parts on the motion to appoint the trustee. I see no reason to have that document on this Court's record at this time. It's before the SEC. If you want it, file a [Freedom Of Information Act] request and deal with it there. I'm going to strike that out, the Latham [Report], because I see no basis for it, and it seems to me that it does not in all its particulars comport with the Federal Rules of Civil Procedure. It may very well be admitted into evidence at trial, and if it is it will be on the public record.
>
> \*\*\*
>
> With respect to the Latham Report, it is stricken and will be returned to Mr. Bennett subject, however, to being offered and/or admitted into evidence in whole or in part at the trial on the motion to appoint a trustee.

(D.I. 8 at Ex. A, p. 85-86; 90-91; 94-95.)

Copley then raised the matter of the Committee's pending motion *in limine* to determine the admissibility of the Latham Report, which was, as stated, submitted in its entirety. (*Id.* at 98-99.) Copley sought access to the Latham Report on the ground that the public right of access attaches to materials offered in evidence [**10] regardless of the court's ultimate decision as to admissibility. (*Id.*) The bankruptcy court responded:

> Oh, I agree with that, the fact that the public has the right to critique that decision, but as I said earlier, I think there

Case 1:06-cv-00785-GMS     Document 39     Filed 06/20/2007     Page 44 of 50

311 B.R. 679, *684; 2004 U.S. Dist. LEXIS 13467, **10

are parts of this report that right now have very little to do with the motion to appoint a trustee because of the issue that may arise with respect to other individuals who are not before this Court at this time.

\*\*\*

Let me put in a format that I think is going to be clear. I have stricken the Latham report. I am going to return it to Mr. Bennett. When he files a motion to have its admissibility determined, I expect that I'm going to get a redacted version - or I shouldn't say redacted but I'm going to get from him the part that he expects to admit into evidence. I do not think that all of that report, and this is a preliminary view, I haven't heard any evidence yet, but from looking at the report, I do not think all [of] it is going to be relevant to the motion to appoint a trustee. So I don't think it's going to be necessary for him to submit that entire report. That's just the way I think. Now, If I'm wrong, and he submits the entire [**11] report, then he'll do it understanding that if there are privacy rights of people who are violated that he and his committee at some point in time may stand to suffer for it. That will be his burden at that point.

(*Id.* at 99-100.) The Committee then agreed to withdraw its motion *in limine* without prejudice, and to re-file it, at some future point, seeking admission of only limited portions of the Latham Report. (*Id.* at 101-102.) In the end, the Committee never re-filed its motion *in limine* because [*685] the parties reached an agreement with regard to the appointment of a trustee. (D.I. 13 at 12.) [5] Accordingly, because the "redacted" version was never re-submitted, the entire Latham Report remained stricken from the record.

.    5    The Committee and Peregrine reached a resolution regarding the composition of Peregrine's Board of Directors and the Committee therefore withdrew its motion to appoint a trustee. (D.I. 13 at 13.) On March 28, 2003, the bankruptcy court granted Copley's motion to withdraw the trustee motion. (*Id.*)

.

[**12] On February 1, 2003, Copley filed a motion for reconsideration, asking the bankruptcy court to reconsider its decision to deny public access to the Latham Report. (D.I. 8 at 13.) At a hearing on March 25, 2003, the bankruptcy court reiterated its view that it had cause to deny the public access to the Latham Report because the Report had been inserted into the record inappropriately:

Just because somebody chooses to file something - I'll use an example [of] a trial judge that I practiced before ... used. If I choose to file a roll of toilet paper that's not relevant to anything, then what good is the roll of toilet paper? It's not relevant to anything. Well, just because somebody chooses to file a roll of toilet paper, I'm not sure that that gives the world the right of access to it.

\*\*\*

[The Latham Report], now that the motion has been withdrawn, doesn't meet any of those evidentiary standards because there's no motion to which it attaches. And to the extent that that motion was ever going to be heard at trial, if the document was properly introduced, then it should have been introduced at that time. But the Parties in support of a motion don't generally attach [**13] documents. They attach arguments, not documents, until they're getting ready for trial. Just because somebody files it doesn't mean that it's appropriately filed.

\*\*\*

The point is whether or not at this point there is any document that should even exist on court file, not whether it's relevant to something at all. The issue is should that document have been filed? And, in my view, until it was - it became an evidentiary matter, it should not have been filed. If it became an evidentiary matter, I agree that at that point the public has the right of access, but just because somebody chooses to take a confidential document and put it on record in the court

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 45 of 50

311 B.R. 679, *685; 2004 U.S. Dist. LEXIS 13467, **13

file doesn't mean, I think, that the world has the right of access. There's a privacy component to this that is as equally important as the public component.

(D.I. 8 at Ex. B, pp. 30, 31, 32.) The bankruptcy court further explained that, in its view, the Latham Report should not have been filed because:

It had no evidentiary significance because there wasn't an evidentiary hearing set, and I really don't know why I have to go through an analysis line-by-line of that document. I would have had to do that had it [**14] been offered into evidence, but it should not have been filed. I agree with the concept that it was a strategic issue in terms of putting it before the Court so that I could read everything at the time, but the reality is it was, until time to submit evidence, I think not appropriate in support of the motion. It can be an exhibit to a motion, but that's an evidentiary issue, and we never got to an evidentiary hearing. [*686] I really do not know why I need to address the Latham report any further.

(D.I. 3 at Ex. 23, p. 80.)

On May 27, 2003, the bankruptcy court vacated the Sealing Order. (D.I. 13 at 14.) Peregrine states that "since that time, the parties have been in the process of reviewing, redacting, and unsealing documents that had previously been filed under seal. Some of the documents have been unsealed completely, some of the documents have been unsealed in a redacted version, and some are still in the process of being reviewed." (*Id.* at 15.) On June 16, 2003, the bankruptcy court entered an order denying Copley's motion for reconsideration. (D.I. 8 at Ex. C.) Copley filed this notice of appeal on June 24, 2003. (D.I. 1.)

## III. Standard of Review

[HN1]On appeal, [**15] the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir.1999). When

reviewing mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercises 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir.1981)).

## IV. Discussion

### A. The Appeal

#### 1. Mootness

Peregrine argues that Copley's appeal is moot because "once the Committee and [Peregrine] reached [an] agreement on the appointment of a trustee, and the Committee withdrew its [motion], the Latham Report became utterly irrelevant to the issue pending before the Bankruptcy Court." (D.I. 13 at 15-16.) Furthermore, Peregrine asserts that the Report [**16] is no longer in the custody of the bankruptcy court and that neither the Committee nor Peregrine "has any interest in resubmitting it." (*Id.* at 16.)

Copley asserts that even though the underlying motion had been withdrawn, the Latham Report did not lose its status as a judicial record subject to the right of access. (D.I. 8 at 22-23, D.I. 17 at 6) (citing *In re Continental Illinois Sec. Litig.*, 732 F.2d 1302, 1309-1310 (7th Cir. 1984) ("withdrawal of the motion is immaterial to whether the presumption of access applies" to the document at issue because the report was the basis for factual and legal findings of the court)). Copley also states that the Latham Report remains under the control of the bankruptcy court. (D.I. 17 at 6.) At the March 25, 2003 hearing, the bankruptcy court said:

Okay. Well, to the extent that I struck the document, I also required the party that filed it to maintain it, so that in the event I determine there's a right of access, it's available and can be reproduced before the Court. So, I think in terms of that remedy, the document is there, and it can be reproduced. In fact, I'm sure it exists in lots of other places where the [**17] Court can acquire it if need be. If that's the issue you're getting to, my right, my

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 46 of 50

311 B.R. 679, *686; 2004 U.S. Dist. LEXIS 13467, **17

striking it from the record also directed the party to maintain it until further order.

(D.I. Ex. 8 at 35.) Because [HN2]the public right of access, while not unfettered, did attach to the Latham Report when Copley submitted it to the bankruptcy court, see [*687] *infra* part 2, and the irrelevancy of the contents of documents is not alone a basis for denying public access, see *Joint Stock Soc'y, 104 F. Supp. 2d at 402-403*, and because the bankruptcy court still has control over the Latham Report, Copley's appeal is not moot.

## 2. Public Right of Access

Copley's motion to intervene in this case and motion to unseal the Latham Report is based on [HN3]the public's common law right of access to judicial proceedings and records. The existence of such a right is beyond dispute. *See, e.g., Miller v. Indiana Hospital, 16 F.3d 549, 551 (3d Cir. 1994); Leucadia, Inc. v. Applied Extrusion Tech., 998 F.2d 157, 158 (3d Cir. 1994); Littlejohn v. BIC Corp., 851 F.2d 673, 677-78 (3d Cir. 1988).* "Access means more than the ability to attend open court [**18] proceedings; it also encompasses the right of the public to inspect and to copy judicial records." *Littlejohn, 851 F.2d at 678.* This right of access applies to substantive motions in judicial proceedings. *Leucadia, Inc., 998 F.2d at 164.*

As the Third Circuit has explained,

[HN4]the public's exercise of its common law access right in civil cases promotes public confidence in the judicial system by enhancing testimonial trustworthiness and the quality of justice dispensed by the court. As with other branches of government, the bright light cast upon the judicial process by public observation diminishes possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness. In addition, access to civil proceedings and records promotes 'public respect for the judicial process' and helps assure that judges perform their duties in

an honest and informed manner.

*In re Cendant Corp., 260 F.3d 183, 192 (3d Cir. 2001)* (citations and internal quotations omitted).

Copley [**19] correctly argues that [HN5]once the Committee filed the motion to appoint a trustee, with the Latham Report attached as an exhibit, it became a judicial record subject to a presumptive right of access. (D.I. 8 at 18; D.I. 17 at 12.) It is well established in the Third Circuit that the filing of a document with the court renders it a judicial record that is subject to the right of access. In *In re Cendant Corp.* the Third Circuit explained that

whether or not a document or record is subject to the right of access turns on whether that item is considered to be a 'judicial record.' ... The status of a document as a 'judicial record,' in turn, depends on whether a document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings .... Filing clearly establishes such status ....

*260 F.3d at 192. See also Leucadia, 998 F.2d at 161-162* ("The filing of a document gives rise to a presumptive right of access"); *Joint Stock Soc'y v. UDV N. Am., Inc., 104 F. Supp. 2d 390, 402-403 (D. Del. 2000)* [HN6]("All materials that are the subject of an evidentiary ruling by the [**20] court, whether or not found admissible, are part of the records for purposes of the public's right to inspect and copy"); *Zenith Radio Corp. v. Matsushita Electric Industrial Co., 529 F. Supp. 866, 897 (E.D. Pa. 1981)* ("The right [of public access] undoubtedly attaches to all materials that are filed with the clerk of court, unless filed under seal pursuant to court order, because they are so clearly records within the meaning of the doctrine"). *Cf. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 783* [*688] *(3d Cir. 1994)* (stating that the First Circuit, in *FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 410 (1st Cir. 1987)*, "articulated a persuasive and perhaps desirable rule" in holding that [HN7]documents not even part of the court file were accessible under the right of access doctrine because "they were duly submitted to the court" and were "relevant and material to the matters *sub judice*").

Peregrine argues that the Latham Report was never a

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 47 of 50

311 B.R. 679, *688; 2004 U.S. Dist. LEXIS 13467, **20

judicial record subject to the public's right of access because it was initially filed under seal, and thus no right of access could attach to it at that time. (D.I. 13 at 29) (quoting *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F. Supp. 866, 897 (E.D. Pa. 1981) [**21] ("The right [of public access] undoubtedly attaches to all materials that are filed with the clerk of court, unless filed under seal pursuant to court order.")). However, [HN8]even though the public may not have a right of access to a sealed document, a document filed under a blanket sealing order is still a judicial record that is at least subject to the assertion of a right of access. *See Leucadia*, 998 F.2d at 165. The public has the right to challenge the sealing of a particular document.

Peregrine also asserts that "even though courts have often focused on the act of filing as giving rise to a presumptive right of access," the right of access should be limited to documents to be considered by the Court as part of a judicial decision. (*Id.* at 30.) The Third Circuit rejected this argument in *Littlejohn*, 851 F.2d at 685 n. 28 [HN9](rejecting the argument that "a presumption of public access to evidence admitted at trial cannot be applied absent a case-by-case review of the extent to which the evidence formed the basis of any eventual decision"). Additionally, Peregrine cites *Littlejohn*, 851 F.2d at 683, for the proposition that there [**22] is no right of public access to trial exhibits that were no longer on file with the court after they were returned to the owners. Peregrine also cites *Pansy*, 23 F.3d at 783, for the idea that there was no right of access to a settlement agreement where the agreement was returned to the parties without having been filed. (D.I. 13 at 31.) However, both cases are distinguishable on the points for which Peregrine cites them. Unlike the settlement agreement in *Pansy*, the Latham Report was actually filed with the court, and unlike *Littlejohn*, the request for access in the present action came in an active case and was made before the Latham Report was removed from the record. In *Littlejohn*, the request for access came after the case was closed and the evidence had been returned to the parties.

Because the Latham Report was a judicial record and thus, unless properly sealed, presumptively subject to the right of access, the bankruptcy court was obligated, when Copley brought its motion to unseal the Report, to make a determination as to whether any or all of the Latham Report should remain under seal. *See infra* part 3.

### 3. Protective Orders [6]

> 6 Since protective orders, confidentiality orders, and sealing orders are "functionally similar," *see Pansy*, 23 F.3d at 786, these terms are used interchangeably in this section.

[**23] As previously noted, the Committee filed the Latham Report under seal. Federal Rule of Civil Procedure 26(c)(7) [HN10]authorizes a court to "make any order which justice requires," and, with regard to commercial information, to enter an order that "commercial information not be revealed or be revealed only in a designated [*689] way ...." A court also has the "inherent equitable power to grant confidentiality orders, whether or not such orders are specifically authorized by procedural rules." *Pansy*, 23 F.3d at 785.

[HN11]When parties need to exchange voluminous documents and information, with a substantial likelihood that a large number of documents contain confidential information, "because of the benefits of umbrella protective orders in cases involving large scale discovery, the court may construct a broad umbrella protective order upon a threshold showing by the movant of good cause." *Pansy*, 23 F.3d at 787 n. 17. However, as already discussed, the Federal Rules of Civil procedure permit members of the public to challenge an overly protective sealing order. *Leucadia*, 998 F.2d at 165 (citing *In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d 139, 146 (2d Cir.1987)). [**24]

[HN12]Where a protective order is challenged on the grounds that it affords inadequate public access to judicial records, the Court must balance the strong common law presumption of access "against the factors militating against access." *Leucadia*, 998 F.2d at 165 (quoting *Bank of America National Trust & Savings Assoc. v. Hotel Rittenhouse Assoc.*, 800 F.2d 339, 344 (3d Cir. 1986)). *See also In re Cendant Corp.*, 260 F.3d at 194 [HN13](the "party seeking the closure of a hearing or the sealing of part of the judicial record bears the burden of showing that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure .... As is often the case when there are conflicting interests, a balancing process is contemplated") (citation and quotations omitted); *Pansy*, 23 F.3d 786 (good cause must be shown to justify a protective order and "good cause is established on a showing that disclosure will work a clearly defined and serious injury the party

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 48 of 50

311 B.R. 679, *689; 2004 U.S. Dist. LEXIS 13467, **24

seeking disclosure. The injury must be shown with specificity .... The burden of justifying [**25] the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the order").

