IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REMY, INC., UNIT PARTS COMPANY, and WORLDWIDE AUTOMOTIVE, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 06-785-*** |
| CIF LICENSING, LLC, D/B/A GE LICENSING, WELLS MANUFACTURING CORP., TADITEL US, INC., and WETHERILL ASSOCIATES, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## GE LICENSING'S MOTION TO DISMISS, OR IN THE ALTERNATIVE TO STAY

Defendant CIF Licensing, LLC d/b/a GE Licensing ("GE") hereby respectfully moves, pursuant to the first-filed rule, that the Court dismiss plaintiff's claims against GE and GE's counterclaims, without prejudice, on the ground that an earlier-filed action involving all required parties and the same controversy is pending in the United States District Court for the Eastern District of Texas ("the Texas Case"). GE's second amended complaint in that action relates back to its original filing date, preserving that Court's status as the first-filed forum with respect to all parties. In the alternative, GE respectfully requests that this action be stayed pending the resolution of the Texas Case.

## BACKGROUND

This controversy arose because of a suit GE filed in the Eastern District of Texas—*CIF Licensing, LLC d/b/a GE Licensing v. Denso Corp., et. al.*, No. 2:06-cv-345-DF (E.D. Tex.)—on August 30, 2006, alleging infringement of United States Patent No. 4,773,159, the same patent at issue in this case. (*See* Ex. A, GE's Texas Compl.) Of the three original defendants in the Texas

suit, two settled, leaving Remy International, Inc. as the only remaining defendant.  Remy International is the corporate parent of the plaintiffs in this suit—Remy, Inc., Unit Parts Company, and World Wide Automotive ("the Remy Subsidiaries").

As part of the effort to reach a settlement in the Texas case, Remy International's counsel, who also represents the Remy Subsidiaries, negotiated with GE on behalf of Remy International.  On December 21, 2006, once it had become clear that no settlement was possible, Remy International filed a motion to dismiss the Texas case for lack of personal jurisdiction, the same day the Remy Subsidiaries filed this Delaware action seeking a declaration of non-infringement, invalidity, and unenforceability of the '159 Patent.[1]

In its motion to dismiss the Texas case, Remy International asserted that it was not the correct defendant because it does not make or sell the accused products, describing itself as "merely a corporate shell owning stock in the various Remy subsidiaries."  (*See* Ex. B, Remy International Texas Mot. To Dismiss, at 1.)  In response, GE requested leave to amend its Texas complaint to join the proper defendants, the Remy Subsidiaries, and consented to the dismissal of Remy International if the amendment were permitted.  On July 3, 2007 the Texas Court granted GE leave to amend (Ex. C), and GE has filed its Second Amended Complaint, joining the Remy Subsidiaries in the Texas suit (Ex. D)  However, in its order granting GE leave to amend, Judge Folsom stayed the Texas suit pending a decision by this Court as to which of the two cases

---

[1] The Remy Subsidiaries' complaint also alleges indemnity claims against their suppliers, Taditel US, Inc, Wells Manufacturing, Inc., and Wetherill Associates, Inc. ("the Indemnity Defendants").  One of the Indemnity Defendants, Wells Manufacturing, has, in turn, asserted a third-party indemnity claim against its upstream supplier, STMicroelectronics, Inc.

should be deemed the first-filed action: "The Court expressly leaves the 'first filed' issue for the Delaware court to resolve if properly presented." (Ex. C at 5.) GE accordingly has filed this motion in order to present this Court with an appropriate procedural vehicle to decide which case should be deemed the first-filed action and to thereby determine the venue in which this dispute will be litigated.

## ARGUMENT

### I.    THE TEXAS CASE IS FIRST-FILED AND SHOULD PROCEED TO JUDGMENT.

When deciding which of two closely related patent infringement cases involving overlapping parties and identical issues should proceed, this court applies the first-filed rule. *See, e.g.*, *Genentech, Inc. v. Eli Lilly and Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993); *E.E.O.C. v. University of Pennsylvania*, 850 F.2d 969, 971 (3rd Cir. 1988) ("[i]n all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it") (quoting *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3rd Cir. 1941)); *Corixa Corp. v. IDEC Pharm. Corp.*, 2002 WL 265094, *1 (D. Del. 2002) ("[w]here two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference absent special circumstances").

Although the Remy Subsidiaries did not become participants in this controversy until they filed this declaratory judgment suit on December 21, 2006, the Texas Case is nonetheless the first-filed case with respect to these parties because the amended Texas complaint, naming them as defendants, relates back to August 30, 2006, FED. R. CIV. P. 15(c), almost four months prior to the commencement of this Delaware action:

> Relation back is dependent upon four factors, all of which must be satisfied: (1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in

> maintaining its defense; (3) that party must or should have known
> that, but for a mistake concerning identity, the action would have
> been brought against it; and (4) the second and third requirements
> must have been fulfilled within the prescribed limitations period.
> *Fromson v. Citiplate, Inc.*, 886 F.2d 1300, 1303 (Fed. Cir. 1989).

*Schiavone v. Fortune*, 477 U.S. 21, 29 (1986).

It is uncontroverted that all four factors are satisfied in this case. First, GE's Second Amended Complaint alleges conduct identical to the original complaint—the manufacture and sale of voltage regulators that infringe GE's '159 patent. (*See* Ex. D). Second, the Remy Subsidiaries received actual knowledge of this action from its inception through their common counsel and, as a result, executed a coordinated litigation strategy by filing this suit and the Motion to Dismiss in the Texas Case on the same day. *See also E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 621 F.Supp. 310, 314 (D. Del. 1985) (applying Rule 15(c) in a patent infringement case where plaintiff sought to add a wholly-owned subsidiary corporation to an action where the parent corporation was already a defendant, and holding that this prong was satisfied because of the "close intercorporate relationship of the parties"). Third, the Remy Subsidiaries therefore knew that they were intended as the proper defendants. Finally, the Remy Subsidiaries had proper notice because they responded to the Texas suit by bringing this action within the prescribed 120 day Rule 4(m) limitations period. (*Compare* Ex. A *with* Remy Delaware Compl., Docket Item No. 1.)

Courts routinely apply the "first-to-file" rule in patent infringement cases under nearly identical circumstances. For example, in *Aerotel, Ltd. v. Sprint Corp.*, 100 F.Supp.2d 189 (S.D.N.Y. 2000), the plaintiff sued a holding company that, unknown to the plaintiff, did not actually make or sell the infringing products. As here, the holding company's subsidiaries (which actually made and sold the infringing products) rushed into a more preferred forum and sued the patentee for a declaratory judgment. As here, the patentee amended its complaint to add the sub-

4

sidiaries, after which the holding company brought a motion to dismiss and/or transfer under the "first-to-file" rule.  The court denied the motion under the relation-back doctrine.  *See also Nutri-Health Supplements, LLC v. Block Drug Co.*, 2007 WL 38159 (D. Ariz. 2007) (applying first-filed rule to grant motion to dismiss declaratory judgment suit for non-infringement and invalidity because defendant's complaint in other forum related back under Rule 15(c)); *Optima, Inc. v. Republic Indus., Inc.*, 1995 WL 72430 (E.D. La. 1995) (applying Rule 15(c) relation back doctrine to deny motion to dismiss or transfer patent infringement case under first-filed rule where plaintiff initially sued non-existent party and proper defendant subsequently brought declaratory judgment suit in other forum).

The same result should occur here.  GE should not be deprived of its forum choice simply because Remy International concealed the fact that its subsidiaries were the correct defendants until settlement negotiations broke down, raising the issue only when its subsidiaries were poised to simultaneously ambush GE with a declaratory judgment complaint in Delaware.  It is particularly appropriate for this Court to refuse to permit such flagrant forum shopping where, as here, the Remy Subsidiaries have had actual knowledge of these proceedings from their inception and Remy International's participation in settlement negotiations led GE to believe that it was dealing with the proper party.  *See, e.g., Sorrels v. Sears, Roebuck & Co.*, 84 F.R.D. 663, 667 (D. Del. 1979) (applying Rule 15(c) and stating, "[w]here a potential defendant misleads a plaintiff into thinking that another party should be sued, that defendant should not be able to claim surprise at its being brought into the action").

## II.    ALL NECESSARY PARTIES ARE AVAILABLE IN THE TEXAS SUIT.

The just resolution of this case does not depend on the presence of the Indemnity Defendants.  Although the Remy Subsidiaries offer no supporting documents, they allege that the In-

demnity Defendants owe a contractual duty to indemnify one or more of them for liability if the accused products are found to infringe GE's patent. Any such indemnity obligation, if it does exist, is premature until liability on the underlying patent infringement claim becomes fixed and certain. It is black letter law—in both Texas and Delaware—that claims against indemnitors may not be brought *unless and until* there is a judgment of liability against their indemnitee. *See, e.g., Scharf v. Edgcomb Corp.*, 864 A.2d 909, 919 (Del. Super. 2004) (stating that the cause of action for indemnification does not accrue until the indemnitee is "confident any claim against him . . . has been resolved with certainty"); *Chesapeake Utilities Corp. v. Chesapeake and Poto-mac Tel. Co. of Maryland*, 401 A.2d 101, 102 (Del. Super. 1979) (stating that the point at which an indemnification claim is ripe "is the point at which the indemnitee suffers loss or damage through payment of a claim after judgment or settlement"); *Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 208 (Tex. 1999) ("the longstanding rule [is] that a claim under a liability indemnification clause does not accrue, and thus is not mature, until the indemnitee's liability to the party seeking damages becomes fixed and certain"); *D. Wilson Const. Co. v. Cris Equip. Co., Inc.*, 998 S.W.2d 388, 396 (Tex. App. 1999) ("[i]n the case of a promise to indemnify against liability, a cause of action accrues to the indemnitee only when the liability has become fixed and certain, as by rendition of a judgment"). There is no compelling reason preventing the Remy Subsidiaries from proceeding against the Indemnity Defendants in this forum should the Texas court enter a finding of liability on the underlying patent claim.

## CONCLUSION

For the foregoing reasons, the Remy Subsidiaries' Complaint in this case should be dismissed pursuant to the first-filed rule, or in the alternative, the case should be stayed pending the outcome of Civil Action No. 2:06-cv-00345-DF, currently pending in the Eastern District of Texas.

