IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

REMY, INC., UNIT PARTS COMPANY, and )
WORLDWIDE AUTOMOTIVE, LLC, )
                                  )
            Plaintiffs, )
                                  )    C.A. No. 06-785-***
     v. )
                                    )
CIF LICENSING, LLC d/b/a GE LICENSING, )
TADITEL MANUFACTURING CORP., )
TADITEL US, INC., and WETHERILL )
ASSOCIATES, INC., )
                                  )
          Defendants. )
                                  )

## REPLY MEMORANDUM IN SUPPORT OF THE MOTION OF GE LICENSING TO DISMISS OR, IN THE ALTERNATIVE, TO STAY

      The Texas lawsuit is indisputably the first-filed of these two litigations, and not even Remy seriously argues otherwise. Ordinarily, this incontrovertible fact would be dispositive of which of two litigations should proceed to judgment. Nevertheless, Remy persists in pressing a salmagundi of disparate arguments in support of a departure from the customary application of the first-filed rule. Those arguments are either meritless or badly unfaithful to the facts—and sometimes both. Under the circumstances, this Court should decline Remy's invitation to depart from ordinary procedure, and should dismiss or stay these proceedings in deference to a previously-filed lawsuit that has been pending since August 2006—almost four full months prior to the commencement of these duplicative proceedings.

## I.    THE TEXAS ACTION IS THE FIRST-FILED ACTION AND SHOULD PROCEED TO JUDGMENT FIRST.

      GE sued Remy International for patent infringement in Texas in August 2006—almost four months before Remy, Inc. filed this mirror-image action for declaratory relief. (Ex. A, Texas Docket Sheet, Docket Item No. 1.) Unknown to GE, however, Remy International is a

mere corporate "shell" (Remy's words) without operations, and the parties who actually make and sell (including undisputed sales in Texas) the infringing products are Remy's corporate subsidiaries. Such a development is neither remarkable nor uncommon in civil litigation—especially in today's world of labyrinthine corporate structures—which is why the Federal Rules of Civil Procedure provide an express remedy known as the "relation back" doctrine. Fed. R. Civ. P. 15(c). According to the "relation back" doctrine, a plaintiff is guaranteed its initial filing date—here, August 2006—for *all* purposes where, as here, the plaintiff sued the *wrong* corporate entity and the *right* corporate entity knows about the suit. (*See* GE Opening Br., pp. 3-5.)

Here, Remy does not dispute—notwithstanding three briefs in Texas and one in this Court—that the right Remy entities at all relevant times knew that GE had sued the wrong Remy entity. Here, Remy does not dispute that for almost four months counsel for all of the Remy parties—including all of the Remy subsidiaries that are declaratory plaintiffs in this Court—negotiated continuously with counsel for GE to effect a settlement of this case[1] while the right Remy entities lied in wait preparing to file duplicative proceedings in this Court in the event that settlement negotiations became futile and shopping for a preferred forum became more strategically appealing. Here, Remy does not dispute that Judge Folsom granted GE's timely motion to substitute the right Remy entities for the wrong Remy entity in the Texas action. (Ex. B, Judge Folsom Order, July 3, 2007, p. 5.) And here, Remy does not dispute that, on these incontrovertible facts, GE is entitled to the full benefit of Rule 15's "relation back" doctrine. Indeed, Remy's entire briefing on the question—both here and in Texas—fails even to *mention*, much less attempt to *distinguish*, the "relation back" doctrine. Under the circumstances, the Texas action is

---

[1] GE sued three entities in Texas—Denso Corporation, Valeo, Inc. (later substituted by Valeo Sistemas Electricos S.A.), and Remy. Both Denso and Valeo have settled and taken licenses under the patent-in-suit. (Ex. B, Judge Folsom Order, July 3, 2007, pp. 1-2.) Remy remains the sole holdout.

the first-filed action and naturally should proceed to judgment first.

Rather than address the "relation back" issue, Remy makes three unrelated arguments. The first misrepresents the facts. The second misrepresents the facts and is irrelevant. The third simply misstates the law. First, Remy mischaracterizes Judge Folsom's order by arguing that Judge Folsom somehow already considered and rejected GE's "relation back" argument in staying the Texas proceedings unconditionally. (Remy Br., pp. 1, 3-4.) But Judge Folsom's order does not say anything of the kind. Rather, Judge Folsom's order stayed these proceedings only temporarily, pending this Court's decision about which action was first-filed:

> The Court further **STAYS** the present action *pending further action by the Delaware court*. The Court need not resolve the "first filed" issue in order to grant [GE]'s motion for leave to amend. The Court expressly leaves the "first filed" issue for the Delaware court to resolve if properly presented.

(Ex. B, Judge Folsom Order, July 3, 2007, pp. 4-5 (bold and capitalization in the original; emphasis added).) Nothing in that order even arguably purports to stay the Texas proceedings unconditionally. And nothing in that order even purports to address, much less reject, GE's "relation back" argument. Indeed, to the extent that Judge Folsom's order even mentions the issue of an unconditional stay, it expressly rejects it. *Id.* ("Also, the Court is not inclined to grant an *unconditional stay* pending reexamination of the '159 Patent") (emphasis added). Under the circumstances, Remy's argument that Judge Folsom somehow considered and rejected GE's "relation back" argument, and somehow granted an unconditional stay of the Texas proceedings, is highly misleading at best.

Second, Remy argues that GE "clearly" could and should have known that it sued the wrong Remy entity in Texas. (Remy Br., p. 3.) Apart from being entirely irrelevant to the factors that govern a Rule 15 analysis (*see* GE's Opening Br., pp. 3-5), Remy's argument rests on "evidence" that states the exact opposite. Exhibit C to Remy's brief, for example, states unam-

biguously that Remy International—*the very party whom GE sued initially in Texas*— "manufactures," "re-manufacturers," and "distributes" the very "alternators" that GE accuses of infringement in this case:

> Remy International, Inc., headquartered in Anderson, Indiana, is a leading *manufacturer*, *remanufacturer* and *distributor* of Delco Remy brand heavy duty systems and Remy brand starters and *alternators*.

(Remy Br., Ex. C (emphasis added).)  According to Remy, therefore, GE somehow should have divined that Remy International, Inc. is *not* the "manufacturer," "re-manufacturer" or "distributor" of the infringing "alternators" from evidence that expressly states the opposite.  Charitably speaking, that argument is frivolous.

Finally, Remy misstates settled law by arguing that the first court to acquire jurisdiction over all parties is the first-filed action.  (Remy Br., p. 14.)  That argument is flatly contrary to Rule 15 and the "relation back" doctrine, which explains why Remy is unable to cite any supporting authority in support of its argument.[2]  Indeed, crediting Remy's radical position would deprive every plaintiff of its forum choice simply by allowing a defendant to file a collateral action in a different forum and adding a single new party.  Nothing in the Federal Rules of Civil Procedure or the controlling precedents of this Court permits such an inequitable result.

---

[2] Remy's references to *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119 (8th Cir. 1985) (cited at Remy Br., pp. 8 - 9) are not to the contrary.  *Orthmann* involved a tort action in which the plaintiff sustained a personal injury at the defendant's campground in Wisconsin, but brought suit in his home forum, Minnesota.  When the defendant challenged the Minnesota court's exercise of personal jurisdiction, plaintiff brought an identical suit in Wisconsin, in order to toll the statute of limitations should the Minnesota case be dismissed.  He asked that the Wisconsin court stay the proceedings pending resolution of the jurisdictional issue in Minnesota.  Instead, the Wisconsin court dismissed the case under Rule 12(b)(6) and the case was subsequently reversed and remanded by the Seventh Circuit.  Relying on concerns of judicial economy, the Eighth Circuit held that even though the Minnesota case was first-filed, the second-filed Wisconsin case should proceed because it was more developed and because there was no cloud over jurisdiction over the defendant.  Nothing in *Orthmann* suggests, much less holds, that a second-filed case should proceed to judgment simply because it is the first court to obtain personal jurisdiction over non-essential additional parties not present in the first action.

Consequently, the Texas Action is the first-filed action and, barring some compelling reason to depart from ordinary procedure, should proceed to judgment first.

Remy provides none.