In the present action, Copley, by making its motion to unseal, challenged the "umbrella" protective order entered by the bankruptcy court. However, rather than conducting an analysis to determine whether the factors "militating against access" outweighed the public interest in disclosure, which, Copley believes, if done, would have left at least a portion of the Latham Report for the public to review (D.I. 17 at 16), the bankruptcy court struck the entire Latham Report from the record.

Significantly, subsequent to striking the Latham Report, the bankruptcy court vacated the Sealing Order and "the parties have been in the process of reviewing, redacting, and unsealing documents that had previously been filed under seal." (D.I. 13 at 14-15.) Peregrine asserts that "some of the documents have been unsealed completely, some have been unsealed in a redacted version, and some are still in the process of being sealed." (*Id.*)

That type of analysis and balancing process was required after Copley filed its motion to unseal the Latham Report, but it did not [**26] occur. [7]

> 7   Although the bankruptcy court "looked at" the Latham Report (D.I. 8 at Ex. A, p. 82), it is unclear what that means. It does appear, however, that the bankruptcy court did not determine that all of the information in the Latham Report was irrelevant to the motion to appoint a trustee.

**4. Authority of the bankruptcy court to strike the Latham Report**

Peregrine argues that striking the Latham Report from the record was proper [*690] because the bankruptcy court had the authority and discretion to do so in light of its concern that the "document contained confidential and potentially very harmful material regarding third parties, most of which was obviously irrelevant to the issue of whether a trustee should be appointed." (D.I. 13 at 19-20; *see also* D.I. 8 at Ex. A, p. 82.)

[HN14]Under 11 U.S.C. § 105(a), bankruptcy courts

may "issue an order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 105 specifically codifies what [**27] are traditionally called "inherent powers" [8] to give the bankruptcy courts the necessary ability to manage the cases on their docket. Those powers provide courts with "the necessary authority to manage the arguments and conduct of parties to ensure judicial efficiency and to do justice." *In re Johnson,* 236 B.R. 510, 521 (D.D.C. 1999) *(citing Roadway Express v. Piper,* 447 U.S. 752, 765, 767 n. 14, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980)). In addition, Rule 9018 of the Rules of Bankruptcy Procedure [HN15]gives a bankruptcy court the power "on motion or on its own initiative, with or without notice" to "make any order which justice requires ... to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code."

> 8   *See In re Stone,* 986 F.2d 898, 901-903 (5th Cir. 1993) [HN16]("Where it appears that a court cannot adequately and efficiently carry out its duties without employing some special device, the court has the inherent power to do so").

[**28]   [HN17]The bankruptcy court was appropriately concerned with the privacy interests of third parties who were not before the court, and it is well established that a court has the power and discretion to strike a document in order to protect legitimate interests. [9] Indeed, while it may be presumptuous, I believe I understand the entirely legitimate interests and concerns underlying the bankruptcy court's ruling in this matter. Whether for proper reasons or for the improper *in terrorum* effect that putting the entire Latham Report in the record would have on the debtor, the Committee filed the full Report with its motion for the appointment of a trustee. The bankruptcy court was then put to the burden of dealing with reporters' demands to see the tantalizing tales of corporate malfeasance that people suspected the report contained. Moreover, as the court noted, the filing of the report was wholly premature. It was not clear when or even if the court would need to take evidence on the motion. [10] Hence, there was understandable appeal to striking the document in its entirety, with the direction that it be refiled later if appropriate. The problem with that solution, though, is that it vastly [**29] undervalues the right of public access which in fact has been undermined by the Committee's action and the bankruptcy court's order to strike. In *In re Cendant Corp.,* 260 F.3d at 197, the Third Circuit stated that [HN18]"the

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 49 of 50

311 B.R. 679, *690; 2004 U.S. Dist. LEXIS 13467, **29

discretion that exists [to [*691] balance the factors for and against access] ... must be exercised properly because the issuance of a confidentiality order overriding the common law right of access contemplates an analytical process." Therefore, once the motion to unseal was made, the bankruptcy court was required to make a determination as to whether any or all of the Latham Report should have remained under seal.

> 9 [HN19]"Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Littlejohn, 851 F.2d at 678* (quoting *Nixon v. Warner Communications, Inc., 435 U.S. 589, 598, 55 L. Ed. 2d 570, 98 S. Ct. 1306 (1978)*. Thus, the common law establishes a presumption of public access to court proceedings and records, but the "courts may deny access to judicial records, for example, where they are sources of business information that might harm a litigant's competitive standing." *Id.*

[**30]

> 10 Because the Committee and Peregrine settled their dispute over the appointment of a trustee, it turned out no evidence was necessary, and the frustration attendant to the drain on judicial resources may thereby have been compounded in this case.

If the facts were different, and if the bankruptcy court had decided to strike the Latham Report from the record when it was initially filed, before a motion to unseal was made, the decision to strike may have been a valid exercise of power properly within the bankruptcy court's discretion. Striking the Latham Report from the record also may have been proper if the bankruptcy court had simultaneously ordered the Committee to refile a redacted version, since a redacted version would have addressed both the privacy concerns of the uninvolved third parties and the right of access. However, that is not what happened.

Here, the uncontradicted facts demonstrate that the Committee filed under seal a motion to appoint a trustee. The Committee also filed a *motion in limine* to determine the admissibility of the Latham Report, which, as both the bankruptcy [**31] court and Peregrine acknowledged, was relevant to the motion to appoint a trustee. (D.I. 8 at Ex. A, p. 82; D.I. 27 at 24-25.) Copley

later intervened in the case, invoking its right of public access, and made a motion to unseal the Latham Report. It was in response to that motion that the bankruptcy court decided to strike the Report from the record. That action in that specific context was improper in light of the public's right of access to judicial records and was an abuse of the bankruptcy court's discretion. Accordingly, the bankruptcy court's decision to strike the Latham Report from the record must be reversed and remanded. Upon remand, the bankruptcy court shall cause the Latham Report to be placed back into the public record, subject to the Sealing Order, and the party seeking the continued sealing of the Report, namely Peregrine, shall, in accordance with the standards set forth by the Third Circuit, show justification for having the Latham Report, or any part of it, remain under seal. [11]

> 11 It should not be assumed that, after the bankruptcy court undertakes the balancing and analytical process explained above, Copley will actually get any part of the Latham Report. After private third party information, confidential business information, and information protected by the attorney client privilege or as attorney work product is removed, there may be nothing left of the Latham Report to unseal. Because the Committee has now been disbanded, it may not be possible to lay at its doorstep the cost associated with its decision to file the full Report. If that is in fact the case, more's the pity, because my decision on this appeals not intended as a refutation the bankruptcy court's concern that the Committee was not justified in filing the Report in the first instance.

[**32] **B. The Motion to Compel**

Because I have ordered the bankruptcy court to place the Latham Report back into the record, and it will be reviewed in accordance with the public access standards set forth by the Third Circuit, Copley's motion to compel will be denied at moot.

**C. The Motion for Judicial Notice**

Peregrine, in its motion for judicial notice (D.I. 19), requests that I take judicial notice of the "Transcript of the Omnibus Hearing before Honorable Judith K. Fitzgerald United States Bankruptcy Judge", "Order Pursuant to *Section 1129 of the Bankruptcy Code* Confirming Debtor's Fourth Amended Plan of

Case 1:06-cv-00785-GMS    Document 39    Filed 06/20/2007    Page 50 of 50

311 B.R. 679, *691; 2004 U.S. Dist. LEXIS 13467, **32

Reorganization, [*692] as Modified, Dated July 14, 2003," "Stipulation and Order Authorizing Creditors Committee to File Documents Under Seal," Confidentiality Agreement with the SEC, Department of Justice Subpoena, and "Fourth Amended Plan of Reorganization of [Peregrine] as Modified, Dated July 14, 2003." (D.I. 21 at Exs. A-F.)

Federal Rule Of Evidence 201 provides, [HN20]"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) [**33] capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Because [HN21]a court may take judicial notice of "matters of public record," *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002), and it is not unfair to Copley to do so, I will take judicial notice of these documents. *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197 (3d Cir. 1995) [HN22]("Judicial notice may be taken at any stage during the proceeding, including on appeal as long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority") (citations omitted). However, I will take judicial notice only of the existence and contents of these documents, without making any determination regarding the truth of any facts represented therein. Accordingly, Peregrine's motion for judicial notice will be granted.

**V. Conclusion**

For the reasons set forth herein, this case will be reversed and remanded. An appropriate order will issue.

**ORDER** - July 12, 2003

For the reasons set forth in the Memorandum [**34] Opinion issued on this date,

The decision of the bankruptcy court to strike the Latham Report from the record is reversed and remanded. The bankruptcy court shall cause the Latham Report to be placed back into the public record, subject to the Sealing Order in the case, and the Appellees shall justify having the Latham Report, or any part of it, remain under seal. The Appellant's motion to compel (D.I. 7) is DENIED as moot. The Appellees' motion for judicial notice (D.I. 19) is GRANTED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware

# TAB 6

LEXSEE



Analysis
As of: Jun 20, 2007

## CAPT. SURENDER MALHAN and ALINA MALHAN, Plaintiffs, Pro-se, v. THE ANTHONY ROBBINS COMPANIES, Defendant.

### Civil Action No. 05-CV-05951 (WJM)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

### 2006 U.S. Dist. LEXIS 20558

### March 24, 2006, Decided

**SUBSEQUENT HISTORY:** Reconsideration denied by, Motion denied by Malhan v. Anthony Robbins Cos., 2006 U.S. Dist. LEXIS 38132 (D.N.J. June 9, 2006)

**CORE TERMS:** seminar, refund, pro-se, emotional distress, entirety, reimbursement, sit, breach of contract, infliction, liberally, emotional, distress, seating, programming, conditions precedent, construing, departure, agony, time spent, failure to state a claim, valid contract, contractual provision, outrageous, favorable, authentic, assigned, tuition, session, severe, badge

**COUNSEL:** [*1] CAPT. SURENDER MALHAN, Plaintiff, Pro se, JERSEY CITY, NJ, US.

ALINA MALHAN, Plaintiff, Pro se, JERSEY CITY, NJ, US.

For THE ANTHONY ROBBINS COMPANIES, Robbins Research International, Inc., Defendant: ALYSON M. WEISS, LOEB & LOEB LLP, NEW YORK, NY.

**JUDGES:** William J. Martini, U.S.D.J.

**OPINION BY:** William J. Martini

**OPINION**

## LETTER OPINION

Dear Litigants:

This matter comes before the Court on Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), seeking to dismiss *pro-se* Plaintiffs' complaint in its entirety. [1] Plaintiffs oppose the motion. The Court adjudicates this matter on the papers. Fed. R. Civ. P. 78. For the reasons stated below, Defendant's motion to dismiss is **GRANTED** and Plaintiffs' complaint is **DISMISSED** in its entirety.

> 1    Plaintiffs filed a "Motion to Add to the Complaint" on February 21, 2006. The Court, recognizing that Plaintiffs are pro-se and deserve certain latitude, considers the Complaint amended. Fed. R. Civ. P. 15.

## [*2] BACKGROUND

Pro-se Plaintiffs, Capt. Surender and Alina Malhan (Myronova), enrolled by signed contract dated August 17, 2004 (the "Contract") [2] in a seminar program (the "Seminar") offered by Defendant Robbins Research International. [3] At signing, Plaintiffs paid a total of $ 20,495. [4] The Contract outlined specific procedures by which Plaintiffs could seek refunds if they were dissatisfied with the Seminar. Plaintiffs arranged to attend Defendant's Seminar in Palm Springs, California from

December 4-10, 2004. Although they claim to have been verbally assured in advance by Defendant that they would be able to sit together for the duration of the Seminar, upon arrival Plaintiffs were informed that no such preference would be assured; indeed, Plaintiffs were assigned to different groups. After three days disputing their seating arrangements (and during which Plaintiffs attended the Seminar), Plaintiffs chose to leave the Seminar of their own accord; at no point were Plaintiffs asked by Defendants to leave the Seminar. Plaintiffs subsequently failed to follow the refund procedures outlined in the Contract, nor did they return their Seminar materials as required under the [*3] Contract. Three months later, Plaintiffs began discussions with Defendants for a refund of their moneys; Plaintiffs claim a full refund was not offered.

> 2    Alina Malhan's Contract is dated August 17, 2004; Surender Malhan's Contract is dated only "August 2004."
>
> 3    The Contract is called a "Mastery University Enrollment Agreement." (Both Contracts are attached as Weiss Aff. Exs. A and B.).
>
> 4    Although Plaintiffs' Complaint claims $ 20,440, the contracts themselves indicate the higher figure.

Plaintiffs filed their Complaint in the Superior Court of New Jersey on November 9, 2005 seeking full refund of the Contract fees; Plaintiffs also seek approximately $ 62,400 for six days lost wages (Plaintiffs offer scant quantification of this loss), $ 1,000,000 compensation for mental agony caused by their inability to attend the Robbins lectures and the humiliation of leaving the Seminar, $ 2,000,000 for "business damages, the strain on marital relations, loss of name, loss of reputation, loss of identity" and [*4] "mental programming," and further damages to their business's future value in excess of $ 10,000,000 in addition to compensation for time spent, and physical duress, litigating this case.

Defendant filed notice to remove the case to federal court on December 22, 2005 under 28 U.S.C. § 1332 and 28 U.S.C. § 1441 on diversity grounds. The case was assigned to this Court on January 17, 2005.

## DISCUSSION

### A. Standard for Dismissal Pursuant to Rule 12(b)(6)

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998). In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. [*5] Pension Benefit Guar. Corp. v. White Consol. Indus. 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, when a document attached to the motion to dismiss, but not submitted with the complaint, is undisputed and authentic and the basis for the plaintiff's claims, a court may consider such a document. Pension Benefit, 998 F.2d at 1196. Likewise, a document attached by a defendant to a motion to dismiss is considered part of the pleading if it is referred to in the complaint and is central to the plaintiff's claims. See Pryor v. NCAA, 288 F.3d 548, 559-60 (3d Cir. 2002). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts that could be proved consistent with the allegations," a court may dismiss a complaint for failure to state a claim. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984); Zynn v. O'Donnell, 688 F.2d 940, 941 (3d Cir. 1982).

The Court recognizes the long-standing practice of construing pro-se plaintiffs' pleadings liberally. See, e.g. United States v. Miller, 197 F.3d 644, 648 (3d Cir. 1999). [*6] Moreover, when a motion to dismiss involves a pro-se plaintiff, the court must "find that it is clear 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Zynn v. O'Donnell, 688 F.2d at 941 (quoting Haines v. Kerner, 404 U.S. 519, 521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)).

### B. Defendant's 12(b)(6) Motion to Dismiss for Failure to State a Claim is GRANTED

It is somewhat difficult to divine from Plaintiffs' pro-se Complaint the exact nature of their claims against Defendant. However, reading the Complaint liberally, it would appear that Plaintiffs seek recompense based on a purported breach of the Contract with Defendants for

their enrollment in Defendant's Seminar. To that end, Count One seeks reimbursement of Seminar tuition.

Count Two seeks reimbursement of time loss attributable to Plaintiffs' attending the Seminar.