ASHBY & GEDDES

/s/ *Lauren E. Maguire*

_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant*
*CIF Licensing, LLC, d/b/a/ GE Licensing*

*Of Counsel:*

Bradford Lyerla
Jeffrey H. Dean
Scott Sanderson
Marshall Gerstein & Borun LLP
233 South Wacker Drive
6300 Sears Tower
Chicago, IL  60606-6357
(312) 474-6300

Dated: July 17, 2007
182335.1

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FILED CLERK
U.S. DISTRICT COURT

2006 AUG 30  PM 4: 36

TEXAS EASTERN

BY_____

| | |
|---|---|
| CIF Licensing, LLC, d/b/a<br>GE Licensing,<br><br>Plaintiff,<br><br>v.<br><br>DENSO CORPORATION,<br>Remy International, Inc., and<br>Valeo, Inc.<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

Case No. 2:06cv345

JURY TRIAL DEMANDED

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff CIF Licensing, LLC, d/b/a GE Licensing ("GE Licensing"), brings this action against Defendants DENSO CORPORATION ("DENSO"), Remy International, Inc. ("Remy"), and Valeo, Inc. ("Valeo"), alleging as follows:

### The Parties

1.    Plaintiff GE Licensing is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Princeton, New Jersey 08540. GE Licensing is the owner of all right, title, and interest in and to United States Patent No. 4,733,159 (the "Patent") by assignment, with the right to recover damages for all past infringement of the Patent. The Patent was duly and legally issued on March 22, 1988 by the United States Patent and Trademark Office. The invention of the Patent concerns a voltage regulator system for automobile alternators, including a unique high frequency charge pump. A copy of the Patent is attached hereto as Exhibit A.

2.    Upon information and belief, Defendant DENSO is a Japanese corporation with its principal place of business and home office at 1-1 Showa-cho, Kariya Aichi 448-8661, Japan.

Although DENSO does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, DENSO does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, DENSO may be served with process by serving the Texas Secretary of State, who is deemed to be DENSO's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

3.      Upon information and belief, Defendant Remy is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business and home office located at 2902 Enterprise Drive, Anderson, Indiana 46013. Although Remy does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, Remy does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Remy may be served with process by serving the Texas Secretary of State, who is deemed to be Remy's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

4.      Upon information and belief, Defendant Valeo is a corporation organized and existing under the laws of the State of New York, with its principal place of business and home office located at 3000 University Drive, Auburn Hills, Michigan 48326. Upon information and belief, Valeo maintains branch offices in El Paso, TX, Fort Worth, TX, and Pharr, TX. Valeo also does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent and recruiting Texas residents for employment (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042). Valeo has not registered to do business in Texas, and does not maintain

2

a designated agent for service of process in Texas. Therefore, Valeo may be served with process by serving the person in charge of its business in Texas. TEX. CIV. PRAC. & REM. CODE § 17.043.

### Jurisdiction and Venue

5.   This action for infringement arises under the patent laws of the United States, Title 35, United States Code, including § 271. This Court has exclusive jurisdiction under Title 28, United States Code, particularly § 1338(a).

6.   Defendant DENSO has committed the tort of patent infringement in the Eastern District. Defendant DENSO has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant DENSO resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

7.   Defendant DENSO is subject to personal jurisdiction in Texas and this District.

8.   Defendant Remy has committed the tort of patent infringement in the Eastern District. Defendant Remy has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Remy resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

9.   Defendant Remy is subject to personal jurisdiction in Texas and this District.

10.   Defendant Valeo has committed the tort of patent infringement in the Eastern District. Defendant Valeo has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent or has sold such products under circumstances in which it

3

was reasonably foreseeable that the products would be shipped into the Eastern District.

Accordingly, Defendant Valeo resides in the Eastern District as the term "reside" is defined in

28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C.

§§ 1391(b) and (c), and 1400(b).

11.    Defendant Valeo is subject to personal jurisdiction in Texas and this District.

## COUNT I
(Patent Infringement – DENSO)

### Defendant DENSO's Activities

1-11.    Plaintiff hereby repeats and incorporates by reference ¶1-11 as ¶1-11 of this

Count I.

12.    Defendant DENSO operates as a manufacturer and wholesaler of automotive

motor vehicle supplies and parts, including alternators containing voltage regulator units.

Defendant DENSO sells such supplies and parts to entities engaged in the automobile industry

in North America.

13.    On information and belief, the above-mentioned activities by Defendant DENSO

have amounted to infringement, directly, by inducement, and/or by contributing to the

infringement, of the Patent.

14.    Plaintiff GE Licensing is the owner of all right, title and interest in and to the

Patent with the right to recover damages for all past infringement of the Patent.

15.    On information and belief, DENSO is infringing the Patent willfully and with

knowledge.  On information and belief, DENSO will continue infringing the Patent unless

enjoined by this Court.

16.    As a result of DENSO's infringing conduct, GE Licensing has been damaged and

will continue to suffer irreparable harm without the issuance of an injunction by this Court.

17.    DENSO's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## COUNT II
(Patent Infringement – Remy)

### Defendant Remy's Activities

1-17.    Plaintiff hereby repeats and incorporates by reference ¶1-17 of Count I as ¶1-17 of this Count II.

18.    Defendant Remy operates as a manufacturer and re-manufacturer of original equipment and aftermarket electrical components for automobiles, light trucks, medium and heavy duty trucks and other heavy duty vehicles, including alternators containing voltage regulator units. Defendant Remy sells such components to original equipment manufacturers and dealers, automotive retail chains and warehouse distributors in North America, Europe, Latin America, and Asia-Pacific.

19.    On information and belief, the above-mentioned activities by Defendant Remy have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

20.    On information and belief, Remy is infringing the Patent willfully and with knowledge. On information and belief, Remy will continue infringing the Patent unless enjoined by this Court.

21.    As a result of Remy's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

22.    Remy's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## COUNT III

(Patent Infringement – Valeo)

### Defendant Valeo's Activities

1-22.    Plaintiff hereby repeats and incorporates by reference ¶1-22 of Count II as ¶1-22 of this Count III.

23.    Defendant Valeo operates as a manufacturer of automotive motor vehicle parts, including alternators containing voltage regulator units. Valeo sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe.

24.    On information and belief, the above-mentioned activities by Defendant Valeo have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

25.    On information and belief, Valeo is infringing the Patent willfully and with knowledge. On information and belief, Valeo will continue infringing the Patent unless enjoined by this Court.

26.    As a result of Valeo's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

27.    Valeo's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

### Requested Relief

WHEREFORE, Plaintiff GE Licensing prays that this Court enter judgment.

a.    Finding that Defendants DENSO, Remy, and Valeo have infringed, induced others to infringe and/or committed acts of contributing infringement of the Patent under 35 U.S.C. § 271.

6

b. Enjoining Defendants DENSO, Remy, and Valeo and their subsidiaries, agents, officers and employees, and all others acting in concert with them, from infringing, inducing infringement, and contributing to the infringement of the Patent.

c. Ordering Defendants DENSO, Remy, and Valeo to award GE Licensing an amount that adequately compensates GE Licensing for Defendants' infringement, including lost profits (and/or a reasonably royalty), treble damages, court costs, pre-judgment interest, post-judgment interest and attorney's fees under 35 U.S.C. §§ 284 and 285.

d. Granting GE Licensing such other and further relief as is just.

### Demand for Jury Trial

Plaintiff GE Licensing hereby demands a jury trial on all claims and issues triable of right by a jury.

Dated August 30, 2006

Respectfully submitted,

BY: _____
(signed by permission by Otis Carroll)
Bradford P. Lyerla. **Lead Attorney**
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-mail: blyerla@marshallip.com

OF COUNSEL:

Anthony G. Sitko
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: asitko@marshallip.com

Jeffrey H. Dean
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: jdean@marshallip.com

Anthony S. Hind
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: ahind@marshallip.com

Otis W. Carroll
Texas Bar No. 03895700
IRELAND, CARROLL & KELLEY, P.C.
6101 South Broadway, Suite 500
Tyler, Texas  75703
Tel: (903) 561-1600
Fax: (903) 581-1070
E-Mail: Fedserv@icklaw.com

Attorneys for Plaintiff CIF Licensing, LLC
d/b/a GE Licensing

# United States Patent [19]

## Edwards et al.

[11] Patent Number: **4,733,159**

[45] Date of Patent: **Mar. 22, 1988**

[54] **CHARGE PUMP VOLTAGE REGULATOR**

[75] Inventors: **Arthur J. Edwards**, Hoffman Estates, Ill.; **Mihaly Lamoth**, Coppet, Switzerland

[73] Assignee: **Motorola, Inc.**, Schaumburg, Ill.

[21] Appl. No.: **924,100**

[22] Filed: **Oct. 28, 1986**

[51] Int. Cl.⁴ ................................................ G05F 1/56

[52] U.S. Cl. ...................................... 323/282; 322/28

[58] Field of Search ............... 323/282, 284; 318/139; 322/28

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,343,060 | 9/1967 | Ingraham | 323/282 X |
| 3,447,065 | 5/1969 | Kuhn | 322/28 X |
| 4,210,856 | 7/1980 | Taylor | 320/17 |
| 4,346,337 | 8/1982 | Watrous | 322/25 |
| 4,386,310 | 5/1983 | Sievers | 322/28 |
| 4,388,586 | 6/1983 | Lamoth | 323/283 |
| 4,388,587 | 6/1983 | Lamoth et al. | 323/283 |
| 4,580,090 | 4/1986 | Bailey et al. | 323/282 X |
| 4,636,711 | 1/1987 | Freymuth | 318/139 X |

### OTHER PUBLICATIONS

Motorola Data Sheets XPC1500 for the 16 Ampere Logic-to-Power Switch.
Motorola Data Sheet MPC1500, Logic-to-Power Switch Block Diagram.

*Primary Examiner*—Patrick R. Salce
*Assistant Examiner*—Marc S. Hoff
*Attorney, Agent, or Firm*—Phillip H. Melamed

[57] **ABSTRACT**

A voltage regulator (11) provides a pulse width modulated voltage regulator output (40) to a drive circuit (37) to provide field coil excitation for a voltage generator (15-17) providing a charging signal for a battery (14). The voltage regulator output determines on/off states of an FET power switching device (28) coupled in series with a field coil (17) across a maximum power source voltage potential $V_{BAT}$ corresponding to battery voltage. The drive circuit includes a charge pump (26, 35, 36) with a low capacitance capacitor (26) coupled and decoupled across a source of voltage potential at a rate determined by a high frequency signal (41), provided by the regulator, having a frequency substantially in excess of the frequency of the voltage regulator output. The drive circuit includes a pair of switches (21, 35) which alternately couple one terminal of the capacitor to either battery voltage or ground potential in accordance with the voltage regulator output. The above configuration provides a control voltage (44) at the gate of the FET substantially in excess of battery voltage and this insures maximum field current when the FET is on. This is achieved with a minimum capacitance for the capacitor, thus reducing circuit size and cost. Battery current drain of the drive circuit is minimized by disconnecting the one terminal of the capacitor from battery voltage when the FET is off.