## II.    REMY OFFERS NO COMPELLING REASON TO DEPART FROM THE ORDINARY APPLICATION OF THE FIRST-FILED RULE.

It is black letter law that a plaintiff's forum choice is a "paramount" consideration in determining where a case and controversy shall be adjudicated. *Shutte v Armco Steel Corp.*, 413 F.2d 22, 25 (3rd Cir. 1970) (vacating transfer order and stating, "[i]t is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request"); *see also HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307 (Fed. Cir. 1999) (reversing transfer order and stating, "[a] transfer of venue for the convenience of the parties normally requires that the court give great weight to the plaintiff's choice of forum"); *Bhatnagar v. Surrendra Overseas, Ltd.*, 52 F.3d 1220, 1226 (3rd Cir. 1995) (affirming denial of transfer on forum non conveniens grounds and stating, "a plaintiff's choice of forum is entitled to great deference"). Unless the facts "strongly favor" disturbing a plaintiff's forum choice, courts will not do so. *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508 (1947) (reversing dismissal and stating, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"). Here, Remy posits several reasons why this Court should deprive GE of its choice of forum. None, either alone or in combination, is sufficient to "strongly favor" adjudicating this dispute in Delaware.

First, Remy argues that "the Eastern District of Texas has already heard GE's first-to-file argument yet stayed the Texas Action in deference to the Delaware Action." (Remy Br., p. 2.) But this is simply untrue, as discussed above. (*See* supra pp. 3-5.) Judge Folsom merely stayed the Texas proceedings "pending" a ruling by this Court on the "first-filed" question. (Ex. B,

Judge Folsom Order, July 3, 2007, p. 4.)  Were this Court to determine that the Texas action is first-filed and grant GE's motion to dismiss or stay, Judge Folsom is prepared to see this controversy to final judgment.  Indeed, as a practical matter, Judge Folsom could do no more in aid of his own jurisdiction given the procedural posture of both cases; the only further action available would have been an injunction against the Delaware proceedings—an extraordinary order that is rarely consistent with the comity owed between and among courts in our federal system.

Second, Remy argues that this action is "months ahead" of the Texas action.  (Remy Br., p. 2.)  But that is neither true nor relevant. The Texas Action was filed almost *four months before* the Delaware action, and, even were it not, the relevant factor is not the *duration* of a case, but its substantive *development*.  Here, neither the Texas nor the Delaware litigations has advanced to any substantive stage.  And even were the Delaware action more substantively advanced, nothing prevents the parties from transporting their dispute, without interruption or incident, to a different courthouse.

Third, Remy argues that "special circumstances" make the first-filed question "irrelevant."  (Remy Br., p. 2.)  But that argument is incompatible with Judge Folsom's order, which on its face does not consider the first-filed question to be "irrelevant," notwithstanding three Texas briefs by Remy arguing otherwise.  Remy's arguments based on the balance of hardships and principles of equity fare no better.  It is undisputed that the Remy parties are selling accused products in Texas.  If Texas is a sufficiently convenient place for Remy to reap the benefits of modern commerce, then it also should be a sufficiently convenient place for Remy to incur the burdens of civil litigation.  Indeed, that is the precise bargain a party makes where, as here, it "purposefully avails" itself of the benefits of the laws of a specific jurisdiction.  *See, e.g., Hendrickson v. Reg O Co.*, 657 F.2d 9, 14 (3rd Cir. 1981) (affirming denial of motion to dismiss and stating, "if a defendant 'purposefully avails itself of the privilege of conducting activities within

the forum state,' . . . it has clear notice that it is subject to suit there") (quoting *World-wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). In all events, Remy's appeals to principles of fairness ring particularly hollow where, as here, it was Remy that needlessly created this forum controversy in the first instance. Remy lied in wait for nearly four months without informing GE that GE had sued the wrong party in Texas, only to file this action and thereby create two lawsuits where there should be only one. Few principles are as well settled as the maxim that equity does not come to the aid of parties with unclean hands, *Gaudiosi v. Mellon*, 269 F.2d 873, 881 (3rd Cir. 1959) ("[n]o principle is better settled than the maxim that he who comes into equity must come with clean hands") (quoting *Root Refining Co. v. Universal Oil Prods. Co.*, 169 F.2d 514, 534-535 (3rd Cir. 1948)), and this case is no exception.

Fourth, Remy argues that the third-party suppliers have consented to jurisdiction in this Court and are obligated to indemnify Remy in the event of a finding of infringement. That argument, too, misses the mark. Although the third-party suppliers have indeed consented to the *jurisdiction* of this Court, *none* (save Remy itself) urges this Court to try the patent infringement claims together with the host of premature and contingent indemnity claims in the *same* action before the *same* jury at the *same* time. And for good reason. Trying the patent claims together with the indemnity claims before the same jury at the same time would greatly complicate these proceedings and would create an intolerable risk of jury confusion—all because of claims that are premature and may never need to be tried in the first instance. Indeed, the indemnity claims comprise a complex maze of divergent disputes and disparate arguments ranging from contract interpretation to the application of the *Colorado River* abstention doctrine—arguments involving proofs that are wholly irrelevant and collateral to (and contingent upon) GE's patent infringement claim. On one hand, Wetherill Associates "specifically disputes" the existence of any agreements to which it is a party creating a duty to indemnify Remy. (Wetherill Answer, D.I. 16,

p. 3.)  On the other, Wells Manufacturing and Taditel US assert affirmative defenses under the

Uniform Commercial Code and argue that, in all events, the purchase orders with Remy are so

rife with misspellings, typographical errors, and confused language as to be "ambiguous, unintel-

ligible, unconscionable, and unenforceable as against public policy." (Wells Answer, D.I. 24 at

4.)  Wells, for its part, adds yet a fifth dispute by asserting the issues of pass-through indemnity

and the proper application of an abstention doctrine by joining its upstream supplier, STMicro-

electronics, with an indemnity dispute of its own.   (D.I. 24, pp. 10-14.)   Indeed, the Wells-

STMicro dispute is itself the subject of state court proceedings in the District Court of Dallas

County, Texas, *STMicroelectronics, Inc. v. Wells Manufacturing Corp.*, No. DC-06-11257 (Dist.

Ct. Dallas County), where a two-week trial is set to begin before Judge Ashby on Oct 22, 2007.

(See Ex. C, Dallas County Docket Sheet.)

Under the circumstances, it makes no sense to argue, as Remy does, that judicial econ-

omy somehow favors allowing the patent and contingent indemnity claims to move forward and

be tried together.  (Remy Br., pp. 9 - 12.)  If anything, the opposite is true, which is why the gen-

eral rule is that indemnity claims are premature and should not be permitted to be tried together

with the underlying action on liability. *See, e.g., Scharf v. Edgcomb Corp.*, 864 A.2d 909, 919

(Del. Super. 2004) (stating that the cause of action for indemnification does not accrue until the

indemnitee is "confident any claim against him . . . has been resolved with certainty"); *Chesa-

peake Utilities Corp. v. Chesapeake and Poto-mac Tel. Co. of Maryland*, 401 A.2d 101, 102

(Del. Super. 1979) (stating that the point at which an indemnification claim is ripe "is the point at

which the indemnitee suffers loss or damage through payment of a claim after judgment or set-

tlement"); *Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 208 (Tex. 1999) ("the

longstanding rule [is] that a claim under a liability indemnification clause does not accrue, and

thus is not mature, until the indemnitee's liability to the party seeking damages becomes fixed

and certain"); *D. Wilson Const. Co. v. Cris Equip. Co., Inc.*, 998 S.W.2d 388, 396 (Tex. App. 1999) ("[i]n the case of a promise to indemnify against liability, a cause of action accrues to the indemnitee only when the liability has become fixed and certain, as by rendition of a judgment").

Remy's authority is not to the contrary. In *Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203 (Tex. 1999) (cited at Remy Br., p. 11.), the Court stated in dicta that a claim for attorneys' fees by an indemnitee against an indemnitor could have been heard together with the underlying action for indemnification. That case is both unremarkable and irrelevant. In *Rust-Oleum Corp. v. Fitz*, 801 N.E.2d 754 (Ind. Ct. App. 2004), the claim for indemnification involved a single indemnitor and, in all events, was removed from the case for failure to include the claim in the pre-trial order. And finally, in *Mendelson v. Delaware River & Bay Auth.*, 112 F.Supp.2d 386 (D. Del. 2000), the claim for indemnity was already *adjudicated and fixed* through arbitration *prior to trial*, and thus was no longer a contested issue by the time the case went to the jury. None of these decisions suggests, much less holds, that judicial economy is somehow furthered by combining complex patent claims with a maze of premature and contingent indemnity claims and sub-claims in the same courtroom before the same jury at the same time.

Finally, Remy argues that GE is engaged in "nothing more than forum shopping" given that Texas bears "no significant relationship" to GE's infringement claims. (Remy Br., p. 2.) That argument is both hypocritical and wrong. If anyone has engaged in forum shopping it is Remy, who lied in wait during four months of negotiations without informing GE of the identity of the real parties in interest, who filed duplicative proceedings in this Court together with premature indemnification claims, and who greatly multiplied these proceedings by requiring the parties to litigate about the proper forum in both Texas and Delaware—all to escape the jurisdiction of a state in which Remy sells infringing products, from which Remy reaps substantial

commercial benefits, and of whose laws Remy has purposely availed itself.