Count Three appears to allege intentional infliction of emotional distress as a result of Defendant's supposed breach, complaining specifically of the "Mental Agony" Plaintiffs experienced due to their early departure from the Seminar.

Count Four claims harms from Defendant's "negative [*7] programming" of Plaintiffs during their time at the Seminar, as well as other losses due to Defendant's alleged breach.

Counts Five and Six seek reimbursement for time loss and physical stress experienced by Plaintiffs while pursuing litigation.

Counts Seven through Twelve seek various forms of relief including refunds for other attendees and changes in the way that Defendant manages the Seminar.

As explained below, it is clear that Plaintiffs have failed to state a claim as to any count and the Complaint must be dismissed in its entirety.

### (I) Defendant's Did Not Breach the Contract

Construing their Complaint liberally, it appears that Plaintiffs accuse Defendant of breaching the Contract by not guaranteeing Plaintiffs' preferred seating at the Seminar. (Compl. at 6.) Although it is unclear to the Court, Plaintiffs may also be claiming breach due to Defendants failure to refund their Seminar fees after Plaintiffs left the Seminar. (*Id.*) However, Plaintiffs' Complaint and other pleadings have not properly alleged any breach of contract by Defendant. In order to state a cause of action for breach of contract, Plaintiffs must allege each of the following elements: (1) a [*8] valid contract existed between Plaintiffs and Defendant, (2) Defendant breached this contract, (3) Plaintiffs performed under this contract, and (4) Plaintiffs were damaged as a result of Defendant's breach. See *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F.Supp.2d 543, 566 (D.N.J. 2003); *see also Bhari Info. Tech. Sys. Pvt. Ltd. v. Allied Boston Bank, Inc.*, 2005 U.S. Dist. LEXIS 40094, No. C 05-01223 SI, 2005 WL 3481473 at *5 (N.D.Cal. Dec. 20, 2005). 5

5  New Jersey choice of law principles governing contract interpretation might necessitate application of California, rather than New Jersey, law in analyzing the Contract. See *Nat'l Util. Svc. Inc. v. Chesapeake Corp.*, 45 F.Supp.2d 438, 446-47 (D.N.J. 1999). However, whether the Court applies California or New Jersey law, it reaches the same conclusions on this motion to dismiss.

Although Plaintiffs may claim that their inability to be seated when and where they desired constituted a breach, the Contract terms as written in no way guaranteed [*9] Plaintiffs their preferred seating; nor have Plaintiffs provided any evidence favoring an interpretation of the Contract that would support such a contention. 6 Furthermore, Plaintiffs' contention that they were forced to leave the Seminar by Defendant is contradicted by Plaintiffs' own Complaint in which Plaintiffs write that "we left - we walked out of the seminar -- ... [but Defendant] did not directly ask us to leave. They just refused to allow us to sit together. They just refused to allow us to sit where we wanted to sit." (Compl. at 5-6.) Accordingly, there is no support for the contention that Defendant committed any breach related to Plaintiffs' early departure from the Seminar.

6  The Contracts signed in August 2004 by both Plaintiffs makes no mention of guaranteed seating. Furthermore, paragraph 5(a) of the Contract specifies that signatories "acknowledge that you are not relying on any warranties, promises, guarantees or representations made by us or anyone acting or claiming to act on behalf of us unless they are in writing and made part of this Agreement." (Contract P5(a).

[*10]  Likewise, the Contract outlines clear procedures for obtaining refunds due to dissatisfaction with the Seminar. Couched as a "Money-Back Guarantee," the Contract states that "in the unlikely event that, having participated in the first half of [the Seminar] you decide that particular session is not right for you, simply notify a designated RRI official, in writing at the program and turn in your notebook, name badge, and course materials - we will fully refund your tuition for that session of Master University." (Contract P6.) The refund clause thus outlined specific conditions Plaintiffs must have fulfilled before Defendant would provide Plaintiffs a refund. It is well established that

"parties to a contract are at liberty to agree on one or more conditions precedent upon which their liability will depend. A condition precedent has been defined as a fact or event occurring subsequently to the making of a valid contract and which must exist or occur before there is a right to immediate performance, before there is a breach of contract duty or before the usual judicial remedies are available."

_Watson v. City of Salem_, 934 F.Supp 643, 660 (D.N.J. 1995) [*11] (internal citations omitted). _Accord NGV Gaming Ltd. v. Upstream Point Molate, LLC_, 355 F.Supp.2d 1061, 1064-65 (N.D.Cal 2005).

Plaintiffs do not contend that they met the conditions precedent for a refund under the Contract. Specifically, they do not claim to have either turned in their conference materials and badge, or to have requested a refund in writing at the Seminar; indeed, it appears they waited three months to request a refund. (Compl. at 6, 21.) Having failed to meet the precedent conditions, Defendant had no obligation to provide Plaintiffs' refund; therefore Defendant's failure to provide such refund did not constitute a breach.

Likewise, absent any breach by Defendants, Plaintiffs are not entitled to reimbursement for time spent at the Seminar. Indeed, the Contract clearly set forth that, even if a refund is sought, Seminar participants would receive "no reimbursement for . . . transportation/ accommodation costs or for any other costs" Plaintiffs may have incurred. (Contract P6.) Therefore, absent any breach, the Contract precludes Plaintiffs' plea they be reimbursed for time spent at the Seminar. As no breach occurred, this claim must be dismissed.

[*12] **(ii) Plaintiffs' Claims for Intentional Infliction of Emotional Distress and Other Forms of Relief are Unfounded** .

Plaintiffs' claim to have suffered "severe mental agony" as a result of their early departure from the Seminar has no basis in law. Construing the Complaint liberally, the Court interprets these allegations to most closely resemble a claim for intentional infliction of emotional distress as a result of Defendants' alleged

breach. Under New Jersey law, a plaintiff may recover for emotional distress damages resulting from a breach of contract where the breach was "both intentional and outrageous and proximately cause[d] severe, foreseeable emotional distress." _Zawadowicz v. CVS Corp._, 99 F. Supp. 2d 518, 540-41 (D.N.J. 2000). [7]

> 7    California law does not generally allow recovery for emotional distress as a result of contractual breach unless the express purpose of the contract was the mental or emotional well being of one of the parties. _Averbach v. Vnescheconombank_, 280 F.Supp.2d 945, 960 n.7 (N.D.Cal. 2003).

[*13] As explained above, no breach occurred upon which Plaintiffs' emotional distress claim might rest. However, even if such a breach existed, Plaintiffs have demonstrated no evidence whatsoever of "intentional and outrageous" behavior on the part of Defendant. In contrast, the Complaint demonstrates that Defendant made certain accommodations to Plaintiffs' request to sit together. (Compl. at 4-6.) Moreover, Plaintiffs chose to leave the Seminar of their own accord, with no urging by Defendant. (_Id._ at 5-6.) Therefore, any distress they may have had at missing part of the Seminar was a result of Plaintiffs' own actions.

Furthermore, Plaintiffs fail to demonstrate, nor can the Court construe from the pleadings, any valid claim or legal theory related to Count Four's supposed mental programming by Defendant, or the various pleas in Counts Seven through Twelve, upon which relief might be granted.

**(iii) Plaintiffs' Claims for Litigation Related Injuries and Expenses Must be Denied**

It is well settled New Jersey and California law that Plaintiffs cannot ordinarily recover for injuries brought on or enhanced by the litigation process. _See Blakey v. Continental Airlines, Inc._, 992 F.Supp. 731, 736 n.3 (D.N.J. 1998); [*14] _MacCharles v. Bilson_, 186 Cal.App.3d 954, 957-58, 231 Cal. Rptr. 155 (Cal. Ct. App. 1986). Likewise, absent a court rule or an express contractual provision, a party may not recover litigation expenses, such as attorney's fees, in an action for damages. _State Dept. of Envtl. Prot. v. Ventron Corp._, 94 N.J. 473, 468 A.2d 150, 166 (N.J. 1983); _MacCharles_, 186 Cal.App.3d at 957-58. As there was no such express contractual provision in the Contract, Plaintiffs' claims

for injuries and expenses related to the litigation process cannot survive this motion to dismiss.

## CONCLUSION

In summary, Plaintiffs have failed to show any claim for breach of the Contract by Defendant. Likewise, Plaintiffs' claims for intentional infliction of emotional distress, negative programming, and other forms of relief are without merit. Finally, Plaintiffs have not demonstrated any basis upon which to recover for physical and monetary costs associated with their pursuing this litigation. Therefore, and for the reasons outlined above, Defendant's motion to dismiss must be **GRANTED,** and Plaintiffs' Complaint will be **DISMISSED** in its entirety.

An appropriate Order accompanies [*15] this Letter Opinion.

s/ **William J. Martini, U.S.D.J.**

## ORDER

For the reasons set forth in the accompanying Letter Opinion, and for good cause shown,

**IT IS** on this    day of March 2006, hereby

**ORDERED** that Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is **GRANTED;** and it is further

**ORDERED** that Plaintiff's complaint is **DISMISSED** in its entirety.

s/ **William J. Martini, U.S.D.J.**

# **TAB 7**

LEXSEE



Cited
As of: Jun 20, 2007

JAMES MOORE, Plaintiff, v. THE JOHN S. TILLEY LADDERS COMPANY,
INC., Defendant and Third Party Plaintiff, v. ANTHONY COPPOLLA, SR., and
COMMERCIAL TRANSPORT, INC., and CHARLES EVANS, Third Party
Defendants.

NO. 92-5902

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

1993 U.S. Dist. LEXIS 2300

February 23, 1993, Decided
February 24, 1993, Filed; February 25, 1993, Entered

**DISPOSITION:** [*1] The motion will be granted and
the case will be dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant ladder
manufacturer filed a motion to dismiss or, alternatively,
to stay plaintiff victim's action to recover for personal
injuries sustained when he fell while working on one of
the manufacturer's ladders. The manufacturer argued that
the victim's action should have been dismissed or stayed
pending the outcome of two parallel state court
proceedings the victim filed in connection with his
injuries.

**OVERVIEW:** The victim claimed that the federal suit
should not have been stayed because it was distinct from
the state actions. After a hearing, the court granted the
manufacturer's motion and dismissed the action.
Abstention was warranted if the manufacturer proved the
existence of exceptional circumstances to justify
abstention, including the fact that the state and federal
actions were parallel. The manufacturer met that burden
where it was joined as a defendant to the victim's first
state action, precedent established that additional

defendants were subject to all claims of the parties
involved, and the first state action alleged claims
identical to those of the federal suit. The federal suit was
also parallel to the second state action because the actions
presented identical issues and involved identical parties.
Thus, the court held that abstaining would avoid
duplicative efforts and inconsistent adjudications. Based
on its review of additional factors favoring abstention, the
court held that no purpose would be served by
entertaining the federal suit because the identical state
law issues had been pending for one year in an action that
would more comprehensively dispose of all issues.

**OUTCOME:** The court granted the manufacturer's
motion to dismiss or, alternatively, to stay the victim's
federal action to recover for personal injuries. The court
further dismissed the victim's action with prejudice.

**CORE TERMS:** state action, federal action, abstention,
ladder, joined, strict liability, breach of warranties,
warehouse, weigh, state proceedings, exceptional
circumstances, present case, piecemeal, adequacy, action
pending, state law, rules of decision, cases present,
federal forum, federal case, comprehensively,
substantively, parallelism, state-court, surrender,

avoiding, progress, identical claim, abstaining, trailer

**LexisNexis(R) Headnotes**

*Civil Procedure > Federal & State Interrelationships > Abstention*
*Evidence > Inferences & Presumptions > General Overview*
[HN1]District courts can dismiss or stay certain cases to await the outcome of parallel proceedings in state court. Abstention under the Colorado River Doctrine, however, should not be granted lightly. The task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under Colorado River to justify the surrender of that jurisdiction. The party seeking abstention has the burden of proving the existence of "exceptional circumstances."

*Civil Procedure > Federal & State Interrelationships > Abstention*
[HN2]In deciding whether to stay or dismiss a case, the district court should first determine whether the state and federal actions are indeed parallel; in other words, do the cases present the same issues and parties? While the state and federal actions need not be identical, the United States Court of Appeals for the Third Circuit has held that for Colorado River to apply, the state court must be able to address all claims.

*Civil Procedure > Parties > Joinder > Permissive Joinder*
[HN3]Under Pa. R. Civ. P. 2255(d), all additional defendants become immediately subject to plaintiff's claims just as if plaintiff had originally named them as defendants. An additional defendant is also subject to the allegations in the additional defendants' complaints.

*Civil Procedure > Parties > Joinder > Permissive Joinder*
[HN4]Pa. R. Civ. P. 2255(d) provides that plaintiff shall recover from an additional defendant found liable to him alone or jointly with defendant as though such additional defendant had been joined as a defendant and duly served and the initial pleading of plaintiff had averred such liability.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Federal & State Interrelationships > Abstention*
[HN5]In determining parallelism in deciding whether to stay or dismiss a case, the district court must also look to whether the cases present the same parties. The fact that the state action is more comprehensive works in favor of applying the Colorado River Doctrine. Once it has been established that the cases are parallel, the district court should then balance the disadvantages and advantages of dismissing or staying the federal case, with the balance heavily weighted in favor of the exercise of jurisdiction. The United States Supreme Court has identified six factors the district court should consider in deciding whether to dismiss or stay a case over which it has unquestioned jurisdiction: (1) whether one court has first obtained jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the state and federal courts obtained jurisdiction; (5) the source of law that will provide the rules of decision; and (6) the adequacy of the state court proceedings to protect the parties' rights. The decision to dismiss or stay an action, however, should not rest on a mechanical checklist. The weight to be given to any one factor may vary from case to case, and no one factor is necessarily determinative.

*Civil Procedure > Federal & State Interrelationships > Abstention*
[HN6]The United States Supreme Court has noted that "by far the most important factor" in deciding whether to dismiss a federal action in favor of a state action is the strong federal policy against piecemeal litigation. Analysis of this factor entails inquiry into whether the claims of all parties in interest can satisfactorily be adjudicated in the state-court proceedings.

*Civil Procedure > Federal & State Interrelationships > Abstention*
*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN7]In the context of a district court's decision as to whether to stay a federal action in favor of a state action, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.

*Civil Procedure > Federal & State Interrelationships > Abstention*

[HN8]While the absence of federal issues does not require the surrender of jurisdiction, it does favor abstention where the bulk of the litigation would necessarily revolve around the state-law rights of numerous parties.

**COUNSEL:** For JAMES MOORE, PLAINTIFF: THOMAS J. METTEE, 8515 FRANKFORD AVENUE, PHILADELPHIA, PA 19136.

For THE JOHN S. TILLEY LADDERS CO., INC., DEFENDANT, THIRD-PARTY PLAINTIFF: ARTHUR M. TOENSMEIER, POST & SCHELL, P.C., 1800 J.F.K. BLVD., 19TH FL. PHILA, PA 19103, USA.

For ANTHONY COPPOLLA, SR., COMMERCIAL TRANSPORTATION, INC., THIRD-PARTY DEFENDANTS: CATHERINE S. STRAGGAS, TIMBY, BROWN, & TIMBY, 1818 MARKET STREET, SUITE 3100, PHILA, PA 19103, USA. For CHARLES EVANS, THIRD-PARTY DEFENDANT: MICHAEL J. MC ALLISTER, 216 WEST WASHINGTON SQUARE, PHILA, PA 19106, USA.