**18 Claims, 2 Drawing Figures**





*FIG. 1*



FIG.2

4,733,159

1

**CHARGE PUMP VOLTAGE REGULATOR**

### BACKGROUND OF THE INVENTION

The present invention generally relates to the field of voltage regulators, and in particular to voltage regulator systems utilized to control the charging of a battery, such as the battery in a vehicle.

In prior voltage regulator systems for vehicles it is known to provide a voltage regulator which senses battery voltage and provides a pulse width modulated output signal that varies in duty cycle in accordance with the difference between sensed battery voltage and a reference signal. This output signal is used to control a power switching device connected in series with a field coil across the battery voltage potential. The field coil controls excitation of stator windings of a voltage generating system which, after rectification of the output of the stator windings, provides a charging signal for the battery. Such voltage regulator systems, as described above, are conventional and well understood.

In some of the above-noted voltage regulator systems, it is necessary to provide a relatively large voltage, larger than battery voltage, at a control terminal of the power switching device so as to insure that maximum field current is provided when the switching device is on. In some cases an FET (field effect transistor) is utilized as the power switching device, with the drain electrode connected to battery voltage and the source terminal is connected through the field coil to ground potential. In such a configuration, to provide a gate voltage in excess of battery voltage when it is desired to have the FET on, a prior voltage regulator system has utilized a voltage doubler circuit. In the prior voltage doubler circuit, a voltage of approximately twice battery voltage is selectively provided at the gate terminal to insure that approximately the entire battery voltage potential is applied across the field coil when the FET is on.

The voltage doubler circuit of the prior voltage regulator relies on utilizing the pulse width modulated output signal of the voltage regulator to selectively couple and decouple a large magnitude capacitor across the battery voltage potential via a switch device. The end result is that essentially a voltage doubler is provided by the capacitor and the selective switching of the capacitor across the battery voltage potential. However, in such a configuration, a very large capacitance for the capacitor is utilized to insure that at high duty cycle percentages of the voltage regulator output signal, the voltage across the capacitor does not substantially decrease during the long on-duty cycle and thereby decrease the magnitude of the voltage at the gate electrode of the FET. When the prior voltage regulator produced an output signal which essentially resulted in the FET being on all of the time since field coil current was required all of the time, additional complex logic circuitry was required to provide some alternate coupling and decoupling of the capacitor across the battery voltage, and this increased the circuit cost. Without this additional logic circuitry, the twice battery voltage to be maintained at one terminal of the large capacitance capacitor would decrease due to leakage effects and the loading of the turned-on FET device. This is undesirable as it would result in reducing field coil current when the voltage regulator has indicated that maximum field coil current should be provided. Also, the required large magnitude capacitor is expensive, and it cannot be

2

implemented as part of an integrated circuit so as to reduce circuit cost.

### SUMMARY OF THE INVENTION

An object of the present invention is to provide an improved voltage regulator which overcomes the aforementioned deficiencies.

A more particular object of the present invention is to provide a voltage regulator which does not require a large magnitude capacitor but still provides a switching control voltage substantially in excess of battery voltage at the gate of an FET device connected in series with the field coil that controls the output of a voltage generator which implements battery charging.

In one embodiment of the present invention, an improved voltage regulator is provided. The voltage regulator comprises: regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison; drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals coupled in series with a control element of a voltage control means, which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential, wherein the improvement comprises said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device.

Essentially, the above-recited configuration results in utilization of a relatively small magnitude capacitor while still providing a switching voltage at the control terminal of the power switching device that is substantially in excess of the maximum power source voltage potential, which preferably corresponds to battery voltage in the vehicle charging system. Preferably, the power switching device comprises an N channel field effect transistor (FET) in which the gate electrode is the control terminal the drain electrode is connected to

4,733,159

3

positive battery voltage and the source electrode is connected through a field coil to ground potential. Preferably, the voltage regulator means output signal comprises a pulse width modulated switching signal which selectively couples one terminal of the capacitor, at which said increased voltage signal is provided, to ground during one polarity of the duty cycle of the regulator output signal and during another polarity of the regulator output signal couples this terminal to battery voltage.

Preferably the high frequency switching signal is at least two orders of magnitude higher than the frequency of the regulator output signal, and this results in requiring only a very small capacitance for the selectively series coupled capacitor thus reducing component cost and size. This also permits synthesizing the capacitor as part of an integrated circuit which includes other regulator components. In addition, the present invention contemplates utilizing the pulse width modulated output signal of the regulator and a switch device to alternately couple and decouple the capacitive terminal at which the increased voltage is produced to battery voltage, and this minimizes battery current drain during which no field current is desired. Also, this insures no substantial battery current drain when the voltage regulator is off and a low voltage regulator output signal is provided.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the invention, reference should be made to the drawings, in which:

FIG. 1 is a schematic diagram of a voltage regulator system constructed in accordance with the present invention; and

FIG. 2 comprises a series of graphs A through F illustrating waveforms of signals provided at the terminals A through F in FIG. 1.

DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, a voltage regulator system 10 is illustrated in which a substantially conventional pulse width modulated voltage regulator 11 has a voltage sensing input terminal 12 connected to a positive battery voltage terminal 13 also designated as $V_{BAT}$. The terminal 13 corresponds to the positive electrode of a vehicle battery 14 which has its negative electrode connected to ground potential. Charging of the battery 14 is accomplished by means of a plurality of stator output windings 15 which provide an output that is rectified by a rectifier circuit 16. The output of the stator windings 15 is controlled, as is conventionally understood, by the current excitation applied to a field coil 17 having a flyback transient suppression diode 18 connected thereacross.

Essentially, the voltage across the battery is sensed by the voltage regulator 11 via the signal at the terminal 12. The voltage regulator compares this voltage to an internal or external reference voltage signal provided at a terminal 19, and in response to this comparison produces a pulse width modulated regulator output signal at an output terminal 20. The duty cycle of this pulse width modulated output signal at terminal 20 can vary from approximately 0% to 100% and is essentially determined in accordance with the difference between the sensed battery voltage and the reference signal at the terminal 19. This is accomplished in a conventional manner as is understood to those in the voltage regula-

4

tor art field, and can be implemented by a number of different circuit configurations for the voltage regulator 11. The constant frequency regulator disclosed in U.S. Pat. No. 4,386,310 to Sievers, assigned to the same assignee as the present invention, can be used for the above described voltage regulator 11. Also see U.S. Pat. Nos. 4,388,586 and 4,388,587. Essentially, the voltage regulator system 10, as is understood, responds to the pulse width modulated switching output signal at the terminal 20 so as to provide field coil current such that the battery voltage at the terminal 13 is maintained at a predetermined voltage with respect to the voltage magnitude of the reference signal at the terminal 19. This operation is conventional.

Essentially, the present invention involves providing a drive circuit means so as to couple the pulse width modulated regulator output signal at the terminal 20 to the field coil 17 so as to control field coil current excitation. This is accomplished in an advantageous manner by a relatively simple and economical drive circuit utilizing inexpensive components. The construction and operation of the drive circuit means is as follows.

The battery voltage terminal 13 is connected through a resistor 13A to the emitter of a PNP first switch device transistor 21 which has its collector coupled through a diode 22 to a terminal 23 also designated as terminal D. The emitter of transistor 21 is coupled to ground through an effective 20 volt Zener diode 13B and coupled through a resistor 24 to a terminal 25 also designated as terminal C. A relatively small magnitude capacitor 26 is connected between the terminals C and D wherein the capacitor 26 has a typical capacitance magnitude of 50 picofarads.

The terminal D is connected through a diode 27 to a gate electrode G of an N channel FET transistor 28 wherein the gate electrode is also designated by the terminal E. A drain electrode D of the FET is directly connected to the battery voltage terminal 13, and a source electrode S of the FET corresponds to a terminal F. A Zener diode 29 is connected between the terminals E and F to insure that no excessive voltage can be applied between the gate and source electrodes which would cause destruction of the FET. In FIG. 1, the effective internal input capacitance of the FET is illustrated as an inherent capacitor 30 connected between the gate and source electrodes and having a typical magnitude of 1000 picofarads. The FET 28 is utilized as a power switching device that controls current in the field coil 17.

The source electrode of the FET is connected through a current sensing resistor 31 to a terminal 32 at which one end of the field coil 18 is connected and a cathode of the flyback diode 18 is connected. Another end of the field coil 17 and the anode of the diode 18 are connected to ground potential. The amount of field coil current being drawn can be measured by noting the voltage drop across the resistor 31, if desired. With this configuration the output electrodes (drain and source) of the FET are connected in series with field coil 17 between a maximum power source potential corresponding to the battery voltage.

The pulse width modulated regulator output signal at the terminal 20 is connected to a terminal 33 also designated as terminal A. This terminal is connected through a level shifter or isolation device 34 to the base electrode of the first switch device transistor 21. The terminal 33 is also connected directly to the base electrode of an NPN transistor 35 which comprises a third switch

4,733,159

5

device transistor having its emitter connected to ground and its collector connected to the terminal E. An effective 40 volt Zener diode 35A is connected between the collector and base electrodes of the transistor 35. A second switch device transistor 36 comprising an NPN transistor has its collector connected to the terminal C, its emitter connected to ground potential and its base electrode connected to a terminal B which is contemplated as being an additional output terminal of the voltage regulator 11 at which a very high frequency switching signal is provided. It is contemplated that the high frequency switching signal at the terminal B is a constant frequency signal having a frequency of 200 to 300 kilohertz, as contrasted with the frequency of the pulse width modulated regulator output signal at the terminal 20 which has an output frequency of 50 to 70 hertz.

The operation of the voltage regulator system 10 in FIG. 1 will now be discussed with reference to the signal waveforms shown in the graphs A through F in FIG. 2. It should be noted that the signal waveforms illustrated in FIG. 2 in graphs A through F correspond to the voltage waveforms of electrical signals provided at the terminals A through F, respectively, in FIG. 1. In the graphs in FIG. 2, the vertical axes are representative of signal magnitude, and the horizontal axes are representative of time. It should also be noted that the time scale utilized to illustrate the very high frequency signal at the terminal B, and its affect on other signals, is not drawn to scale with regard to the much slower varying signal of the pulse width modulated regulator output signal at terminal 20 corresponding to the signal at terminal A. However, this has been done to enhance the clarity of the Figures as is readily understood.