\*   \*   \*

Judge Folsom asked this Court to decide which action—Texas or Delaware—was first-filed. The answer is plain. Under the "relation back" doctrine, the Texas action was first-filed and Remy has not argued otherwise. Instead, Remy relies upon a collection of disparate reasons why this Court should depart from ordinary procedure, deprive GE of its legitimate forum choice, and greatly multiply and complicate these proceedings with a maze of indemnification claims, some or all of which may never need to be adjudicated in the first place. None of those arguments warrants, much less compels, such an illogical and inefficient result.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in GE's opening brief, the Court should grant GE's motion to dismiss or, in the alternative, stay this case. Alternatively, the Court should dismiss the patent claims and counterclaims and stay the indemnification claims for subsequent adjudication if and when the Texas proceedings yield a judgment of infringement against one or more of the Remy parties.

ASHBY & GEDDES

/s/ *Lauren E. Maguire*
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant*
*CIF LICENSING, LLC D/B/A/ GE LICENSING*

*Of Counsel:*

Bradford Lyerla
Jeffrey H. Dean
Scott Sanderson
MARSHALL GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Sears Tower
Chicago, IL 60606-6357
(312) 474-6300

Dated: August 10, 2007
183095.1

- 11 -

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FILED CLERK
U.S. DISTRICT COURT

2006 AUG 30  PM 4: 36

TEXAS EASTERN

BY_____

| | | |
|---|---|---|
| CIF Licensing, LLC, d/b/a<br>GE Licensing, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 2:06 cv 345 |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| DENSO CORPORATION, | § | |
| Remy International, Inc., and | § | |
| Valeo, Inc. | § | |
| | § | |
| Defendants. | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff CIF Licensing, LLC, d/b/a GE Licensing ("GE Licensing"), brings this action

against Defendants DENSO CORPORATION ("DENSO"), Remy International, Inc. ("Remy"),

and Valeo, Inc. ("Valeo"), alleging as follows:

### The Parties

1.      Plaintiff GE Licensing is a limited liability company organized and existing

under the laws of the State of Delaware, with its principal place of business in Princeton, New

Jersey 08540. GE Licensing is the owner of all right, title, and interest in and to United States

Patent No. 4,733,159 (the "Patent") by assignment, with the right to recover damages for all past

infringement of the Patent. The Patent was duly and legally issued on March 22, 1988 by the

United States Patent and Trademark Office. The invention of the Patent concerns a voltage

regulator system for automobile alternators, including a unique high frequency charge pump. A

copy of the Patent is attached hereto as Exhibit A.

2.      Upon information and belief, Defendant DENSO is a Japanese corporation with

its principal place of business and home office at 1-1 Showa-cho, Kariya Aichi 448-8661, Japan.

Although DENSO does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see,* TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, DENSO does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, DENSO may be served with process by serving the Texas Secretary of State, who is deemed to be DENSO's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

3.      Upon information and belief, Defendant Remy is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business and home office located at 2902 Enterprise Drive, Anderson, Indiana 46013. Although Remy does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent (*see,* TEX. CIV. PRAC. & REM. CODE § 17.042), upon information and belief, Remy does not maintain a regular place of business in Texas, has not registered to do business in Texas, and does not maintain a designated agent for service of process in Texas. Therefore, Remy may be served with process by serving the Texas Secretary of State, who is deemed to be Remy's agent for service of process. TEX. CIV. PRAC. & REM. CODE § 17.044.

4.      Upon information and belief, Defendant Valeo is a corporation organized and existing under the laws of the State of New York, with its principal place of business and home office located at 3000 University Drive, Auburn Hills, Michigan 48326. Upon information and belief, Valeo maintains branch offices in El Paso, TX, Fort Worth, TX, and Pharr, TX. Valeo also does business in Texas by, among other things, committing acts that constitute the tort of infringement of the Patent and recruiting Texas residents for employment (*see,* TEX. CIV. PRAC. & REM. CODE § 17.042). Valeo has not registered to do business in Texas, and does not maintain

a designated agent for service of process in Texas. Therefore, Valeo may be served with process by serving the person in charge of its business in Texas. TEX. CIV. PRAC. & REM. CODE § 17.043.

## Jurisdiction and Venue

5.      This action for infringement arises under the patent laws of the United States, Title 35, United States Code, including § 271. This Court has exclusive jurisdiction under Title 28, United States Code, particularly § 1338(a).

6.      Defendant DENSO has committed the tort of patent infringement in the Eastern District. Defendant DENSO has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant DENSO resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

7.      Defendant DENSO is subject to personal jurisdiction in Texas and this District.

8.      Defendant Remy has committed the tort of patent infringement in the Eastern District. Defendant Remy has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent or has sold such products under circumstances in which it was reasonably foreseeable that the products would be shipped into the Eastern District. Accordingly, Defendant Remy resides in the Eastern District as the term "reside" is defined in 28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C. §§ 1391(b) and 1400(b).

9.      Defendant Remy is subject to personal jurisdiction in Texas and this District.

10.     Defendant Valeo has committed the tort of patent infringement in the Eastern District. Defendant Valeo has sold and shipped into the Eastern District products that infringe on Plaintiff GE Licensing's Patent or has sold such products under circumstances in which it

was reasonably foreseeable that the products would be shipped into the Eastern District.

Accordingly, Defendant Valeo resides in the Eastern District as the term "reside" is defined in

28 U.S.C. § 1391(c), and, therefore, venue in the Eastern District is proper under 28 U.S.C.

§§ 1391(b) and (c), and 1400(b).

11.     Defendant Valeo is subject to personal jurisdiction in Texas and this District.

**COUNT I**
(Patent Infringement – DENSO)

**Defendant DENSO's Activities**

1-11.     Plaintiff hereby repeats and incorporates by reference ¶1-11 as ¶1-11 of this

Count I.

12.     Defendant DENSO operates as a manufacturer and wholesaler of automotive

motor vehicle supplies and parts, including alternators containing voltage regulator units.

Defendant DENSO sells such supplies and parts to entities engaged in the automobile industry

in North America.

13.     On information and belief, the above-mentioned activities by Defendant DENSO

have amounted to infringement, directly, by inducement, and/or by contributing to the

infringement, of the Patent.

14.     Plaintiff GE Licensing is the owner of all right, title and interest in and to the

Patent with the right to recover damages for all past infringement of the Patent.

15.     On information and belief, DENSO is infringing the Patent willfully and with

knowledge.  On information and belief, DENSO will continue infringing the Patent unless

enjoined by this Court.

16.     As a result of DENSO's infringing conduct, GE Licensing has been damaged and

will continue to suffer irreparable harm without the issuance of an injunction by this Court.

17.    DENSO's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## COUNT II
(Patent Infringement – Remy)

### Defendant Remy's Activities

1-17.    Plaintiff hereby repeats and incorporates by reference ¶1-17 of Count I as ¶1-17 of this Count II.

18.    Defendant Remy operates as a manufacturer and re-manufacturer of original equipment and aftermarket electrical components for automobiles, light trucks, medium and heavy duty trucks and other heavy duty vehicles, including alternators containing voltage regulator units. Defendant Remy sells such components to original equipment manufacturers and dealers, automotive retail chains and warehouse distributors in North America, Europe, Latin America, and Asia-Pacific.

19.    On information and belief, the above-mentioned activities by Defendant Remy have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

20.    On information and belief, Remy is infringing the Patent willfully and with knowledge. On information and belief, Remy will continue infringing the Patent unless enjoined by this Court.

21.    As a result of Remy's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

22.    Remy's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

## COUNT III

(Patent Infringement – Valeo)

### Defendant Valeo's Activities

1-22.    Plaintiff hereby repeats and incorporates by reference ¶1-22 of Count II as ¶1-22 of this Count III.

23.    Defendant Valeo operates as a manufacturer of automotive motor vehicle parts, including alternators containing voltage regulator units. Valeo sells such parts to entities engaged in the automobile industry, consisting of various divisions of vehicle manufacturers in North America and Europe.

24.    On information and belief, the above-mentioned activities by Defendant Valeo have amounted to infringement, directly, by inducement, and/or by contributing to the infringement, of the Patent.

25.    On information and belief, Valeo is infringing the Patent willfully and with knowledge. On information and belief, Valeo will continue infringing the Patent unless enjoined by this Court.

26.    As a result of Valeo's infringing conduct, GE Licensing has been damaged and will continue to suffer irreparable harm without the issuance of an injunction by this Court.