**JUDGES:** Reed, Jr.

**OPINION BY:** LOWELL A. REED, JR.

**OPINION**

**MEMORANDUM**

**Reed, J.**

**February 23, 1993**

Currently before me is the motion of defendant The John S. Tilley Ladders Company ("Tilley") to dismiss or, alternatively, to stay this action pending the outcome of parallel state court actions (Document No. 5).

. This Court has jurisdiction over this case pursuant to 28 U.S.C.A. § 1332 (West 1966 & Supp. 1992), as the parties are of diverse citizenship, and the amount in controversy is alleged to be in excess of $ 50,000.

For the reasons discussed [*2] below, the motion will be granted and the case will be dismissed.

**I. FACTUAL BACKGROUND** [1]

1    The facts surrounding the accident are derived from the complaint.

In October, 1990, Anthony Coppolla, Sr. ("Coppolla") acting as an agent of Commercial Transport, Inc. ("CTI"), employed Charles Evans as an independent contractor for the purpose of installing hot asphalt on the roof of a CTI warehouse. Charles Evans, in turn, hired the plaintiff, James Moore ("Moore"), to work on the project.

In order to allow the workers to gain access to the warehouse roof, CTI positioned a trailer against the side of the warehouse and placed a wooden folding ladder atop the trailer and against the warehouse wall. On October 24, 1990, Moore was ascending the ladder when it slipped away from the warehouse wall. Somehow, the falling ladder caused a bucket of hot tar to fall on Moore. As a consequence, Moore sustained severe third-degree burns all over his body.

The ladder was manufactured by Tilley. Moore claims that the ladder was [*3] defective in that it lacked "safety feet." He filed this action on October 12, 1992 seeking damages based on negligence, strict liability and breach of warranties.

Fifteen months prior to filing this action, Moore commenced an action in the Court of Common Pleas of Philadelphia for damages sustained as a result of the same accident (hereinafter referred to as "State Action I"). In that action, Moore sued CTI and Coppolla for negligence. CTI and Coppolla then joined Moulton Ladder & Supply Company ("Moulton") as an additional defendant. Moulton joined Tilley and Phillips Hardware as additional defendants based on the tort theories of negligence, strict liability and breach of warranties. Tilley then joined Charles Evans. [2]

2    In this action, Tilley has joined Coppolla, CTI and Charles Evans as third-party defendants.

On October 23, 1992, several days after Moore filed this federal action against Tilley, Moore filed an identical claim against Tilley and Phillips Hardware in the Court of Common Pleas of Philadelphia [*4] (hereinafter referred to as "State Action II"). [3] In sum, Moore has filed a total of three lawsuits to recover for injuries sustained in the roofing accident -- two in state court and

one in federal court.

> 3    Moore claims he filed State Action II to preserve his direct claim against Tilley in the event that this federal action was dismissed.

Tilley now moves this Court to dismiss plaintiff's complaint or, alternatively, to stay this action pending the outcome of the parallel state court proceedings.

## II. DISCUSSION

### A.

#### Colorado River Abstention

Although federal courts have a "virtually unflagging obligation" to decide all cases within their jurisdiction, the Supreme Court has held that as a matter of "wise judicial administration," [HN1]district courts can dismiss or stay certain cases to await the outcome of parallel proceedings in state court. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). Abstention under the Colorado River Doctrine, [*5] however, should not be granted lightly. Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 14 (1983) (quoting Colorado River, 424 U.S. at 813). The Supreme Court has emphasized that the task is

> not to find some substantial reason for the *exercise* of federal jurisdiction. . . ; rather, the task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under Colorado River to justify the *surrender* of that jurisdiction.

Moses H. Cone, 460 U.S. at 25-26. The party seeking abstention has the burden of proving the existence of "exceptional circumstances." Robinson v. Ruiz, 772 F. Supp. 212, 214 (D. Del. 1991); Southeastern Pennsylvania Transportation Authority v. American Coastal Industries, Inc., 682 F. Supp. 285, 286 (E.D. Pa. 1988).

[HN2]In deciding whether to stay or dismiss a case, the district court should first determine whether the state and federal actions are indeed parallel; in other words, do the cases present the same issues and parties? [*6] Aetna Cas. & Sur. Co. v. Sterner, 700 F. Supp. 252, 256 (E.D. Pa. 1988). While the state and federal actions need

not be identical, the Third Circuit has held that for Colorado River to apply, the state court must be able to address all claims. University of Maryland v. Peat Marwick Main & Co., 923 F.2d 265, 276 & n.16 (3d Cir. 1991); see also Fidelity Federal Bank v. Larken Motel Co., 764 F. Supp. 1014, 1017 & n.6 (E.D. Pa. 1991).

Moore contends that the state and federal actions are not parallel because in State Action I, Moore has no direct claim against Tilley. Tilley, on the other hand, points out that in State Action II, Moore filed the identical claims against Tilley only days after filing the complaint in this federal action.

It is clear that State Action II and the present federal action are parallel in that they present the same issues and parties. Indeed, Moore's complaint in this action is substantively identical to his complaint in State Action II. Furthermore, although not as immediately evident, State Action I is also parallel to this federal action.

In State Action I, Moulton, [*7] an additional defendant, joined Tilley as an additional defendant based on negligence, strict liability and breach of warranties. [HN3]Under Pa.R.C.P. 2255(d), all additional defendants become immediately subject to the plaintiff's claims just as if the plaintiff had originally named them as defendants. Sheriff v. Eisele, 381 Pa. 33, 112 A.2d 165, 166 (Pa. 1955). [4] Therefore, Tilley is subject to Moore's initial claims against CTI and Coppolla in State Action I. Further, the Superior Court of Pennsylvania has held that "an additional defendant is [also] subject . . . *to the allegations in the additional [defendants' complaints]*." Pushnik v. Winky's Drive In Restaurants, Inc., 242 Pa. Super. 323, 363 A.2d 1291, 1298 (Pa. 1976) (emphasis added); see also Atlanta International Ins. Co. v. School Dist. of Philadelphia, 786 F.2d 136, 140 & 141 n.3 (3d Cir. 1986). Therefore, Moulton's complaint against Tilley in State Action I causes Moore's original pleading to be construed to contain the allegations made by Moulton against Tilley for negligence, strict liability and breach of warranties. In other words, contrary to Moore's [*8] contention, Moore does have a direct action against Tilley in State Action I for the same claims alleged in this federal action -- namely negligence, strict liability and breach of warranties. [5]

> 4   [HN4]Pa.R.C.P. 2255(d) provides:
>
> > The plaintiff shall recover from an additional defendant found

liable to him alone or jointly with the defendant as though such additional defendant had been joined as a defendant and duly served and the initial pleading of the plaintiff had averred such liability.

5    I also note that Moore's complaint in State Action II and in the present federal action is taken virtually verbatim from Moulton's complaint against Tilley in State Action I.

[HN5]In determining parallelism, the district court must also look to whether the cases present the same parties. All parties to the present case are also parties to State Action I, while all parties to State Action I are not parties to the present case. 6 Rather than counsel against finding the actions parallel, however, the fact that the state [*9] action is more comprehensive works in favor of applying the Colorado River Doctrine. See Aetna Cas. & Sur. Co., 700 F. Supp. at 256; see also Schneider Nat. Carriers, Inc. v. Carr, 903 F.2d 1154, 1156 (7th Cir. 1990) ("The existence of additional parties in one suit does not of itself destroy parallelism."). I conclude, therefore, that State Action I and this federal action present the same issues and parties and, therefore, are parallel.

6    State Action I includes two additional defendants -- Moulton and Phillips Hardware.

Once it has been established that the cases are parallel, the district court should then balance the disadvantages and advantages of dismissing or staying the federal case, "with the balance heavily weighted in favor of the exercise of jurisdiction." Moses H. Cone, 460 U.S. at 16. The Supreme Court has identified six factors the district court should consider in deciding whether to dismiss or stay [*10] a case over which it has unquestioned jurisdiction:

(1) whether one court has first obtained jurisdiction over property;

(2) the inconvenience of the federal

forum;

(3) the desirability of avoiding piecemeal litigation;

(4) the order in which the state and federal courts obtained jurisdiction;

(5) the source of law that will provide the rules of decision; and

(6) the adequacy of the state court proceedings to protect the parties' rights.

Moses H. Cone, 460 U.S. at 23 & 26; Colorado River, 424 U.S. at 818; see also Ingersoll-Rand Financial Corp. v. Callison, 844 F.2d 133 (3d Cir. 1988). The decision to dismiss or stay an action, however, should not rest on a mechanical checklist. Moses H. Cone, 460 U.S. at 16. Indeed, the weight to be given to any one factor may vary from case to case, id., and no one factor is necessarily determinative. Id. at 15; see also Colorado River, 424 U.S. at 818-19.

As to the first and second factors, Tilley does not argue that [*11] jurisdiction over property is involved in the present case, nor does it argue that the federal forum is more inconvenient than the state forum. Tilley does contend, however, that the remaining four factors all weigh in favor of abstention.

*Policy of Avoiding Piecemeal Litigation*

[HN6]The Supreme Court has noted that "by far the most important factor" in deciding whether to dismiss a federal action in favor of a state action is the strong federal

policy against piecemeal litigation. Moses H. Cone, 460 U.S. at 16. Analysis of this factor entails inquiry into whether the claims of all parties in interest can satisfactorily be adjudicated in the state-court proceedings. Robinson, 772 F. Supp. at 215.

Here, it is clear that the same factual and legal determinations necessary in the federal action are also necessary in the state actions. However, additional issues may be resolved in the state proceedings because State Action I involves additional defendants. See Lumen Construction, Inc. v. Brant Construction Co., 780 F.2d 691, 695 (7th Cir. 1985) (district court dismisses case pursuant to [*12] Colorado River where, among other factors, the state case is a "good deal more comprehensive than the federal case."). Also, because both courts would be deciding several identical issues, inconsistent adjudications are possible.

In sum, the state actions would most comprehensively address all the issues in the case, including the issues presented in this federal action. Abstaining in favor of the state proceedings will, therefore, avoid duplicative efforts and inconsistent adjudications. I find that this factor weighs heavily in favor of abstention.

### The Order in Which the State and Federal Courts Obtained Jurisdiction

Tilley points out that Moore filed State Action I fifteen months before filing the federal action. Moore, on the other hand, argues that because State Action II was filed several days after the federal action, this factor is a wash. The Supreme Court has held that [HN7]"priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." Moses H. Cone, 460 U.S. at 21.

According to Tilley, there has been substantial discovery in State Action [*13] I during the fifteen months prior to the filing of this action. Moore does not dispute that in State Action I, Tilley, CTI and Coppolla have served Interrogatories and Requests for Production of Documents which have been answered by Moore. In addition, the parties have already taken the depositions of Moore, Coppolla, and two CTI employees. I find, therefore, that the order in which the courts obtained jurisdiction and the amount of progress already made in

State Action I weigh in favor of abstention.

### The Source of Law That Will Provide the Rules of Decision

[HN8]While the "absence of federal issues does not require the surrender of jurisdiction, it does favor abstention where 'the bulk of the litigation would necessarily revolve around the state-law . . . rights of [numerous] parties.'" General Reinsurance Corp. v. CIBA-GEIGY Corp., 853 F.2d 78, 82 (2d Cir. 1988) (quoting Moses H. Cone, 460 U.S. at 23 n.28). In this case, the substantive law to be applied in both the federal and state actions is exclusively Pennsylvania law. I find, therefore, that this factor also weighs in favor of abstention. See Aetna [*14] Cas. & Sur. Co., 700 F. Supp. at 257 ("Where all other factors are equal, our respect for notions of comity and federalism tip the balance in favor of deferring to a state court for resolution of state law issues.").

### The Adequacy of the State Court Proceedings to Protect the Parties' Rights

Finally, this last factor, the adequacy of the state forum to protect the rights of the parties, also favors abstention. The Court of Common Pleas of Philadelphia County and the state appellate courts, applying a well-developed body of Pennsylvania products liability and tort law, are fully capable of protecting the parties substantively and procedurally, especially where only state claims are raised.

### B. Conclusion

After carefully balancing the factors discussed above, I conclude that Tilley has met its burden of showing that exceptional circumstances do exist which allow dismissal of this action pursuant to Colorado River. It is clear that entertaining this suit in federal court would serve no useful purpose as the identical state law issues have been pending before a state court for over a year in a case that would more comprehensively [*15] dispose of all the issues.

### C. Dismissal or Stay

I find that dismissal is in the best interests of wise judicial administration because no issues will remain for resolution after the state proceedings end. See

1993 U.S. Dist. LEXIS 2300, *15

Ingersoll-Rand, 844 F.2d at 138 ("dismissal under Colorado River contemplates that parallel state-court litigation will completely resolve the issues between the parties and that the federal court will have nothing further to do with the case.").

## III. CONCLUSION

For the reasons discussed above, Tilley's motion will be granted and this case will be dismissed without prejudice.

An appropriate Order follows.

ORDER

**AND NOW**, this 23rd day of February, 1993, upon consideration of the motion of defendant The John S. Tilley Ladders Company, Inc. to dismiss or, alternatively, to stay this action pending the outcome of parallel state court actions (Document No. 5), and the response of the plaintiff thereto, for the reasons stated in the attached memorandum, and having found that abstaining from exercising jurisdiction and dismissing this case in favor of parallel state court proceedings is in the interest of wise judicial [*16] administration, it is hereby **ORDERED** that the motion to dismiss is **GRANTED**, and the complaint is **DISMISSED** without prejudice.

**IT IS FURTHER ORDERED** that because I have abstained from exercising the jurisdiction of this Court, I do not decide the motion of third-party defendant Charles Evans to dismiss the third-party complaint (Document No. 12).

This is a final adjudication.

LOWELL A. REED, JR., J.

# **TAB 8**

LEXSEE



Positive
As of: Jun 20, 2007

DEREK J. OATWAY, Plaintiff, v. AMERICAN INT'L GROUP, INC., Plan
Administrator of Stock Option Plan, AMERICAN INT'L GROUP, INC., a Delaware
Corporation, and 1987 EMPLOYEE STOCK OPTION PLAN, an Employee
Welfare Benefit Plan, Defendants.

C.A. No. 01-033-GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2002 U.S. Dist. LEXIS 1771; 27 Employee Benefits Cas. (BNA) 2404

February 5, 2002, Decided

**SUBSEQUENT HISTORY:** Affirmed by Oatway v.
Am. Int'l Group, 2003 U.S. App. LEXIS 7051 (3d Cir.
Del., Apr. 14, 2003)

**DISPOSITION:**    [*1] Defendants' Motion to Dismiss
GRANTED; and Plaintiff's Motion for Summary
Judgment declared MOOT.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants moved to
dismiss plaintiff's amended complaint on the ground that
the complaint failed to state a claim under § 502(a)(1)(B)
of the Employee Retirement Income Security Act.
Plaintiff moved for summary judgment.