As shown in FIG. 2, the voltage regulator 11 provides a pulse width modulated signal 40 at the terminal A wherein the duty cycle of this signal is variable and is determined in accordance with the difference between the sensed battery voltage at the terminal 19 and the reference signal voltage at the terminal 12 and the high, or positive, polarity 41A of the duty cycle portion of the signal 40, no field current will be drawn, but during the low, or negative, polarity 41B of the duty cycle of the signal 40, field current will be provided so as to charge the battery 14. The signal 40 illustrates that at a reference time $t_0$, there is a high to low transition indicating the commencement of a low state for the signal 40 during which field current will flow. The frequency of the signal 40 is typically between 50 to 70 hertz, and the duty cycle can vary between extreme percentages such as 0 to 100% depending upon how much field current the voltage regulator 11 determines is necessary.

In generating the pulse width modulated signal 40 at the terminal 20, it is contemplated that the voltage regulator may internally use a very high frequency reference oscillator. Alternatively, a separate high frequency reference oscillator may be provided within the voltage regulator 11 even though this signal may not be utilized to generate the pulse width modulated regulator output signal 20. In either event, the voltage regulator 11 provides at the terminal B a very high frequency signal comprising a series of pulses wherein the frequency is 200 to 300 kilohertz. This is generally shown in graph B in FIG. 2, even though the time scale for graph B does not correspond to the same time scale utilized for graph A.

6

Essentially, in response to the high and low outputs provided at the terminal 20 by the voltage regulator 11, the first and third switch transistor devices 21 and 35, will be alternately opened and closed. More specifically, in response to a high signal level at the terminal A, transistor 35 will be turned on, therefore grounding the gate electrode of the FET and limiting the voltage at the terminal D to only one diode drop above ground potential. At the same time, this high signal level at terminal A, via the level shifter 34, will result in effectively turning off the first switch device 21 and thereby decouple the battery voltage terminal 13 from the capacitor terminal D via the transistor 21 and diode 22.

During the time that a high or positive logic level is present at the terminal A, and even when a low logic level is present at the terminal A, a high frequency signal 41 is continuously provided at the terminal B as illustrated in graph B in FIG. 2. The signal 41 is not necessarily continuously provided during the duty cycle polarity 41A of signal 40. This high frequency signal continually results in turning the transistor 36 on and off and, therefore, alternately connecting the terminal C to ground potential and then opening this connection. When a positive signal level is provided at a terminal A, the opening and closing of the transistor switch 36 results in providing a corresponding ramp signal 42 at terminal C as illustrated in graph C in FIG. 2. During the time that the transistor 36 is on, terminal C is connected to ground potential, but when transistor 36 is off, the potential at terminal C rises due to a charging current provided from the battery voltage terminal 13 through the resistor 24. Typically, the peak of this ramp signal during a positive logic state at the terminal A will be approximately 2.5 volts less than the battery voltage at the terminal 13, which is typically 14 volts. Thus, approximately 11.5 volts is the magnitude of the voltage peaks of the signal 42 for a positive logic state at the terminal A which corresponds to no field current being conducted. During this same time, a relatively small magnitude square wave varying at the same frequency as the high frequency signal 41 is at the terminal D wherein the signal at the terminal D is generally designated by the reference numeral 43 in graph D. The peak magnitude of the signal 43 when a positive logic state is at the terminal A is approximately $+1$ volt since at that time the transistor 35 is on and the peaks of signal at the terminal D are limited by the clipping action provided by the diode 27. Typically, a slight negative voltage is provided at the terminal D when a positive logic state is present at terminal A and the transistor 36 is turned off.

Since a positive logic state at the terminal A turns the transistor 35 on, this means that at this time the gate electrode of the FET is at ground potential, and, therefore, the FET is turned off. While the FET is turned off, field current will not flow in the field coil 17 by virtue of power (current) supplied by the battery 14. A signal 44 in graph E in FIG. 2 illustrates the voltage waveform for the signal at the gate electrode of the FET, and a signal 45 in graph F in FIG. 2 illustrates the voltage waveform at the source electrode of the FET. The signals at the terminals F and 32 are identical, except for a minor voltage shift in case field current is flowing due to the drop across the resistor 31. Thus a graph of the signal at terminal 32 is not provided.

Essentially, prior to the time $t_0$ shown in FIG. 2, there is no field coil current because the FET 28 is turned off. At the time $t_0$, the transistor 35 which was previously on, is now turned off, thus removing the clamping ac-

4,733,159

7

tion provided at the gate electrode of the FET by virtue of the transistor 35 and diode 27. At the same time, since a low or negative logic state is now provided at the terminal A, the transistor 21 is turned on via level shifter 34 resulting in applying approximately battery voltage at the terminal D by virtue of the transistor 21 and diode 22. This is illustrated in the graphs in FIG. 2 by the abrupt rising transient present at the time $t_0$ in the signals 43, 44 and 45. Immediately after $t_0$ the signal 43 has a magnitude of $V_{BAT}$—1 diode drop, signal 44 has a magnitude of $V_{BAT}$—2 diode drops, and signal 45 has a magnitude of approximately 7 volts representing the difference between the signal 44 at the terminal E and the gate-to-source turn-on threshold developed across the FET 28.

After the time $t_0$, the transistor 36 continues to be switched on and off at a very rapid rate in accordance with the pulses of the high frequency signal 41. This results in only a slight change in the peak magnitudes of the signal 42 at the terminal C, and this slight increase in magnitude is due to the fact that the clamping action of the diode 27 to ground potential through the transistor 35 has now been removed. However, the significance of continuing the high frequency switching after the time $t_0$ is more evident in the signals 43 through 45. For signal 43, it is noted that what essentially happens is that the ramp signal provided at the terminal C is now effectively transferred to the terminal D and superimposed upon a DC level of approximately the battery voltage $V_{BAT}$ at the terminal 13 minus the series drop across the transistor 21 and diode 22. This essentially results in the signal 43 reaching peak magnitudes of approximately twice the battery voltage since the AC variation of the signal 42 is now effectively superimposed on a DC level of approximately battery voltage.

In response to the signal 43, the diode 27, and the effective input capacitance 30 of the FET effectively provide a peak rectification circuit such that the signal 44 essentially follows the envelope of the signal peaks of the signal 43 less the voltage drop across diode 27. This is illustrated in graph E in FIG. 2. The signal 45 at the source electrode essentially tracks the gate voltage and, therefore, also increases, but the maximum value of the signal 45 is achieved at battery voltage since this signal cannot exceed the drain voltage wherein the drain electrode is directly connected to the relatively constant voltage $V_{BAT}$ at the battery voltage terminal 13. However, as seen in graph F in FIG. 2, the signal 45 does increase from a voltage somewhat below battery voltage to approximately battery voltage during the time that field current is flowing. This means that maximum possible field current is provided during the time that a low logic level is provided for the signal 40 since the source voltage of the FET will now reach approximately battery voltage due to the effective saturation of the FET device 28. This is possible in the present invention since the gate voltage is maintained in excess of the battery voltage $V_{BAT}$ present at the drain electrode and this situation is required in order to maintain the FET in an on condition with the source at $V_{BAT}$. At a subsequent time $t_x$, the signal 40 undergoes a logic state inversion resulting in the turning off of field current, and this is maintained until a subsequent time $t_1$ at which time the turn-on cycle is reinstituted.

Essentially, the present invention is concerned with providing a voltage as high as possible at the terminal F such that maximum field coil current can be drawn when the voltage regulator 11 indicates that field cur-

8

rent should be provided. This is accomplished by the present circuit providing approximately battery voltage $V_{BAT}$ at the source electrode of the FET. In order to accomplish this, a much higher than $V_{BAT}$ voltage must be provided at the gate of the N channel FET to insure that the FET turns on and remains on since there is a minimum gate-to-source threshold which must be exceeded in order for the FET to be on. The present invention is concerned with how this larger than battery voltage control signal at the gate of the FET can be produced efficiently and with minimum expense. It should be noted that the reason that the field coil 17 is not provided in the drain circuit of the FET, is that many voltage regulator systems do not wish to subject the field coil to constant positive voltage potential even when no field current is to be drawn. Thus, in the present circuit, the field coil is in the source circuit of the N channel FET, and the FET essentially acts as a source follower. Also, an N channel FET is used since P channel FETs are substantially more expensive.

The present invention essentially provides the approximately twice battery voltage signal at the gate of the FET when it is desired to commence field current. This occurs by use of the high frequency switching provided by the signal 41 at the terminal B and the use of a relatively small magnitude capacitor 26. This is contrasted with prior voltage regulator systems, which while recognizing that a high gate voltage is desirable, implemented this by utilizing relatively slow switching speeds with a very large magnitude capacitor to form a battery voltage doubling system. Those prior systems were not cost effective in implementing field current for 100% of the time, because they required utilization of extensive additional logic circuitry required to provide some periodic interruptions (in case a 100% duty cycle was required) for charging the large capacitor. In addition, the prior systems required an extremely large magnitude capacitor 26 to insure that there was not a substantial decrease in the voltage being maintained at the terminal D after commencement of field current flow. The present invention avoids these problems by implementing very rapid switching via the transistor 36 and, therefore can utilize a very small capacitor (typically 50 picofarads), for the capacitor 26. This enhances circuit performance and reduces circuit cost. In the present circuit, rather than relying on the massive capacitance of the capacitor 26, now the inherent gate-to-source capacitance of the FET 28 can be relied on to maintain an appropriate voltage at the terminal E during field current flow, and thus no additional large capacitor is required. The small size of the capacitor 26 makes it possible to synthesize, on a single integrated circuit chip, substantially all of the components of a driver circuit 37, shown dashed in FIG. 1, and the regulator 11, except the FET 28 and the resistor 31.

In addition to the above advantages, the present invention minimizes battery current drain during a condition of no field current flow. This is because the switch 21 will effectively decouple the capacitor terminal D from battery voltage when no field current is required. If the transistor 21 were replaced by a direct connection between the anode of the diode 22 and the terminal 13, then there would have to be some provision to prevent excessive battery current drain because of the shorting action provided by the transistor 35 and additional leakage current associated with the FET, when this device is off and no field current is drawn. These problems are avoided by utilization of the transistor 21 which is

4,733,159

9

switched alternately with respect to, but at the same frequency as, the transistor 35. Thus transistor 21 prevents series coupling the capacitor 26 between $V_{BAT}$ at terminal 13 and ground during duty cycle portions 41A, and permits such coupling during 41B, and this reduces battery current drain. Also, this insures no substantial battery current drain when the voltage regulator is off, and, therefore, a low voltage regulator output signal at terminal 20 is provided. The effective Zener diode 13B protects the transistors 21 and 36 from excessive battery voltage transients caused by battery load variations, and the effective Zener 35A protects the transistor 35 against transients at the terminal E.