27.    Valeo's willful infringement of the Patent and other conduct make this an exceptional case under 35 U.S.C. § 285.

### Requested Relief

WHEREFORE, Plaintiff GE Licensing prays that this Court enter judgment.

a. Finding that Defendants DENSO, Remy, and Valeo have infringed, induced others to infringe and/or committed acts of contributing infringement of the Patent under 35 U.S.C. § 271.

b. Enjoining Defendants DENSO, Remy, and Valeo and their subsidiaries, agents, officers and employees, and all others acting in concert with them, from infringing, inducing infringement, and contributing to the infringement of the Patent.

c. Ordering Defendants DENSO, Remy, and Valeo to award GE Licensing an amount that adequately compensates GE Licensing for Defendants' infringement, including lost profits (and/or a reasonably royalty), treble damages, court costs, pre-judgment interest, post-judgment interest and attorney's fees under 35 U.S.C. §§ 284 and 285.

d. Granting GE Licensing such other and further relief as is just.

### Demand for Jury Trial

Plaintiff GE Licensing hereby demands a jury trial on all claims and issues triable of

right by a jury.

Dated August 30, 2006

Respectfully submitted,

BY: _____
(signed by permission by Otis Carroll)
Bradford P. Lyerla. **Lead Attorney**
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-mail: blyerla@marshallip.com

OF COUNSEL:

Anthony G. Sitko
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: asitko@marshallip.com

Jeffrey H. Dean
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: jdean@marshallip.com

7

Anthony S. Hind
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448
E-Mail: ahind@marshallip.com

Otis W. Carroll
Texas Bar No. 03895700
IRELAND, CARROLL & KELLEY, P.C.
6101 South Broadway, Suite 500
Tyler, Texas  75703
Tel: (903) 561-1600
Fax: (903) 581-1070
E-Mail: Fedserv@icklaw.com

           Attorneys for Plaintiff CIF Licensing, LLC
           d/b/a GE Licensing

# United States Patent [19]

**Edwards et al.**

[11] Patent Number: **4,733,159**

[45] Date of Patent: **Mar. 22, 1988**

[54] **CHARGE PUMP VOLTAGE REGULATOR**

[75] Inventors: **Arthur J. Edwards**, Hoffman Estates, Ill.; **Mihaly Lamoth**, Coppet, Switzerland

[73] Assignee: **Motorola, Inc.**, Schaumburg, Ill.

[21] Appl. No.: **924,100**

[22] Filed: **Oct. 28, 1986**

[51] Int. Cl.⁴ ............................................. G05F 1/56
[52] U.S. Cl. .............................. 323/282; 322/28
[58] Field of Search ................ 323/282, 284; 318/139; 322/28

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,343,060 | 9/1967 | Ingraham | 323/282 X |
| 3,447,065 | 5/1969 | Kuhn | 322/28 X |
| 4,210,856 | 7/1980 | Taylor | 320/17 |
| 4,346,337 | 8/1982 | Watrous | 322/25 |
| 4,386,310 | 5/1983 | Sievers | 322/28 |
| 4,388,586 | 6/1983 | Lamoth | 323/283 |
| 4,388,587 | 6/1983 | Lamoth et al. | 323/283 |
| 4,580,090 | 4/1986 | Bailey et al. | 323/282 X |
| 4,636,711 | 1/1987 | Freymuth | 318/139 X |

**OTHER PUBLICATIONS**

Motorola Data Sheets XPC1500 for the 16 Ampere Logic–to–Power Switch.
Motorola Data Sheet MPC1500, Logic–to–Power Switch Block Diagram.

*Primary Examiner*—Patrick R. Salce

*Assistant Examiner*—Marc S. Hoff
*Attorney, Agent, or Firm*—Phillip H. Melamed

[57] **ABSTRACT**

A voltage regulator (11) provides a pulse width modulated voltage regulator output (40) to a drive circuit (37) to provide field coil excitation for a voltage generator (15–17) providing a charging signal for a battery (14). The voltage regulator output determines on/off states of an FET power switching device (28) coupled in series with a field coil (17) across a maximum power source voltage potential $V_{BAT}$ corresponding to battery voltage. The drive circuit includes a charge pump (26, 35, 36) with a low capacitance capacitor (26) coupled and decoupled across a source of voltage potential at a rate determined by a high frequency signal (41), provided by the regulator, having a frequency substantially in excess of the frequency of the voltage regulator output. The drive circuit includes a pair of switches (21, 35) which alternately couple one terminal of the capacitor to either battery voltage or ground potential in accordance with the voltage regulator output. The above configuration provides a control voltage (44) at the gate of the FET substantially in excess of battery voltage and this insures maximum field current when the FET is on. This is achieved with a minimum capacitance for the capacitor, thus reducing circuit size and cost. Battery current drain of the drive circuit is minimized by disconnecting the one terminal of the capacitor from battery voltage when the FET is off.

**18 Claims, 2 Drawing Figures**





*FIG. 1*



FIG.2

4,733,159

1

# CHARGE PUMP VOLTAGE REGULATOR

## BACKGROUND OF THE INVENTION

The present invention generally relates to the field of voltage regulators, and in particular to voltage regulator systems utilized to control the charging of a battery, such as the battery in a vehicle.

In prior voltage regulator systems for vehicles it is known to provide a voltage regulator which senses battery voltage and provides a pulse width modulated output signal that varies in duty cycle in accordance with the difference between sensed battery voltage and a reference signal. This output signal is used to control a power switching device connected in series with a field coil across the battery voltage potential. The field coil controls excitation of stator windings of a voltage generating system which, after rectification of the output of the stator windings, provides a charging signal for the battery. Such voltage regulator systems, as described above, are conventional and well understood.

In some of the above-noted voltage regulator systems, it is necessary to provide a relatively large voltage, larger than battery voltage, at a control terminal of the power switching device so as to insure that maximum field current is provided when the switching device is on. In some cases an FET (field effect transistor) is utilized as the power switching device, with the drain electrode connected to battery voltage and the source terminal is connected through the field coil to ground potential. In such a configuration, to provide a gate voltage in excess of battery voltage when it is desired to have the FET on, a prior voltage regulator system has utilized a voltage doubler circuit. In the prior voltage doubler circuit, a voltage of approximately twice battery voltage is selectively provided at the gate terminal to insure that approximately the entire battery voltage potential is applied across the field coil when the FET is on.

The voltage doubler circuit of the prior voltage regulator relies on utilizing the pulse width modulated output signal of the voltage regulator to selectively couple and decouple a large magnitude capacitor across the battery voltage potential via a switch device. The end result is that essentially a voltage doubler is provided by the capacitor and the selective switching of the capacitor across the battery voltage potential. However, in such a configuration, a very large capacitance for the capacitor is utilized to insure that at high duty cycle percentages of the voltage regulator output signal, the voltage across the capacitor does not substantially decrease during the long on-duty cycle and thereby decrease the magnitude of the voltage at the gate electrode of the FET. When the prior voltage regulator produced an output signal which essentially resulted in the FET being on all of the time since field coil current was required all of the time, additional complex logic circuitry was required to provide some alternate coupling and decoupling of the capacitor across the battery voltage, and this increased the circuit cost. Without this additional logic circuitry, the twice battery voltage to be maintained at one terminal of the large capacitance capacitor would decrease due to leakage effects and the loading of the turned-on FET device. This is undesirable as it would result in reducing field coil current when the voltage regulator has indicated that maximum field coil current should be provided. Also, the required large magnitude capacitor is expensive, and it cannot be

2

implemented as part of an integrated circuit so as to reduce circuit cost.

## SUMMARY OF THE INVENTION

An object of the present invention is to provide an improved voltage regulator which overcomes the aforementioned deficiencies.

A more particular object of the present invention is to provide a voltage regulator which does not require a large magnitude capacitor but which still provides a switching control voltage substantially in excess of battery voltage at the gate of an FET device connected in series with the field coil that controls the output of a voltage generator which implements battery charging.

In one embodiment of the present invention, an improved voltage regulator is provided. The voltage regulator comprises: regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison; drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means, which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential, wherein the improvement comprises said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device.

Essentially, the above-recited configuration results in utilization of a relatively small magnitude capacitor while still providing a switching voltage at the control terminal of the power switching device that is substantially in excess of the maximum power source voltage potential, which preferably corresponds to battery voltage in the vehicle charging system. Preferably, the power switching device comprises an N channel field effect transistor (FET) in which the gate electrode is the control terminal the drain electrode is connected to

4,733,159

3

positive battery voltage and the source electrode is connected through a field coil to ground potential. Preferably, the voltage regulator means output signal comprises a pulse width modulated switching signal which selectively couples one terminal of the capacitor, at which said increased voltage signal is provided, to ground during one polarity of the duty cycle of the regulator output signal and during another polarity of the regulator output signal couples this terminal to battery voltage.