**OVERVIEW:** Plaintiff was given stock options as
performance incentives. The stock options were good for
10 years. Plaintiff resigned and was told that the stock
options had to be exercised by a certain date, well before
the 10 year period. Plaintiff failed to exercise the stock
option by the new deadline, but attempted to exercise
within the 10 year period. However, defendants declined
to honor the stock option, so plaintiff brought suit under §
502(a)(1)(B) of the Employee Retirement Income
Security Act. Defendants moved to dismiss and plaintiff
moved for summary judgment. The court granted

defendants' motion to dismiss because under the plain
language of the plan, the purpose of the stock plan was
not to provide severance, retirement, death or disability
benefits. Instead, its purpose was to provide a financial
incentive for plaintiff to remain with defendants and to
improve his work performance. Furthermore, the express
purpose of the stock plan was a bonus plan. While
plaintiff may have been individually permitted to exercise
his options subsequent to retirement, the primary purpose
of the stock plan was to provide additional benefits
during the course of employment.

**OUTCOME:** Defendants' motion to dismiss was
granted. Plaintiff's motion for summary judgment was
declared moot.

**CORE TERMS:** benefit plan, stock options, retirement,
disability, pension, stock, state law claims, retirement
income, fiduciary duties, summary judgment, purpose of
providing, administrator, subject matter jurisdiction,
pension plan, payment of benefits, termination, training,
bonus, subsidiary, breach of contract, termination of
employment, entitled to benefits, statutory definition,
express purpose, covered employment, method of
calculating, supplemental jurisdiction, systematically,
unemployment, incidentally

Case 1:06-cv-00785-GMS    Document 39-2    Filed 06/20/2007    Page 17 of 36

2002 U.S. Dist. LEXIS 1771, *1; 27 Employee Benefits Cas. (BNA) 2404

LexisNexis(R) Headnotes

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1]A motion to dismiss pursuant to the provisions of Fed. R. Civ. P. 12(b)(6) should not be granted unless, accepting all allegations in the complaint as true and viewing them in a light most favorable to the plaintiff, the court rules that the plaintiff is not entitled to relief as a matter of law. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Federal Jurisdiction & Removal*
[HN2]The Employee Retirement Income Security Act (ERISA) gives federal courts subject matter jurisdiction over claims brought pursuant to 29 U.S.C.S. § 1132(a)(1)(B). This section authorizes a cause of action for benefits due under an employee benefit plan. Because an ERISA plan is necessary before ERISA's provisions apply, the court must first determine whether an employer's plan is, in fact, an ERISA employee welfare benefit plan. If the answer to this threshold question is no, then the court may dismiss the plaintiff's claims that he is entitled to benefits under ERISA.

*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > General Overview*
[HN3]See 29 U.S.C.S. § 1002(1).

*Labor & Employment Law > Employment Relationships > At-Will Employment > Employees*

*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN4] 29 U.S.C.S. § 186(c) includes within the definition of "employee welfare plan" those plans which provide holiday and severance benefits, and benefits which are similar. 29 C.F.R. § 2510.3-1(a)(3).

*Labor & Employment Law > Disability & Unemployment Insurance > Disability Benefits > General Overview*
*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN5]To constitute an employee welfare plan, a plan must be designed specifically to provide employees with medical, unemployment, disability, death, vacation, or other specified benefits or to provide income following retirement in order to come within the purview of the Employee Retirement Income Security Act. The statutory definition does not embrace plans that may incidentally result in payment of benefits after retirement, death or disability. Thus, merely because a plan may in some circumstances continue to pay proceeds after an employee's death or disability does not make it a welfare benefit plan.

*Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN6]The Employee Retirement Income Security Act applies only to an employee welfare benefit plan or to an employee pension benefit plan or a plan which is both.

*Labor & Employment Law > Disability & Unemployment Insurance > Disability Benefits > General Overview*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN7]Plans that might incidentally result in payment of benefits after retirement, death or disability only fall

Case 1:06-cv-00785-GMS    Document 39-2    Filed 06/20/2007    Page 18 of 36

2002 U.S. Dist. LEXIS 1771, *1; 27 Employee Benefits Cas. (BNA) 2404

under the Employee Retirement Income Security Act if they were established or maintained for the express purpose of doing so.

*Pensions & Benefits Law > Employee Benefit Plans > Pension Benefit Plans*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN8]The Employee Retirement Income Security Act pension plans include any plan established or maintained by an employer that, by its express terms results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. 29 U.S.C.S. § 1002(2)(A)(ii).

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Qualified Domestic Relations Orders*
[HN9]The Employee Retirement Income Security Act pension plans exclude bonuses for work performed, unless such bonuses are systematically deferred to termination of covered employment or beyond, or so as to provide retirement income to employees. 29 C.F.R. § 2510.3-2(c).

**COUNSEL:** For DEREK J. OATWAY, plaintiff: Richard R. Wier, Jr., Law Offices of Richard R. Wier, Jr., Wilmington, DE.

For AMERICAN INTERNATIONAL GROUP, INC., AMERICAN INTERNATIONAL GROUP, INC., 1987 EMPLOYEE STOCK OPTION PLAN, defendants: Regina A. Iorii, Stephen E. Jenkins, Carolyn Shelly Hake, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM AND ORDER**

## I. INTRODUCTION

On January 17, 2001, the plaintiff, Derek J. Oatway ("Oatway"), filed a complaint in the above-captioned action. He amended his complaint on February 13, 2001. In his amended complaint, he alleges that American International Group, Inc. ("AIG") wrongfully denied him benefits under the 1987 Employee Stock Option Plan (the "Plan"). He now seeks to recover those benefits pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1132(a)(1)(B). He further claims that AIG, as the Plan administrator, breached its fiduciary duties by failing to [*2] properly administer the Plan in violation of 29 U.S.C. § 1133. Finally, Oatway asserts state law claims against AIG based on breach of contract and estoppel.

Presently before the court are the defendants' motion to dismiss Oatway's amended complaint on the grounds that it fails to state a claim under ERISA and Oatway's motion for summary judgment. For the following reasons, the court will grant the defendants' motion to dismiss.

## II. BACKGROUND

Oatway was employed by AIG until approximately August 26, 1992. On various occasions from 1983 through 1990, AIG and Oatway entered into written Incentive Stock Option Agreements (the "Agreements"). These Agreements granted Oatway the right to purchase certain numbers of shares of AIG common stock at set exercise prices per share. Specifically, on January 18, 1990, AIG granted Oatway an Incentive Stock Option to purchase 200 shares at $ 96 per share. On October 11, 1990, AIG granted Oatway an Incentive Stock Option to purchase 200 shares at $ 58.625 per share. [1] These options were granted under the AIG Plan in consideration of Oatway's performance as an employee of AIG.

> 1    Oatway refers to the terms of the January 18, 1990 and October 11, 1990 Incentive Stock Option Agreements and the 1987 Employee Stock Option Plan throughout his Amended Complaint. He has therefore incorporated these documents by reference into his pleading. The court may rely on such documents in deciding a motion to dismiss. *See In re Rockefeller Ctr. Properties, Inc. Securities Litig., 184 F.3d 280, 287 (3d Cir. 1999)* (noting that, on a motion to dismiss, "a court can consider a document integral to or explicitly

2002 U.S. Dist. LEXIS 1771, *2; 27 Employee Benefits Cas. (BNA) 2404

relied upon in the complaint."). Neither party objects to the court relying on these documents.

[*3] AIG's Plan provides selected employees of AIG, including its parent or subsidiary corporations, with the options to purchase shares of AIG common stock. The purpose of the Plan is:

> To advance the interests of American International Group, Inc. ("AIG") by providing certain of the key employees of AIG and of any parent or subsidiary corporation of AIG, upon whose judgment, initiative and efforts the successful conduct of the business of AIG largely depends, with an additional incentive to continue their efforts on behalf of such corporations, as well as to attract to such corporations people of training, experience and ability.

Options granted under the Plan may normally be exercised beginning one year after they are granted, in set installments. AIG's board of directors determine the amount of the installments at the time of the grant. To the extent that an optionee does not purchase the maximum number of shares permitted under an option in any one year, he or she may purchase such shares in a subsequent year during the term of the option. Each of the option grants at issue provided that it expired ten years from the date of its issuance. Each of the option grants further [*4] specified that, in the event of termination of employment prior to the normal retirement age, the option must be exercised within three months after such termination.

On or about August 26, 1992, Oatway retired from AIG. Since he retired prior to the normal retirement age, AIG advised him that he was required to exercise all his remaining stock options by November 1992. Oatway alleges that after he complained about being denied the ten-year period to exercise his options, AIG agreed to allow him to exercise the options over the ten-year period, rather than within three months of his retirement.

On or about January 25, 2000, Oatway discovered that the option exercise date under the January 18, 1990 Incentive Stock Agreement had already expired. He claims that he immediately notified AIG via facsimile of his "intention and desire" to exercise this grant. AIG refused to allow him to do so.

On October 1, 2000, Oatway finally "exercised" the options under both the January 18, 1990 and October 11, 1990 Incentive Stock Option Agreements, but AIG refused to accept either exercise. He asserts that he appealed the denial to AIG as the "Plan Administrator." AIG rejected his appeal.

Oatway [*5] subsequently filed this complaint on January 17, 2001. On March 13, 2001, the defendants filed a motion to dismiss Oatway's Amended Complaint. On April 10, 2001, Oatway filed a motion for summary judgment.

## III. STANDARD OF REVIEW: MOTION TO DISMISS

[HN1]A motion to dismiss pursuant to the provisions of Rule 12(b)(6) should not be granted unless, accepting all allegations in the complaint as true and viewing them in a light most favorable to the plaintiff, the court rules that the plaintiff is not entitled to relief as a matter of law. *In re Fruehauf Trailer Corp., 250 B.R. 168, 183 (D. Del 2000)* (citing *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997); see also Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)* ("A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."). "The issue is not whether a plaintiff will ultimately prevail but whether [*6] the claimant is entitled to offer evidence to support the claims." *In re Burlington, 114 F.3d at 1420.*

## IV. DISCUSSION

[HN2]ERISA gives federal courts subject matter jurisdiction over claims brought pursuant to 29 U.S.C. § 1132(a)(1)(B). This section authorizes a cause of action for benefits due under an employee benefit plan. *See 29 U.S.C. § 1132(a)(1)(B).* Because an ERISA "plan" is necessary before ERISA's provisions apply, the court must first determine whether AIG's 1987 Plan is, in fact, an ERISA "employee welfare benefit plan." *See Long v. Excel Telecommunications Corp., 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808,* at *2 (N.D. Tex. Oct. 18, 2000). If the answer to this threshold question is no, then the court may dismiss the plaintiff's claims that he is entitled to benefits under ERISA. *See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried*

Page 4

Case 1:06-cv-00785-GMS    Document 39-2    Filed 06/20/2007    Page 20 of 36

2002 U.S. Dist. LEXIS 1771, *6; 27 Employee Benefits Cas. (BNA) 2404

*Employees,* 974 F.2d 391, 395 (3d Cir. 1992) (noting that a plaintiff's failure to prove the existence of an employee benefit plan, though it results in the dismissal of the claim, does not deprive the district court of subject matter jurisdiction [*7] to enter a judgment on the merits.")

A. Is the 1987 Plan an Employee Welfare Benefit Plan Under ERISA?

Oatway contends that the 1987 Plan is an "employee welfare benefit plan" under which he is entitled to benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). The court disagrees.

[HN3]ERISA defines an "employee welfare benefit plan" as:

> Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care, or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions). [2]

2   [HN4]Section 186(c) includes within the definition of "employee welfare plan" those plans which provide holiday and severance benefits, and benefits which are similar. *See* 29 C.F.R. § 2510.3-1(a)(3).

[*8]   *See* 29 U.S.C. § 1002(1).

[HN5]To constitute an employee welfare plan, a plan "must be designed specifically to provide employees with medical, unemployment, disability, death, vacation, or other specified benefits or to provide income following

retirement in order to come within the purview of ERISA." *Long,* 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808, at *4; *see also* 29 U.S.C. § 1002(1) (requiring that an ERISA plan be "established or maintained . . . for the purpose of providing" the benefits listed in the statute.). The statutory definition does not embrace plans that may incidentally result in payment of benefits after retirement, death or disability. *See Long,* 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808, at *2; *Hagel v. United Land Co.,* 759 F. Supp. 1199, 1203 (E.D. Va. 1991). Thus, merely because a plan "may in some circumstances continue to pay . . . proceeds after an employee's death or disability does not make it a welfare benefit plan." *Murphy v. Inexco Oil Co.,* 611 F.2d 570, 574 (5th Cir. 1980).

Furthermore, these holdings are consistent with congressional findings and the declaration of policy that supported [*9] ERISA's enactment. In enacting ERISA, Congress did not intend "to control every aspect of the employer-employee relationship or every promise made to employees." *Murphy,* 611 F.2d at 574. Rather, Congress "intended to protect employees with many years of service who were losing anticipated retirement benefits because of inadequate vesting provisions, lack of funding, or other problems." *Long,* 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808, *2. Because Congress "sought only to deal with those types of plans that had created the problems it sought to remedy . . . by its terms, [HN6]ERISA applies only to "an employee welfare benefit plan or to an employee pension benefit plan or a plan which is both." *See Murphy,* 611 F.2d at 574 (quoting 29 U.S.C. § 1002(3)).

Although the Third Circuit has not addressed the issue of whether an incentive stock option plan is an employee benefit plan within the meaning of ERISA, other courts that have considered the question have uniformly held that it is not. *See Long,* 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808, at *3-4; *Hahn v. National Westminster Bank, N.A.,* 99 F. Supp. 2d 275, 279-280 (E.D.N.Y. 2000); [*10] *Goodrich v. CML Fiberoptics, Inc.,* 990 F. Supp. 48, 49-50 (D. Mass. 1998). In *Long,* a former employee claimed that his employer terminated him for the purpose of depriving him of benefits under the company's stock option plan in violation of ERISA. *Long,* 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808, at *2. The court granted the former employer's motion for summary judgment, holding that the company's stock plan was not a benefit

Case 1:06-cv-00785-GMS    Document 39-2    Filed 06/20/2007    Page 21 of 36

2002 U.S. Dist. LEXIS 1771, *10; 27 Employee Benefits Cas. (BNA) 2404

plan under ERISA. *See* 2000 U.S. Dist. LEXIS 15479, [WL] at *3-4. In its holding, the court examined the purpose of the company's stock option plan, which was:

> to provide a means by which selected Employees of and Consultants to the Company and its Affiliates may be given an opportunity to purchase stock of the Company. The Company, by means of the Plan, seeks to retain the services of the persons who are now Employees of or Consultants to the Company and its Affiliates, to secure and retain the services of new Employees and Consultants, and to provide incentives for such persons to exert maximum efforts for the success of the Company and its Affiliates.

*See* 2000 U.S. Dist. LEXIS 15479, *9 [WL] at *3. The court further noted that, "nowhere does [the company's] Stock Option Plan indicate that its [*11] purpose is to defer compensation. In fact, the plan itself indicated that it was intended to operate as an incentive and bonus program. *See id.*

Finally, the Department of Labor, which is the agency charged with interpreting and enforcing ERISA, has also recognized that stock option plans are not necessarily employee welfare benefit plans. *See U.S. Dep't of Labor Opinion Letter* 79-80 A, 1979 WL 7016 (Nov. 13, 1979) (stating that stock option plans were not employee welfare benefit plans within the meaning of ERISA § 3(1) because they were not established or maintained for the purpose of providing any of the benefits listed in § 3(1) or 302(c) of the Labor Management Relations Act, 1947).