While specific embodiments of the present invention have been shown and described, further modifications and improvements will occur to those skilled in the art. All such modifications which retain the basic underlying principles disclosed and claimed herein are within the scope of this invention.

We claim:

1. A voltage regulator comprising:

regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison;

drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential,

wherein the improvement comprises said peak voltage increasing means comprising a capacitor selectively coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device.

10

2. A voltage regulator according to claim 1 wherein said predetermined characteristic of said regulator output signal, which characteristic is determined in accordance with said comparison, comprises duty cycle.

3. A voltage regulator according to claim 2 wherein said drive circuit means includes means for selectively preventing said series coupling of said capacitor across said predetermined power source voltage potential during duty cycle portions of said regulator output signal of a predetermined polarity and permitting said series coupling during duty cycle portions of said regulator output signal of an opposite predetermined polarity.

4. A voltage regulator according to claim 3 wherein said predetermined power source voltage potential that said capacitor is selectively series coupled and decoupled across substantially comprises said maximum power source voltage potential that said power switching device and control element of said voltage control means are coupled across.

5. A voltage regulator according to claim 4 wherein the frequency of said high frequency signal pulses is at least one order of magnitude higher than the frequency of said regulator output signal.

6. A voltage regulator according to claim 5 wherein said preventing means of said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal.

7. A voltage regulator according to claim 6 wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal.

8. A voltage regulator according to claim 1 wherein said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal.

9. A voltage regulator according to claim 8 wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal.

10. A voltage regulator according to claim 9 wherein said first capacitor terminal is coupled to said power switching device control terminal through a peak rectifying diode

4,733,159

**11**

11. A voltage regulator according to claim 10 wherein said first predetermined voltage is coupled to said first capacitor terminal through a diode.

12. A voltage regulator according to claim 11 wherein said power switching device comprises an FET having gate, drain and source electrodes corresponding to said control and output terminals, respectively.

13. A voltage regulator according to claim 12 wherein said drain electrode is coupled to a source of constant voltage potential and wherein the effective internal capacitance of said FET between said gate and source electrodes is substantially larger than the capacitance of said capacitor.

14. A voltage regulator according to claim 13 wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil.

**12**

15. A voltage regulator according to claim 1 wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil.

16. A voltage regulator according to claim 15 wherein said voltage generator means includes stator windings, in addition to said field coil, and a rectifier circuit means for receiving the output of said stator windings and providing a charging signal for a battery so as to maintain a predetermined battery voltage thereacross.

17. A voltage regulator according to claim 16 wherein said predetermined voltage across said battery corresponds to said predetermined maximum power source voltage potential.

18. A voltage regulator according to claim 1 wherein the frequency of said high frequency pulses is at least one order of magnitude higher than the frequency of said regulator output signal.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.   :   4,733,159

DATED        :   March 22, 1988

INVENTOR(S) :   Arthur J. Edwards and Mihaly Lamoth

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In claim 1, Col. 9, line 35, after "voltage control means", please insert --,--.

### Signed and Sealed this

### Twenty-seventh Day of September, 1988

*Attest:*

DONALD J. QUIGG

*Attesting Officer*                    *Commissioner of Patents and Trademarks*

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CIF Licensing, LLC d/b/a<br>GE Licensing, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 2:06-CV-00345-DF |
| vs. | § | |
| | § | |
| Denso Corporation, | § | |
| Remy International, Inc., and | § | |
| Valeo, Inc. | § | |
| | § | |
| | § | |
| Defendants. | § | |

### DEFENDANT REMY INTERNATIONAL, INC.'S
### MOTION TO DISMISS FOR WANT OF PERSONAL JURISDICTION

Defendant Remy International, Inc. ("Remy International" or "Defendant") through its

undersigned counsel and pursuant to FED. R. CIV. P. 12(b)(2) files this motion to dismiss for lack

of personal jurisdiction and in support states as follows:

**I.      Summary of Motion**

Defendant is a holding company that owns stock in various subsidiaries that manufacture

products with the Delco Remy® and World Wide Automotive® brand names, among others.  It

does not manufacture any products.  It does not derive income from the sale of products.  It does

not license the Remy brand names and obtain revenue from licensing fees.  Instead, Remy

International is just a privately held corporate shell that owns stock in various Remy subsidiaries.

Remy International does not engage in any business outside the states of Indiana, its

headquarters, and Delaware, its state of incorporation.

The products are sold exclusively by various Remy International subsidiaries and

affiliates that contract with various distributors to market and sell throughout the nation.  The

Remy subsidiaries are separate from Remy International.    Remy International does not manufacture, sell or solicit for sale any product in Texas.  Remy International has no offices, employees, agents, property, or bank accounts in Texas.  Remy International does not have a certificate to do business in Texas and maintains no registered agent for service of process in Texas.

Plaintiff bears the burden of proof to demonstrate that Remy International is subject to jurisdiction in Texas, but cannot meet that burden.  Defendant should not be before this Court because the State of Texas cannot exercise personal jurisdiction over it.  For that reason, the Court should grant Defendant's Rule 12(b)(2) motion and dismiss this action.

II.    **Facts Supporting Motion to Dismiss.**

The Declaration of Remy International's Vice President – Taxes, John C. Fitzenberger ("Decl."), is Exhibit A to this Motion and negates jurisdiction over Remy International.

Remy International has no assets, employees, or agents in Texas.  Decl. at ¶ 4.  It does not maintain a registered agent for service of process, it also is not registered to do business in Texas.  Decl. at ¶ 4.  Remy International does not sell goods for distribution in Texas and does not derive revenue from any sale of goods in Texas.  Decl. at ¶ 5.  Remy International does not own, operate or lease property in Texas, does not sell products directly to the Texas market and does not sell products with the intent that they reach the Texas market.  Decl. at ¶ 5.

Instead, Remy International is a Delaware corporation with its principal place of business in Indiana.  Decl. at ¶ 2.  Remy International holds stock in other companies which make and sell products with the Delco Remy®, World Wide Automotive® and other brand names.  Decl. at ¶ 3  Remy International does not manufacture the Delco Remy®, World Wide Automotive® or any other branded products that any of those other companies make.  Decl. at ¶ 3.  The companies in

which Remy International holds stock are separate entities from Remy International that maintain separate bylaws, corporate records, financial records and bank accounts. Decl. at ¶ 7. The products that those companies sell do not provide revenue directly to Remy International. Decl. at ¶ 6. Remy International does not license the Remy products nor derive license fees from distribution of those products. Decl. at ¶ 6. Distributors of Delco Remy® and World Wide Automotive® products do not contract directly with Remy International. Decl. at ¶ 6. Remy International also does not use Plaintiff's trade secrets. Decl. at ¶ 8.

## III.    Argument.

### A.    Applicable law.

A court may exercise personal jurisdiction over a nonresident defendant if (1) the Texas Long Arm Jurisdiction Statute creates personal jurisdiction over the defendant, and (2) the exercise of personal jurisdiction is consistent with the Fourteenth Amendment Due Process Clause. *See Revell v. Lidov,* 317 F.3d 467, 469 (5th Cir. 2002). Because the Texas Long Arm Statute reaches to constitutional limits, this Court need only engage in the due process analysis. *Id.* at 470.

Personal jurisdiction over a non-resident defendant comports with the requirements of due process if (a) the nonresident purposely availed himself of the benefits and protections of the forum state by establishing minimum contacts with the state; and (b) the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *See Lewis v. Fresne,* 252 F.3d 352, 358 (5th Cir. 2001). Plaintiff can establish Remy International's minimum contacts with Texas only by (a) alleging a continuous and systematic pattern of contact with the forum ("general jurisdiction"), or (b) alleging that Texas has jurisdiction because this lawsuit arises

from Remy International's contacts with Texas ("specific jurisdiction"). *E.g., Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-415 (1984).

Courts examine other factors to determine if "fair play and substantial justice" would be offended by an exercise of jurisdiction by the forum. Those factors include: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *World Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 298 (1980). Thus, even if the nonresident defendant has purposefully established minimum contacts with the forum state, the exercise of jurisdiction may not be fair and reasonable under the facts in a particular case. *Id.* Because Remy International does not have minimum contacts with Texas that would subject it to personal jurisdiction in this State, this Court need not engage in a "fair play and substantial justice" analysis.

Plaintiff claims that Remy International "operates as a manufacturer and re-manufacturer of original equipment and aftermarket electrical components" for various vehicles and "sells such components to original equipment manufacturers and dealers, automotive retail chains and warehouse distributors." Complaint at ¶ 21. Plaintiff alleges "upon information and belief" that these actions constitute infringement of its patent, Complaint at ¶ 22, and that such infringement has occurred in Texas. Complaint at ¶ 3. Plaintiff does not unequivocally claim that Remy International has infringed its patent and does not directly allege that the hypothesized infringement occurred in Texas. Despite the inherent vagueness of Plaintiff's allegations, they resemble stream of commerce jurisdictional claims that arise from the presence of a purportedly infringing product in the forum state. This is because Plaintiff does not allege that Remy

International has targeted the Texas market, and even if it had the Fitzenberger Declaration would disprove any such allegation. See Decl. at § 5.

For patent disputes, the presence of an infringing item in the forum state, by itself, does not establish jurisdiction over the defendant where the defendant sells its products through independent distributors; instead, the plaintiff must prove that the defendant has an "established distribution channel" that funnels the infringing product into the forum state. *Compare Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1565-66 (Fed. Cir. 1994) (noting that absence of distribution channel is factor in finding no personal jurisdiction) *with Osteotech, Inc. v. GenSci Regen. Servs., Inc.*, 6 F. Supp. 2d 349, 354 (D.N.J. 1998) (holding that defendant that sold directly to forum state was subject to jurisdiction over alleged infringement). Without proof of the established distribution channel that sends the allegedly offending product into the forum state, the plaintiff cannot meet its burden to prove jurisdiction over the purported infringer. *See Beverly Hills Fan* at 1565, n. 15 ("In defendants' cases, in which jurisdiction was found not to exist, there was no such channel in place").

Remy International sells nothing. As the Fitzenberger Declaration shows, it is a holding company that does not manufacture, design or market products. For that reason, Remy International has never sold directly to a Texas consumer and the Court should apply the *Beverly Hills Fan* analysis to determine whether Remy International derived revenue from Texas through an established distribution channel.