Preferably the high frequency switching signal is at least two orders of magnitude higher than the frequency of the regulator output signal, and,this results in requiring only a very small capacitance for the selectively series coupled capacitor thus reducing component cost and size. This also permits synthesizing the capacitor as part of an integrated circuit which includes other regulator components. In addition, the present invention contemplates utilizing the pulse width modulated output signal of the regulator and a switch device to alternately couple and decouple the capacitive terminal at which the increased voltage is produced to battery voltage, and this minimizes battery current drain during duty cycle portions of the regulator output signal during which no field current is desired. Also, this insures no substantial battery current drain when the voltage regulator is off and a low voltage regulator output signal is provided.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the invention, reference should be made to the drawings, in which:

FIG. 1 is a schematic diagram of a voltage regulator system constructed in accordance with the present invention; and

FIG. 2 comprises a series of graphs A through F illustrating waveforms of signals provided at the terminals A through F in FIG. 1.

DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, a voltage regulator system 10 is illustrated in which a substantially conventional pulse width modulated voltage regulator 11 has a voltage sensing input terminal 12 connected to a positive battery voltage terminal 13 also designated as $V_{BAT}$. The terminal 13 corresponds to the positive electrode of a vehicle battery 14 which has its negative electrode connected to ground potential. Charging of the battery 14 is accomplished by means of a plurality of stator output windings 15 which provide an output that is rectified by a rectifier circuit 16. The output of the stator windings 15 is controlled, as is conventionally understood, by the current excitation applied to a field coil 17 having a flyback transient suppression diode 18 connected thereacross.

Essentially, the voltage across the battery is sensed by the voltage regulator 11 via the signal at the terminal 12. The voltage regulator compares this voltage to an internal or external reference voltage signal provided at a terminal 19, and in response to this comparison produces a pulse width modulated regulator output signal at an output terminal 20. The duty cycle of this pulse width modulated output signal at the terminal 20 can vary from approximately 0% to 100% and is essentially determined in accordance with the difference between the sensed battery voltage and the reference signal at the terminal 19. This is accomplished in a conventional manner as is understood to those in the voltage regula-

4

tor art field, and can be implemented by a number of different circuit configurations for the voltage regulator 11. The constant frequency regulator disclosed in U.S. Pat. No. 4,386,310 to Sievers, assigned to the same assignee as the present invention, can be used for the above described voltage regulator 11. Also see U.S. Pat. Nos. 4,388,586 and 4,388,587. Essentially, the voltage regulator system 10, as is understood, responds to the pulse width modulated output signal at the terminal 20 so as to provide field coil current such that the battery voltage at the terminal 13 is maintained at a predetermined voltage with respect to the voltage magnitude of the reference signal at the terminal 19. This operation is conventional.

Essentially, the present invention involves providing a drive circuit means so as to couple the pulse width modulated regulator output signal at the terminal 20 to the field coil 17 so as to control field coil current excitation. This is accomplished in an advantageous manner by a relatively simple and economical drive circuit utilizing inexpensive components. The construction and operation of the drive circuit means is as follows.

The battery voltage terminal 13 is connected through a resistor 13A to the emitter of a PNP first switch device transistor 21 which has its collector coupled through a diode 22 to a terminal 23 also designated as terminal D. The emitter of transistor 21 is coupled to ground through an effective 20 volt Zener diode 13B and coupled through a resistor 24 to a terminal 25 also designated as terminal C. A relatively small magnitude capacitor 26 is connected between the terminals C and D wherein the capacitor 26 has a typical capacitance magnitude of 50 picofarads.

The terminal D is connected through a diode 27 to a gate electrode G of an N channel FET transistor 28 wherein the gate electrode is also designated by the terminal E. A drain electrode D of the FET is directly connected to the battery voltage terminal 13, and a source electrode S of the FET corresponds to a terminal F. A Zener diode 29 is connected between the terminals E and F to insure that no excessive voltage can be applied between the gate and source electrodes which would cause destruction of the FET. In FIG. 1, the effective internal input capacitance of the FET is illustrated as an inherent capacitor 30 connected between the gate and source electrodes and having a typical magnitude of 1000 picofarads. The FET 28 is utilized as a power switching device that controls current in the field coil 17.

The source electrode of the FET is connected through a current sensing resistor 31 to a terminal 32 at which one end of the field coil 17 is connected and a cathode of the flyback diode 18 is connected. Another end of the field coil 17 and the anode of the diode 18 are connected to ground potential. The amount of field coil current being drawn can be measured by noting the voltage drop across the resistor 31, if desired. With this configuration the output electrodes (drain and source) of the FET are connected in series with field coil 17 between a maximum power source potential corresponding to the battery voltage.

The pulse width modulated regulator output signal at the terminal 20 is connected to a terminal 33 also designated as terminal A. This terminal is connected through a level shifter or isolation circuit 34 to the base electrode of the first switch device transistor 21. The terminal 33 is also connected directly to the base electrode of an NPN transistor 35 which comprises a third switch

4,733,159

5

device transistor having its emitter connected to ground and its collector connected to the terminal E. An effective 40 volt Zener diode 35A is connected between the collector and base electrodes of the transistor 35. A second switch device transistor 36 comprising an NPN transistor has its collector connected to the terminal C, its emitter connected to ground potential and its base electrode connected to a terminal B which is contemplated as being an additional output terminal of the voltage regulator 11 at which a very high frequency switching signal is provided. It is contemplated that the high frequency switching signal at the terminal B is a constant frequency signal having a frequency of 200 to 300 kilohertz, as contrasted with the frequency of the pulse width modulated regulator output signal at the terminal 20 which has an output frequency of 50 to 70 hertz.

The operation of the voltage regulator system 10 in FIG. 1 will now be discussed with reference to the signal waveforms shown in the graphs A through F in FIG. 2. It should be noted that the signal waveforms illustrated in FIG. 2 in graphs A through F correspond to the voltage waveforms of electrical signals provided at the terminals A through F, respectively, in FIG. 1. In the graphs in FIG. 2, the vertical axes are representative of signal magnitude, and the horizontal axes are representative of time. It should also be noted that the time scale utilized to illustrate the very high frequency signal at the terminal B, and its affect on other signals, is not drawn to scale with regard to the much slower varying signal of the pulse width modulated regulator output signal at the terminal 20 corresponding to the signal at terminal A. However, this has been done to enhance the clarity of the Figures as is readily understood.

As shown in FIG. 2, the voltage regulator 11 provides a pulse width modulated signal 40 at the terminal A wherein the duty cycle of this signal is variable and is determined in accordance with the difference between the sensed battery voltage at the terminal 12 and the reference signal voltage at the terminal 19. During a high, or positive, polarity 41A of the duty cycle portion of the signal 40, no field current will be drawn, but during the low, or negative, polarity 41B of the duty cycle of the signal 40, field current will be provided so as to charge the battery 14. The signal 40 illustrates that at a reference time $t_0$, there is a high to low transition indicating the commencement of a low state for the signal 40 during which field current will flow. The frequency of the signal 40 is typically between 50 to 70 hertz, and the duty cycle can vary between extreme percentages such as 0 to 100% depending upon how much field current the voltage regulator 11 determines is necessary.

In generating the pulse width modulated signal 40 at the terminal 20, it is contemplated that the voltage regulator may internally use a very high frequency reference oscillator. Alternatively, a separate high frequency reference oscillator may be provided within the voltage regulator 11 even though this signal may not be utilized to generate the pulse width modulated regulator output signal 20. In either event, the voltage regulator 11 provides at the terminal B a very high frequency signal comprising a series of pulses wherein the frequency is 200 to 300 kilohertz. This is generally shown in graph B in FIG. 2, even though the time scale for graph B does not correspond to the same time scale utilized for graph A.

6

Essentially, in response to the high and low outputs provided at the terminal 20 by the voltage regulator 11, the first and third switch transistor devices 21 and 35, will be alternately opened and closed. More specifically, in response to a high signal level at the terminal A, transistor 35 will be turned on, therefore grounding the gate electrode of the FET and limiting the voltage at the terminal D to only one diode drop above ground potential. At the same time, this high signal level at the terminal A, via the level shifter 34, will result in effectively turning off the first switch device 21 and thereby decouple the battery voltage terminal 13 from the capacitor terminal D via the transistor 21 and diode 22.