The court finds that the Plan at issue here does not meet the statutory definition of an employee welfare plan. The Plan was not created for the purpose of providing retirement income. Rather, the stated purpose of the 1987 Plan is:

> to advance the interests of American International Group, Inc. ("AIG") by providing certain of the key employees of AIG and of any parent or subsidiary corporation of AIG, upon whose judgment, initiative and efforts the successful conduct [*12] of the business

of AIG largely depends, with an additional incentive to continue their efforts on behalf of such corporations, as well as to attract to such corporations people of training, experience and ability.

Therefore, under the plain language of the Plan, its purpose is not to provide severance, retirement, death or disability benefits. Instead, its purpose is to provide a financial incentive for employees to remain with AIG and to improve their performance at AIG. Although the Plan provided that upon retirement, death, or disability, the option could still be exercised, subject to time restrictions, any payment of benefits at that time were merely incidental. Furthermore, it is clear that "[HN7]plans that might incidentally result in payment of benefits after retirement, death or disability . . . only fall under ERISA if they were established or maintained for the express purpose of doing so." *Long,* 2000 U.S. Dist. LEXIS 15479, 2000 WL 1562808, at *2 (citing *Murphy,* 611 F.2d at 574-75).

Accordingly, because the Plan itself is clearly an incentive plan, it is not an employee welfare benefit plan within the meaning of ERISA.

## B. Is the 1987 Plan an Employee Pension Benefit [*13] Plan Under ERISA?

Oatway suggests that the Plan "can also be characterized under ERISA as a pension plan or an employee pension benefit plan." [HN8]ERISA pension plans include any plan established or maintained by an employer that, by its express terms "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan." 29 U.S.C. § 1002(2)(A)(ii).

The Department of Labor has interpreted [HN9]ERISA pension plans to exclude bonuses for work performed, unless such bonuses are "systematically deferred to termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c). By the express purpose of the Plan itself, it is clear that this is a bonus plan. Although Oatway alleges that his ability to exercise his options continued after his retirement from AIG, this

2002 U.S. Dist. LEXIS 1771, *13; 27 Employee Benefits Cas. (BNA) 2404

does not transform the bonus plan into "one whose payments are systematically deferred to the termination [*14] of employment or one whose purpose is to provide retirement income." See *Hahn v. National Westminster Bank, N.A.*, 99 F. Supp. 2d 275, 276 (E.D.N.Y. 2000). Rather, this is a plan were "post-retirement payments [are] only incidental to the goal of providing current compensation." See *Hahn*, 99 F. Supp. 2d at 279. Thus, the court recognizes that, while Oatway may have been individually permitted to exercise his options subsequent to retirement, the primary purpose of the Plan as a whole was to provide additional benefits to employees during the course of their employment. See *Laflan v. Electronic Data Systems Corp.*, 856 F. Supp. 339, 345 (E.D. Mich. 1994).

Accordingly, the court finds that the Plan at issue here is not an employee pension benefit plan within the meaning of ERISA.

## C. Does the Plan Administrator Owe Oatway a Fiduciary Duty Under ERISA?

Oatway next alleges that AIG, as the Plan's administrator, breached its fiduciary duties under ERISA § 503. See 29 U.S.C. § 1133. The basis for this claim is that AIG failed to set forth adequate factual reasons why it denied his benefits appeal. Oatway [*15] further claims that AIG failed to advise him of what further information he needed to meet options pay status requirements under the Plan.

As the court discussed at some length above, the Plan does not fall within the definition of a qualified ERISA plan. Therefore, the court finds that AIG could not owe Oatway any ERISA fiduciary duties under the

Plan.

## D. State Law Claims

Oatway next asserts state law claims for breach of contract and estoppel. He notes that, "if the court were to determine that there is an ERISA plan, then this court's supplemental jurisdiction over Count III is appropriate." However, because this Plan is not covered by ERISA, there is no federal question jurisdiction under ERISA. Moreover, the court has merely focused on the jurisdictional issues presented by these claims, and has not devoted any resources to the merits of the claims. See *Voege v. The Magnavox, Co.*, 439 F. Supp. 935, 943 (D. Del. 1977). The court, therefore, declines to exercise supplemental jurisdiction over Oatway's remaining state law claims. See 28 U.S.C. § 1367(c)(3). Accordingly, the court will dismiss them for lack of subject matter jurisdiction.

## [*16] V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

> 1. The Defendants' Motion to Dismiss (D.I. 7) is GRANTED; and

> 2. Oatway's Motion for Summary Judgment (D.I. 10) is declared MOOT.

Date: February 5, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# TAB 9

LEXSEE



Cited
As of: Jun 20, 2007

PURSUIT ATHLETIC FOOTWEAR, INC., Plaintiff, v. SAVE POWER LIMITED,
EXTRAVEST HOLDINGS LIMITED, SILVER EAGLE HOLDINGS LIMITED,
and THE GRANDE HOLDINGS LIMITED, Defendants.

Civil Action No. 96-40 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1996 U.S. Dist. LEXIS 8158

June 7, 1996, Decided

**NOTICE:**    [*1] NOT FOR PUBLICATION

**DISPOSITION:**    Defendants' Motion to Transfer will
be granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, creditor,
collection agent, owner of creditor (owner), and
controlling shareholder of owner (shareholder), filed a
motion to transfer venue of plaintiff debtor's adversary
bankruptcy proceeding pursuant to 28 U.S.C.S. §§
1404(a), 1412.

**OVERVIEW:** Debtor, creditor, and collection agent
entered into ·a finance agreement. Both debtor and
creditor alleged that the other party had breached this
agreement, and debtor filed an action against creditor,
collection agent, owner, and shareholder in Texas.
Creditor then filed a complaint against directors and
officers of debtor in Texas. Debtor filed for bankruptcy in
Delaware under 11 U.S.C.S. § 101 et seq. and filed the
present adversary proceeding contemporaneously. The
parties stipulated to withdraw the reference of the
adversary proceeding to the bankruptcy court. The court
granted the motion to transfer the adversary proceeding to
Texas because (1) debtor's, and collection agent's,
principal places of business were in Texas. (2) The

overwhelming majority of witnesses were in Texas, and
Delaware would not be any more convenient than Texas
as to those witnesses who resided in Hong Kong. (3) The
issues in the Texas actions were identical to those in the
present case, and a denial of transfer would result in
duplicative proceedings and a waste of judicial resources.
And (4) the possibility of inconsistent verdicts between
the Delaware and Texas courts weighed in favor of
transfer.

**OUTCOME:** The court granted the motion to transfer
venue.

**CORE TERMS:** adversary proceeding, convenience,
senior, interests of justice, athletic, bankruptcy
proceeding, principal place of business, shoes,
convenient, lender, convenience of witnesses,
subordination, indebtedness, declaration, collateral,
financing, reside, footwear, venue, weighs, security
interest, foreclose, resident, civil action, transferred,
working capital, choice of forum, litigating, fiduciary,
customer

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Venue >*

1996 U.S. Dist. LEXIS 8158, *1

*Change of Venue*
*Civil Procedure > Venue > Federal Venue Transfers >*
*Convenience Transfers*
*Civil Procedure > Venue > Motions to Transfer >*
*General Overview*
[HN1] 28 U.S.C.S. §§ 1404(a), 1412 both provide for transfer of venue upon fulfillment of certain conditions.

*Civil Procedure > Venue > Federal Venue Transfers >*
*General Overview*
[HN2]See 28 U.S.C.S. § 1404(a).

*Bankruptcy Law > Practice & Proceedings > Venue >*
*Change of Venue*
*Civil Procedure > Venue > Motions to Transfer >*
*General Overview*
[HN3]See 28 U.S.C.S. § 1412.

*Civil Procedure > Venue > Federal Venue Transfers >*
*Convenience Transfers*
*Civil Procedure > Venue > Motions to Transfer >*
*Convenience of Witnesses*
*Civil Procedure > Venue > Special Venue*
[HN4]The decision to transfer venue under either 28 U.S.C.S. § 1404 or 28 U.S.C.S. § 1412 has been determined to turn on the same issues. The only factor not expressly listed in § 1412 is the convenience of witnesses factor. However, courts which use § 1412 to determine the transfer motion subsume the convenience of witnesses inquiry into the convenience of the parties inquiry.

*Civil Procedure > Venue > Federal Venue Transfers >*
*General Overview*
[HN5]In ruling on motions, under 28 U.S.C.S. § 1404(a), courts have not limited their consideration to the three enumerated factors in § 1404(a), which are convenience of parties, convenience of witnesses, or interests of justice. Courts should consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum. While there is no definitive formula or list of factors to consider, courts have considered many variants of the private and public interests protected by the language of § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers >*

*Convenience Transfers*
[HN6]The private interests that are protected by the language of 28 U.S.C.S. § 1404(a) include plaintiff's forum preference as manifested in the original choice, the defendant's preference, whether the claim arose elsewhere, the convenience of the parties as indicated by their relative physical and financial condition, the convenience of the witnesses, but only to the extent that witnesses may actually be unavailable for trial in one of the fora, and the location of books and records, similarly limited to the extent that the files cannot be produced in the alternative forum.

*Civil Procedure > Venue > Federal Venue Transfers >*
*General Overview*
*Civil Procedure > Federal & State Interrelationships >*
*Erie Doctrine*
[HN7]The public interests that are protected by the language of 28 U.S.C.S. § 1404(a) include the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interest in deciding local controversies at home, the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases.

**COUNSEL:** Edward M. McNally, Esq., Kent A. Jordan, Esq., and John D. Demmy, Esq., of Morris, James, Hitchens & Williams, Wilmington, Delaware; attorneys for plaintiff.

Laura Davis Jones, Esq., and Janet Z. Charlton, Esq., of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; Of Counsel: Alan W. Harris, Esq., and John C. Wynne, Esq., of Andrews & Kurth L.L.P.. Dallas, Texas; attorneys for defendants.

**JUDGES:** Murray M. Schwartz, Senior District Judge

**OPINION BY:** Murray M. Schwartz

**OPINION**

**MEMORANDUM OPINION**

    Dated: June 7, 1996

    Wilmington, Delaware

**Murray M. Schwartz, Senior District Judge**

**I. Introduction**

Before the Court is the motion of defendants Save Power Limited ("Save Power"), Silver Eagle Holdings Limited ("Silver Eagle"), Extravest Holdings Limited ("Extravest"), and The Grande Holdings Limited ("Grande") (collectively, "defendants") to transfer venue ("Motion to Transfer") of the pending Adversary Proceeding which has been filed by plaintiff Pursuit Athletic Footwear, Inc. ("Pursuit" or "plaintiff"). Docket Item ("D.I.") 6. Defendants have moved to transfer this Adversary Proceeding [*2] to the Northern District of Texas pursuant to 28 U.S.C. § 1404(a), the general transfer statute, and 28 U.S.C. § 1412, the transfer statute specifically applicable to proceedings under Chapter 11 of the Bankruptcy Code. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157, and venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1409(a). For the reasons set forth below, defendants' Motion to Transfer will be granted.

**II. The Parties**

Pursuit is a Delaware corporation with its principal place of business in Tarrant County, Texas. D.I. 13 at P 1 (First Amended Complaint ("Complaint")), P 1; D.I. 8, Exhibit ("Exh.") 6, at P 2. Pursuit is engaged in the business of selling athletic footwear. D.I. 13 at PP 8-9. Riddell Athletic Footwear, Inc. ("Riddell") is Pursuit's affiliated, non-operating holding company, and while not a party to this Adversary Proceeding, filed for bankruptcy protection simultaneously with Pursuit in the Bankruptcy Court for the District of Delaware, the court in which this Adversary Proceeding was initially filed. Riddell is a Nevada corporation with its principal place of business in Texas. Riddell is a leading manufacturer of [*3] football helmets. *Id.* P 8. Pursuit is wholly owned by Riddell, and is the licensee of the "Riddell" trademark (the "Riddell License"), which has been fundamental to Pursuit's business. *Id.* Pursuit's business plan was to combine the valuable Riddell trademark with moderately priced athletic shoes for ultimate use by consumers. *Id.* PP 8-9.

Save Power is a Hong Kong corporation with its principal place of business in Kowloon, Hong Kong. Save Power is engaged in the business of manufacturing and supplying athletic shoes, and conducts its business throughout the United States. *Id.* P 2. Extravest is a Nevada corporation with its principal place of business in

Farmers Branch, Texas. *Id.* P 3. Extravest serves as a collection agent on behalf of Save Power under the agreement which has spawned the dispute between the parties to this litigation. D.I. 13, Exh. A. Silver Eagle is a Bermuda corporation with its principal place of business in Hong Kong. Complaint, P 4. Silver Eagle owns 100% of the stock of Save Power and Extravest. *Id.* P 4. Grande is a Cayman Islands corporation with its principal place of business in Hong Kong. *Id.* P 5. Grande owns a controlling interest [*4] in Silver Eagle. *Id.*

**III. Factual Background**

The controversy between the parties has its genesis in a Finance and Security Agreement (the "Finance Agreement"), entered into by Pursuit, Save Power and Extravest, dated February 15, 1994. D.I. 13, Exh. A. Under the terms of the Finance Agreement, Save Power contracted to provide both working capital and athletic footwear to Pursuit. *Id.* Pursuit acknowledged indebtedness to Save Power of $ 23 million, and received an additional loan of approximately $ 5 million, the total amount of indebtedness never to exceed $ 28 million without Save Power's consent. *Id.* The proceeds from the sales of Pursuit's shoes were to be paid to any "Senior Lender," as defined, who would then pay Save Power through its collection agent, Extravest. *Id.* In return for the financing commitment, Save Power received a senior lien on the Riddell License and a second lien on Pursuit's accounts receivable and inventory. *Id.*

Contemporaneously with the execution of the Finance Agreement, Save Power, Pursuit and Heller Financial, Inc. ("Heller"), a California-based commercial lender, entered into an agreement whereby further financing would be [*5] provided to Pursuit from Heller in return for a senior lien on Pursuit's accounts receivable and inventory (the "Subordination Agreement"). D.I. 13, Exh. B. Save Power agreed to subordinate $ 20 million of its outstanding indebtedness and its security interest in the collateral in order to facilitate further funding of Pursuit by Heller. *Id.* Under the Subordination Agreement, Save Power may not exercise its rights of foreclosure as long as any "Senior Debt," as defined therein, remains unpaid. *Id.* Pursuit's customers were to pay Heller directly, and Heller, in turn, was to apply a portion of the payments to Pursuit's indebtedness, and the remainder to Extravest on behalf of Save Power. *Id.*

Troubles began, however, even before the Finance Agreement was executed and implemented. Because the

Page 3

parties dispute the facts surrounding the breaches of contract alleged by each, both accounts will be given. Pursuit alleges that labor difficulties at the Save Power/Silver Eagle production facilities caused a disruption in the production of shoes. Complaint, P 11. At the same time, Pursuit alleges that defendants were of questionable financial stability, which seriously impaired their [*6] ability to provide working capital according to the Finance Agreement. *Id.* P 12. Notwithstanding these alleged impediments, Save Power entered into the Finance Agreement without disclosing them to Pursuit, and a short time thereafter, Save Power failed to deliver shoes to Pursuit in accordance with the Finance Agreement, and of the shoes Save Power did deliver, many were of dubious quality. *Id.* PP 11-15. Pursuit alleges that defendants began to assume control over the Pursuit operations with the intent to cause Pursuit to default on its royalty obligations to Riddell, at which point, defendants would foreclose upon the Riddell License. *Id.* PP 16-19. However, the Finance Agreement contained a provision precluding Save Power from foreclosing on the Riddell License when any Senior Lender remains unpaid. *Id.* P 20. Pursuit alleges that Heller, as Senior Lender, was still owed money from Pursuit, and thus foreclosure was an unavailable option for Save Power. Pursuit further alleges that defendants exerted pressure on Heller to not renew the financing arrangement with Pursuit. Heller acceded to that pressure. *Id.* PP 21-22. Left without financing, Pursuit was forced to [*7] seek financing elsewhere, and was able to obtain refinancing of the loan with Syntek Finance Corporation ("Syntek"), a commercial lender, whereby Syntek purportedly assumed the rights and obligations of Heller as Senior Lender under the Subordination Agreement. *Id.* P 23.