In federal court, the plaintiff has the burden to affirmatively prove that the defendant is subject to the forum state's jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) (holding that after plaintiff demonstrates sufficient minimum contacts to satisfy due process, defendant then can defeat jurisdiction only with a "compelling case that the presence of

some other considerations would render jurisdiction unreasonable"); *Electronics for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1351-52 (Fed. Cir. 2003) (citing same). In this case, Plaintiff cannot meet its burden to prove Remy International's minimum contacts with Texas, therefore the Court should grant Remy International's motion to dismiss.

## B. Texas has no jurisdiction over Remy International.

To establish jurisdiction over a non-resident defendant in patent cases, the Federal Circuit requires the plaintiff to show that the state long-arm statute applies and that the requirements of due process are met. *E.g., Commissariat A L'Energie Atomique v. Chi Mei Optoelec. Corp.*, 395 F.3d 1315, 1319 (Fed. Cir. 2005). As this Court has noted, the Texas Long-Arm Jurisdictional Statute reaches to the limits of due process, therefore this Court need only conduct a due process examination. *E.g., Marshall Pack'g Co. v. Nestle Waters N. Am., Inc.*, 2006 WL 871015 (E.D. Tex. March 24, 2006).

The due process inquiry has two elements: does the defendant have minimum contacts with Texas; and does subjecting the defendant to personal jurisdiction comport with traditional notions of fair play and substantial justice? *Lewis v. Fresne,* 252 F.3d 352, 358 (5th Cir. 2001). Minimum contacts analysis examines whether the defendant is subject to general or specific jurisdiction in Texas. Thus, if the defendant engages in continuous and systematic contact with Texas, it is subject to jurisdiction in this State at all times under a theory of general jurisdiction. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-415 (1984); *Central Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2001).

If the defendant does not engage in continuous and systematic contact with Texas, then it may be subject to specific jurisdiction arising from the transactions or occurrences that are the basis of the complaint. The Federal Circuit has a three-prong test for specific jurisdiction: (1)

did the defendant purposefully direct its activities at the forum; (2) does the claim arise from or relate to those activities directed at the forum; (3) is assertion of jurisdiction reasonable and fair. *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1378 (Fed. Cir. 1998).

1.    Remy International is not subject to general jurisdiction.

The Fitzenberger Declaration negates Texas' general jurisdiction.  As the Declaration clearly notes, Remy International does not engage in business in Texas, does not have property or an agent for service of process in Texas and is not registered to do business in Texas.  Decl. at § 4.  Remy International not only lacks systematic contacts with Texas, it has no continuing contacts with Texas at all.  Thus, the Court should find that Remy International is not subject to general jurisdiction. *See Helicopteros Nacionales*, 466 U.S. at 414-415.

2.    Remy International is not subject to specific jurisdiction.

Remy International has no connection to Texas.  The crux of the minimum contacts analysis is whether Remy International has purposefully taken actions directed to Texas.  As the Fitzenberger Declaration demonstrates, Remy International has not purposefully directed any contact toward the State of Texas.  Instead, any such contacts between Remy International and Texas would be purely fortuitous or accidental: it would only have occurred through a random act initiated by an outside party.  Such a contact lacks "purposeful direction" toward Texas instigated by Remy International.

Contacts by a defendant with the forum that are fortuitous, random or result solely from the unilateral activity of an outside party do not count in the "minimum contacts" analysis. *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1359 (Fed. Cir. 1998) (citing *Burger-King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  In other words, a Remy International "contact" with Texas that another party initiated, without input or knowledge of

Remy International itself, has no relevance in the minimum contacts analysis. This is because "[i]n simple terms, doing business with a company that does business in [the forum] is not the same as doing business in [the forum]." *Red Wing Shoe*, 148 F.3d at 1361. Similarly, in a situation unique to patent cases, letters from a patentee cannot create jurisdiction. *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1206 (Fed. Cir. 2003) ("The patent system has national application. If infringement letters created jurisdiction, the patentee could be haled into court anywhere the letters were sent"). The converse is also true: because sending infringement letters to an alleged infringer constitutes a contact with the forum generated by the unilateral action of the patentee, receipt of infringement letters from a patentee cannot confer jurisdiction on the alleged infringer in the forum state. *See Rudzewicz*, 471 U.S. at 475.

As the Fitzenberger Declaration demonstrates, Remy International has no purposeful contact with Texas. It has no offices, agents, property, or assets in this State. It does not send the Remy-branded products to, or advertise such products in, this State, nor does it solicit business in Texas.

For these reasons, Plaintiff cannot even meet the first prong of the Federal Circuit's three-prong test for specific jurisdiction: action by the defendant purposefully directed at the forum state. *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1378 (Fed. Cir. 1998); *see also North Am. Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1580 (Fed. Cir. 1994) (defendants who voluntarily placed articles into "stream of commerce" conscious that articles were destined for forum state were subject to jurisdiction in forum). Remy International never directed any of its products or advertisements to Texas and never placed allegedly infringing articles into the stream of commerce with the intent or knowledge that the products would go to Texas. Because Plaintiff cannot prove Remy International engaged in purposeful action directed

at Texas, by definition Plaintiff cannot meet the second prong of the Federal Circuit's three-part test for personal jurisdiction: proof that its claims arise from or relate to Remy International activities *directed* at the forum. Therefore, Plaintiff cannot prove a prima facie case for personal jurisdiction over Remy International.

### 3. Remy International is not subject to jurisdiction as a related company.

Remy International's status as the holding company for the various Remy entities, standing alone, does not subject it to the jurisdiction of the Texas forum. *See 3D Sys., Inc. v. Aarotech Labs., Inc., supra,* 160 F.3d at 1380. Instead, the Federal Circuit has stated that courts should not "lightly cast aside" the corporate veil between a parent and its subsidiary based on the subsidiary's actions toward the forum state. *Id.* The Federal Circuit therefore requires that the separate corporate forms be upheld unless there are "specific, unusual circumstances" that call for piercing the corporate veil, or unless the plaintiff can prove "specific intent to escape liability for a specific tort." *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 552 (Fed. Cir. 1990). Plaintiff neither alleges nor offers proof that Remy International arranged its corporate structure with the specific intent to escape liability for the specific torts Plaintiff claims Remy International committed.

The Remy family of companies consists of separate corporate entities that maintain separate bylaws, corporate records, financial records and bank accounts. Decl. at ¶ 7. In similar situations, district courts have held that they did not have personal jurisdiction over the parent corporation for its subsidiaries' alleged acts. *Meteoro Amusement Corp. v. Six Flags,* 267 F.Supp.2d 263, 273-74 (N.D.N.Y. 2003); *Androphy v. Smith & Nephew, Inc.,* 31 F.Supp.2d 620, 622 (N.D. Ill. 1998). In *Meteoro Amusement,* the court rejected plaintiff's claims that defendant Six Flags, Inc. was subject to personal jurisdiction in New York through its subsidiaries because,

among other reasons, the link between Six Flags' sale of season passes to its amusement parks over the internet to New York residents was too attenuated from the later use of such pass by a customer to ride the one rollercoaster, located at a Six Flags park in California, that allegedly infringed Metcoro's patents. 267 F.Supp.2d at 277-78. Because the infringement could only have an effect in New York if a New York resident went to California and rode the infringing ride, the purposeful availment of New York's forum by Six Flags did not exist. *See id.*

The *Androphy* court similarly rejected the plaintiff's attempt to have the court exercise jurisdiction over Johnson & Johnson ("J&J") – the parent holding company of the various Johnson & Johnson pharmaceutical entities. The court noted that J&J "is a holding company which neither transacts business nor contracts to provide products or services in Illinois" and that "it is not registered to do business in Illinois, and it has no agents here." 31 F.Supp.2d at 622. It also noted that J&J had not "manufactured, used or sold the . . . instruments at issue in the instant suit, either in Illinois or elsewhere." *Id.* J&J and its subsidiaries maintained wholly separate corporate identities; therefore, the court granted J&J's motion to dismiss for want of personal jurisdiction. *Id.*

Remy International is similar to J&J and Six Flags Inc., it is a parent holding company that holds stock in various business entities that manufacture, design, market and distribute the Remy products. Remy International maintains a separate identity from its various subsidiaries and related companies. It has no ties to Texas of any sort – instead, it only has purposefully availed itself of jurisdiction in Indiana, its home state, and Delaware, its state of incorporation. Because Remy International does not reach out to other forums, this state cannot exercise personal jurisdiction over it. This Court should therefore grant Remy International's Motion to Dismiss.

**III.    Conclusion and Prayer.**

This Court cannot exercise personal jurisdiction over Remy International, Inc. because it has not purposefully availed itself of the Texas forum. For that reason, the Court should dismiss this action against Remy International for want of personal jurisdiction.

Dated:  December 21, 2006

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

By:      /s/ Christopher M. Joe
         Christopher M. Joe
         Attorney in Charge
         Texas State Bar No. 00787770
         E-mail: joec@gtlaw.com
         Russell J. DePalma
         Texas State Bar No. 00795318
         E-mail:  depalmar@gtlaw.com
         2200 Ross Avenue, Suite 5200
         Dallas, Texas 75201
         Phone: (214) 665-3604
         Fax:    (214) 665-5904

*ATTORNEYS FOR DEFENDANT*
*REMY INTERNATIONAL, INC.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on December 21, 2006. Any other counsel of record will be served by facsimile transmission and first class mail.

/s/ Christopher M. Joe
Christopher M. Joe

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CIF LICENSING, LLC, d/b/a | § | |
| GE LICENSING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:06-CV-345-DF |
| | § | |
| DENSO CORPORATION, REMY | § | |
| INTERNATIONAL, INC., and VALEO, | § | |
| INC., | § | |
| | § | |
| Defendants. | § | |

**O R D E R**

Before the Court is Plaintiff's Motion for Leave to File Second Amended Complaint.

Dkt. No. 44.  Also before the Court is Defendant's response, Plaintiff's reply, and Defendant's

sur-reply.  Dkt. No. 47, 51 & 53.  The Court held a hearing on May 21, 2007, at which the Court

requested supplemental briefing.  The parties have each filed a supplemental brief.  Dkt. Nos. 56

& 57.  Having considered the briefing and all relevant papers and pleadings, the Court finds that

Plaintiff's Motion for Leave to File Second Amended Complaint should be **GRANTED**.  The

Court further finds that the present action should be **STAYED**.

**I.  BACKGROUND**

Plaintiff filed suit on August 30, 2006 alleging infringement of United States Patent No.