During the time that a high or positive logic level is present at the terminal A, and even when a low logic level is present at the terminal A, a high frequency signal 41 is continuously provided at the terminal B as illustrated in graph B in FIG. 2. The signal 41 is not necessarily continuously provided during the duty cycle polarity 41A of signal 40. This high frequency signal continually results in turning the transistor 36 on and off and, therefore, alternately connecting the terminal C to ground potential and then opening this connection. When a positive signal level is provided at a terminal A, the opening and closing of the transistor switch 36 results in providing a corresponding ramp signal 42 at terminal C as illustrated in graph C in FIG. 2. During the time that the transistor 36 is on, terminal C is connected to ground potential, but when transistor 36 is off, the potential at terminal C rises due to a charging current provided from the battery voltage terminal 13 through the resistor 24. Typically, the peak of this ramp signal during a positive logic state at the terminal A will be approximately 2.5 volts less than the battery voltage at the terminal 13, which is typically 14 volts. Thus, approximately 11.5 volts is the magnitude of the voltage peaks of the signal 42 for a positive logic state at the terminal A which corresponds to no field current being conducted. During this same time, a relatively small magnitude square wave varying at the same frequency as the high frequency signal 41 is at the terminal D wherein the signal at the terminal D is generally designated by the reference numeral 43 in graph D. The peak magnitude of the signal 43 when a positive logic state is at the terminal A is approximately +1 volt since at that time the transistor 35 is on and the peaks of signal at the terminal D are limited by the clipping action provided by the diode 27. Typically, a slight negative voltage is provided at the terminal D when a positive logic state is present at terminal A and the transistor 36 is turned off.

Since a positive logic state at the terminal A turns the transistor 35 on, this means that at this time the gate electrode of the FET is at ground potential, and, therefore, the FET is turned off. While the FET is turned off, field current will not flow in the field coil 17 by virtue of power (current) supplied by the battery 14. A signal 44 in graph E in FIG. 2 illustrates the voltage waveform for the signal at the gate electrode of the FET, and a signal 45 in graph F in FIG. 2 illustrates the voltage waveform at the source electrode of the FET. The signals at the terminals F and 32 are identical, except for a minor voltage shift in case field current is flowing due to the drop across the resistor 31. Thus a graph of the signal at terminal 32 is not provided.

Essentially, prior to the time $t_0$ shown in FIG. 2, there is no field coil current because the FET 28 is turned off. At the time $t_0$, the transistor 35 which was previously on, is now turned off, thus removing the clamping ac-

4,733,159

7

tion provided at the gate electrode of the FET by virtue of the transistor 35 and diode 27. At the same time, since a low or negative logic state is now provided at the terminal A, the transistor 21 is turned on via level shifter 34 resulting in applying approximately battery voltage at the terminal D by virtue of the transistor 21 and diode 22. This is illustrated in the graphs in FIG. 2 by the abrupt rising transient present at the time $t_0$ in the signals 43, 44 and 45. Immediately after $t_0$ the signal 43 has a magnitude of $V_{BAT}-1$ diode drop, signal 44 has a magnitude of $V_{BAT}-2$ diode drops, and signal 45 has a magnitude of approximately 7 volts representing the difference between the signal 44 at the terminal E and the gate-to-source turn-on threshold developed across the FET 28.

After the time $t_0$, the transistor 36 continues to be switched on and off at a very rapid rate in accordance with the pulses of the high frequency signal 41. This results in only a slight change in the peak magnitudes of the signal 42 at the terminal C, and this slight increase in magnitude is due to the fact that the clamping action of the diode 27 to ground potential through the transistor 35 have now been removed. However, the significance of continuing the high frequency switching after the time $t_0$ is more evident in the signals 43 through 45. For signal 43, it is noted that what essentially happens is that the ramp signal provided at the terminal C is now effectively transferred to the terminal D and superimposed upon a DC level of approximately the battery voltage $V_{BAT}$ at the terminal 13 minus the series drop across the transistor 21 and diode 22. This essentially results in the signal 43 reaching peak magnitudes of approximately twice the battery voltage since the AC variation of the signal 42 is now effectively superimposed on a DC level of approximately battery voltage.

In response to the signal 43, the diode 27, and the effective input capacitance 30 of the FET effectively provide a peak rectification circuit such that the signal 44 essentially follows the envelope of the signal peaks of the signal 43 less the voltage drop across diode 27. This is illustrated in graph E in FIG. 2. The signal 45 at the source electrode essentially tracks the gate voltage and, therefore, also increases, but the maximum value of the signal 45 is achieved at battery voltage since this signal cannot exceed the drain voltage wherein the drain electrode is directly connected to the relatively constant voltage $V_{BAT}$ at the battery voltage terminal 13. However, as seen in graph F in FIG. 2, the signal 45 does increase from a voltage somewhat below battery voltage to approximately battery voltage during the time that field current is flowing. This means that maximum possible field current is provided during the time that a low logic level is provided for the signal 40 since the source voltage of the FET will now reach approximately battery voltage due to the effective saturation of the FET device 28. This is possible in the present invention since the gate voltage is maintained in excess of the battery voltage $V_{BAT}$ present at the drain electrode and this situation is required in order to maintain the FET in an on condition with the source at $V_{BAT}$. At a subsequent time $t_x$, the signal 40 undergoes a logic state inversion resulting in the turning off of field current, and this is maintained until a subsequent time $t_1$ at which time the turn-on cycle is reinstituted.

Essentially, the present invention is concerned with providing a voltage as high as possible at the terminal F such that maximum field coil current can be drawn when the voltage regulator 11 indicates that field cur-

8

rent should be provided. This is accomplished by the present circuit providing approximately battery voltage $V_{BAT}$ at the source electrode of the FET. In order to accomplish this, a much higher than $V_{BAT}$ voltage must be provided at the gate of the N channel FET to insure that the FET turns on and remains on since there is a minimum gate-to-source threshold which must be exceeded in order for the FET to be on. The present invention is concerned with how this larger than battery voltage control signal at the gate of the FET can be produced efficiently and with minimum expense. It should be noted that the reason that the field coil 17 is not provided in the drain circuit of the FET, is that many voltage regulator systems do not wish to subject the field coil to constant positive voltage potential even when no field current is to be drawn. Thus, in the present circuit, the field coil is in the source circuit of the N channel FET, and the FET essentially acts as a source follower. Also, an N channel FET is used since P channel FETs are substantially more expensive.

The present invention essentially provides the approximately twice battery voltage signal at the gate of the FET when it is desired to commence field current. This occurs by use of the high frequency switching provided by the signal 41 at the terminal B and the use of a relatively small magnitude capacitor 26. This is contrasted with prior voltage regulator systems, which while recognizing that a high gate voltage is desirable, implemented this by utilizing relatively slow switching speeds with a very large magnitude capacitor to form a battery voltage doubling system. Those prior systems were not cost effective in implementing field current for 100% of the time, because they required utilization of extensive additional logic circuitry required to provide some periodic interruptions (in case a 100% duty cycle was required) for charging the large capacitor. In addition, the prior systems required an extremely large magnitude capacitor 26 to insure that there was not a substantial decrease in the voltage being maintained at the terminal D after commencement of field current flow. The present invention avoids these problems by implementing very rapid switching via the transistor 36 and, therefore can utilize a very small capacitor (typically 50 picofarads), for the capacitor 26. This enhances circuit performance and reduces circuit cost. In the present circuit, rather than relying on the massive capacitance of the capacitor 26, now the inherent gate-to-source capacitance of the FET 28 can be relied on to maintain an appropriate voltage at the terminal E during field current flow, and thus no additional large capacitor is required. The small size of the capacitor 26 makes it possible to synthesize, on a single integrated circuit chip, substantially all of the components of a driver circuit 37, shown dashed in FIG. 1, and the regulator 11, except the FET 28 and the resistor 31.

In addition to the above advantages, the present invention minimizes battery current drain during a condition of no field current flow. This is because the switch 21 will effectively decouple the capacitor terminal D from battery voltage when no field current is required. If the transistor 21 were replaced by a direct connection between the anode of the diode 22 and the terminal 13, then there would have to be some provision to prevent excessive battery current drain because of the shorting action provided by the transistor 35 and additional leakage current associated with the FET, when this device is off and no field current is drawn. These problems are avoided by utilization of the transistor 21 which is

4,733,159

9

switched alternately with respect to, but at the same frequency as, the transistor 35. Thus transistor 21 prevents series coupling the capacitor 26 between $V_{BAT}$ at terminal 13 and ground during duty cycle portions 41A, and permits such coupling during 41B, and this reduces battery current drain. Also, this insures no substantial battery current drain when the voltage regulator is off, and, therefore, a low voltage regulator output signal at terminal 20 is provided. The effective Zener diode 13B protects the transistors 21 and 36 from excessive battery voltage transients caused by battery load variations, and the effective Zener 35A protects the transistor 35 against transients at the terminal E.