Defendants present a different version of the facts. Defendants' position is that Pursuit exceeded the maximum indebtedness of $ 28 million allowable under the Finance Agreement, which had the effect of terminating Save Power's obligations to provide working capital and supply shoes. D.I. 8, Exh. 6, PP 10-11. [1] Defendants also take the position that Heller, as Senior Lender, had been fully repaid and therefore, under the Finance Agreement, all customer payments were to be paid directly to Extravest on behalf of Save Power. *Id.* P 13. Rather than allow the customer payments to go to Save Power through Extravest, as provided in the Finance Agreement, Pursuit wrongfully diverted the payments to itself. *Id.* This act, among others, constituted a default

under the Finance Agreement, which triggered the rights of Save Power to foreclose on its collateral. *Id.* PP 16-18.

> 1 Save Power stated its position in a prior filing with the United States District Court for the Northern District of Texas, in a counterclaim to an action brought by Pursuit. *See infra.* The Court has set forth Save Power's contentions solely to provide context for this Adversary Proceeding.

[*8] Pursuit and Riddell brought a state civil action in the 236th Judicial District Court of Tarrant County, Texas on May 26, 1995, raising several claims against Save Power, Extravest, Silver Eagle and Grande. [2] The complaint alleged the following causes of action: (1) a declaration that the financing provided by Syntek is Senior Debt, as that term is defined in the Finance Agreement, that Syntek is a Senior Lender under the Finance Agreement, and that Save Power's liens are subordinated to the indebtedness resulting from the refinancing of the loan by Syntek; (2) breach of contract by reason of Save Power's failure to provide adequate working capital, failure to timely deliver athletic shoes, and delivering of defective athletic shoes; (3) tortious interference with contractual and business relations among Pursuit, Riddell and Heller; (4) economic duress and breach of duty of good faith and fair dealing; and (5) attorneys' fees.

> 2 Because none of the parties included the complaint in the state court action as part of the record, the Court takes judicial notice, pursuant to Federal Rule of Evidence 201, of the complaint, filed on May 26, 1995, in the 236th Judicial District in the District Court of Tarrant County, Texas; removed to the Northern District of Texas, Fort Worth Division, on August 11, 1995. *See Riddell Athletic Footwear, Inc. v. Save Power Ltd.,* Civil Action No. 4-95-CV-594-Y.

[*9] Save Power removed the action to the Northern District of Texas, Fort Worth Division, on the grounds of diversity jurisdiction (the "Fort Worth Action"). [3] Save Power also filed a counterclaim after removal. D.I. 8, Exh. 6. Save Power sought (1) damages for breach of contract due to Pursuit's failure to pay amounts owed and failure to recognize Save Power's security interests under the Finance Agreement; (2) injunctive relief prohibiting Pursuit from selling, transferring or otherwise disposing of its assets and from collecting or converting Save Power's collateral; and (3) a

declaration that Pursuit is in default of the Agreement, which default allows Save Power to take possession of its secured collateral. Finally, Save Power sought the right to judicially foreclose on that collateral. *See id.*

> 3  Pursuit and Riddell promptly filed a motion to remand the action to state court on the ground that the district court did not have diversity jurisdiction over the parties. D.I. 8, Exh. 20. Briefing on the motion to remand has been completed, but no disposition of the motion had occurred before the case was administratively closed on November 22, 1995, due to the pendency of the Bankruptcy Proceeding. *See* D.I. 8, Exh. 5.

[*10] On August 21, 1995, Save Power filed a complaint in the Northern District of Texas, Dallas Division, against Ernest Wood, Jr., Harry D. Wood, Linda B. Wood, Stanley Wood, High Five Athletic, Inc., Stan's Sports Center, Inc. and E. Wood & Associates, Inc. *See Save Power Ltd. v. Wood,* Civil Action No. 3-95-CV-1811-H (the "Wood Action"); D.I. 8, Exh. 7. The action was brought against these defendants who were acting as directors and officers of Pursuit and other related sporting goods retailers. The gravamen of the complaint was a claim for breach of fiduciary duty, fraudulent conveyances from Pursuit to the sports retailers, and other equitable grounds. *See id.* Save Power's theory centered on the alleged misappropriation and diversion of funds from Pursuit by its directors and officers, facilitated by their positions as directors and officers, to the detriment of Save Power, who continued to provide funding pursuant to the Finance Agreement. This action was transferred from the Dallas Division to the Fort Worth Division of the Northern District of Texas by Order dated August 28, 1995, D.I. 8, Exh. 12, because of the pendency of the Fort Worth Action. Judge Terry R. Means, before [*11] whom the Fort Worth Action was pending, ordered consolidation of the cases by Order of August 31, 1995. D.I. 8, Exh. 14.

On September 11, 1995, Save Power filed a complaint in the Fort Worth Division of the Northern District of Texas against Syntek, requesting a declaration that Save Power holds a perfected security interest under the Finance Agreement that is superior to that of Syntek; that Save Power is entitled to foreclose on its security interest in the Pursuit assets; and that Syntek does not possess any rights under the Subordination Agreement.

D.I. 8, Exh. 17. *See Save Power Ltd. v. Syntek Finance Corp.,* Civil Action No. 495-CV-665-A (the "Syntek Action").

On November 3, 1995, Pursuit and Riddell filed voluntary petitions for protection pursuant to Chapter 11 of 11 U.S.C. § 101 *et seq.* in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Proceeding"), and continued to operate the business as debtors in possession under 11 U.S.C. §§ 1107 and 1108. D.I. 20, Exh. 2 at P 1. Pursuit contemporaneously filed the present Adversary Proceeding, Adv. Pro. No. A-95-100, in the Bankruptcy Court, naming Save Power, Extravest, Silver Eagle and Grande as defendants. [*12] *See* Complaint. By joint stipulation, the parties agreed to Withdraw the Reference of the Adversary Proceeding to the Bankruptcy Court, and an Order Withdrawing the Reference was entered on February 20, 1996. D.I. 3.

In its complaint, Pursuit alleges that Save Power (1) breached its contractual obligations to provide adequate working capital and supply products; (2) made false statements and omitted material facts during the negotiations of the Finance Agreement, thereby fraudulently inducing Pursuit to enter into the Finance Agreement; (3) made misrepresentations which caused Pursuit to enter into the Finance Agreement; (4) exercised dominion and control over Pursuit, assuming fiduciary obligations to Pursuit which it breached; (5) affiliates aided and abetted the breach of fiduciary duties; (6) engaged in inequitable conduct for which equitable subordination of Save Power's liens is appropriate; (7) tortiously interfered with the Subordination Agreement between Heller and Pursuit, as well as contracts between Pursuit and its customers; (8) tortiously interfered with prospective economic advantage; (9) benefitted from a lien fraudulently conveyed, in that Pursuit did not receive [*13] adequate consideration therefor; and finally, Pursuit sought a declaration that Save Power may not foreclose on the Riddell License or any other asset so long as any Senior Debt remains outstanding.

Defendants filed the present Motion to Transfer the Adversary Proceeding to the Fort Worth Division of the Northern District of Texas. Defendants argue that (1) all parties, except those in the Far East, are located in Texas, while none have any substantive connection with Delaware; (2) the vast majority of relevant witnesses and documents are located in Texas, not Delaware; and (3) the Adversary Proceeding raises claims which arise out of

the same facts and circumstances that are the subject of the Fort Worth Action, which has already been significantly advanced. D.I. 7. Pursuit has opposed the Motion to Transfer, arguing that the interests of justice disfavor transfer in that (1) there is a presumption against transfer in a bankruptcy case; (2) Pursuit is financially unable to retain Texas counsel; (3) Save Power unnecessarily delayed in filing this motion; (4) the balance of convenience does not favor Texas because (a) the locations of witnesses and documents are not in Texas; (b) plaintiff's [*14] choice of forum should be accorded deference; and (c) and the situs of the events giving rise to the claims and applicable law does not favor Texas; and finally, (5) the Texas District Court lacks jurisdiction over the Fort Worth Action, which was removed from state court, and thus the pendency of that case does not warrant transfer. D.I. 12.

IV. Analysis

This analysis begins with the language of the transfer statutes, [HN1] 28 U.S.C. §§ 1404(a) and 1412, both of which provide for transfer of venue upon fulfillment of certain conditions. The general transfer statute found at [HN2]section 1404(a) provides:

> For the convenience of the parties and the witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it may have been brought.

The transfer statute governing bankruptcy matters, found at [HN3] 28 U.S.C. § 1412, provides:

> A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

[HN4]The decision to transfer venue under either section 1404 and 1412 has been determined to turn on the [*15] same issues. In re Emerson Radio Corp., 52 F.3d 50, 55 (3d Cir. 1995) ("Section 1412 largely include[s] the same criteria for transfer of cases as section 1404(a), i.e., 'the interest of justice' or 'the convenience of the parties' . . . ."). The only factor not expressly listed in section 1412 is the convenience of witnesses factor. [4] However, courts which use section 1412 to determine the transfer motion

subsume the convenience of witnesses inquiry into the convenience of the parties inquiry. See, e.g., In re Oklahoma City Assocs., 98 Bankr. 194, 199 (Bankr. E.D. Pa. 1989); In re Indus. Pollution Control, Inc., 137 Bankr. 176, 181 (Bankr. W.D. Pa. 1992). [5]

> [4] Also absent from section 1412 is a requirement that the proposed transferee forum be one in which the original action could have initially been brought. In this case, the petition for bankruptcy could have been filed in the Bankruptcy Court for the Northern District of Texas pursuant to 28 U.S.C. § 1408(1), and this Adversary Proceeding would similarly have been properly filed in that court pursuant to 28 U.S.C. §§ 1334 and 157. Accordingly, this difference between the statutes will not be further addressed.

[*16]

> [5] Defendants have moved to transfer this action pursuant to both sections 1404(a) and 1412, although they argue that the appropriate transfer statute to be applied is section 1404(a). As authority for this proposition, defendants cite Goldberg Holding Corp. v. NEP Prods., Inc., 93 Bankr. 33, 34 (Bankr. S.D.N.Y. 1988), where the Bankruptcy Court for the Southern District of New York held that section 1404 governs transfer motions for "related to" actions, since section 1412, by its own terms, only governs actions arising under title 11. Defendants argue that this Adversary Proceeding is non-core, and therefore is a "related to" proceeding within the meaning of the Bankruptcy Code. Pursuit has not contested the transfer provision preference of defendants. Since the Third Circuit Court of Appeals has expressly held that the inquiry under both provisions is largely the same, the Court declines to address whether the action is a "core" or "related to" proceeding.

In Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995), the Third Circuit Court of Appeals listed a number of [*17] factors which have been deemed relevant to this inquiry, beyond those enumerated in the statute itself. The factors listed by the Jumara court are set forth as follows:

> [HN5]In ruling on § 1404(a) motions,

courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." While there is no definitive formula or list of factors to consider, courts have considered many variants of the private and public interests protected by the language of § 1404(a).

[HN6]The private interests have included: plaintiff's forum preference as manifested in the original choice, the defendant's preference, whether the claim arose elsewhere, the convenience of the parties as indicated by their relative physical and financial condition, the convenience of the witnesses -- but only to the extent that witnesses may actually be unavailable for trial in [*18] one of the fora, and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

[HN7]The public interests have included: the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interest in deciding local controversies at home, the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases.

*Id. at 879-80* (citations omitted). For analytical clarity, those factors set forth by the Third Circuit appellate court

which are found in the statute itself will be discussed under separate headings. All other relevant considerations will be addressed under the broad interests of justice inquiry.

A. *Convenience of Parties*

A brief review of the parties and their respective citizen ships indicates a preference for this litigation to proceed in the Northern District of Texas. Pursuit maintains its principal place of business in Tarrant County, Texas. The fact that Texas is Pursuit's "home turf" [*19] suggests that it would be a more appropriate forum for the litigation, given that all its officers, directors, employees and other individuals with pertinent knowledge are located in the same state. D.I. 8 at A-2-3 (Declaration of John C. Wynne ("Wynne Decl.")). Defendants Save Power, Silver Eagle and Grande all maintain their principal places of business in Hong Kong, a location geographically remote from both Texas and Delaware. Litigation in the United States, regardless of the location, would presumably be inconvenient for the Hong Kong defendants in all respects: thus, the convenience of the parties factor with respect to these defendants does not cut strongly in either direction. However, defendant Extravest maintains its principal place of business in Dallas County, Texas. With respect to Extravest officers, directors and employees acting on behalf of the company, Texas would be a more convenient forum. Therefore, on balance, the convenience of the parties factor weighs somewhat in favor of transfer to Texas.

B. *Convenience of Witnesses*

The convenience of witnesses factor overwhelmingly favors transfer of this action to Texas. The witnesses with information from Pursuit [*20] include Ernest Wood, Chairman of the Board of Directors; Harry Wood, President; Linda Wood, former Vice President; Jeffrey Mattich, Chief Financial Officer; Joe McCarthy, Credit Manager; Michael Cahill, Vice President of Operations; Herman Franke, collections manager; Holly Ramone, financial assistant; and Sandy Aguilar, accounts payable. D.I. 8 at A-3 (Wynne Decl.). All of these witnesses are located in Texas. Other Pursuit witnesses are Stanley Wood, who resides in Oklahoma; Fred Brooks, a consultant who resides in Connecticut; and Arthur Tse, a Director, who resides in Hong Kong. *Id.* As to the majority of these witnesses, litigation in Texas would be vastly more convenient.

In addition to Messrs. Wood, Mattich, McCarthy and Cahill, Save Power's witnesses may include the following witnesses residing in Hong Kong: Yvonne Ho, Silver Eagle Managing Director; Charles Chan, assistant financial controller; and S.Y. Lee, Silver Eagle Board Member. *See, e.g.,* D.I. 8, Exh. 15. Additionally, Christopher Ho, Silver Eagle Chairman of the Board, and Rose Kong, Senior Manager of Special Projects, both of whom will be witnesses, reside in Singapore. *See id.* By Pursuit's own admission, [*21] Rose Kong, who will likely be an important witness for Save Power, maintains an apartment in Dallas and spends most of her time there. D.I. 8, Exh. 10 at 3. With respect to these witnesses, with the exception of Rose Kong, litigation in Delaware would not be any more or less convenient than in Texas.