4,733,159 (the "'159 Patent").  Complaint, Dkt. No. 1.  Plaintiff named Denso Corporation and

Valeo, Inc. as defendants, with whom Plaintiff has settled.  Dkt. Nos. 19 & 42.  Plaintiff filed its

First Amended Complaint on October 20, 2006, which added Valeo Sistemas Electricos S.A. de

C.V. as a defendant, with whom Plaintiff has also settled.  Dkt. No. 12 & 42.  Plaintiff's

Complaint and First Amended Complaint both name "Remy" as a defendant, and Plaintiff served

defendant Remy International, Inc. ("Defendant").  *See* Dkt. Nos. 1, 5 & 12.  Defendant is the

only remaining defendant in the present suit.

Remy Inc., a subsidiary of Defendant, together with other subsidiaries, filed a declaratory

judgment action in the District of Delaware on December 21, 2006 (the "Delaware Action").  D.

Del., Civil Action No. 1:06-CV-785, Dkt. No. 1.

Defendant has filed a Motion to Dismiss for Want of Personal Jurisdiction.  Dkt. No. 24.

By its response filed on April 30, 2007, Plaintiff seeks leave to file a Second Amended

Complaint.  Dkt. No. 44.  Plaintiff is "prepared to consent to the relief requested by [Defendant]

. . . conditioned on the Court granting [Plaintiff] leave to name the correct Remy entity as a

defendant in this case."  *Id.* at 1.

## II.  THE PARTIES' POSITIONS

Plaintiff concedes that Remy International is the "wrong party" and seeks leave to file a

Second Amended Complaint that names Remy, Inc., the "correct Remy entity," as a defendant.

Dkt. No. 44 at 1.  Remy Inc. is a wholly owned subsidiary of Remy International.  *Id.* at 2; *see*

*also id.* at Ex. C; Dkt. Nos. 24 at 1 & 47 at 1-2.

Defendant argues that Plaintiff's amendment would be futile because the District of

Delaware is the "first-filed" court as to Remy Inc.  Dkt. No. 47 at 8-10.  Defendant thus submits

that a stay or a transfer to the District of Delaware would be appropriate if the Court grants leave

for Plaintiff to amend.  *Id.* at 3.  Defendant argues that granting Plaintiff's motion for leave to

amend would prejudice Defendant by subjecting it to "dual patent litigation simultaneously

proceeding in two forums, while this Court may not have personal jurisdiction over some of the necessary parties (the supplier indemnitors)." *Id.* at 11.  In the alternative, Defendant seeks a stay of the present action pending reexamination of the '159 Patent in the United States Patent and Trademark Office.  *Id.* at 12-15.

Plaintiff replies that the present action should be deemed "first-filed" upon amendment because Rule 15(c) provides for relation back.  Dkt. No. 51 at 2 (citing *Schiavone v. Fortune*, 477 U.S. 21, 29 (1986), *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189 (S.D.N.Y. 2000), *Nutri-Health Supplements, LLC v. Block Drug Co.*, 2007 WL 38159 (D. Ariz. 2007) & *Optima, Inc. v. Republic Indus., Inc.*, 1995 WL 72430 (E.D. La. 1995)).  Plaintiff also argues that a stay pending reexamination of the '159 Patent is inappropriate.  *Id.* at 4 (citing *Soverain Software LLC v. Amazon.com*, 356 F. Supp. 2d 660, 663 (E.D. Tex. 2005)).

In sur-reply, Defendant argues that Plaintiff fails to satisfy any of the *Foman* factors.  Dkt. No. 53 at 2-3 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Alternatively, Defendant argues that if the Court grants leave to amend, then justice and judicial economy favor a stay.  *Id.* at 3.  Defendant also argues that "the relation back doctrine does not establish this as the first filed case . . . ." *Id.* at 5.

In supplemental briefing, Plaintiff argues that its assertion of counterclaims in the Delaware Action is irrelevant because Plaintiff was "*required* [Plaintiff] to include all compulsory counterclaims pursuant to Rule 13(a)."  Dkt. No. 56 at 3.  Plaintiff argues that "at the time [Plaintiff] answered [in the Delaware Action], a motion based on the first-filed rule in Delaware would have been premature because [Plaintiff] could not *at that time* represent that the correct parties were defendants in Texas."  *Id.* at 4.  Plaintiff submits *Ballard Medical Products*

*v. Concord Labs, Inc.* as authority that counterclaims in the Delaware Action should not affect this Court's analysis of Plaintiff's motion.  *Id.* at 3 (discussing 700 F. Supp. 796 (D. Del. 1988)).

In its supplemental brief, Defendant submits that neither party "[has] been able to find any case discussing this exact set of procedural circumstances."  Dkt. No. 57 at 3.  Defendant argues that Plaintiff fails to show prejudice.  Dkt. No. 57 at 4-5.  Defendant also argues that "Delaware is currently the only forum in which this action is effectively proceeding . . . ."  *Id.* at 4.  Defendant submits *Orthmann v. Apple River Campground, Inc.*, which Defendant characterizes as containing applicable principles of federal comity.  765 F.2d 119 (8th Cir. 1985).  In the alternative, Defendant argues that "[i]f leave to amend is granted, a stay and or transfer will continue to be appropriate because GE's first-to-file argument will be swallowed by the interests of justice and judicial economy."  *Id.* at 8.  Defendant argues that *Ballard* is inapplicable because that court did not address a motion to amend.  *Id.* at 10.

### III.  DISCUSSION

Under Federal Rule of Civil Procedure ("Rule") 15(a), "leave [to amend] shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a); s*ee also Foman*, 371 U.S. at 182.

The Court's present Scheduling Order sets an April 7, 2008 deadline for amendment of pleadings without leave of Court.  Dkt. No. 58 at 2.  The Court is nonetheless mindful of the interest of comity between federal district courts.  For this reason, the parties submitted supplemental briefing.  The Court finds that the assertion of counterclaims in the Delaware Action does not affect this Court's analysis of Plaintiff's motion for leave to amend its complaint.  Plaintiff's motion for leave to amend should be **GRANTED**.

The Court further **STAYS** the present action pending further action by the Delaware

court.  The Court need not resolve the "first filed" issue in order to grant Plaintiff's motion for leave to amend.  The Court expressly leaves the "first filed" issue for the Delaware court to resolve if properly presented.

Also, the Court is not inclined to grant an unconditional stay pending reexamination of the '159 Patent.  *See Soverain Software*, 356 F. Supp. 2d 660, 663 (finding that "staying the case, based solely on speculation of what might possibly happen during reexamination, would be inefficient and inappropriate"); *see also Antor Media Corp. v. Motorola, Inc.*, Civil Action No. 5:06-CV-240, Dkt. No. 53, entered Feb. 23, 2007 (denying unconditional stay and discussing conditional stay in *Antor Media Corp. v. Nokia, Inc.*, Civil Action No. 2:05-cv-186, Dkt. No. 410).

## IV.  CONCLUSION

Plaintiff's Motion for Leave to File Second Amended Complaint (Dkt. No. 44) is hereby **GRANTED**.  Plaintiff shall have leave to re-file its proposed Second Amended Complaint on the Court's electronic docket.  It is further

**ORDERED** that the present case is **STAYED** pending further action by the Delaware court.

**SIGNED this 2nd day of July, 2007.**

DAVID FOLSOM
UNITED STATES DISTRICT JUDGE

# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS,
MARSHALL DIVISION

| | | |
|---|---|---|
| CIF LICENSING, LLC, d/b/a | § | |
| GE LICENSING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:06cv345 |
| | § | |
| DENSO CORPORATION, VALEO, INC., | § | JURY TRIAL DEMANDED |
| VALEO SISTEMAS ELECTRICOS S.A. DE | § | |
| C.V., REMY, INC., UNIT PARTS | § | |
| COMPANY, and WORLD WIDE | § | |
| AUTOMOTIVE, LLC, | § | |
| | § | |
| Defendants. | | |

---

## SECOND AMENDED COMPLAINT

---

Plaintiff CIF Licensing, LLC, d/b/a GE Licensing ("GE Licensing"), brings this action against Defendants DENSO CORPORATION ("DENSO"), Valeo, Inc., Valeo Sistemas Electricos S.A. de C.V. ("Valeo CV"), Remy, Inc., Unit Parts Company, and World Wide Automotive, LLC alleging as follows:

### The Parties

1.     Plaintiff GE Licensing is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Princeton, New Jersey 08540.  GE Licensing is the owner of all right, title, and interest in and to United States patent No. 4,733,159 (the "Patent") by assignment, with the right to recover damages for all past infringement of the Patent. The Patent was duly and legally issued on March 22, 1988 by the United States Patent and Trademark Office. The invention of the Patent contains a voltage regu-

lator system for automobile alternators, including a unique high frequency charge pump. A copy of the Patent is attached hereto as Exhibit A.

2.      Upon information and belief, Defendant DENSO is a Japanese corporation with its principal place of business and home office at 1-1 Showa-cho, Kariya Aichi 448-8661, Japan. Although DENSO does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, DENSO does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, DENSO may be served with process by serving the Texas Secretary of State, who is deemed to be DENSO's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

3.      Upon information and belief, Defendant Valeo Inc. is a corporation organized and existing under the laws of the state of New York, with its principal place of business and home office at 3000 University Drive, Auburn Hills, Michigan 48326. Upon information and belief, Valeo Inc. maintains branch offices in El Paso, TX, Fort Worth, TX, and Pharr, TX. Valeo Inc. also does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent and recruiting Texas residents for employment (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042).  Valeo Inc. has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Valeo Inc. may be served with process by serving the person in charge of its business in Texas. TEX. CIV. PRAC. & REM. CODE § 17.043.

4.      Upon information and belief, Defendant Valeo CV is a Mexican corporation with its principal place of business and home office at Avenida Circuito Mexico No. 160, Z.I. Parque

Tres Naciones, 78395 San Luis Potosi, Mexico. Although Valeo CV does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (see, Tex. Civ. Prac. & Rem. Code § 17.042), upon information and belief, Valeo CV does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Valeo CV may be served with process by serving the Texas Secretary of State, who is deemed to be Valeo CV's agent for service of process. Tex. Civ. Prac. & Rem. Code § 17.044.

5.      Upon information and belief, Defendant Remy Inc. is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business and home office at 2902 Enterprise Drive, Anderson, Indiana 46013.  Upon information and belief, Remy Inc. maintains a branch office in Laredo, TX.  Remy Inc. also does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent and recruiting Texas residents for employment (see, Tex. Civ. Prac. & Rem. Code § 17.042).  Remy Inc. has been registered to do business in Texas since Nov. 11, 2004 and maintains in Texas a registered agent, The Corporation Service Company at 701 Brazos Street Suite 1050, Austin, TX 78701.