While specific embodiments of the present invention have been shown and described, further modifications and improvements will occur to those skilled in the art. All such modifications which retain the basic underlying principles disclosed and claimed herein are within the scope of this invention.

We claim:

1. A voltage regulator comprising:
regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison;
drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential,
wherein the improvement comprises said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device.

10

2. A voltage regulator according to claim 1 wherein said predetermined characteristic of said regulator output signal, which characteristic is determined in accordance with said comparison, comprises duty cycle.

3. A voltage regulator according to claim 2 wherein said drive circuit means includes means for selectively preventing said series coupling of said capacitor across said predetermined power source voltage potential during duty cycle portions of said regulator output signal of a predetermined polarity and permitting said series coupling during duty cycle portions of said regulator output signal of an opposite predetermined polarity.

4. A voltage regulator according to claim 3 wherein said predetermined power source voltage potential that said capacitor is selectively series coupled and decoupled across substantially comprises said maximum power source voltage potential that said power switching device and control element of said voltage control means are coupled across.

5. A voltage regulator according to claim 4 wherein the frequency of said high frequency signal pulses is at least one order of magnitude higher than the frequency of said regulator output signal.

6. A voltage regulator according to claim 5 wherein said preventing means of said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal.

7. A voltage regulator according to claim 6 wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal.

8. A voltage regulator according to claim 1 wherein said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal.

9. A voltage regulator according to claim 8 wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal.

10. A voltage regulator according to claim 9 wherein said first capacitor terminal is coupled to said power switching device control terminal through a peak rectifying diode

4,733,159

11

11. A voltage regulator according to claim 10 wherein said first predetermined voltage is coupled to said first capacitor terminal through a diode.

12. A voltage regulator according to claim 11 wherein said power switching device comprises an FET having gate, drain and source electrodes corresponding to said control and output terminals, respectively.

13. A voltage regulator according to claim 12 wherein said drain electrode is coupled to a source of constant voltage potential and wherein the effective internal capacitance of said FET between said gate and source electrodes is substantially larger than the capacitance of said capacitor.

14. A voltage regulator according to claim 13 wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil.

12

15. A voltage regulator according to claim 1 wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil.

16. A voltage regulator according to claim 15 wherein said voltage generator means includes stator windings, in addition to said field coil, and a rectifier circuit means for receiving the output of said stator windings and providing a charging signal for a battery so as to maintain a predetermined battery voltage thereacross.

17. A voltage regulator according to claim 16 wherein said predetermined voltage across said battery corresponds to said predetermined maximum power source voltage potential.

18. A voltage regulator according to claim 1 wherein the frequency of said high frequency pulses is at least one order of magnitude higher than the frequency of said regulator output signal.

*    *    *    *    *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    :    4,733,159

DATED         :    March 22, 1988

INVENTOR(S) : Arthur J. Edwards and Mihaly Lamoth

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In claim 1, Col. 9, line 35, after "voltage control means", please insert ―,―.

Signed and Sealed this

Twenty-seventh Day of September, 1988

Attest:

DONALD J. QUIGG

Attesting Officer          Commissioner of Patents and Trademarks

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CIF LICENSING, LLC, d/b/a | § | |
| GE LICENSING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:06-CV-345-DF |
| | § | |
| DENSO CORPORATION, REMY | § | |
| INTERNATIONAL, INC., and VALEO, | § | |
| INC., | § | |
| | § | |
| Defendants. | § | |

**O R D E R**

Before the Court is Plaintiff's Motion for Leave to File Second Amended Complaint.

Dkt. No. 44.  Also before the Court is Defendant's response, Plaintiff's reply, and Defendant's

sur-reply.  Dkt. No. 47, 51 & 53.  The Court held a hearing on May 21, 2007, at which the Court

requested supplemental briefing.  The parties have each filed a supplemental brief.  Dkt. Nos. 56

& 57.  Having considered the briefing and all relevant papers and pleadings, the Court finds that

Plaintiff's Motion for Leave to File Second Amended Complaint should be **GRANTED**.  The

Court further finds that the present action should be **STAYED**.

**I.  BACKGROUND**

Plaintiff filed suit on August 30, 2006 alleging infringement of United States Patent No.

4,733,159 (the "'159 Patent").  Complaint, Dkt. No. 1.  Plaintiff named Denso Corporation and

Valeo, Inc. as defendants, with whom Plaintiff has settled.  Dkt. Nos. 19 & 42.  Plaintiff filed its

First Amended Complaint on October 20, 2006, which added Valeo Sistemas Electricos S.A. de

C.V. as a defendant, with whom Plaintiff has also settled. Dkt. No. 12 & 42. Plaintiff's

Complaint and First Amended Complaint both name "Remy" as a defendant, and Plaintiff served

defendant Remy International, Inc. ("Defendant"). *See* Dkt. Nos. 1, 5 & 12. Defendant is the

only remaining defendant in the present suit.

Remy Inc., a subsidiary of Defendant, together with other subsidiaries, filed a declaratory

judgment action in the District of Delaware on December 21, 2006 (the "Delaware Action"). D.

Del., Civil Action No. 1:06-CV-785, Dkt. No. 1.

Defendant has filed a Motion to Dismiss for Want of Personal Jurisdiction. Dkt. No. 24.

By its response filed on April 30, 2007, Plaintiff seeks leave to file a Second Amended

Complaint. Dkt. No. 44. Plaintiff is "prepared to consent to the relief requested by [Defendant]

. . . conditioned on the Court granting [Plaintiff] leave to name the correct Remy entity as a

defendant in this case." *Id.* at 1.

## II. THE PARTIES' POSITIONS

Plaintiff concedes that Remy International is the "wrong party" and seeks leave to file a

Second Amended Complaint that names Remy, Inc., the "correct Remy entity," as a defendant.

Dkt. No. 44 at 1. Remy Inc. is a wholly owned subsidiary of Remy International. *Id.* at 2; *see

also id.* at Ex. C; Dkt. Nos. 24 at 1 & 47 at 1-2.

Defendant argues that Plaintiff's amendment would be futile because the District of

Delaware is the "first-filed" court as to Remy Inc. Dkt. No. 47 at 8-10. Defendant thus submits

that a stay or a transfer to the District of Delaware would be appropriate if the Court grants leave

for Plaintiff to amend. *Id.* at 3. Defendant argues that granting Plaintiff's motion for leave to

amend would prejudice Defendant by subjecting it to "dual patent litigation simultaneously

proceeding in two forums, while this Court may not have personal jurisdiction over some of the necessary parties (the supplier indemnitors)." *Id.* at 11. In the alternative, Defendant seeks a stay of the present action pending reexamination of the '159 Patent in the United States Patent and Trademark Office. *Id.* at 12-15.

Plaintiff replies that the present action should be deemed "first-filed" upon amendment because Rule 15(c) provides for relation back. Dkt. No. 51 at 2 (citing *Schiavone v. Fortune*, 477 U.S. 21, 29 (1986), *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189 (S.D.N.Y. 2000), *Nutri-Health Supplements, LLC v. Block Drug Co.*, 2007 WL 38159 (D. Ariz. 2007) & *Optima, Inc. v. Republic Indus., Inc.*, 1995 WL 72430 (E.D. La. 1995)). Plaintiff also argues that a stay pending reexamination of the '159 Patent is inappropriate. *Id.* at 4 (citing *Soverain Software LLC v. Amazon.com*, 356 F. Supp. 2d 660, 663 (E.D. Tex. 2005)).

In sur-reply, Defendant argues that Plaintiff fails to satisfy any of the *Foman* factors. Dkt. No. 53 at 2-3 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Alternatively, Defendant argues that if the Court grants leave to amend, then justice and judicial economy favor a stay. *Id.* at 3. Defendant also argues that "the relation back doctrine does not establish this as the first filed case . . . ." *Id.* at 5.

In supplemental briefing, Plaintiff argues that its assertion of counterclaims in the Delaware Action is irrelevant because Plaintiff was "*required* [Plaintiff] to include all compulsory counterclaims pursuant to Rule 13(a)." Dkt. No. 56 at 3. Plaintiff argues that "at the time [Plaintiff] answered [in the Delaware Action], a motion based on the first-filed rule in Delaware would have been premature because [Plaintiff] could not *at that time* represent that the correct parties were defendants in Texas." *Id.* at 4. Plaintiff submits *Ballard Medical Products*

-3-

*v. Concord Labs, Inc.* as authority that counterclaims in the Delaware Action should not affect this Court's analysis of Plaintiff's motion. *Id.* at 3 (discussing 700 F. Supp. 796 (D. Del. 1988)).