Third party witnesses likely to be called include the following witnesses located in Texas: Terry Schumate, an officer of International Health Products, the one-third owner of Pursuit's parent and Syntek; Scott Miller, former Syntek officer; Gene Philips, a principal behind International Health Products and Syntek; Steve Winarcyzk, former Vice President of Finance for Extravest; and Anita Stacey, former product development manager for Pursuit. Additional third party witnesses include Joe Grosz, from New York; Rob Christy, located in Hong Kong; and Harry Friedman of Heller, located in California. D.I. 8 at A-3 (Wynne Decl.). As to the majority of these third party witnesses, litigation in Texas would be more convenient.

The overwhelming majority of these witnesses are in Texas. It is beyond dispute that litigating this matter in Texas will be more convenient for these Texas-based witnesses. [*22] Pursuit dismisses this fact with the self-serving statement that "no witness will be more inconvenienced by trying this case [in Delaware], except possibly Mr. E. Wood and other Pursuit employees. That, however, is not 'Save Power's problem.'" D.I. 12 at 22. Whether Save Power need concern itself with Pursuit's witnesses is not the issue: the Court must determine whether the convenience to *all* witnesses weighs strongly in favor of a transfer. The Court finds that it does.

The Court also notes that at least at some point, Pursuit was in agreement with this Court's belief that the convenience of witnesses factor favors the Northern District of Texas. On the issue of proper forum in the Fort Worth Action, Judge Means had requested briefing on the applicability of the forum selection clause of the Finance

Agreement, which provided that New York would be the appropriate forum. *See* D.I. 8, Exh. 10. Pursuit submitted a memorandum arguing that the forum selection clause should not be enforced for "compelling" and "countervailing" reasons, stating that "all of the Plaintiffs' choice of forum is the Northern District of Texas, and the convenience of the parties and witnesses require [*23] the forum to be the Northern District of Texas." D.I. 8, Exh. 10 at 2. The claims in the Fort Worth Action, which has been administratively closed due to the pendency of the Bankruptcy Proceeding, and the claims in this Adversary Proceeding are, for all intents and purposes, identical. [6] *Compare,* Complaint, D.I. 13 at B-1, *with* Fort Worth Action Complaint. Thus, many of the witnesses will also be identical. With respect to the Fort Worth Action, Pursuit observed:

> In the Riddell case, [7] the witnesses for Plaintiffs will be Ernest Wood, Jr., Jeffrey Mattich, Harry Wood, Frederic Brooks, Joseph McCarthy, David Sheridan and possibly Linda Wood. All of these individuals with the exception of Frederic Brooks are residents of Dallas County, Texas. Frederic Brooks is a resident of Connecticut.
>
> The main witnesses for Defendants in the Riddell case will be Rose Kong, Yvonne Ho and Carmen Eggleston. Carmen Eggleston is an expert witness for Defendants and she resides in Texas. Yvonne Ho is a resident of Hong Kong. Rose Kong, although legally a resident of Hong Kong, maintains an apartment in Dallas and spends most of her time in Dallas.
>
> Extravest Holdings Limited, [*24] one of the Defendants in the Riddell case, is a Nevada corporation with its principal place of business in Dallas, Texas.
>
> . ...
>
> In the case brought by Save Power [8], Defendants Linda Wood, Ernest Wood and Harry Wood reside in the Northern District of Texas. Defendant Stanley

Wood is a resident of Tulsa, Oklahoma. Defendant High Five Athletic Shoe Warehouse, Inc. is located in Dallas, and Defendant Stan's Sports Center, Inc. is located in Tulsa.

D.I. 8, Exh. 10 at 2-3.

6    This Court is not the first to recognize the virtually identical nature of the claims raised in the Fort Worth Action with those raised in the present action. In ruling on motions filed in connection with the Bankruptcy Proceeding, Bankruptcy Judge Balick made the following observations about the similarity of the claims:

...Pursuit has filed an adversary proceeding here with *allegations that are substantially identical to those in the [Fort Worth] action.* The complaint seeks damages based on breach of contract, fraud, breach of fiduciary duty, tortious interference. *The complaint seeks identical declaratory relief as the [Fort Worth] action.* In addition, the complaint seeks to avoid the security interest as a fraudulent conveyance, and equitably subordinate the defendants' claims, liens and interests.

D.I. 8, Exh. 1 at 9 (Memorandum Opinion of Bankruptcy Judge Balick) (emphasis supplied).

[*25]

7    Pursuit's reference to the "Riddell case" refers to the Fort Worth Action, the original action filed by Pursuit and Riddell against defendants in Texas state court, subsequently removed to the Northern District of Texas.

8    Pursuit's reference to the "case brought by Save Power" refers to the Wood Action, which has been transferred and consolidated with the Fort Worth Action.

Pursuit continued in its argument by stating that it would be more convenient for the witnesses for *both* parties to the Fort Worth Action, as well as the Wood Action, if the case were tried in Texas:

Since all of Plaintiffs' major witnesses in the Riddell case, with the exception of Frederic Brooks, live in the Northern District of Texas, *obviously, the convenience of Plaintiffs' witnesses would be best served by leaving the case in the Northern District of Texas.*

In the suit brought by Save Power, all of the individual defendants, with the exception of Stanley Wood who lives in Oklahoma, live in Texas. *Obviously, the convenience of these Defendants would be served by leaving the case* [*26] *in Texas.*

Additionally, Rose Kong, the most important witness for both Save Power and the other Defendants in the Riddell case, maintains an apartment in Dallas. The office of Defendant Extravest Holdings Limited in also located in Dallas.

*Id.* at 5-6 (emphasis supplied). Pursuit concluded its memorandum by capaciously stating:

Since there is absolutely no connection between the State of New York and either the Riddell case or the case brought by Save Power, and *since all parties and witnesses would be greatly inconvenienced rather than convenienced by transfer of this case to New York, the case should remain in the Northern District of Texas. Also, to require Riddell and Pursuit whose officers, directors, employees, warehouse and office are allllocated in Tarrant County and Dallas County, to go to New York to lid gate this matter would be unjust and unreasonable.*

*Id.* at 6-7 (emphasis supplied).

Pursuit's argument has been quoted extensively to illustrate that the concerns about the virtual absence of a connection of the Fort Worth Action to any forum *other* than the Northern District of Texas, and the correlative inconvenience and expense [*27] of having to travel out-of-state, are concerns which are equally weighty in the present Adversary Proceeding. Pursuit has not

provided any reason why the same concerns which prompted its desire to remain in Texas in the Fort Worth Action would not also be present in litigating this matter in Delaware. The only difference which Pursuit highlights allegedly favoring litigating the matter in Delaware is the fact that at this point, Pursuit's documents are located in Delaware, pursuant to Save Power's document request, an allegation Save Power denies. *See* D.I. 20 at C-3, P 3 ("The fact of the matter is that Save Power never requested that the documents be shipped to Delaware and, indeed, would not have done so, as the counsel handling the Bankruptcy Proceeding and [this action] are in Texas.") (Second Declaration of John C. Wynne ("Second Wynne Decl.")).

This factor, assuming *arguendo* that it is true, does not overcome the substantial inconvenience to the parties and witnesses so carefully laid out in Pursuit's memorandum submitted in connection with the Fort Worth Action. With respect to convenience of witnesses, Pursuit merely argues that defendants failed to show that any [*28] key witnesses "will fail to appear in Delaware" and failed to explain "what exactly it is that the Save Power witnesses who live in Texas will say that is so important." D.I. 20 at 21. In a footnote, Pursuit obliquely notes that "the Pursuit witnesses will all come to Delaware to testify." *Id.* at n.11. Pursuit, however, confuses the issue of convenience with that of compulsory attendance: that the witnesses will appear does *not* mean that their appearance is convenient, or more convenient in one location than in another. At any rate, Pursuit certainly appeared to appreciate the nature of Save Power's witnesses' testimony when it authored its memorandum in the Fort Worth Action. To the extent that Pursuit still remains unclear, defendants have provided explicit record evidence detailing the subject matter of each of their witnesses' proposed testimony. *See* D.I. 13, Exh. 15 (Rule 26(a)(1) Initial Disclosures) [9]; D.I. 20 at C-9, PP 21-23 (Second Wynne Decl.).

> 9    The Court acknowledges that the Initial Disclosures were filed in connection with the Fort Worth Action rather than with the Adversary Proceeding. While these persons were not named in connection with this matter, given the similarity of the claims between this Adversary Proceeding and the Fort Worth Action, it is reasonable to assume that most, if not all, of these same parties will also have knowledge pertinent to the present action. *See also* D.I. 8 at A-3

(Wynne Decl.); D.I. 20 at C-9-10, PP 21-23 (Second Wynne Decl.). The Court also notes that both parties exhibit substantial agreement as to which persons will be integral to resolution of this dispute.

[*29] C. *Interests of Justice*

Defendants argue that the interests of justice factor weighs in favor of transfer. Defendants argue that plaintiffs' first choice of forum, i.e. the situs of the Fort Worth Action, was in the Northern District of Texas, and therefore, plaintiffs' choice of forum in this action, raising substantially similar claims, deserves little weight. Defendants also argue that this litigation has no connection with Delaware, whereas the interest in litigating in Texas is substantial, given the fact that related actions are pending in Texas. The Court agrees. The Fort Worth Action had been pending in the Northern District of Texas since August, 1995, a period of time in which several motions were filed, orders were entered and hearings were held. As Bankruptcy Judge Balick noted, "Judge Means has already heard testimony on the merits of the allegations and issued a 15 page decision. He has thus advanced significantly along the judicial learning curve." D.I. 8, Exh. 1 at 10. As noted above, the issues before Judge Means in the Fort Worth Action are virtually indistinguishable from those in the present case.

Further supporting this conclusion is the fact that the related [*30] Syntek Action was transferred to Judge Means, who then ordered the two actions consolidated, because of the similarity of parties and issues and resultant savings of judicial resources. Denying this Motion to Transfer would necessarily result in duplicative proceedings and a waste of judicial resources. *See Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 26, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960)* ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."); *see also SmithKline Corp. v. Sterling Drug, Inc., 406 F. Supp. 52, 55 (D. Del. 1975)* ("One of the prime components of the 'interest of justice' is the maintenance of sound judicial administration. Central to efficient and effective judicial administration is a policy, implied in section 1404(a), of proper conservation and utilization of judicial resources.") (citations omitted). Another consideration motivating this conclusion is the specter of

inconsistent judgments. There is a very real possibility that the claims raised in the Fort Worth Action could yield a certain result, while [*31] those very same claims could yield a different result in this Court. The possibility of inconsistent verdicts further weighs in favor of transfer.

Pursuit argues that the interests of justice would not be served by transfer to Texas because it would be unable to retain counsel in Texas to litigate this matter there, as it lacks the funds necessary to pay such counsel. However, over $ 800,000 of attorneys' fees have already been expended in connection with the Fort Worth Action. *See* D.I. 8 at A-1-2 (Wynne Decl.). Further, Pursuit has applied in the Bankruptcy Court for authorization to retain different Texas counsel. Save Power has not objected to Pursuit's retention of Texas counsel, but opposes the use of collateral to pay that counsel. In answer to Pursuit's argument, this Court is confident that the Bankruptcy Court will rule on Pursuit's request for authorization to retain Texas counsel in a manner consistent with the merits as presented to that court.

Pursuit also argues that defendants delayed in filing the Motion to Transfer, which prejudiced Pursuit to an extent where it would be "just plain unfair" to transfer the case to Texas. *See* D.I. 12 at 19. Defendants respond [*32] that they made it clear "from the outset of the filing made in this [Action] that [they] considered Delaware to be an improper, inconvenient forum and that Save Power would soon be filing a Motion to Transfer." D.I. 20, at C-3, P 5 (Second Wynne Decl.). Furthermore, nothing in the record indicates that defendants engaged in any dilatory tactics which would make it inequitable to transfer this action to Texas.

Pursuit argues that because Save Power has only moved for transfer of the Adversary Proceeding, rather than the entire Bankruptcy Proceeding, which is still pending in the Bankruptcy Court, there is a presumption against transfer and in favor of keeping the entire case in the same locus of the Bankruptcy Proceeding. However, at present, the Bankruptcy Proceeding and the Adversary Proceeding are already separate and distinct. Pursuit agreed to Withdraw the Reference to the Bankruptcy Court for this Adversary Proceeding. Thus, Pursuit has already agreed to litigate these matters separately, and there are now two courts which must familiarize themselves with the issues and facts presented and render decisions on the merits. Secondly, to the extent there exists a "presumption" [*33] against transfer of an adversary proceeding away from the district where the bankruptcy proceeding is pending, the analysis is quite different where related proceedings are pending in the proposed transferee forum, and most of the relevant witnesses are located in that forum. *See In re Leedy Mortgage Co.*, 62 Bankr. 303 (Bankr. E.D. Pa. 1986) (adversary proceeding transferred away from district in which bankruptcy proceeding was pending because most of the witnesses were situated in the proposed transferee forum). In conclusion, the Court finds that the interests of justice favor transfer to the Northern District of Texas.

## V. Conclusion

The balance of considerations relevant to this transfer of venue issue weighs in favor of transfer to the Northern District of Texas. Accordingly, defendants' Motion to Transfer will be granted. An appropriate order will be entered.

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on June 20, 2007, a true and correct copy of the

foregoing document was filed with the Clerk of the Court using CM/ECF which will send

notification that such filing is available for viewing and downloading to the following counsel of

record:

Thomas C. Grimm, Esq.
MORRIS NICHOLS ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801

Jeffrey Bove, Esq.
Dana K. Hammond, Esq.
CONNOLLY, BOVE, LODGE & HUTZ
1107 N. Orange Street
Wilmington, DE 19801

Donald J. Detweiler, Esq.
Titania R. Mack, Esq.
GREENBURG TRAURIG LLP
1007 N. Orange St., Ste. 1200
Wilmington, DE 19801

Steven J. Balick, Esq.
John G. Day, Esq.
Lauren E. McGuire
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801

David E. Moore, Esq.
POTTER ANDERSON & CORROON,
LLP
1313 N. Market St.
Hercules Plaza, 6th Floor
Wilmington, DE 19801

I further certify that on June 20, 2007, I caused copies of the foregoing document to be

served by hand delivery on the above-listed counsel and on the following counsel of record as

indicated.

### BY U.S. MAIL

Bradford Lyerla, Esq.
Jeffrey Dean, Esq.
Scott Sanderson, Esq.
MARSHALL GERSTEIN & BROUN LLP
233 S. Wacker Dr.
6300 Sears Tower
Chicago, IL 60606

Stephen Milbrath, Esq.
ALLEN DYER DOPPLET MILBRATH
& CHRIST, PA
255 S. Orange Avenue, Ste. 1401
Orlando, FL 32802

Holiday Banta, Esq.
WOODARD EMHARDT MORIARTY
MCNETT & HENRY LLP
111 Monument Circle, Ste. 3700
Indianapolis, IN 46204

YOUNG CONAWAY STARGATT & TAYLOR, LLP


_____ */s/ Adam W. Poff* _____
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
*apoff@ycst.com*
Attorneys for STMicroelectronics, Inc.