6.      Upon information and belief, Defendant Unit Parts Company is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business and home office at 4600 SE 59th Street, Oklahoma City, Oklahoma 73135.  Unit Parts Company does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (see, Tex. Civ. Prac. & Rem. Code § 17.042).  Unit Parts Company has been registered to do business in Texas since January 19, 2006 and maintains in Texas a registered agent, The Corporation Service Company at 701 Brazos Street Suite 1050, Austin, TX 78701.

7.      Upon information and belief, Defendant World Wide Automotive, LLC is a lim-ited liability company organized and existing under the laws of the state of Virginia, with its principal place of business and home office at 300 West Brooke Road, Winchester, VA 22603. World Wide Automotive, LLC does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see*, TEX. CIV. PRAC. & REM. CODE § 17.042).

## Jurisdiction and Venue

8.      This action for infringement arises under the patent laws of the United States, Ti-tle 35, United States Code, including § 271. This Court has exclusive jurisdiction under Title 28, United States Code, particularly § 1338(a).

9.      Defendant DENSO has committed the tort of patent infringement in the Eastern District. Defendant DENSO has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accord-ingly, Defendant DENSO resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

10.     Defendant DENSO is subject to personal jurisdiction in Texas and this District.

11.     Defendant Valeo Inc. has committed the tort of patent infringement in the Eastern District. Defendant Valeo Inc. has sold and shipped into the Eastern District products that in-fringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Valeo Inc. resides in the Eastern District as the term "reside" is defined

4

in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

      12.     Defendant Valeo Inc. is subject to personal jurisdiction in Texas and this District.

      13.     Defendant Valeo CV has committed the tort of patent infringement in the Eastern District. Defendant Valeo CV has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Valeo CV resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

      14.     Defendant Valeo CV is subject to personal jurisdiction in Texas and this District.

      15.     Defendant Remy Inc. has committed the tort of patent infringement in the Eastern District.  Defendant Remy Inc. has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Remy Inc. resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

      16.     Defendant Remy Inc. is subject to personal jurisdiction in Texas and this District.

      17.     Defendant Unit Parts Company has committed the tort of patent infringement in the Eastern District.  Defendant Unit Parts Company has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into

5

the Eastern District. Accordingly, Defendant Unit Parts Company resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

18.    Defendant Unit Parts Company is subject to personal jurisdiction in Texas and this District.

19.    Defendant World Wide Automotive, LLC has committed the tort of patent infringement in the Eastern District. Defendant World Wide Automotive, LLC has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent and/or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant World Wide Automotive, LLC resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and (c), and 1400(b).

20.    Defendant World Wide Automotive, LLC is subject to personal jurisdiction in Texas and this District.

## COUNT I
(Patent Infringement – DENSO)

### Defendant DENSO's Activities

1-20.   Plaintiff hereby repeats and incorporates by reference ¶¶1-14 as ¶¶1-14 of this Count I.

21.    Defendant DENSO operates as a manufacturer and wholesaler of automotive motor vehicle supplies and parts, including alternators containing voltage regulator units. Defendant DENSO sells such supplies and parts to entities engaged in the automobile industry in North America.

6

22.     On information and belief, the above-mentioned activities by Defendant DENSO have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

23.     Plaintiff GE Licensing is the owner of all right, title and interest in and to the Patent with the right to recover damages for all past infringement of the Patent.

24.     On information and belief, DENSO is infringing the Patent willfully and with knowledge.  On information and belief, DENSO will continue infringing the Patent unless enjoined by this Court.

25.     As a result of DENSO's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

26.     DENSO's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

**COUNT II**
(Patent Infringement – Valeo Inc)

**Defendant Valeo Inc's Activities**

1-26.   Plaintiff hereby repeats and incorporates by reference ¶¶1-20 of Count I as ¶¶1-20 of this Count II.

27.     Defendant Valeo Inc. operates as a manufacturer of automotive motor vehicle parts, including alternators containing voltage regulator units. Valeo Inc. sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe.

28.     On information and belief, the above-mentioned activities by Defendant Valeo Inc. have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

29.     On information and belief, Valeo Inc. is infringing the Patent willfully and with knowledge. On information and belief, Valeo Inc. will continue infringing the Patent unless enjoined by this Court.

30.     As a result of Valeo Inc's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

31.     Valeo Inc's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

### Count III
(Patent Infringement – Valeo CV)

### Defendant Valeo CV's Activities

1-31.   Plaintiff hereby repeats and incorporates by reference ¶¶1-25 of Count II as ¶¶1-25 of this Count III.

32.     Defendant Valeo CV operates as a manufacturer of automotive motor vehicle parts, including alternators containing voltage regulator units. Valeo CV sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe.

33.     On information and belief, the above-mentioned activities by Defendant Valeo CV have amounted to infringement, directly, by inducement, and/or by contributing to the infringement of the Patent.

34.     On information and belief, Valeo CV is infringing the Patent willfully and with knowledge. On information and belief, Valeo CV will continue infringing the Patent unless enjoined by this Court.

35.     As a result of Valeo CV's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

36.     Valeo CV's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## COUNT IV
### (Patent Infringement – Remy Inc)

### Defendant Remy Inc's Activities

1-36.   Plaintiff hereby repeats and incorporates by reference ¶¶1-30 of Count III as ¶¶1-30 of this Count IV.

37.     Defendant Remy Inc. operates as a manufacturer and re-manufacturer of original equipment and aftermarket electrical components for automobiles, light trucks, medium and heavy duty trucks and other heavy duty vehicles, including alternators containing voltage regulator units. Defendant Remy Inc. sells such components to original equipment manufacturers and dealers, automotive retail chains and warehouse distributors in North America, Europe, Latin America, and Asia-Pacific.

38.     On information and belief, the above-mentioned activities by Defendant Remy Inc. have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

39.     On information and belief, Remy Inc. is infringing the Patent willfully and with knowledge. On information and belief, Remy Inc. will continue infringing the Patent unless enjoined by this Court.

40.     As a result of Remy Inc.'s infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

41.     Remy Inc.'s willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

9

## COUNT V
(Patent Infringement – Unit Parts Company)

### Defendant Unit Parts Company's Activities

1-41.   Plaintiff hereby repeats and incorporates by reference ¶¶1-30 of Count III as ¶¶1-30 of this Count IV.

42.   Defendant Unit Parts Company operates as a manufacturer of premium automotive alternators and starters, including alternators containing voltage regulator units. Defendant Unit Parts Company sells such components to original equipment manufacturers and dealers, automotive retail chains and warehouse distributors in North America, Europe, Latin America, and Asia-Pacific.

43.   On information and belief, the above-mentioned activities by Defendant Unit Parts Company have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

44.   On information and belief, Unit Parts Company is infringing the Patent willfully and with knowledge. On information and belief, Unit Parts Company will continue infringing the Patent unless enjoined by this Court.

45.   As a result of Unit Parts Company's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

46.   Unit Parts Company's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## COUNT VI
(Patent Infringement – World Wide Automotive, LLC)

### Defendant World Wide Automotive, LLC's Activities

1-46.  Plaintiff hereby repeats and incorporates by reference ¶¶1-30 of Count III as ¶¶1-30 of this Count IV.

47.  Defendant World Wide Automotive, LLC. operates as a manufacturer of engine electrical and electronic equipment, specializing in automotive automotive alternators, including alternators containing voltage regulator units. Defendant World Wide Automotive, LLC sells such components to original equipment manufacturers and dealers, automotive retail chains and warehouse distributors in North America, Europe, Latin America, and Asia-Pacific.

48.  On information and belief, the above-mentioned activities by Defendant World Wide Automotive, LLC have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

49.  On information and belief, World Wide Automotive, LLC is infringing the Patent willfully and with knowledge. On information and belief, World Wide Automotive, LLC will continue infringing the Patent unless enjoined by this Court.

50.  As a result of World Wide Automotive, LLC's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

51.  World Wide Automotive, LLC's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

### Requested Relief

WHEREFORE, Plaintiff GE Licensing prays that this Court enter judgment.

11

a.   Finding that Defendants DENSO, Valeo Inc., Valeo CV, Remy Inc., Unit Parts Company, and World Wide Automotive, LLC have infringed, induced others to infringe and/or committed acts of contributing infringement of the Patent under 35 U.S.C. § 271.

b.   Enjoining Defendants DENSO, Valeo Inc., Valeo CV, Remy Inc., Unit Parts Company, and World Wide Automotive, LLC and their subsidiaries, agents, officers and employees, and all others acting in concert with them, from infringing, inducing infringement, and contributing to the infringement of the Patent.

c.   Ordering Defendants DENSO, Valeo Inc., Valeo CV, Remy Inc., Unit Parts Company, and World Wide Automotive, LLC to award GE Licensing an amount that adequately compensates GE Licensing for Defendants' infringement, including lost profits (and/or a reasonably royalty), treble damages, court costs, pre-judgment interest, post-judgment interest and attorney's fees under 35 U.S.C. §§ 284 and 285.

d.   Granting GE Licensing such other and further relief as is just.

### Demand for Jury Trial

Plaintiff GE Licensing hereby demands a jury trial on all claims and issues triable of right by a jury.

Dated: July 10, 2007

Respectfully submitted,

CIF Licensing, LLC, d/b/a
GE Licensing


BY: /s/ Bradford P. Lyerla
       **(by permission Otis Carroll)**
       Bradford P. Lyerla, Lead Attorney
       MARSHALL, GERSTEIN & BORUN LLP
       6300 Sears Tower
       233 South Wacker Drive
       Chicago, IL 60606-6357
       Tel: (312) 474-6300
       Fax: (312) 474-0448
       E-mail: blyerla@marshallip.com

OF COUNSEL:

Anthony G. Sitko
MARSHALL, GERSTEIN & BORUN LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: asitko@marshallip.com

Jeffrey H. Dean
MARSHALL, GERSTEIN & BORUN LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: jdean@marshallip.com

Anthony S. Hind
MARSHALL, GERSTEIN & BORUN LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: ahind@marshallip.com

13

Otis W. Carroll
Texas Bar No. 03895700
IRELAND, CARROLL & KELLEY, P.C.
6101 South Broadway
Suite 500
Tyler, Texas  75703
Tel: (903) 561-1600
Fax: (903) 581-1070

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by facsimile transmission and/or first class mail this 10th day of July, 2007.

__/s/ Otis Carroll_____

14