In its supplemental brief, Defendant submits that neither party "[has] been able to find any case discussing this exact set of procedural circumstances." Dkt. No. 57 at 3. Defendant argues that Plaintiff fails to show prejudice. Dkt. No. 57 at 4-5. Defendant also argues that "Delaware is currently the only forum in which this action is effectively proceeding . . . ." *Id.* at 4. Defendant submits *Orthmann v. Apple River Campground, Inc.*, which Defendant characterizes as containing applicable principles of federal comity. 765 F.2d 119 (8th Cir. 1985). In the alternative, Defendant argues that "[i]f leave to amend is granted, a stay and or transfer will continue to be appropriate because GE's first-to-file argument will be swallowed by the interests of justice and judicial economy." *Id.* at 8. Defendant argues that *Ballard* is inapplicable because that court did not address a motion to amend. *Id.* at 10.

### III. DISCUSSION

Under Federal Rule of Civil Procedure ("Rule") 15(a), "leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); s*ee also Foman*, 371 U.S. at 182.

The Court's present Scheduling Order sets an April 7, 2008 deadline for amendment of pleadings without leave of Court. Dkt. No. 58 at 2. The Court is nonetheless mindful of the interest of comity between federal district courts. For this reason, the parties submitted supplemental briefing. The Court finds that the assertion of counterclaims in the Delaware Action does not affect this Court's analysis of Plaintiff's motion for leave to amend its complaint. Plaintiff's motion for leave to amend should be **GRANTED**.

The Court further **STAYS** the present action pending further action by the Delaware

-4-

court.  The Court need not resolve the "first filed" issue in order to grant Plaintiff's motion for leave to amend.  The Court expressly leaves the "first filed" issue for the Delaware court to resolve if properly presented.

Also, the Court is not inclined to grant an unconditional stay pending reexamination of the '159 Patent.  *See Soverain Software*, 356 F. Supp. 2d 660, 663 (finding that "staying the case, based solely on speculation of what might possibly happen during reexamination, would be inefficient and inappropriate"); *see also Antor Media Corp. v. Motorola, Inc.*, Civil Action No. 5:06-CV-240, Dkt. No. 53, entered Feb. 23, 2007 (denying unconditional stay and discussing conditional stay in *Antor Media Corp. v. Nokia, Inc.*, Civil Action No. 2:05-cv-186, Dkt. No. 410).

## IV.  CONCLUSION

Plaintiff's Motion for Leave to File Second Amended Complaint (Dkt. No. 44) is hereby **GRANTED**.  Plaintiff shall have leave to re-file its proposed Second Amended Complaint on the Court's electronic docket.  It is further

**ORDERED** that the present case is **STAYED** pending further action by the Delaware court.

**SIGNED this 2nd day of July, 2007.**

_____
DAVID FOLSOM
UNITED STATES DISTRICT JUDGE

# EXHIBIT C

# Texas District & County Courts

## TX District & County - Dallas (District Only)
## (Dallas 134th District Court)

## DC-06-11257

## STMICROELECTRONICS INC vs. WELLS MANUFACTURING CORPORATION, et al

### This case was retrieved from the court on Monday, August 06, 2007

## Header

|  |  |
|---|---|
| Case Number: | DC-06-11257 |
| Date Filed: | 11/01/2006 |
| Date Full Case Retrieved: | 08/06/2007 |
| Misc: | (235) Other (Civil); District Civil |

[Summary] [Participants] [Proceedings] [Dispositions] [Payments]

## Summary

## No Information is Available for this case

## Participants

| Litigant | Attorney |
|---|---|
| Stmicroelectronics Inc | Craddock, Thomas W |
| Plaintiff | Plaintiff |
| Kimball Electronics, Inc. | |
| Defendant | |
| Kimball International, Inc. | Rickman, Robert L |
| Defendant | Defendant |
| Wells Manufacturing Corporation | Sessions, William Lewis |
| Defendant | Defendant |
| Wetherill Associates,Inc., | |
| Defendant | |

## Proceedings

| Date | Details |
|---|---|
| 11/01/2006 | Citation |
|  | Kimball International, Inc. Unserved |
|  | Kimball Electronics, Inc. Served 11/07/2006 |
| 11/01/2006 | Citation Sos/Coi/Coh/Hag |
|  | Sos |
|  | Wells Manufacturing Corporation Served 11/03/2006 |

| | |
|---|---|
| 11/01/2006 | Issue Citation |
| 11/01/2006 | Issue Citation Comm of Ins or Sos |
| 11/01/2006 | Original Petition (Oca) |
| 11/07/2006 | Citation Sos/Coi/Coh/Hag |
| | Issued by Carroll Jones |
| | Kimball International, Inc. Served 11/09/2006 |
| 11/07/2006 | Issue Citation Comm of Ins or Sos |
| 12/04/2006 | Original Answer - General Denial |
| 12/04/2006 | Original Answer - General Denial |
| 12/11/2006 | Miscellanous Event |
| | Ret Cit Sos-Kimball International |
| 01/04/2007 | Rule 11 |
| 01/05/2007 | Objection |
| | Pltf-Crt/Appt/Mediator |
| 01/08/2007 | Amended Petition |
| | 2nd Amd Pet |
| 01/08/2007 | Issue Citation |
| | Second Amended |
| 01/11/2007 | Citation |
| | Wetherill Associates,Inc., Unserved |
| 01/31/2007 | Rule 11 |
| 03/26/2007 | Plea to Jurisdiction |
| | Dfts-M/Dism/Lack Subject Matter Jurisdiction |
| 03/27/2007 | Plea to Jurisdiction |
| | Dfts-Suppl/M/Dism/Lack Subject Matter Jurisdicition |
| 04/05/2007 | Miscellanous Event |
| | Unopposed M/Requesting Permission to Participate Intexas Proceedings |
| 04/05/2007 | Response |
| | Pltf-To The Plea to The Jurisdiction & M/Dismiss For Lack of Subject Matter |
| 04/09/2007 | Order - Misc. |
| | Requesting Permission to Participate in TX Proceeding Non-Resident Atty-Michael Gannon |
| | Vol./Book 376G, Page 420, 1 Pages |
| 04/09/2007 | Plea to Jurisdiction (10:00 AM) (Judicial Officer ASHBY, ANNE) |
| | Defts-M/Dism/Lack/Subject Matter Jurisdiction-30m |
| 06/07/2007 | Affidavit |
| 06/07/2007 | Notice of Nonsuit |
| | Solely With Respect to Wetherill Associates, Inc. |
| 06/08/2007 | Note - Clerks |
| | Copy Craddock |
| 06/08/2007 | Order - Nonsuit |
| | Wetherrill Associates |
| | Vol./Book 377G, Page 180, 1 Pages |
| 06/18/2007 | Order - Mediation |
| | Vol./Book 377G, Page 489, 2 Pages |
| 07/18/2007 | Rule 11 |
| 07/20/2007 | Jury Demand (Oca) |
| | Vol./Book J23, Page 490, 1 Pages |
| 07/20/2007 | Miscellanous Event |
| | Dfts-M/Stay |
| 07/20/2007 | Order - Partial Dismissal |
| | Pltf-& Plea Jurisdiction as to Defts-Kimball International Inc & Kimball Electronics Inc Only |
| | Vol./Book 379G, Page 18, 2 Pages |

10/22/2007    Trial Setting (Non Jury)

## Dispositions

# No Information is Available for this case

## Payments

| Date | Details | Amount |
|------|---------|--------|
| | Defendant Wells Manufacturing Corporation | |
| | Total Financial Assessment | 30.00 |
| | Total Payments and Credits | 30.00 |
| | Balance Due as of 08/06/2007 | 0.00 |
| 07/23/2007 | Transaction Assessment | 30.00 |
| 07/23/2007 | Payment (Case Fees), Receipt # 40759-2007-DCLK, Sessions Lambert Selwyn Llp | (30.00) |
| | Plaintiff Stmicroelectronics Inc | |
| | Total Financial Assessment | 265.00 |
| | Total Payments and Credits | 265.00 |
| | Balance Due as of 08/06/2007 | 0.00 |
| 11/01/2006 | Transaction Assessment | 217.00 |
| 11/01/2006 | Transaction Assessment | 28.00 |
| 11/01/2006 | Payment (Case Fees), Receipt # 65143-2006-DCLK, Mcguired Craddock & Strother PC | (245.00) |
| 11/07/2006 | Transaction Assessment | 12.00 |
| 11/07/2006 | Payment (Case Fees), Receipt # 66448-2006-DCLK, Mcguire Craddock & Strother PC | (12.00) |
| 01/08/2007 | Transaction Assessment | 8.00 |
| 01/08/2007 | Payment (Case Fees), Receipt # 1006-2007-DCLK, Mcguire Craddock & Strother PC | (8.00) |

Copyright © 2007 LexisNexis CourtLink, Inc. All rights reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***