# CONNOLLY BOVE LODGE & HUTZ LLP

#### ATTORNEYS AT LAW

Jeffrey B. Bove
Partner

TEL (302) 888-6241
FAX (302) 656-9072
EMAIL jbove@cblh.com
REPLY TO Wilmington Office

WILMINGTON, DE

The Nemours Building
1007 North Orange St.
P.O. Box 2207
Wilmington, DE 19899
TEL: (302) 658 9141
FAX: (302) 658 5614
WEB: www.cblh.com

January 4, 2008

The Honorable Magistrate Judge Thynge
United States District Court
  for the District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Room 6100
Lockbox 8
Wilmington, DE  19801

      Re:    <u>Remy, Inc. v. CIF Licensing, LLC, d/b/a GE Licensing, et al., C.A. No.:  06-785</u>

Dear Magistrate Judge Thynge:

      We represent Defendant Wells Manufacturing, L.P. ("Wells") in the above-captioned action, and we write pursuant to the Court's Order of December 14, 2007 (D.I. 69) to provide the Court with Wells's arguments in support of its motion to stay this case pending the outcome of the United States Patent Office's reexamination of the patent at issue in this case.

## I.    <u>Nature and Stage of the Proceedings</u>

      The patent at issue in this case, U.S. Patent No. 4,733,159 to Edwards et. al. ("the '159 Patent" and "the Patent-In-Suit"), expired on October 28, 2006.  The case has yet to enter discovery.  No trial date has been set, and no scheduling order has been entered.

      Remy, Inc. ("Remy") filed a complaint for a declaratory judgment (on behalf of Remy, Unit Parts Company, and Worldwide Automotive, LLC (collectively, "Plaintiffs")) of non-infringement, invalidity, or unenforceability of the '159 Patent owned by CIF Licensing, LLC d/b/a GE Licensing ("GE Licensing").  Remy's Complaint also includes claims for indemnification from Wells, Taditel US, Inc. and Wetherill Assoc., Inc. that are contingent upon a finding that Remy has infringed the '159 Patent.  Wells has, in turn, made a claim against STMicroelectronics, Inc. for indemnification in the event that a judgment is entered against Wells on Remy's indemnification claim.  There are multiple, pending motions relating to venue and dismissal questions that are under the Court's advisement.

## II.    <u>Statement of Facts</u>

      Remy filed a reexamination request concerning the '159 Patent on February 26, 2007, arguing that "a substantial new question of patentability exists because none of the three

Magistrate Judge Thynge
January 4, 2008
Page 2

anticipating references [U.S. Patents No. 4,420,700 to Fay et al.; 4,603,269 to Hochstein; and 4,736,121 to Cini et al.] were before the Examiner, and each of these references teaches what the inventors contended was the 'novel distinction' of the '159 Patent." Exhibit A, Remy's Request for *Ex Parte* Reexamination Under 37 C.F.R. § 1.510 at 4. The U.S. Patent and Trademark Office granted this request. Exhibit B, Decision Granting *Ex Parte* Reexamination.

On December 4, 2007, Wells filed an additional patent reexamination request concerning the '159 Patent. Exhibit C, Wells's Request for *Ex Parte* Reexamination Under 37 C.F.R. § 1.510. According to U.S. Patent and Trademark Office ("Office") statistics, 91% of all reexamination requests made have been granted. Exhibit D, Ex Parte Reexamination Filing Data—March 31, 2007, 908 PLI/Pat 79 at 2 (August 2007) (analyzing data from July 1, 1981 until March 31, 2007). It is the policy of the U.S. Patent Office that if a second reexamination request for a patent is granted while the first request is pending, then the two proceedings will be consolidated by the Office. 37 C.F.R. 1.565(c): "If ex parte reexamination is ordered while a prior ex parte reexamination is pending and prosecution in the prior ex parte reexamination proceeding has not been terminated, the ex parte reexamination proceedings will be consolidated and result in the issuance of a single certificate under § 1.570." On this basis, Wells believes that its request will be granted and will be consolidated with Remy's reexamination proceeding.

The statistics available from the Office also point out that the likely time to decision in a reexamination proceeding is between 18 and 23 months. Exhibit D at 3. Applying this information to the present circumstances, it is likely that the Office will issue a reexamination certificate sometime between August 2008 and January 2009, or within 8 to 12 months.

### III.    Statement of Law and Argument

#### A.    The Decision To Stay Is Within The Discretion Of The Court.

The decision to grant a motion to stay is firmly within the discretion of the Court. *Cost. Bros., Inc. v. Travelers Indem. Co.*, 760 F.2d 58, 60 (3d Cir. 1985); *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988)("[C]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination."). The Court should exercise its discretion to impose a stay in this case in order to obviate the need for this Court to spend its resources deciding issues that may be made moot if the '159 Patent's claims are cancelled or amended on reexamination.

#### B.    Motions To Stay Pending Reexamination Are Liberally Granted.

Numerous courts have recognized that "in passing the legislation establishing the reexamination proceeding, Congress stated its approval of district courts liberally granting stays within their discretion." *See, e.g., Emhart Indus. v. Sankyo Seiki Mfg.*, 3 U.S.P.Q. 2d 1889, 1890 (N.D. Ill. 1987). Accordingly, courts generally take advantage of the benefits provided by staying litigation pending reexamination by granting stays unless there are unusual circumstances counseling against it. *See e.g. ASCII Corp. v. STD Entm't USA Inc.*, 844 F. Supp. 1378, 1381 (N.D. Cal. 1994). No such circumstances exist here, and the stay should be granted.

Magistrate Judge Thynge
January 4, 2008
Page 3

C.    A Stay Will Avoid Wasting The Court's Time Deciding Issues Relating to Claims That Mostly Likely Will Be Cancelled Or Changed After Reexamination.

A primary benefit "of the reexamination procedure is to eliminate trial of that issue (when the claim is canceled) or to facilitate trial of that issue by providing the district court with the expert view of the PTO (when a claim survives reexamination proceeding)." *Abbott Diabetes Care, Inc. v. Dexcom, Inc.*, 06-514, 2007 WL 2892707, at *5 (D. Del. Sep. 30, 2007) (citing *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342 (Fed. Cir. 1983)). Accordingly, most courts strive to balance the benefits obtained from reexamination with the potential cost if one party would be unfairly disadvantaged by the stay. The factors that courts consider vary according to the circumstances of each case, but they generally fall into one of two groups: factors relating to efficiency and/or judicial economy and factors relating to equity.

For example, in *Abbott Diabetes Care, Inc.*, 2007 WL 2892707 at *4 (citing *United Sweetener USA, Inc. v. Nutrasweet Co.*, 766 F. Supp. 212, 217 (D. Del. 1991)), the Court considered: (1) how completion of the reexamination process would focus and simplify any issues which may remain for trial, and (2) whether the case had progressed through the discovery phase and was progressing toward a certain trial date. These factors are "efficiency" factors, focusing on efficient administration of justice and thereby conserving the resources of the court and the litigants. The court in *Gioello Enters. Ltd. v. Mattel, Inc.*, 99-375, 2001 WL 125340, at *1 (D. Del. Jan. 21, 2001), put a fine point on the efficiencies that it identified with granting a stay pending reexamination:

> (1) all prior art presented to the court at trial will have been first considered by the PTO with its particular expertise, (2) many discovery problems relating to the prior art can be alleviated, (3) if patent is declared invalid, the suit will likely be dismissed, (4) the outcome of the reexamination may encourage a settlement without further involvement of the court, (5) the record of the reexamination would probably be entered at trial, reducing the complexity and the length of the litigation, (6) issues, defenses, and evidence will be more easily limited in pre-trial conferences and (7) the cost will likely be reduced both for the parties and the court.

*Gioello Enters. Ltd. v. Mattel, Inc.*, 2001 WL 125340 at *1 (D. Del. 2001) (citations omitted); *see also Fisher Controls Co. Inc. v. Control Components Inc.*, 443 F. Supp. 581, 582 (S.D. Iowa 1977); *Emhart Indus.*, 3 U.S.P.Q.2d at 1890. These benefits apply equally to the circumstances of the present case, and they support Wells's motion for a stay.

As recognized in *Gioello*, claim invalidity and non-infringement are issues that the PTO's decision will influence. *Gioello Enters. Ltd.*, 2001 WL 125340 at *1. Here, as in *Gioello*, there is a significant likelihood that invalidity issues that would otherwise be appropriate for resolution by summary judgment could be more efficiently and less expensively addressed via reexamination. Without a stay, however, it is foreseeable that this Court could be addressing issues in motions for summary judgment or at trial that are identical to those raised before the

Magistrate Judge Thynge
January 4, 2008
Page 4

PTO in the reexamination. The Court need not deprive itself of the expertise the PTO has with respect to the '159 Patent, which expertise in itself warrants a stay here. Moreover, the PTO proceedings potentially can moot Plaintiffs' declaratory judgment action and thereby end this case.

> D.    The Stay Is Not Being Requested For Tactical Reasons And The Procedural
>        Posture Of The Case Weighs In Favor Of A Stay.

The court in *United Sweetener* also considered "equity" factors, including the contention of the non-moving party that a stay would allow the patent holder to "maintain not only a threat against the plaintiffs and their customers, but an exclusive market as well." *United Sweetener USA, Inc.*, 766 F. Supp. at 216. The court in *Abbott Diabetes Care* was concerned about "whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party." *Abbott Diabetes Care, Inc.*, 2007 WL 2892707 at *4. After balancing the efficiency and equity factors, the courts in *United Sweetener* and *Abbott* granted the stays.

In the present case, the '159 Patent has expired. Therefore, there can be no threat of an exclusive market and no tactical disadvantage to GE Licensing if a stay is granted. As well, this case is factually identical to *Abbott Diabetes Care* in terms of the procedural posture. There, as here, there was no scheduling order in place, no discovery had taken place, the claim construction process had not been started, expert reports had not been exchanged, and a trial date had not been set. *Id.* at *5. Often a district court will deny a stay in a case undergoing reexamination when the stay request is raised too late in the litigation. Clearly, this is not a factor here. Imposition of a stay is therefore warranted and requested.

## IV.    Conclusion

Wells expects that the outcome of the administrative reexamination proceeding will moot many, and perhaps all, of the patent issues in this case. By staying the case, the Court and the parties will save their resources to apply later if the '159 Patent emerges from the reexamination with any valid claim, and they will avoid the duplication of effort (repetition of discovery, expert reports, and possibly a *Markman* hearing) that would follow if the Court were to permit the case to proceed pending reemergence of a likely different '159 Patent. This will lighten the burden on the Court and jury, if, indeed, any issues remain for the Court or jury to address. Additionally, the reexamination process will provide a fair and much less expensive path for all parties for the resolution of these complex issues. Counsel for Plaintiffs and counsel for Defendant Taditel US Inc. have advised us that Plaintiffs and Taditel US Inc. concur with the request for the stay. Action staying the case is therefore respectfully requested.

Respectfully submitted,

*/s/ Jeffrey B. Bove*

Jeffrey B. Bove

# EXHIBIT A



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In the Reexamination of: | Examiner: To Be Assigned |
| Edwards, et al. | |
| Patent No. 4,733,159 | I hereby certify that this correspondence is being deposited with the U.S. Postal Service as Express Mail Receipt No. EV780365355US, in an envelope addressed to: MS Ex Parte Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on February 26, 2007 |
| Issue Date: March 22, 1988 | |
| Original Assignee: Motorola, Inc. | |

*Sandra Lee Bourassa, PLS*
Sandra Lee Bourassa, PLS

## REQUEST FOR *EX PARTE* REEXAMINATION UNDER 37 C.F.R. § 1.510

Mail Stop Ex Parte Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

03/01/2007 KDOZIER 00000002 502775 90008506
01 FC:1812     2520.00 DA

Dear Sir:

The undersigned hereby submits, under the provisions of 37 C.F.R. § 1.501 et seq., a Request for Reexamination of all claims (claims 1 though 18) of U.S. Patent No. 4,733,159 to Edwards et al., issued March 22, 1988, entitled "Charge Pump Voltage Regulator" ("'159 patent" or '159"). The application for the '159 patent was filed on October 28, 1986. Even though the '159 patent has expired (as of October 28, 2006), it is still in the period of enforceability of the patent and reexamination of the '159 patent is still both proper and important. MPEP § 2211. Notably, the '159 patent is presently involved in a litigation between the Requester and the '159 patent's current assignee. The '159 patent is currently assigned to CIF Licensing, LLC ("CIF"). The '159 patent was originally assigned to Motorola, Inc. ("Motorola").

## I.    SUMMARY

The '159 patent teaches a system for charging a battery, such as a car battery. The system controls when the battery is charged by controlling when the battery is connected to a power source. The system uses as a voltage generator to charge the battery such as the alternator commonly driven by a car's engine. The system uses a transistor, particularly a field effect transistor (FET), to control when the battery is charged. The '159 patent focuses on the circuitry that controls the FET, and thereby controls the charging of the battery. More specifically, the '159 patent focuses on the high frequency signal used in the circuitry that controls the FET.

The '159 patent teaches that the circuitry which controls the FET must produce a higher voltage than the battery voltage. This need for a higher voltage is a well known

Patent No. 4,733,159
Attorney Docket No. 078944.010600

need that is based on a commonly-known characteristic of FETs. A high voltage may be obtained by using another voltage source or by increasing the voltage taken from the battery. The '159 patent teaches increasing the voltage taken from the battery. Several devices were commonly used (when the application for the '159 patent was filed) to increase voltage, such as transformers and charge pumps. The '159 patent teaches using a charge pump to increase the voltage taken from the battery.

A charge pump increases a voltage the same way batteries may be stacked in series to create a larger voltage. For example, four batteries are often placed end-to-end (positive to negative) in order to create a 6V potential using four 1.5V batteries. In a charge pump, a "flying" capacitor is used like a battery and placed end-to-end with a "holding" capacitor to create a larger voltage. The holding capacitor takes the charge from the flying capacitor and then the flying capacitor is charged again. This process is repeated many times, putting more and more charge onto the holding capacitor, thereby increasing the voltage on the holding capacitor. Therefore, the flying capacitor is said to "pump" charge onto the holding capacitor, and hence the name "charge pump" is used to describe the flying capacitor and holding capacitor.

The '159 patent discloses the alleged improvement of charging and discharging the flying capacitor at a high frequency. A high frequency allows the circuit to have a flying capacitor that is very small (i.e., has a very low capacitance) because even though a very small flying capacitor only charges the holding capacitor a very small amount each time it is connected to the holding capacitor, the process is repeated many times per second (i.e., at a high frequency) and thus the total charging effect can be very large. By using a high frequency, and thus a very small capacitor for the flying capacitor, the

Patent No. 4,733,159
Attorney Docket No. 078944.010600

charge pump circuit is inexpensive to produce as an integrated circuit. As will be shown, the alleged improvement was well known in the art before the application for the '159 patent was filed.

This Request for Reexamination is based on four prior art references.[1] In some instances, a reference teaches each element of each claim of the '159 patent, i.e., anticipates the '159 patent. In other instances, references teach each element of each claim of the '159 patent in combination with each other and the combination of the references would have been obvious. However, notably, three[2] of the four prior art patents included with this Request disclose a high frequency signal for the flying capacitor, which the inventors declared to be the novel feature of all the claims during prosecution of the '159 patent.

The fourth prior art patent included with this Request, the U.S. Patent to Bowman, renders obvious many of the claims in view of each of the three anticipating patents. Bowman illustrates the clear motivation someone with skill in the art would have appreciated when the application for the '159 patent was filed to apply the teachings of the three anticipating patents to the exact invention disclosed in the '159 patent. Specifically, the fourth patent, to Bowman, teaches controlling the charging of a car battery via controlling a transistor switch between a car's power source (e.g., alternator) and the car battery. One skilled in the art reading the four patents would have been motivated to combine the teachings of Bowman with the teachings of each of the other three patents because they each teach a high frequency charge pump solution to the

---

[1] U.S. Patents to Fay (4,420,700), Hochstein (4,603,269), Cini (4,736,121), and Bowman (4,636,706). Each of these patents are identified in greater detail in Section II ("Prior Art") and are described in greater detail in Section V ("Discussion of the Prior Art ...").

[2] U.S. Patents to Fay, Hochstein, and Cini.

Patent No. 4,733,159
Attorney Docket No. 078944.010600

problem of raising the control signal voltage and Bowman teaches the use of a charge

pump to raise the voltage of a control signal for charging a car battery.

Clearly a substantial new question of patentability exists because none of the three

anticipating patents were before the Examiner, and each of these references teaches what

the inventors contended was the "novel distinction" of the '159 patent. In addition, the

Bowman patent was not before the Examiner, and, hence, raises a substantial new

question of patentability as will be shown below in detail.


## II.    PRIOR ART

This Request for Reexamination is based upon the following four prior art

references:

1.    U.S. Patent No. 4,420,700 to Fay et al. entitled "Semiconductor Current

Regulator and Switch," filed May 26, 1981, issued on December 13, 1983, citable under

35 U.S.C. § 102(a), (b), and (e), and attached hereto as Exhibit A ("Fay" or "Ex. A").

This reference was not cited in the '159 file history.

2.    U.S. Patent No. 4,603,269 to Hochstein entitled "Gated Solid State FET

Relay," filed on June 25, 1984, issued on July 29, 1986, citable under 35 U.S.C. § 102(a),

and (e), and attached hereto as Exhibit B ("Hochstein" or "Ex. B"). This reference was

not cited in the '159 file history.

3.    U.S. Patent No. 4,736,121 to Cini et al. entitled "Charge Pump Circuit for

Driving N-channel MOS Transistors," filed on August 18, 1986, issued on April 5, 1988,

citable under 35 U.S.C. § 102(e), and attached hereto as Exhibit C ("Cini" or "Ex. C").

This reference was not cited in the '159 file history.

4.    U.S. Patent No. 4,636,706 to Bowman et al. entitled "Generator Voltage Regulating System," filed on September 12, 1985, issued on January 13, 1987, citable under 35 U.S.C. § 102(e), and attached hereto as Exhibit D ("Bowman" or "Ex. D"). This reference was not cited in the '159 file history.

The following documents are also attached as Exhibits in support of this Request:

5.    U.S. Patent No. 4,733,159 to Edwards et al., filed on October 28, 1986, issued on March 22, 1988, entitled "Charge Pump Voltage Regulator," attached hereto as Exhibit E ("'159 patent," "'159" or "Ex. E").

6.    File History of U.S. Patent Application No. 06/924,100, now U.S. Patent No. 4,733,159, attached hereto as Exhibit F ("'159 FH" or "Ex. F").

Pursuant to 35 U.S.C. § 303, the above-listed prior art references raise "substantial new questions of patentability" with respect to claims 1-18 of the '159 patent. As required by 37 C.F.R. § 1.510(b)(1), a statement pointing out each substantial new question of patentability is provided below for each identified claim for which reexamination is requested. Furthermore, a detailed explanation of the pertinence and manner of applying the cited patents and publications to each identified claim is provided pursuant to 37 C.F.R. § 1.510(b)(2). As required by 37 C.F.R. § 1.510(b)(3), (b)(4), copies of the pertinent patents and publications relied upon, and a copy of the entire '159 patent including the front face, drawings, and specification/claims (in double column format) are included. The file history of the '159 patent and the publications cited during prosecution are also provided herewith. The fee for requesting reexamination under 37 C.F.R. § 1.20(c)(1) is also enclosed.

### III.    THE '159 PATENT AND PROSECUTION HISTORY

#### 1.    Summary of the '159 Patent

The '159 patent teaches using a charge pump to increase the voltage of a signal to more efficiently operate a transistor. The field effect transistor (FET) described in the '159 patent operates preferably when the gate voltage is maintained above the drain electrode voltage. The charge pump is used to create a larger gate voltage than the drain voltage. In essence, the charge pump boosts the voltage level of a control signal for a power transistor which controls the charging of a battery, for example a car battery. The car battery voltage is sensed and compared to a reference, and a pulse width modulated charging signal is created to control the charging of the car battery from a field coil. To operate the charge pump, a high frequency signal is added to the charging signal and the output of the charge pump is the same charging signal, only at a higher voltage. The key novelty claimed by the '159 patent is the use of a high frequency switching signal for the charge pump which is "substantially in excess of the frequency" of the charging signal.

A charge pump is widely understood to be a circuit which can increase voltages without using inductors. A common charge pump is a capacitor switched between two voltages such that the terminals of the capacitor "pump" charge from one voltage potential to another. The terminals of the capacitor are connected in a sequence so that charge is moved from a lower voltage potential to a higher voltage potential, thus creating a higher voltage potential in the process.

For example, two capacitors may double a voltage by being charged to the same voltage potential and then having one capacitor's low-potential terminal connected to the other capacitor's high potential terminal. Standard 1.5 volt batteries are commonly used

to create 3V, 4.5V or 9V in the same way, by connecting the negative (low-potential) terminal of one battery to the positive (high-potential) terminal of another battery. In the '159 patent, a "flying" capacitor is like a battery and the flying capacitor is charged up and placed end-to-end with a "holding" capacitor, which is like another battery. The holding capacitor takes the charge from the flying capacitor and then the flying capacitor is charged again. The flying capacitor is said to "fly" back and forth between connections in the process of being charged and discharged. This process is repeated many times, putting more and more charge onto the holding capacitor, thereby increasing its voltage.

The '159 patent discloses in the Background section that the existing charge pumps were able to perform the functions claimed by the patent, but that the flying capacitor had to be large. A large flying capacitor is expensive to produce in a charge pump circuit as an integrated circuit.

The '159 patent discloses the alleged improvement of using a high frequency switching signal for the flying capacitor. Well understood laws of physics dictate that the higher the frequency used to switch the flying capacitor (back and forth from charging to discharging), the lower the capacitance necessary to produce the same charge pumping effect. A high frequency switching signal allows the use of a flying capacitor which has a small capacitance, and the economic advantage to using a small flying capacitor is the reduced price of fabricating the circuit as an integrated circuit.

A frequency is not claimed for high frequency signal but instead is claimed as "substantially in excess of the frequency of the regulator output signal" which is the control signal that is used to control how much the car battery is charged. '159 patent,

Patent No. 4,733,159
Attorney Docket No. 078944.010600

claim 1. As discussed further below, the specification of the '159 patent states that

"substantially in excess" means that preferably the high frequency is at least two orders

of magnitude greater than the frequency of the control signal. '159 patent, col. 3, ll. 11-

13. The specification provides examples of 50-70 Hz for the control signal and 200-300

kHz for the high frequency signal. '159 patent, col. 5, ll. 49-65; Fig. 2.

### 2.    The Claims of the '159 Patent

### A.    Claim 1: The Only Independent Claim

Claim 1, the only independent claim of the '159 patent, recites as follows:

> 1.    A voltage regulator comprising:
>
> regulator means for receiving a sensed voltage signal and for providing in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison;
>
> drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential,
>
> *wherein the improvement comprises*
>
> said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined

Patent No. 4,733,159
Attorney Docket No. 078944.010600

power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal,

said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential,

the charge pump providing said increase voltage signal as an output which is coupled to said control terminal of said power switching device.

('159 patent at claim 1, emphasis added to the transitional phrase).

Claim 1 is written in Jepson format where the prior art is described followed by a transitional phrase (e.g., "the improvement comprising"), and the asserted novel improvement(s) to the prior art. 37 C.F.R. § 1.75(e). Claim 1 thus admits that every element before the transitional phrase is taught by the prior art. 37 C.F.R. § 1.75(e)(1). Indeed, the Jepson format was promoted by the PTO for adoption as a valid form of claim drafting because it clearly delineated the novel elements from those elements which are old. 3-8 Chisum on Patents § 8.06[1][c] (2006). In other words, the limitations following the transitional phrase contain the only asserted novelty of a Jepson claim.

In claim 1, the claimed improvement states that the peak voltage increasing means (e.g., the charge pump) comprises a capacitor operated at a high frequency "substantially in excess" of the frequency of the control signal, thereby providing to the gate of a power transistor an increased voltage signal having the same waveform as the control signal. The patent teaches the preferred meaning for the term "substantially in excess" as it relates to the high frequency signal: "Preferably the high frequency switching signal is at least two orders of magnitude higher than the frequency of the regulator output signal."

Patent No. 4,733,159
Attorney Docket No. 078944.010600

'159 patent, col. 3, ll. 11-13. For example, if the regulator output signal is 1 Hz, the high frequency signal would be at least 100 Hz, or if the regulator output signal is 10 Hz, the high frequency signal would be at least 1000 Hz or 1 kHz. Such a difference of frequencies allows the use of a "very small" capacitor for the charge pump and "permits synthesizing the capacitor as part of an integrated circuit." '159 patent, col. 3, ll. 14-18.

### B.    Claims 2-18: The Dependent Claims

A claim written in dependent form incorporates all of the limitations of the claim(s) on which it depends. 35 U.S.C. § 112, fourth paragraph. All of the 17 dependant claims in the '159 patent depend originally from claim 1 and, thus contain the combination language which makes claim 1 a Jepson claim. Therefore, all of the 17 dependent claims are subject to the same Jepson-style construction as claim 1.

Where a dependent claim in the '159 patent modifies an asserted novel element (i.e. an element following the transitional phrase), the dependent claim changes the corpus of the asserted novel improvement. However, where a dependent claim in the '159 patent modifies the preamble, the dependent claim changes the environment in which the improvement exists or operates, but it does not change the asserted novel improvement. This is because the preamble of a Jepson style claim provides the scope and environment of the claim, but is admittedly prior art. 37 C.F.R. 1.75(e); *see also Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1029 (Fed.Cir. 2002); *Rowe v. Dror*, 112 F.3d 473, 479 (Fed.Cir. 1997); *Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1426 (Fed.Cir. 1997). Thus, dependent claims which modify a Jepson preamble can only aid in the patentability of the claim where the improvement becomes novel (and non-obvious) by limitation of the *environment* in which the

Patent No. 4,733,159
. Attorney Docket No. 078944.010600

improvement exists or operates. As discussed further below, dependent claims 2-4, 6-9, and 12-17 only contain limitations of elements within the preamble, and thus only modify the environment of the improvement asserted in claim 1. However, regardless of whether the limitations in the above claims are in the preamble (as admitted prior art) or are in the asserted improvement following the transitional phrase, all of the elements existed in the prior art long before the application for the '159 patent was filed.

Only four dependent claims of the '159 patent modify elements of the improvement claimed in claim 1. Claims 5 and 18 define a difference of at least one order of magnitude between the high frequency signal and the regulator output signal. Claim 10 provides the limitation that the capacitor is coupled to the power transistor through a peak rectifying diode. Claim 11 provides the limitation that the capacitor is coupled to the first predetermined voltage through another diode.

Each of the other dependent claims of the '159 patent modifies the preamble of claim 1. Claim 2 adds the limitations that the predetermined characteristic of the regulator output signal comprises a duty cycle (i.e. pulse-width modulated) signal and is determined in accordance with the comparison of the battery voltage to a reference voltage. The regulator output signal is noteworthy because the high frequency signal is claimed as part of the improvement to have a substantially higher "pulse frequency" than the regulator output signal. Claim 3 adds the limitation that the drive circuit means includes means for selectively determining the polarity of coupling of the capacitor during different "duty cycle portions" of the regulator output signal. Claims 4 and 17 add the limitation that the predetermined power source potential is the same as the maximum power source voltage potential.

Patent No. 4,733,159
Attorney Docket No. 078944.010600

Additional limitations are added in claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. transistors). An additional limitation is added in claims 7 and 9 that the drive circuit means includes a third switch device (e.g., transistor).

Claim 12 adds the limitation that the power switching device is a field effect transistor (FET). Claim 13 adds the limitations that the drain of the FET is connected to a constant voltage source and that the gate capacitance of the FET (gate-source) is "substantially larger than that of the capacitor."

Claims 14 and 15 add the limitations that the voltage control means includes a voltage generator means and the control element includes a field coil. Claim 16 adds the limitations that the voltage generator means includes stator windings and a rectifier circuit means.

### 3. The File History of the '159 Patent

The following summary of the thin file history of the '159 patent illustrates that the claims were never rejected because of prior art, that the Examiner made of record six references but did not rely upon them, and that the Examiner only rejected claims based on 35 U.S.C. § 112. Furthermore, the inventors provided what would be the only comparison on record between the claims and prior art. The inventors provided an argument allegedly distinguishing the claims over the prior art which they had provided. Most importantly, *none* of the nine references either cited by the Examiner or provided by the inventors included a charge pump. Some of the embodiments in the nine references are similar to the '159 patent's embodiment of controlling the charging of a battery, but none teach a charge pump, which is the structure containing the only asserted

novelty in the '159 patent. In contrast, each of the four references that are included in this Request disclose not only a charge pump, but a charge pump used in the context of boosting a control signal of a transistor which controls power flow from a source (e.g., alternator or voltage generator) to a load (e.g., a battery).

None of the references included with this Request were made of record, relied upon, nor would it seem even considered or compared to the claims during the prosecution. Each of the references in this Request discuss at length charge pumps and either anticipate or make obvious the asserted novelty of the '159 patent, namely, the use of a high frequency signal to drive a charge pump.

Before an Office Action was issued in the prosecution, the inventor submitted an Information Disclosure Statement (IDS) with three references, two of which shared a common inventor, Mihaly Lamoth, with the application for the '159 patent, and the third of which was also assigned to the inventors' employer Motorola. '159 FH, Paper 4. The IDS also included arguments distinguishing all of the claims by emphasizing the importance of the improvement in claim 1, and stating that the improvement in claim 1 was not found in any of the Motorola-owned references provided by the inventors. *Id.* Specifically, the inventors stated that using a high frequency was the improvement over the three references because a high frequency allowed the use of a small flying capacitor. *Id.* In the inventors' own words, "there is no prior art suggestion that the effective charge pump frequency must be substantially higher than the voltage regulator output switching signal in order to obtain improved circuit performance as required in the claims of the present invention." *Id.* Of course, even if the functionality of "improved circuit performance" were required by the claims, the functionality would be inherently taught

by any reference teaching the "substantially higher" charge pump frequency.  MPEP §
2112.01.

In an Office Action following less than two months later, the Examiner rejected
all 17 original claims (1) as lacking adequate disclosure under 35 U.S.C. § 112, first
paragraph because the Examiner was unclear what a "conventional" circuit would be for
producing two output frequencies, with the high frequency being "several thousand times
greater than the other," and (2) as being indefinite under 35 U.S.C. § 112, second
paragraph because claim 1, and hence all the original claims, recited that a capacitor was
placed "between" two nodes of a circuit.  '159 FH, Paper 5.  There were six references
made of record by the Examiner, but none were relied upon to make rejections.  *Id.*  No
other rejections were made against the original 17 claims.  *Id.*

Three months later, in an Amendment, the inventors amended the relevant
original claims (claims 1, 3, and 4) by substituting "between" with "across" in order to
overcome the 35 U.S.C. § 112, second paragraph rejection.  '159 FH, Paper 6.  The
inventors also amended the specification to clarify that the circuit was only
"substantially" conventional in order to overcome the 35 U.S.C. § 112, first paragraph
rejection.  *Id.*  In the Remarks, the inventors argued that the "conventional" circuitry
which produced both a lower frequency signal and a substantially higher frequency signal
could be two circuits.  *Id.*  In the inventors' own words, "either the high frequency signal
is produced by an oscillator that is used by the circuitry in the regulator 11 which
produces the pulse width modulated [lower frequency control] signal or it is produced by
separate oscillator circuitry in the voltage regulator 11."  *Id.*

Patent No. 4,733,159
                              Attorney Docket No. 078944.010600

Also in the Amendment, the inventors added claim 18 which is substantially similar to claim 5 in that it requires the higher frequency to be at least one order of magnitude greater than the lower frequency. *Id.* Two months later, all 18 claims were allowed by the Examiner without further comment. '159 FH, Papers 7 and 8.

Therefore, so far as was reflected in the Office Action and the inventors' Remarks, there was no prior art even suggesting the use of a high frequency charge pump signal. However, as shown in greater detail below, this had been disclosed years earlier in the specifications of the U.S. patents (Exhibits 1-4) that are included in this Request. As discussed in detail below, these four prior art references present substantial new issues of patentability for the '159 patent by anticipating or making obvious all of the claims of the '159 patent.

## IV.    SUMMARY OF THE LAW GOVERNING REEXAMINATION

Requests for Reexamination should be granted where the Examiner determines that a "substantial new question of patentability is raised by the Request." MPEP § 2240. A substantial new question of patentability need only be raised by the Request for one claim in order to grant the Request. *Id.* A final decision of unpatentability does not need to be made with respect to a claim in order for a substantial new question of patentability to be present for to the claim. *Id.*

A substantial new question of patentability exists whenever there is: "substantial likelihood that a reasonable examiner would consider the cited prior art patent or printed publication important in deciding whether or not the claim is patentable. MPEP § 2242. The prior art references in this Request raise substantial new issues of patentability such

that a reasonable Examiner would consider such prior art important in deciding whether the claims are patentable or not.

In determining whether a "substantial new question of patentability" has been shown and that reexamination is therefore appropriate, "the PTO must apply the broadest reasonable meaning to the claim language, taking into account any definitions presented in the specification." *In re Bass*, 314 F.3d 575, 577, 65 U.S.P.Q. 1156 (Fed. Cir. 2002) (citing *In re Yamamoto*, 740 F.2d 1569, 1571, 222 U.S.P.Q. 934, 936 (Fed. Cir. 1984)). This means that the words of the claim must be given their plain meaning unless applicant has provided a clear definition in the specification. *In re Zletz*, 893 F.2d 319, 321, 13 U.S.P.Q.2d 1320, 1322 (Fed. Cir. 1989); *In re Bass*, 314 F.3d at 577 (words given ordinary and accustomed meaning unless the inventor chose to be his own lexicographer in the specification); *Phillips v. AWH Corp.*, 376 F.3d 1382 (Fed. Cir. 2004). The broadest reasonable interpretation of the claims must also be consistent with the interpretation that those skilled in the art would reach. *In re Cortright*, 165 F.3d 1353, 1360, 49 U.S.P.Q.2d 1464, 1468 (Fed. Cir. 1999). In a reexamination, claims should be given the broadest reasonable interpretation, as is done in an original or reissue examination, rather than the interpretation appropriate in an infringement suit. One rationale for this rule is that in a reexamination, unlike an infringement action, the patent owner has the opportunity to amend the claims. *In re Yamamoto*, 740 F.2d at 1571. Thus, in the analysis and discussion presented below, the identified claims are given their broadest reasonable interpretation consistent with the '159 patent specification.

## V.    DISCUSSION OF THE PRIOR ART RELIED UPON TO SUPPORT REEXAMINATION

The key disclosures of the prior art relied upon to support reexamination are discussed in this section. For each reference, there is an explanation of why it creates a substantial new issue of patentability, either alone or in combination with other references, with respect to the claims of the '159 patent. A Claim Chart setting out the limitations of the 18 claims of the '159 patent, and summarizing where the pertinent disclosures are found in the prior art, appears in Section VI of this Request.

**1. U.S. Patent No. 4,420,700 to Fay, "High Frequency Charge Pump," Anticipates Each of the Claims of the '159 Patent.**

Fay issued in 1983 and was not cited in the '159 file history. Fay teaches the use of a high frequency charge pump for the same use as disclosed in the '159 patent, namely to drive a transistor which controls the flow of current from a power source (i.e. a field coil in the '159 patent) to a load (i.e. a battery being recharged). As discussed below, each of the claims of the '159 patent is invalid under 35 U.S.C. § 102 as being anticipated by Fay. Because Fay was not applied in any rejection of the claims during the prosecution of the '159 patent, a substantial new question of patentability as to each claim is raised by Fay.

**A. Fay Teaches the Improvements Claimed in Each of the Claims of the '159 Patent.**

Fay teaches the claimed improvements of the '159 patent, namely the use of a high frequency switching signal which has a substantially higher frequency than the regulator output signal. Fay describes the use of a high frequency charge pump for the same purposes as the '159 patent as follows:

> Converter 38 [i.e. the charge pump] receives oscillations from oscillator 37, converts them to unidirectional pulses, and uses, for example, *a conventional diode capacitor*

17                    Patent No. 4,733,159
Attorney Docket No. 078944.010600

> *voltage "doubling" network* to accumulate these
> unidirectional pulses and provide a voltage to control gate
> 34 which exceeds the value of the power source voltage
> appearing at terminal 8a, thus enabling current flow
> between power source input terminal 8a and load input
> terminal 9a.

Fay, col. 7, ll.24-30 (emphasis added).

Fay teaches using a high frequency for the oscillations from the oscillator 37 to

the charge pump 38. "[R]esistors 55 and 56 and capacitor 57 [which are part of the

oscillator 37] are chosen to produce an oscillation frequency in the range of 100 – 1,000

kilohertz." Fay, col. 7, ll. 49-51. This frequency range discloses all of the frequencies

disclosed by the specification of the '159 patent for the high frequency switching signal

(200-300 kHz). '159 patent, col. 5, ll. 62-65.

Fay teaches an arbitrary control signal which could be pulse-width modulated or

otherwise configured to control the charging of a battery. Indeed, Fay discloses generally

controlling current from a power source (e.g., a field coil) to a load (e.g., a battery being

charged) using the control signal. Fay, col. 1, ll. 7-14. Fay teaches that the control signal

may be created arbitrarily. "[A]ny first predetermined continuous [value], pulse, or pulse

train of external signal applied to terminal 10 may cause oscillator 37 to commence

oscillations, and any second continuous level, pulse, or pulse train of external signal

applied to terminal 10 may cause oscillator 37 to cease oscillations." Fay, col. 5, l. 64 –

col. 6, l. 1. Therefore, the control signal may have as low a frequency as desired, even 1

Hz or lower, and thus the oscillation frequency described above of 100 – 1,000 kHz is

"substantially in excess" of the frequency of the control signal. In addition, therefore,

Fay clearly discloses the limitations of claims 5 and 18 that the high frequency signal

must be at least one order magnitude higher frequency than the control signal.

Patent No. 4,733,159
Attorney Docket No. 078944.010600

Fay discloses the limitations of claim 10 through teaching "[d]iode means 63 couples the output of the diode-capacitor voltage doubler of converter means 38 [which is capacitor 60] to control gate 34 of [power transistor] device 31." Fay, col. 7, l. 67 – col. 8, l. 2; Fig. 4.   Fay discloses the limitations of claim 11 through teaching that the capacitor is coupled to a predetermined voltage via another diode 62, "forming a conventional voltage doubler." Fay, col. 7, ll. 66-67; Fig. 4.

**B.      Fay Teaches the Preamble of Each of the Claims of the '159 Patent.**

Fay employs the charge pump for the same purpose as the '159 patent, namely driving a power transistor into a low resistance "on" state.  See generally, Fay, col. 4, ll. 16-68.  Fay teaches how using low capacitance values and low resistance values can allow the circuit to be "readily integrated." Fay, col. 7, l. 46.

As discussed above, Fay teaches the limitations of claim 2 that the regulator output signal may be regulated as to duty cycle (i.e. pulse-width modulated) in accordance with the comparison of the battery voltage to a reference voltage. Fay, col. 5, l. 64 – col. 6, l. 1.  Fay teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during certain "duty cycle portions" of the regulator output signal. Fay, col. 7, ll. 24-30.  Fay teaches the limitations of claims 4 and 17 that the predetermined power source potential is the same as the maximum power source voltage potential.  Fay, col. 5, ll. 26-30; Figs. 1,3, and 4.

Fay teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Fay transistors 31 and 69). Fay, col. 7, ll. 24-

19                        Patent No. 4,733,159
Attorney Docket No. 078944.010600

30. Fay teaches the limitations of claims 7 and 9 that the drive circuit means includes a third switch device (i.e., Fay clamp 39 or Fay transistor 65). Fay, col. 6, ll. 39-54.

Fay teaches the limitation of claim 12 that the power switching device is a FET through teaching n-channel metal oxide semiconductor (NMOS) transistors which are part of a subset (MOS-FETs) of FET transistors. Fay, col. 4, ll. 57-62. Fay teaches the limitations of claim 13 that the drain of the FET (32) is connected to a constant voltage source (8a) and that the capacitance of the FET (41) is "substantially larger than that of the capacitor." Fay, col. 6, ll. 23-27; Fig. 4. Fay teaches the limitations of claims 14, 15, and 16 as applications which would have been obvious to one of skill in the art based on Fay's general discussion of power source and load already described above. Fay, col. 1, ll. 7-14.

### 2. U.S. Patent No. 4,603,269 to Hochstein, "Gated Solid State FET Relay," Anticipates Each of the Claims of the '159 Patent.

Hochstein was filed on June 25, 1984, issued on July 29, 1986, and was not cited in the '159 file history. Hochstein teaches the use of a high frequency charge pump for the same use as disclosed in the '159 patent, namely to drive a transistor which controls the flow of current from a power source (i.e. a field coil in the '159 patent) to a load (i.e. a battery being recharged). As discussed below, each of the claims of the '159 patent invalid under 35 U.S.C. § 102 as being anticipated by Hochstein. Because Hochstein was not applied in any rejection of the claims during the prosecution of the '159 patent, a substantial new question of patentability as to each claim is raised by Hochstein.

### A. Hochstein Teaches the Improvements Claimed in Each of the Claims of the '159 Patent.

Patent No. 4,733,159
Attorney Docket No. 078944.010600

Hochstein teaches the claimed improvements of the '159 patent, namely the use

of a high frequency switching signal which has a substantially higher frequency than the

regulator output signal. Hochstein describes the use of a high frequency charge pump for

the same purposes as the '159 patent as follows:

> One quarter of a CMOS CD4093BE 2-input NAND gate 52
> is connected as a gated free running square wave oscillator
> running at about 70 KHz; I.C.58 being configured as a
> buffer-inverter to drive the transformerless voltage
> multiplier [i.e. the charge pump] made up of C32, D28,
> D30, C34. This multiplier is normal in most respects,
> except that the power supply connection through diode D28
> is derived through I.C.48.

Hochstein, col. 4, ll. 30-38. Thus, Hochstein teaches using a high frequency (70 kHz) to

drive the charge pump.

For the control signal, Hochstein teaches an arbitrary control signal which could

be pulse-width modulated or could otherwise control the charging of a battery. Indeed,

Hochstein discloses generally controlling current from a power source (e.g., a field coil)

to a load (e.g., a battery being charged) using the control signal. Hochstein, col. 2, ll. 47-

51. Hochstein teaches that the control signal may be created arbitrarily:

> In order for I.C.52 to oscillate and develop high voltage,
> the oscillator control input terminal 50 driven by I.C.48
> must be high. If the control input 18 is held low, the gated
> oscillator 52 does not run, so that no high voltage is
> delivered to the gate 26 of the MOS-FET20. Without gate
> drive the MOS-FET 20 is 'off', interrupting current flow to
> the load 10.

Hochstein, col. 4, ll. 38-44. Therefore, the control signal may have as low a frequency as

desired, even 1 Hz or lower, and thus the oscillation frequency described above of 70

kHz is "substantially in excess" of the frequency of the control signal. In addition,

therefore, Hochstein clearly discloses the limitations of claims 5 and 18 that the high

Patent No. 4,733,159
Attorney Docket No. 078944.010600

frequency signal must be at least one order magnitude higher frequency than the control signal.

Hochstein discloses the limitations of claim 10 through teaching diode 30 connecting the charge pump to the MOS-FET gate. Hochstein, col. 4, ll. 25-44; Figs. 1-3. Hochstein discloses the limitations of claim 11 through teaching that the capacitor is coupled to a predetermined voltage via another diode 28. Hochstein, col. 4, ll. 36-37; Fig. 1.

**B.    Hochstein Teaches the Preamble of Each of the Claims of the '159 Patent.**

Hochstein employs the charge pump for the same purpose as the '159 patent, namely driving a power MOS-FET transistor into a low resistance "on" state. Hochstein at col. 2, ll. 27-32.

As discussed above, Hochstein teaches the limitations of claim 2 that the regulator output signal may be generated arbitrarily such as using a duty cycle (i.e. pulse-width modulated) in accordance with the comparison of a battery voltage to a reference voltage. Hochstein, col. 4, ll. 38-44. Hochstein teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during certain "duty cycle portions" of the regulator output signal. Hochstein, col. 4, ll. 30-38. Hochstein teaches the limitations of claims 4 and 17 that the predetermined power source potential is the same as the maximum power source voltage potential. Hochstein, col. 1, ll. 50-57; Figs. 1-3.

Hochstein teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Hochstein transistor 40 and buffer-inverter 58). Hochstein, col. 3, ll. 16-21; col. 4, ll. 33-35. Hochstein teaches the

limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Hochstein transistor 70). Hochstein, col. 3, ll. 62-67.

Hochstein teaches the limitation of claim 12 that the power switching device is a FET through teaching n-channel metal oxide semiconductor (NMOS) transistors and MOS-FET transistors in general. Hochstein, col. 1, ll. 28-57. Hochstein teaches the limitation of claim 13 that the drain of the FET (20) is connected to a constant voltage source (16). Hochstein, col. 2, ll. 62-66; Figs. 1-3. Hochstein does not disclose specifically that the capacitance of the FET is "substantially larger than that of the capacitor," however the parasitic capacitance between gate and source in a FET is well known to those with skill in the art. Hochstein teaches the limitations of claims 14, 15, and 16 as obvious variations of using a 12 Volt system in an automobile to control loads including solenoids. Hochstein, col. 2, ll. 52-61; col. 6, ll. 26-35.

3.    **U.S. Patent No. 4,736,121 to Cini et al., "Charge Pump Circuit for Driving N-channel MOS Transistors," Anticipates Each of the Claims of the '159 Patent.**

Cini was filed on August 18, 1986, issued on April 5, 1988, and was not cited in the '159 file history. Cini teaches that the use of a high frequency charge pump for the same use as disclosed in the '159 patent, namely to drive a NMOS FET transistor which controls the flow of current from a power source (i.e. a field coil in the '159 patent) to a load (i.e. a battery being recharged), was already known. Cini Background. As discussed below, each of the claims of the '159 patent is invalid under 35 U.S.C. § 102 as being anticipated by Cini. Because Cini was not applied in any rejection of the claims

during the prosecution of the '159 patent, a substantial new question of patentability as to

each claim is raised by Cini.

**A. Cini Teaches the Improvements Claimed in Each of the Claims of the '159 Patent.**

Cini teaches the claimed improvements of the '159 patent, namely the use of a

high frequency switching signal which has a substantially higher frequency than the

regulator output signal. Cini describes the use of a high frequency charge pump for the

same purposes as the '159 patent as follows:

> The charge pump circuit according to FIG. 1 operates as
> follows. In a steady state of the circuit the voltage drop on
> the capacitor 27 is maintained approximately at 12v (i.e.
> the voltage on line 29), by virtue of the capacitor 24 which,
> through the pair of switches 20 and 21 and the diode 25,
> continually charged to a 12 V voltage at a frequency of 500
> kHz.

Cini, col. 2, ll. 41-47. Thus, Cini teaches using a high frequency (500 kHz) to drive the

charge pump.

For the control signal, Cini teaches an arbitrary control signal which could be

pulse-width modulated or could otherwise control the charging of a battery. Indeed, Cini

discloses generally controlling current from a power source (e.g., a field coil) to a load

(e.g., a battery being charged) using the control signal. Cini, col. 2, ll. 48-50. Cini

teaches that the control signal may run the charge pump for "adequately supplying a load

in the DC mode," or, in other words with a control signal with substantially 0 Hz. Cini,

col. 1, ll. 33-36. Cini does not limit the control signal to any frequency; it can have any

frequency at all. Cini, col. 2, ll. 24-27. Therefore, the control signal may have as low a

frequency as desired, and thus the oscillation frequency described above of 500 kHz may

be "substantially in excess" of the frequency of the control signal. In addition, therefore,

Cini clearly discloses the limitations of claims 5 and 18 that the high frequency signal must be at least one order magnitude higher frequency than the control signal.

Cini discloses the limitations of claim 10 through teaching diode 26 connecting the charge pump to the MOS-FET gate. Cini, col. 2, ll. 34-40, 59-63; Figs. 1-2. Cini discloses the limitations of claim 11 through teaching that the capacitor is coupled to a predetermined voltage via another diode 25. Cini, col. 2, ll. 41-47; Figs. 1-2.

**B.    Cini Teaches the Preamble of Each of the Claims of the '159 Patent.**

Cini employs the charge pump for the same purpose as the '159 patent, namely driving a power MOS-FET transistor into a low resistance "on" state. Cini Background, and at col. 2, ll. 26-31.

As discussed above, Cini teaches the limitations of claim 2 that the regulator output signal may be generated arbitrarily such as using a duty cycle (i.e. pulse-width modulated) in accordance with the comparison of a battery voltage to a reference voltage. Cini, col. 1, ll. 33-36; col. 2, ll. 24-27. Cini teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during certain "duty cycle portions" of the regulator output signal. Cini, col. 3, ll. 6-13.

Cini teaches two supply voltages, one is a 12V supply voltage (29) and one is an arbitrary supply voltage (Vcc). Cini, col. 2, ll. 41-68; Figs. 1-2. Cini states that an advantage of the invention is to use the charge pump to quickly charge the MOS-FET gate to "a higher voltage than the supply one." Cini, col. 1, ll. 18-19, 38-41. Therefore, Cini teaches the limitations of claims 4 and 17 because the predetermined power source potential may be the same as the maximum power source voltage potential and the

essence of the invention in Cini is to quickly establish through a charge pump a higher voltage than that available by either supply line. *Id.*

Cini teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Cini switches 20, 21). Cini, col. 2, ll. 24-40. Cini teaches the limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Cini transistor 35). Cini, col. 3, ll. 6-13.

Cini teaches the limitation of claim 12 that the power switching device is a FET through teaching n-channel metal oxide semiconductor (NMOS) transistors and MOS-FET transistors in general. Cini, col. 2, ll. 47-68. Cini teaches the limitation of claim 13 that the drain of the FET is connected to a constant voltage source (Vcc). Cini, col. 2, ll. 54-56; Figs. 1-2. Cini also teaches the other limitation of claim 13 that the capacitance of the FET 2 (represented by Cini capacitor 27 in Fig. 1) is "substantially larger than that of the capacitor" (Cini charge pump capacitor 24) through Cini's reference to it holding the charge pumped by the other capacitor (24). Cini, col. 2, ll. 11-18. Cini teaches the limitations of claims 14, 15, and 16 as obvious variations of using a 12 Volt system to control inductive loads. Cini, col. 3, ll. 14-19.

### 4. U.S. Patent No. 4,636,706 to Bowman et al., "Generator Voltage Regulating System," Makes Obvious Each of the Claims of the '159 Patent.

Bowman was filed on June 25, 1984, issued on July 29, 1986, and was not cited in the '159 file history. Bowman teaches that the use of a charge pump for the same use as disclosed in the '159 patent, namely to drive a FET transistor (Bowman 42) which controls the flow of current from a field coil (generally Bowman generator 14) to a car

battery (Bowman 36) as it is being recharged.  Bowman, col. 1, ll. 4-8.  Bowman

specifically teaches a voltage generator (Bowman 10), a control element including a field

coil (Bowman 14), stator windings (Bowman 12) and a rectifier circuit (Bowman 20).

Bowman, col. 3, ll. 17-39; Fig. 1.  As discussed further below, each of the claims of the

'159 patent is invalid under 35 U.S.C. § 103 as being: (1) obvious over Bowman in view

of Fay, (2) obvious over Bowman in view of Hochstein, and (3) obvious over Bowman in

view of Cini.  One skilled in the art reading the four patents would have been motivated

to combine the teachings of Bowman with the teachings of each of the other three patents

because they each teach a high frequency charge pump solution to the problem of raising

the control signal voltage and Bowman teaches the use of a charge pump to raise the

voltage of a control signal for charging a car battery.  Because Bowman was not applied

in any rejection of the claims during the prosecution of the '159 patent, a substantial new

question of patentability as to each claim is raised by Bowman.

**A.    Bowman Teaches the Application of a Charge Pump to Drive a Power
FET to Control the Charging of a Battery in an Automobile.**

Bowman teaches a charge pump which doubles the available voltage from a

battery in an automobile to effectively drive a FET to control the charging of that battery.

Bowman describes the charge pump as follows:

> [T]he voltage accumulated on capacitor 120 is added to the
> voltage between conductor 98 and ground with the result
> that a sufficient voltage is applied to the gate electrode of
> transistor 42 to bias it conductive.  When the output voltage
> of the bridge rectifier 20 on line 94 is about 14 volts the
> voltage applied to the gate of transistor 42 will be doubled
> to about 28 volts.  When only battery voltage is applied to
> conductor 94 the voltage applied to the gate of transistor 42
> will be doubled to about 24 volts.

Bowman, col. 9, ll. 37-46. Accordingly, Bowman renders obvious all the claims of the '159 patent in view of each of the Fay, Hochstein, or Cini references.

**B.    Bowman Teaches the Limitations added by Claims 2-4, 6-9, and 11-17 of the '159 Patent.**

Bowman teaches the limitations of claim 2 that the regulator output signal uses pulse-width modulation or a duty cycle in accordance with the comparison of a battery voltage to a reference voltage. Bowman, col. 1, ll. 34-41. Bowman teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during certain "duty cycle portions" of the regulator output signal because the output control signal 116 generates the charge pump control signal 202. Bowman, col. 13, ll. 12-14.

Bowman teaches the limitations of claims 4 and 17 because the predetermined power source potential is the same as the maximum power source voltage potential, namely the conductor variously noted as 98, 94, and 48 which is connected to the drain of transistor 42. Bowman, col. 9, ll. 29-30; Figs. 1, 4.

Bowman teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Bowman switches Q70, Q72). Bowman, col. 9, ll. 2-20. Bowman teaches the limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Bowman transistor Q69). Bowman, col. 10, ll. 44-51.

Bowman discloses the limitations of claim 11 through teaching that the capacitor 120 is coupled to a predetermined voltage 98 via diode 207 (embodied as an emitter-base coupled transistor Q71). Bowman, col. 8, ll. 55-58; Figs. 1, 4.

28                                    Patent No. 4,733,159
                    Attorney Docket No. 078944.010600

Bowman teaches the limitation of claim 12 that the power switching device is a FET through teaching the use of a n-channel metal oxide semiconductor (NMOS) transistor 42. Bowman, col. 4, ll. 14-25. Bowman teaches the limitation of claim 13 that the drain of the FET 42 is connected to a constant voltage source (Vcc). *Id.*; Fig. 1. As for the other limitation in claim 13, the large parasitic capacitance between gate and source in a FET is well known to those with skill in the art.

Bowman teaches the limitations of claims 14 and 15 that the voltage control means includes a voltage generator (Bowman 10) means and the control element includes a field coil (Bowman 14). Bowman, col. 1, ll. 34-59; Fig. 1. Bowman teaches the limitation of claim 16 that the voltage generator (Bowman 10) means includes stator windings (Bowman 12) and a rectifier circuit (Bowman 20) means. Bowman, col. 3, ll. 40-62; Fig. 1.

## VI. CLAIM CHART COMPARING THE CLAIMS OF THE '159 TO THE DISCLOSURES OF THE PRIOR ART INCLUDED WITH THIS REQUEST

For the convenience of the Examiner, attached hereto is a claim chart reciting the limitations of the claims of the '159 patent and showing where in the included prior art references the limitations can be found.

## VII. CONCLUSION

As discussed above, the included four prior art references raise a substantial question of patentability with respect to the '159 patent. Each of claims 1-18 of the '159 patent is invalid as anticipated for the following reasons:

1.      Each of claims 1-18 of the '159 patent is anticipated by Fay under 35 U.S.C. § 102(a), (b), and (e) because Fay teaches each of the limitations in each of the claims, including all of the alleged novel improvements of the claims of the '159 patent.

2.      Each of the claims 1-18 of the '159 patent is anticipated by Hochstein under 35 U.S.C. § 102(a), (e) because Hochstein teaches each of the limitations in each of the claims, including all of the alleged novel improvements of the claims of the '159 patent.

3.      Each of the claims 1-18 of the '159 patent is anticipated by Cini under 35 U.S.C. § 102(e) because Cini teaches each of the limitations in each of the claims, including all of the alleged novel improvements of the claims of the '159 patent.

Furthermore, each of the claims 1-18 of the '159 patent is rendered obvious by Bowman in view of Fay under 35 U.S.C. § 103(a) because Bowman teaches the application of a charge pump circuit to boost the voltage of a control signal to a transistor which controls the charging of a car battery from a car alternator or similar power source. Each of the claims 1-18 of the '159 patent is rendered obvious by Bowman in view of Hochstein under 35 U.S.C. § 103(a) because Bowman teaches the application of a charge pump circuit to boost the voltage of a control signal to a transistor which controls the charging of a car battery from a car alternator or similar power source. Each of the claims 1-18 of the '159 patent is rendered obvious by Bowman in view of Hochstein under 35 U.S.C. § 103(a) because Bowman teaches the application of a charge pump circuit to boost the voltage of a control signal to a transistor which controls the charging of a car battery from a car alternator or similar power source.

Patent No. 4,733,159
Attorney Docket No. 078944.010600

For the reasons set for in this Request, and based on the accompanying references, the '159 patent and file history, the undersigned respectfully requests that a Reexamination of all claims of the '159 patent be ordered and that all of the claims be determined to be invalid.

Dated: February 26th, 2007

Respectfully submitted,

Brian A. Carpenter, Reg. No. 37,109
Greenberg Traurig, LLP

Patent No. 4,733,159
Attorney Docket No. 078944.010600

VI.    CLAIM CHART COMPARING THE CLAIMS OF THE '159 TO THE DISCLOSURES
OF THE PRIOR ART INCLUDED WITH THIS REQUEST

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| 1. A voltage regulator comprising: | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. 1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. 1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. 1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. 1.75(e)(1). |
| regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising signal, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison; | See above. | See above. | See above. | See above. |
| drive circuit means coupled to said regulator means and comprising a | See above. | See above. | See above. | See above. |

1

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means which determines said sensed voltage signal, across a maximum power source voltage potential, | | | | |
| said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, | See above. | See above. | See above. | See above. |

2

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential, | See above. | See above. | See above. | See above. |
| wherein the improvement comprises | This is the transitional phrase of the Jepson-style claim. 37 C.F.R. 1.75(e)(2). | This is the transitional phrase of the Jepson-style claim. 37 C.F.R. 1.75(e)(2). | This is the transitional phrase of the Jepson-style claim. 37 C.F.R. 1.75(e)(2). | This is the transitional phrase of the Jepson-style claim. 37 C.F.R. 1.75(e)(2). |
| said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage | Fay describes the use of a high frequency charge pump for the same purposes as the '159 patent as follows: "Converter 38 [i.e. the charge pump] receives | Hochstein describes the use of a high frequency charge pump for the same purposes as the '159 patent as follows: "One quarter of a CMOS CD4093BE 2-input | Cini describes the use of a high frequency charge pump for the same purposes as the '159 patent as follows: "The charge pump circuit according to FIG. | |

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, | oscillations from oscillator 37, converts them to unidirectional pulses, and uses, for example, a conventional diode capacitor voltage "doubling" network to accumulate these unidirectional pulses and provide a voltage to control gate 34 which exceeds the value of the power source voltage appearing at terminal 8a, thus enabling current flow between power source input terminal 8a and load input terminal 9a." Fay Spec., col. 7, ll.24–30 (emphasis added). Fay teaches using a high frequency for the oscillations from the oscillator 37 to the charge pump 38. "[R]esistors 55 and 56 and capacitor 57 [which are part of the oscillator | NAND gate 52 is connected as a gated free running square wave oscillator running at about 70 KHz, I.C.58 being configured as a buffer-inverter to drive the transformerless voltage multiplier [i.e. the charge pump] made up of C32, D28, D30, C34. This multiplier is normal in most respects, except that the power supply connection through diode D28 is derived through I.C.48." Hochstein Spec., col. 4, ll. 30-38. | 1 operates as follows. In a steady state of the circuit the voltage drop on the capacitor 27 is maintained approximately at 12v (i.e. the voltage on line 29), by virtue of the capacitor 24 which, through the pair of switches 20 and 21 and the diode 25, continually charged to a 12 V voltage at a frequency of 500 kHz." Cini Spec., col. 2, ll. 41-47. | |

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | 37] are chosen to produce an oscillation frequency in the range of 100 – 1,000 kilohertz." Fay Spec., col. 7, ll. 49-51. | | | |
| said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, | This can be read as a repetition of the previous limitation, as the most generous reading, or, in a less generous reading, as an indefinite recitation of another charge pump. | This can be read as a repetition of the previous limitation, as the most generous reading, or, in a less generous reading, as an indefinite recitation of another charge pump. | This can be read as a repetition of the previous limitation, as the most generous reading, or, in a less generous reading, as an indefinite recitation of another charge pump. | This can be read as a repetition of the previous limitation, as the most generous reading, or, in a less generous reading, as an indefinite recitation of another charge pump |
| said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, | This is functional language inherently disclosed by the charge pump structure acting on the control signal, as described by Fay. | This is functional language inherently disclosed by the charge pump structure acting on the control signal, as described by Hochstein. | This is functional language inherently disclosed by the charge pump structure acting on the control signal, as described by Cini. | This is functional language inherently disclosed by the charge pump structure acting on the control signal, as described by Bowman. |
| the charge pump providing said increased voltage signal as an | Fay Fig. 1. | Hochstein Figs. 1-3. | Cini Figs. 1-2. | Bowman Fig. 1. |

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| output which is coupled to said control terminal of said power switching device. | | | | |
| 2. A voltage regulator according to claim 1 | See above. | See above. | See above. | See above. |
| wherein said predetermined characteristic of said regulator output signal, which characteristic is determined in accordance with said comparison, comprises duty cycle. | Fay teaches the limitations of claim 2 that the regulator output signal may be regulated as to duty cycle (i.e. pulse-width modulated) in accordance of the comparison of the battery voltage to a reference voltage. Fay Spec, col. 5, l. 64 – col. 6, l. 1. | Hochstein teaches the limitations of claim 2 that the regulator output signal may be generated arbitrarily such as using a duty cycle (i.e. pulse-width modulated) in accordance with the comparison of a battery voltage to a reference voltage. Hochstein Spec., col. 4, ll. 38-44. | Cini teaches the limitations of claim 2 that the regulator output signal may be generated arbitrarily such as using a duty cycle (i.e. pulse-width modulated) in accordance with the comparison of a battery voltage to a reference voltage. Cini Spec., col. 1, ll. 33-36; col. 2, ll. 24-27. | Bowman teaches the limitations of claim 2 that the regulator output signal uses pulse-width modulation or a duty cycle in accordance with the comparison of a battery voltage to a reference voltage. Bowman Spec., col. 1, ll. 34-41. |
| 3. A voltage regulator according to claim 2 | See above. | See above. | See above. | See above. |
| wherein said drive circuit means includes means for selectively preventing said series coupling of said capacitor across said predetermined power | Fay teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during | Hochstein teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during | Cini teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during | Bowman teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during |

Patent No. 4,733,159

Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| source voltage potential during duty cycle portions of said regulator output signal of a predetermined polarity and permitting said series coupling during duty cycle portions of said regulator output signal of an opposite predetermined polarity. | certain "duty cycle portions" of the regulator output signal. Fay Spec, col. 7, ll. 24-30. | certain "duty cycle portions" of the regulator output signal. Hochstein Spec., col. 4, ll. 30-38. | certain "duty cycle portions" of the regulator output signal. Cini Spec., col. 3, ll. 6-13. | certain "duty cycle portions" of the regulator output signal because the output control signal 116 generates the charge pump control signal 202. Bowman Spec., col. 13, ll. 12-14. |
| 4. A voltage regulator according to claim 3 | See above. | See above. | See above. | See above. |
| wherein said predetermined power source voltage potential that said capacitor is selectively series coupled and decoupled across substantially comprises said maximum power source voltage potential that said power switching device and control element of said voltage control means are | Fay teaches the limitations of claims 4 and 17 that the predetermined power source potential is the same as the maximum power source voltage potential. Fay Spec., col. 5, ll. 26-30; Figs. 1,3, and 4. | Hochstein teaches the limitations of claims 4 and 17 that the predetermined power source potential is the same as the maximum power source voltage potential. Hochstein Spec., col. 1, ll. 50-57; Figs. 1-3. | Cini teaches two supply voltages, one is a 12V supply voltage (29) and one is an arbitrary supply voltage (Vcc). Cini Spec., col. 2, ll. 41-68; Figs. 1-2. Cini states that an advantage of the invention is to use the charge pump to quickly charge the MOS-FET gate to "a higher voltage than the supply one." Cini Spec., col. 1, ll. 18- | Bowman teaches the limitations of claims 4 and 17 because the predetermined power source potential is the same as the maximum power source voltage potential, namely the conductor variously noted as 98, 94, and 48 which is connected the drain of transistor 42. Bowman Spec., col. 9, ll. 29-30; Figs. 1, 4. |

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| coupled across. | | | 19, 38-41. Therefore, Cini teaches the limitations of claims 4 and 17 because the predetermined power source potential may be the same as the maximum power source voltage potential and the essence of the invention in Cini is to quickly establish through a charge pump a higher voltage than that available by either supply line. *Id.* | See above. |
| | See above. | See above. | See above. | |
| 5. A voltage regulator according to claim 4 wherein the frequency of said high frequency signal pulses is at least one order of magnitude higher than the frequency of said regulator output signal. | Fay teaches a high frequency signal with a frequency in the range of 100-1,000 kHz which is more than one order of magnitude higher than the frequency of the control signal. Fay Spec., col. 7, ll. 49-51. | Hochstein teaches a high frequency signal of 70 kHz which is more than one order of magnitude higher than the frequency of the control signal. Hochstein Spec., col. 4, ll. 30-44. | Cini teaches a high frequency signal of 500 kHz which is more than one order of magnitude higher than the frequency of the control signal. Cini Spec., col. 2, ll. 41-47. | See above. |
| 6. A voltage regulator | See above. | See above. | See above. | See above. |

8

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| according to claim 5 wherein said preventing means of said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, | Fay teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Fay transistors 31 and 69). Fay Spec., col. 7, ll. 24-30. | Hochstein teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Hochstein transistor 40 and buffer-inverter 58). Hochstein Spec., col. 3, ll. 16-21; col. 4, ll. 33-35. | Cini teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Cini switches 20, 21). Cini Spec., col. 2, ll. 24-40. | Bowman teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Bowman switches Q70, Q72). Bowman Spec., col. 9, ll. 2-20. |
| and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second | See above. | See above. | See above. | See above. |

9

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal. | | | | |
| 7. A voltage regulator according to claim 6 | | | | |
| wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal. | See above. | See above. | See above. | See above. |
| | Fay teaches the limitations of claims 7 and 9 that the drive circuit means includes a third switch device (i.e., Fay clamp 39 or Fay transistor 65). Fay Spec., col. 6, ll. 39-54. | Hochstein teaches the limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Hochstein transistor 70). Hochstein Spec., col. 3, ll. 62-67. | Cini teaches the limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Cini transistor 35). Cini Spec., col. 3, ll. 6-13. | Bowman teaches the limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Bowman transistor Q69). Bowman Spec., col. 10, ll. 44-51. |
| 8. A voltage regulator according to claim 1 | | | | |
| wherein said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in | See above. | See above. | See above. | See above. |
| | Fay teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Fay transistors 31 and | Hochstein teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Hochstein transistor 40 | Cini teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Cini switches 20, 21). | Bowman teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Bowman switches Q70, |

10

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, | 69). Fay Spec., col. 7, ll. 24-30. | and buffer-inverter 58). Hochstein Spec., col. 3, ll. 16-21; col. 4, ll. 33-35. | Cini Spec., col. 2, ll. 24-40. | Q72). Bowman Spec., col. 9, ll. 2-20. |
| and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, in accordance with said pulses of said high frequency signal. | See above. | See above. | See above. | See above. |
| 9. A voltage regulator according to claim 8 | See above. | See above. | See above. | See above. |
| wherein said drive | Fay teaches the | Hochstein teaches the | Cini teaches the | Bowman teaches the |

11

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal. | limitations of claims 7 and 9 that the drive circuit means includes a third switch device (i.e., Fay clamp 39 or Fay transistor 65). Fay Spec., col. 6, ll. 39-54. | limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Hochstein transistor 70). Hochstein Spec., col. 3, ll. 62-67. | limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Cini transistor 35). Cini Spec., col. 3, ll. 6-13. | limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Bowman transistor Q69). Bowman Spec., col. 10, ll. 44-51. |
| 10. A voltage regulator according to claim 9 wherein said first capacitor terminal is coupled to said power switching device control terminal through a peak rectifying diode. | Fay discloses the limitations of claim 10 through teaching "[d]iode means 63 couples the output of the diode-capacitor voltage doubler of converter means 38 [which is capacitor 60] to control gate 34 of [power transistor] device 31." Fay Spec., col. 7, l. 67 – col. 8, l. 2; Fig. 4. | Hochstein discloses the limitations of claim 10 through teaching diode 30 connecting the charge pump to the MOS-FET gate. Hochstein Spec., col. 4, ll. 25-44; Figs. 1-3. | Cini discloses the limitations of claim 10 through teaching diode 26 connecting the charge pump to the MOS-FET gate. Cini Spec., col. 2, ll. 34-40, 59-63; Figs. 1-2. | |
| 11. A voltage regulator according to claim 10 wherein said first predetermined voltage is coupled to said first | Fay discloses the limitations of claim 11 through teaching that the | Hochstein discloses the limitations of claim 11 through teaching that the | Cini discloses the limitations of claim 11 through teaching that the | See above.\n\nBowman discloses the limitations of claim 11 through teaching that the |

12

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| capacitor terminal through a diode. | capacitor is coupled to a predetermined voltage via another diode 62, "forming a conventional voltage doubler." Fay Spec., col. 7, ll. 66-67; Fig. 4. | capacitor is coupled to a predetermined voltage via another diode 28. Hochstein Spec., col. 4, ll. 36-37; Fig. 1. | capacitor is coupled to a predetermined voltage via another diode 25. Cini Spec., col. 2, ll. 41-47; Figs. 1-2. | capacitor 120 is coupled to a predetermined voltage 98 via diode 207 (embodied as an emitter-base coupled transistor Q71). Bowman Spec., col. 8, ll. 55-58; Figs. 1, 4. |
| 12. A voltage regulator according to claim 11 wherein said power switching device comprises an FET having gate, drain and source electrodes corresponding to said control and output terminals, respectively. | See above. Fay teaches the limitation of claim 12 that the power switching device is a FET through teaching n-channel metal oxide semiconductor (NMOS) transistors which are part of a subset (MOS-FETs) of FET transistors. Fay Spec., col. 4, ll. 57-62. | See above. Hochstein teaches the limitation of claim 12 that the power switching device is a FET through teaching n-channel metal oxide semiconductor (NMOS) transistors and MOS-FET transistors in general. Hochstein Spec., col. 1, ll. 28-57. | See above. Cini teaches the limitation of claim 12 that the power switching device is a FET through teaching n-channel metal oxide semiconductor (NMOS) transistors and MOS-FET transistors in general. Cini Spec., col. 2, ll. 47-68. | See above. Bowman teaches the limitation of claim 12 that the power switching device is a FET through teaching the use of a n-channel metal oxide semiconductor (NMOS) transistor 42. Bowman Spec., col. 4, ll. 14-25. |
| 13. A voltage regulator according to claim 12 wherein said drain electrode is coupled to a source of constant voltage potential and | See above. Fay teaches the limitations of claim 13 that the drain of the FET (32) is connected to a | See above. Hochstein teaches the limitation of claim 13 that the drain of the FET (20) is connected to a | See above. Cini teaches the limitation of claim 13 that the drain of the FET is connected to a | See above. Bowman teaches the limitation of claim 13 that the drain of the FET 42 is connected to a |

13

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | constant voltage source (8a). Fay Spec., col. 6, ll. 23-27; Fig. 4. | constant voltage source (16). Hochstein Spec., col. 2, ll. 62-66; Figs. 1-3. | constant voltage source (Vcc). Cini Spec., col. 2, ll. 54-56; Figs. 1-2. | constant voltage source (Vcc). *Id.*; Fig. 1. |
| wherein the effective internal capacitance of said FET between said gate and source electrodes is substantially larger than the capacitance of said capacitor. | Fay teaches the limitation of claim 13 that the capacitance of the FET (41) is "substantially larger than that of the capacitor." Fay Spec., col. 6, ll. 23-27; Fig. 4. | | Cini teaches the limitation of claim 13 that the capacitance of the FET 2 (represented by Cini capacitor 27 in Fig. 1) is "substantially larger than that of the capacitor" (Cini charge pump capacitor 24) through Cini's reference to it holding the charge pumped by the other capacitor (24). Cini Spec., col. 2, ll. 11-18. | |
| 14. A voltage regulator according to claim 13 wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil. | See above.  Fay teaches the limitations of claims 14, 15, and 16 as applications which would have been obvious to one of skill in the art based on Fay's general discussion of | See above.  Hochstein teaches the limitations of claims 14, 15, and 16 as obvious variations of using a 12 Volt system in an automobile to control loads including solenoids. Hochstein | See above.  Cini teaches the limitations of claims 14, 15, and 16 as obvious variations of using a 12 Volt system to control inductive loads. Cini Spec., col. 3, ll. 14-19. | See above.  Bowman teaches the limitations of claims 14 and 15 that the voltage control means includes a voltage generator (Bowman 10) means and the control element includes a field coil |

14

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | power source and load already described above. Fay Spec, col. 1, ll. 7-14. | Spec, col. 2, ll. 52-61; col. 6, ll. 26-35. | | (Bowman 14). Bowman Spec, col. 1, ll. 34-59; Fig. 1. |
| 15. A voltage regulator according to claim 1 | See above. | See above. | See above. | See above. |
| wherein said voltage control means comprises a voltage generator means and | Fay teaches the limitations of claims 14, 15, and 16 as applications which would have been obvious to one of skill in the art based on Fay's general discussion of power source and load already described above. Fay Spec, col. 1, ll. 7-14. | Hochstein teaches the limitations of claims 14, 15, and 16 as obvious variations of using a 12 Volt system in an automobile to control loads including solenoids. Hochstein Spec, col. 2, ll. 52-61; col. 6, ll. 26-35. | Cini teaches the limitations of claims 14, 15, and 16 as obvious variations of using a 12 Volt system to control inductive loads. Cini Spec, col. 3, ll. 14-19. | Bowman teaches the limitations of claims 14 and 15 that the voltage control means includes a voltage generator (Bowman 10) means and the control element includes a field coil (Bowman 14). Bowman Spec, col. 1, ll. 34-59; Fig. 1. |
| wherein said control element of said voltage control means comprises a field coil. | | | | |
| 16. A voltage regulator according to claim 15 | See above. | See above. | See above. | See above. |
| wherein said voltage generator means | Fay teaches the limitations of claims 14, | Hochstein teaches the limitations of claims 14, | Cini teaches the limitations of claims 14, | Bowman teaches the limitation of claim 16 |

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| includes stator windings, in addition to said field coil, and a rectifier circuit means for receiving the output of said stator windings and providing a charging signal for a battery so as to maintain a predetermined battery voltage thereacross. | 15, and 16 as applications which would have been obvious to one of skill in the art based on Fay's general discussion of power source and load already described above. Fay Spec., col. 1, ll. 7-14. | 15, and 16 as obvious variations of using a 12 Volt system in an automobile to control loads including solenoids. Hochstein Spec., col. 2, ll. 52-61; col. 6, ll. 26-35. | 15, and 16 as obvious variations of using a 12 Volt system to control inductive loads. Cini Spec., col. 3, ll. 14-19. | that the voltage generator (Bowman 10) means includes stator windings (Bowman 12) and a rectifier circuit (Bowman 20) means. Bowman Spec., col. 3, ll. 40-62; Fig. 1. |
| 17. A voltage regulator according to claim 16 | See above. | See above. | See above. | See above. |
| wherein said predetermined voltage across said battery corresponds to said predetermined maximum power source voltage potential. | Fay teaches the limitations of claims 4 and 17 that the predetermined power source potential is the same as the maximum power source voltage potential. Fay Spec., col. 5, ll. 26-30; Figs. 1,3, and 4. | Hochstein teaches the limitations of claims 4 and 17 that the predetermined power source potential is the same as the maximum power source voltage potential. Hochstein Spec., col. 1, ll. 50-57; Figs. 1-3. | Cini teaches two supply voltages, one is a 12V supply voltage (29) and one is an arbitrary supply voltage (Vcc). Cini Spec., col. 2, ll. 41-68; Figs. 1-2. Cini states that an advantage of the invention is to use the charge pump to quickly charge the MOS-FET gate to "a higher voltage than the supply one." | Bowman teaches the limitations of claims 4 and 17 because the predetermined power source potential is the same as the maximum power source voltage potential, namely the conductor variously noted as 98, 94, and 48 which is connected the drain of transistor 42. Bowman Spec., col. 9, ll. |

16

Patent No. 4,733,159
Attorney Docket No. 078944.010600

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | | | Cini Spec., col. 1, ll. 18-19, 38-41. Therefore, Cini teaches the limitations of claims 4 and 17 because the predetermined power source potential may be the same as the maximum power source voltage potential and the essence of the invention in Cini is to quickly establish through a charge pump a higher voltage than that available by either supply line. *Id.* | 29-30; Figs. 1, 4. |
| 18. A voltage regulator according to claim 1 | See above. | See above. | See above. | See above. |
| wherein the frequency of said high frequency pulses is at least one order of magnitude higher than the frequency of said regulator output signal. | Fay teaches a high frequency signal with a frequency in the range of 100-1,000 kHz which is more than one order of magnitude higher than the frequency of the control signal. Fay Spec., col. 7, ll. 49-51. | Hochstein teaches a high frequency signal of 70 kHz which is more than one order of magnitude higher than the frequency of the control signal. Hochstein Spec., col. 4, ll. 30-44. | Cini teaches a high frequency signal of 500 kHz which is more than one order of magnitude higher than the frequency of the control signal. Cini Spec., col. 2, ll. 41-47. | |

17

Patent No. 4,733,159
Attorney Docket No. 078944.010600

# EXHIBIT B

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

GREENBERG TRAURIG, LLP

1200 SEVENTEENTH STREET, SUITE 2400

DENVER, CO 80202

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/008,506*.

PATENT NO. *4,733,159*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| **Order Granting / Denying Request For Ex Parte Reexamination** | Control No. | Patent Under Reexamination | |
|---|---|---|---|
| | 90/008,506 | 4,733,159 | |
| | Examiner | Art Unit | |
| | Minh Nguyen | 3992 | |

--*The MAILING DATE of this communication appears on the cover sheet with the correspondence address*--

The request for *ex parte* reexamination filed <u>26 February 2007</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,    b)☒ PTO/SB/08,    c)☐ Other: _____

1. ☒    The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535): **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐  by Treasury check or,

b) ☐  by credit to Deposit Account No. _____,  or

c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Minh  Nguyen
Primary Examiner
Art Unit: 3992

cc:Requester ( if third party requester )

Application/Control Number: 90/008,506                          Page 3
Art Unit: 3992

It is agreed that the consideration of the '700 patent raises a substantial new

question of patentability to claims 1-18 of the '159 patent. As pointed out on pages 17-

20 of the request, the '700 patent teaches a voltage regulator (figure 4) having

improvement features wherein the improvement features comprise peak voltage

increasing means (the circuit in block 38) having a capacitor (capacitor 60) selectively

series coupled and decoupled across a predetermined power source voltage potential

(the power source 8) in accordance with pulses of a high frequency signal ( the

oscillator 37 generates pulses with high frequency in the range of 100-1000 Khz, col.

7:48-51) having a pulse frequency substantially in excess of the frequency of the

regulator output signal ( the regulator output signal is at terminal 10 and col. 5:65-6:4

indirectly indicates that the regulator output signal has the frequency less than the

frequency generated by the oscillator 37 ), said peak voltage increasing means,

therefore, comprising a high frequency charge pump which provides said increased

voltage signal (circuit 38 functions as a charge pump, col. 6:15-38) , said increased

voltage signal having the same general waveform as said regulator output signal but

increased in voltage magnitude to achieve a peak voltage potential in excess of said

maximum power source voltage potential (also see col. 6:15-38 for the operational

description of the circuit 38 which functions as a charge pump), the charge pump

providing said increased voltage signal as an output which is coupled to said control

terminal of said power switching device (the output signal of the circuit 38 is fed to the

gate of the power switching device 11). There is a substantial likelihood that a

reasonable examiner would consider these teachings important in deciding whether or

Application/Control Number: 90/008,506                                    Page 4
Art Unit: 3992

not the claims are patentable. However, the prosecution history of the base application,

US Serial No. 06/924,100, does not indicate that the '700 patent was included for

consideration by the examiner in charge of the base application. Accordingly, the '700

patent raises a substantial new question of patentability as to claims 1-18 which

question has not been decided in the previous examination of the '159 patent.


5.      The request indicates that the requester considers that claims 1-18 are invalid

under 35 USC 102 by the '269 patent.

        It is agreed that the consideration of the '269 patent raises a substantial new

question of patentability to claims 1-18 of the '159 patent. As pointed out on pages 20-

23 of the request, the '269 patent teaches a voltage regulator (figure 1) having

improvement features wherein the improvement features comprise peak voltage

increasing means ( elements: C32, D28, D30 and C34, voltage multiplier ) having a

capacitor (capacitor C34) selectively series coupled and decoupled across a

predetermined power source voltage potential ( at node 16 ) in accordance with pulses

of a high frequency signal ( the oscillator 36 generates pulses with high frequency at

about 70 Khz, col. 4:30-34) having a pulse frequency substantially in excess of the

frequency of the regulator output signal ( the regulator output signal is at terminal 18

and col. 2:57-62 indirectly indicates that the regulator output signal has the frequency

less than the frequency generated by the oscillator 36 ), said peak voltage increasing

means, therefore, comprising a high frequency charge pump which provides said

increased voltage signal ( the group of C32, D28, D30 and C34 elements functions as a

## DECISION GRANTING *EX PARTE* REEXAMINATION

1.      Reexamination has been requested for claims 1-18 of United States Patent
Number 4,733,159 to Edwards et al., entitled "CHARGE PUMP VOLTAGE
REGULATOR".

2.      A substantial new question of patentability affecting claims 1-18 of United States
Patent Number 4,733,159 to Edwards et al. (the '159 patent, hereafter) is raised by the
request for *ex parte* reexamination.

3.      The prior art:

        US Patent No. 4,420,700 to Fay et al., issued on December 13, 1983 (the '700
patent, hereafter).

        US Patent No. 4,603,269 to Hochstein, issued on July 29, 1986 (the '269 patent,
hereafter).

        US Patent No. 4,736,121 to Cini et al., issued on April 5, 1988 (the '121 patent,
hereafter).

        US Patent No. 4,636,706 to Bowman et al., issued on January 13, 1987 (the '706
patent, hereafter).

4.      The request indicates that the requester considers that claims 1-18 are invalid
under 35 USC 102 by the '700 patent.

Application/Control Number: 90/008,506                                                Page 5
Art Unit: 3992

charge pump, col. 4:34-38) , said increased voltage signal having the same general

waveform as said regulator output signal but increased in voltage magnitude to achieve

a peak voltage potential in excess of said maximum power source voltage potential (

voltage multiplier ), the charge pump providing said increased voltage signal as an

output which is coupled to said control terminal of said power switching device (the

output signal of the multiplier on line 26 is fed to the gate of the power switching device

20). There is a substantial likelihood that a reasonable examiner would consider these

teachings important in deciding whether or not the claims are patentable. However, the

prosecution history of the base application, US Serial No. 06/924,100, does not indicate

that the '269 patent was included for consideration by the examiner in charge of the

base application. Accordingly, the '269 patent raises a substantial new question of

patentability as to claims 1-18 which question has not been decided in the previous

examination of the '159 patent.


6.      The request indicates that the requester considers that claims 1-18 are invalid

under 35 USC 102 by the '121 patent.

        It is agreed that the consideration of the '121 patent raises a substantial new

question of patentability to claims 1-18 of the '159 patent. As pointed out on pages 24-

26 of the request, the '121 patent teaches a voltage regulator (figure 2) having

improvement features wherein the improvement features comprise peak voltage

increasing means ( charge pump circuit functions as a peak voltage increasing means,

col. 2:18-20 ) having a capacitor (capacitor 24) selectively series coupled and

decoupled across a predetermined power source voltage potential ( Vcc ) in accordance

with pulses of a high frequency signal ( pulses at node 23 have a high frequency of 500

Khz, col. 2:22-23) having a pulse frequency substantially in excess of the frequency of

the regulator output signal ( the regulator output signal Vin is at the gate terminal of FET

35, col. 3:3-13 indirectly indicates that the regulator output signal has the frequency less

than the frequency generated by the oscillator at node 23 ); said peak voltage

increasing means, therefore, comprising a high frequency charge pump which provides

said increased voltage signal (charge pump circuit, col. 2:18-20) , said increased

voltage signal having the same general waveform as said regulator output signal but

increased in voltage magnitude to achieve a peak voltage potential in excess of said

maximum power source voltage potential ( charge pump circuit, col. 2:18-20 ), the

charge pump providing said increased voltage signal as an output which is coupled to

said control terminal of said power switching device (the output signal feeds to the gate

of the power switching device 2). There is a substantial likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the

claims are patentable. However, the prosecution history of the base application, US

Serial No. 06/924,100, does not indicate that the '121 patent was included for

consideration by the examiner in charge of the base application. Accordingly, the '121

patent raises a substantial new question of patentability as to claims 1-18 which

question has not been decided in the previous examination of the '159 patent.

7.    The request indicates that the requester considers that claims 1-18 are invalid

under 35 USC 103 by the '706 patent in view of each of the '700 patent, the 269 patent

and the '121 patent.

It is not agreed that the consideration of the combination of the '706 patent and

each of the '700 patent, the 269 patent and the '121 patent raises a substantial new

question of patentability to claims 1-18 of the '159 patent. At pages 27-28 of the

request, the requester indicates that the '706 patent teaches a charge pump for driving

a FET to control the charging of the battery and concludes that the combination of the

'706 patent and each of the '700 patent, the 269 patent and the '121 patent renders

claims 1-18 of the '159 patent obvious. As described at col. 1:21-59 of the '706 patent,

there are many techniques for controlling the flow of the current that supplies to

electrical loads in a motor vehicle using pulse width modulation. The '706 patent

teaches a technique having a manner that differs from the previous patents eventhough

they all employing pulse width modulation signal. The requester has not provided any

motivation to replace the unique technique used in the '706 patent by the technique

taught by each of the '700 patent, the 269 patent and the '121 patent and it appears that

there is no motivation to replace the unique technique taught in the '706 patent by the

technique taught in each of the '700 patent, the 269 patent and the '121 patent. As

such, the consideration of the combination of the '706 patent and each of the '700

patent, the 269 patent and the '121 patent does not raise a substantial new question of

patentability to claims 1-18 of the '159 patent since there is no motivation to do such a

combination.

Application/Control Number: 90/008,506                                      Page 8
Art Unit: 3992

8.     Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)).  Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).


9.     The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 4,733,159 throughout the course of this reexamination

proceeding.  The third party requester is also reminded of the ability to similarly apprise

the Office of any such activity or proceeding throughout the course of this reexamination

proceeding.  See MPEP §§ 2207, 2282 and 2286.

Application/Control Number: 90/008,506                                  Page 9
Art Unit: 3992

10.     All correspondence relating to this *ex partes* reexamination proceeding should be

directed as follows:

By **U.S. Postal Service Mail** to:

      Mail Stop *Ex Parte* Reexam
      ATTN:  Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, Virginia 22313-1450

By FAX to:

      571-273-9900
      Central Reexamination Unit

By hand to:

      Customer Service Window
      Randolph Building
      401 Dulany St.
      Alexandria, VA 22314

Application/Control Number: 90/008,506                                    Page 10
Art Unit: 3992

11.    Any inquiry concerning this communication or earlier communication from the

examiner, or as to the status of the proceeding, should be directed to the Central

Reexamination Unit at telephone number (571) 272-7705.


12.    Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).



Conferee # 1          Conferee # 2

                                                    Minh  Nguyen
                                                    Primary Examiner
                                                    Art Unit 3992

# EXHIBIT C

40085-5:TJC:490706

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re the Reexamination of: | ) | Before the Examiner |
| | ) | |
| Edwards et al. | ) | To be assigned |
| | ) | |
| Patent No. 4,733,159 | ) | |
| | ) | |
| Issued March 22, 1988 | ) | |
| | ) | |
| Original Assignee: Motorola, Inc. | ) | |
| | ) | |
| CHARGE PUMP | ) | |
| VOLTAGE REGULATOR | ) | December 4, 2007 |

## REQUEST FOR *EX PARTE* REEXAMINATION UNDER 37 C.F.R. § 1.510

MAIL STOP EX PARTE REEXAM
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

The undersigned hereby submits, under the provisions of 37 C.F.R.§ 1.501 et seq., a Request for Reexamination of all claims (claims 1 through 18) of U.S. Patent No. 4,733,159 to Edwards et al., issued March 22, 1988 and entitled "Charge Pump Voltage Regulator" ("'159 patent" or "'159"). The application for the '159 patent was filed on October 28, 1986. Even though the '159 patent has expired (as of October 28, 2006), it is still in the period of enforceability of the patent and reexamination of the '159 patent is still both proper and important. MPEP §2211. Notably, the '159 patent is presently involved in a litigation between Requester and the '159 patent's current assignee. The

40085-5:TJC:490706

'159 patent is currently assigned to CIF Licensing, LLC ("CIF"). The '159 patent was originally assigned to Motorola, Inc. ("Motorola").

## I.    INTRODUCTORY COMMENTS

A prior Request for Reexamination of the '159 patent was filed on February 26, 2007 by another Requester (Remy, Inc.). The present Request for Reexamination relies upon the same prior art references cited by the prior Requester; however, the current Request presents different arguments regarding how the cited prior art reads upon the claims of the '159 patent.

## II.    SUMMARY

The '159 patent teaches a system for charging a battery, such as a car battery. The system controls when the battery is charged by controlling when the battery is connected to a power source. The system uses a voltage generator, such as an alternator commonly driven by the car's engine, to charge the battery. The system uses a transistor, particularly a field effect transistor (FET), to control when the battery is charged. The '159 patent focuses on the circuitry that controls the FET, and thereby controls the charging of the battery. More specifically, the '159 patent focuses on the high frequency signal used in the circuitry that controls the FET.

The '159 patent teaches that the circuitry which controls the FET must produce a higher voltage than the battery voltage in order to effectively turn on the FET and thereby charge the battery. This need for a higher voltage is a well known need that is based on a

40085-5:TJC:490706

commonly-known characteristic of FETs. A high voltage may be obtained by using another voltage source or by increasing the voltage taken from the battery. The '159 patent teaches increasing the voltage taken from the battery. Several devices were commonly used (when the application for the '159 patent was filed) to increase voltage, such as transformers and charge pumps. The '159 patent teaches using a charge pump to increase the voltage taken from the battery.

In a charge pump, a "flying" capacitor is used with a "holding" capacitor in order to create a voltage that is larger than the supply voltage. The flying capacitor is charged to a voltage, then this charge is transferred to the holding capacitor. The flying capacitor is then charged again. This process is repeated many times, putting more and more charge onto the holding capacitor, thereby increasing the voltage on the holding capacitor. Therefore, the flying capacitor is said to "pump" charge into the holding capacitor, and hence the name "charge pump" has been used in the prior art to describe the use of a flying capacitor and holding capacitor to generate a voltage greater than the supply voltage. The concept of a charge pump was well known prior to the filing of the '159 patent.

The '159 patent discloses the alleged improvement of charging and discharging the flying capacitor at a high frequency. A high frequency allows the circuit to have a flying capacitor that is very small (i.e. has a very low capacitance) because even though a very small flying capacitor only charges the holding capacitor a very small amount each time it is connected to the holding capacitor, the process is repeated many times per second (i.e. at a high frequency) and thus the total amount of charge transferred can be very large. By using a high frequency, and thus a very small capacitor for the flying

40085-5:TJC:490706

capacitor, the charge pump circuit is inexpensive to produce as an integrated circuit. As will be shown, the alleged improvement was well known in the art before the application for the '159 patent was filed.

This Request for Reexamination is based upon four prior art references.[1] In some instances, a reference teaches each element of each claim of the '159 patent, i.e., anticipates the '159 patent. In other instances, references teach each element of each claim of the '159 patent in combination with each other and the combination of references would have been obvious. Notably, three[2] of the four prior art patents included with this Request disclose a high frequency signal for the flying capacitor, which the inventors declared to be the novel feature of the claims during prosecution of the '159 patent.

The fourth prior art patent include with this Request, the U.S. Patent to Bowman, renders obvious many of the claims in view of each of the three anticipating patents. Bowman illustrates the clear motivation that someone with skill in the art would have appreciated when the application for the '159 patent was filed to apply the teachings of the three anticipating patents to the exact invention disclosed in the '159 patent. Specifically, the fourth patent, to Bowman, teaches controlling the charging of a car battery by use of a charge pump to control a transistor switch between the car's battery and the field coil of an alternator that is used to charge the battery. One skilled in the art reading the four patents would have been motivated to combine the teachings of Bowman with the teachings of each of the other three patents because they each teach a high

---

[1] U.S. Patents to Fay (4,420,700), Hochstein (4,603,269), Cini (4,736,121), and Bowman (4,636,706). Each of these patents are identified in greater detail in Section III ("Prior Art") and are described in greater detail in Section VI ("Discussion of the Prior Art...").

[2] U.S. Patents to Fay, Hochstein, and Cini.

40085-5:TJC:490706

frequency charge pump solution to the problem of raising the control signal voltage,

while Bowman teaches the use of a charge pump to raise the voltage of a control signal

for charging a car battery.

Clearly, a substantial new question of patentability exists, because none of the

three anticipating patents were before the Examiner, and each of these references teaches

what the inventors contended was the "novel distinction" of the '159 patent. In addition,

the Bowman patent was not before the Examiner, and, hence, raises a substantial new

question of patentability as will be shown below in detail.

Although the U.S. Patent and Trademark Office has already instituted

Reexamination No. 90/008,506 to review the patentability of the claims in the '159 patent

in view of these four references, the current Requestor presents additional arguments as

to why these four references render each of the claims in the '159 patent unpatentable.


III.    PRIOR ART


This Request for Reexamination is based upon the following four prior art

references:

1.    U.S. Patent No. 4,420,700 to Fay entitled "Semiconductor Current

Regulator and Switch," filed May 26, 1981, issued December 13, 1983, citable under 35

U.S.C. §102(a), (b), and (e), and attached hereto as Exhibit A ("Fay" or "Exhibit A").

This reference was not cited in the '159 patent file history.

2.    U.S. Patent No. 4,603,269 to Hochstein entitled "Gated Solid State FET

Relay," filed June 25, 1984, issued July 29, 1986, citable under 35 U.S.C. §102(a) and

40085-5:TJC:490706

(e), and attached hereto as Exhibit B ("Hochstein" or "Exhibit B"). This reference was not cited in the '159 patent file history.

3.    U.S. Patent No. 4,736,121 to Cini entitled "Charge Pump Circuit for Driving N-Channel MOS Transistors," filed August 18, 1986, issued April 5, 1988, citable under 35 U.S.C. §102(e), and attached hereto as Exhibit C ("Cini" or "Exhibit C"). This reference was not cited in the '159 patent file history.

4.    U.S. Patent No. 4,636,706 to Bowman entitled "Generator Voltage Regulating System," filed September 12, 1985, issued January 13, 1987, citable under 35 U.S.C. §102(e), and attached hereto as Exhibit D ("Bowman" or "Exhibit D"). This reference was not cited in the '159 patent file history.

The following documents are also attached as Exhibits in support of this Request:

5.    U.S. Patent No. 4,733,159 to Edwards entitled "Charge Pump Voltage Regulator," filed October 28, 1986, issued March 22, 1988, and attached hereto as Exhibit E ("'159 Patent" or "Exhibit E").

6.    File History of U.S. Patent Application No. 06/924,100, now U.S. Patent No. 4,733,159, attached hereto as Exhibit F ("'159 FH" or "Exhibit F").

Pursuant to 35 U.S.C. §303, the above-listed prior art references raise "substantial new questions of patentability" with respect to claims 1-18 of the '159 patent. As required by 37 C.F.R. §1.510(b)(1), a statement pointing out each substantial new question of patentability is provided below for each identified claim for which reexamination is requested. Furthermore, a detailed explanation of the pertinence and manner of applying the cited patents to each identified claim is provided pursuant to 37 C.F.R. §1.510(b)(2). As required by 37 C.F.R. §1.510(b)(3) and (b)(4), copies of the

40085-5:TJC:490706

pertinent patents relied upon, and a copy of the entire '159 patent including the front face,

drawings, and specification/claims (in double column format) are included. The file

history of the '159 patent and the publications cited during prosecution are also provided

herewith. The fee for requesting reexamination under 37 C.F.R. §1.20(c)(1) is also

enclosed.

## IV.    THE '159 PATENT AND PROSECUTION HISTORY

### 1.    Summary of the '159 Patent

The '159 patent teaches using a charge pump to increase the voltage of a signal to

more efficiently operate a switching transistor. The field effect transistor (FET)

described in the '159 patent can only be turned fully on when the applied gate voltage is

maintained at a higher level than the drain electrode voltage. Since the drain voltage is

the battery supply voltage used to power the switching circuit, a charge pump is used to

create a gate voltage that is larger than the drain (supply) voltage. The '159 patent

teaches that a charge pump is used to boost the voltage level of a control signal for a

power transistor which controls the charging of a battery, for example a car battery. The

car battery voltage is sensed and compared to a reference, and a pulse width modulated

charging signal is created to control the charging of the car battery by controlling when

current is allowed to pass through the field coil of an alternator that is mechanically

driven by the car's engine. To operate the charge pump, a high frequency signal is used

to control the charging of the holding capacitor, such that the output of the charge pump

is the same charging signal, only at a higher voltage (i.e. a voltage high enough to turn on

40085-5:TJC:490706

the FET power transistor. The key novelty claimed by the '159 patent is the use of a high frequency switching signal for the charge pump which is "substantially in excess of the frequency" of the charging signal.

A charge pump is a widely known prior art circuit that can increase voltages without using inductors. In a charge pump, a "flying" capacitor is used with a "holding" capacitor in order to create a voltage that is larger than the supply voltage. The flying capacitor is charged to a voltage, then this charge is transferred to the holding capacitor. The flying capacitor is then charged again. This process is repeated many times, putting more and more charge onto the holding capacitor, thereby increasing the voltage on the holding capacitor. Therefore, the flying capacitor is said to "pump" charge into the holding capacitor, and hence the name "charge pump" has been used in the prior art to describe the use of a flying capacitor and holding capacitor to generate a voltage greater than the supply voltage. The concept of a charge pump was well known prior to the filing of the '159 patent.

The '159 patent disclosed in the Background section that the existing charge pumps were able to perform the functions claimed by the patent, but that the flying capacitor had to be too large. A large flying capacitor is expensive to produce in a charge pump circuit as an integrated circuit.

The '159 patent discloses the alleged improvement of using a high frequency switching signal for the flying capacitor. Well understood laws of physics dictate that the higher the frequency used to switch the flying capacitor (back and forth from charging to discharging), the lower the capacitance necessary to produce the same charge pumping effect. A high frequency switching signal allows the use of a flying capacitor which has

40085-5:TJC:490706

a small capacitance, and the economic advantage to using a small flying capacitor is the reduced price of fabricating the circuit as an integrated circuit.

A specific frequency is not claimed for the high frequency signal, which is instead claimed as "substantially in excess of the frequency of the regulator output signal" which is the control signal that is used to control how much the car battery is charged. '159 patent, claim 1. As discussed further below, the specification of the '159 patent states that "substantially in excess" means that preferably the high frequency is at least two orders of magnitude (i.e. 100 times) greater than the frequency of the control signal. '159 patent, col. 3, ll. 11-13. The specification provides examples of 50-70 Hz for the control signal and 200-300 kHz for the high frequency signal. '159 patent, col. 5, ll. 49-65; Fig. 2.

### 2.    The Claims of the '159 Patent

### A.    Claim 1: The Only Independent Claim

Claim 1, the only independent claim of the '159 patent, recites as follows:

1.    A voltage regulator comprising:

regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison;

drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator output signal and having at least two output terminals, said output terminals coupled in series with a control element of a voltage control means which determines said sensed voltage signal, across a maximum power source voltage potential, said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, said drive circuit means including a peak voltage

increasing means for receiving said regulator output signal and effectively providing in response thereto a corresponding increased magnitude voltage signal generally varying as said regulator output signal but varying up to a peak voltage potential in excess of said maximum power source voltage potential,

*wherein the improvement comprises*

said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal,

said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential,

the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device.

('159 patent at claim 1, emphasis added to the transitional phrase).

Claim 1 is written in Jepson format where the prior art is described followed by a transitional phrase (i.e. "the improvement comprising"), and the asserted novel improvement(s) to the prior art. 37 C.F.R. §1.75(e). Claim 1 thus admits that every element before the transitional phrase is taught by the prior art. 37 C.F.R. §1.75(e)(1). Indeed, the Jepson format was promoted by the PTO for adoption as a valid form of claim drafting because it clearly delineated the novel elements from those elements which are old. 3-8 Chisum on Patents §8.06[1][c] (2006). In other words, the limitations following the transitional phrase contain the only asserted novelty in a Jepson claim.

In claim 1, the claimed improvement states that the peak voltage increasing means (i.e. the charge pump) comprises a capacitor operated at a high frequency "substantially

40085-5:TJC:490706

in excess" of the frequency of the control signal, thereby providing to the gate of the

power transistor an increased voltage signal having the same waveform as the control

signal. The patent teaches the preferred meaning for the term "substantially in excess" as

it relates to the high frequency signal: "Preferably the high frequency switching signal is

at least two orders of magnitude higher than the frequency of the regulator output signal."

'159 patent, col. 3, ll. 11-13. For example, if the regulator output signal is 1 Hz, the high

frequency signal would be at least 100 Hz, or if the regulator output signal is 10 Hz, the

high frequency signal would be at least 1000 Hz or 1 kHz. Such a difference of

frequencies allows the use of a "very small" capacitor for the charge pump and "permits

synthesizing the capacitor as part of an integrated circuit." '159 patent, col. 3, ll. 14-18.

### B.    Claims 2-18: The Dependent Claims

A claim written in dependent form incorporates all of the limitations of the

claim(s) on which it depends. 35 U.S.C. §112, fourth paragraph. All of the 17 dependent

claims in the '159 patent depend originally from claim 1 and, thus, contain the

combination language which makes claim 1 a Jepson claim. Therefore, all of the 17

dependent claims are subject to the same Jepson-style construction as claim 1.

Where a dependent claim in the '159 patent modifies an asserted novel element

(i.e. an element following the transitional phrase), the dependent claim changes the

corpus of the asserted novel improvement. However, where a dependent claim in the

'159 patent modifies the preamble, the dependent claim changes the environment in

which the improvement exits or operates, but it does not change the asserted novel

improvement. This is because the preamble of a Jepson style claim provides the scope

and environment of the claim, but is admittedly prior art. 37 C.F.R. §1.75(e); *see also*

40085-5:TJC:490706

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1029 (Fed. Cir. 2002); *Rowe v. Dror*, 112 F.3d 473, 479 (Fed. Cir. 1997); *Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1426 (Fed. Cir. 1997). Thus, dependent claims which modify a Jepson preamble can only aid in the patentability of a claim where the improvement becomes novel (and non-obvious) by limitation of the *environment* in which the improvement exists or operates. As discussed further below, dependent claims 2-4, 6-9, and 12-17 only contain limitations of elements within the preamble, and thus only modify the environment of the improvement asserted in claim 1. However, regardless of whether the limitations in the above claims are in the preamble (as admitted prior art) or are in the asserted improvement following the transitional phrase, all of the elements existed in the prior art long before the application for the '159 patent was filed.

Only four dependent claims of the '159 patent modify elements of the improvement claimed in claim 1. Claims 5 and 18 define a difference of at least one order of magnitude between the high frequency signal and the regulator output signal. Claim 10 provides the limitation that the capacitor is coupled to the power transistor through a peak rectifying diode. Claim 11 provides the limitation that the capacitor is coupled to the first predetermined voltage through another diode.

Each of the other dependent claims of the '159 patent modifies the preamble of claim 1. Claim 2 adds the limitations that the predetermined characteristic of the regulator output signal comprises a duty cycle (i.e. pulse-width modulated) signal and is determined in accordance with the comparison of battery voltage to a reference voltage. The regulator output signal is noteworthy because the high frequency signal is claimed as part of the improvement to have substantially higher "pulse frequency" than the regulator

40085-5:TJC:490706

output signal. Claim 3 adds the limitation that the drive circuit means includes means for selectively determining the polarity of coupling of the capacitor during different "duty cycle portions" of the regulator output signal. Claims 4 and 1 add the limitation that the predetermined power source potential is the same as the maximum power source voltage potential.

Additional limitations are added in claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. transistors). An additional limitation is added in claims 7 and 9 that the drive circuit means includes a third switch device (i.e. transistor).

Claim 12 adds the limitation that the power switching device is a field effect transistor (FET). Claim 13 adds the limitations that the drain of the FET is connected to a constant voltage source and that the gate capacitance of the FET (gate-source) is "substantially larger than that of the capacitor."

Claims 14 and 15 add the limitations that the voltage control means includes a voltage generator means and the control element includes a field coil. Claim 16 adds the limitations that the voltage generator means includes stator winding and a rectifier circuit means.

### 3.    The File History of the '159 Patent

The following summary of the thin file history of the '159 patent illustrates that the claims were never rejected in view of prior art, that the Examiner made of record six references but did not rely upon them, and that the Examiner only rejected claims based upon 35 U.S.C. §112. Furthermore, the inventors provided what would be the only comparison on record between the claims and the prior art. The inventors provided an

40085-5:TJC:490706

argument allegedly distinguishing the claims over the prior art which they had provided. Most importantly, *none* of the nine references either cited by the Examiner or provided by the inventors included a charge pump. This is especially curious since charge pumps were well known at the time and, indeed, the Fay reference relied upon here was assigned to the same assignee of the '159 patent application during the period of prosecution.

Some embodiments in the nine references are similar to the '159 patent's embodiment of controlling the charging of a battery, but none teach a charge pump, which is the structure containing the only asserted novelty in the '159 patent. In contrast, each of the four references that are included in this Request disclose not only a charge pump, but a charge pump used in the context of boosting a control signal applied to a transistor which controls power flow from a source (e.g. the battery) to a load (e.g. the field coil of an automotive alternator).

None of the references included with this Request were made of record, relied upon, nor would it seem even considered or compared to the claims during the prosecution. Each of the references in this Request discuss at length charge pumps and either anticipate or make obvious the asserted novelty of the '159 patent, namely, the use of a high frequency signal to drive a charge pump.

Before an Office Action was issued in the prosecution, the inventor submitted an Information Disclosure Statement (IDS) with three references, two of which shared a common inventor, Mihaly Lamoth, with the application for the '159 patent, and the third of which was assigned to the inventor's employer Motorola. '159 FH, Paper 4. The IDS also included arguments distinguishing all of the claims by emphasizing the importance of the improvement in claim 1, and stating that the improvement in claim 1 was not found

40085-5:TJC:490706

in any of the Motorola-owned references provided by the inventors. *Id.* As stated hereinabove, the Motorola-owned Fay reference relied upon herein was not cited by the inventors. In the IDS, the inventors stated that using a high frequency was the improvement over the three references because a high frequency allowed the use of a small flying capacitor. *Id.* In the inventors' own words, "there is no prior art suggestion that the effective charge pump frequency must be substantially higher than the voltage regulator output switching signal in order to obtain improved circuit performance as required in the claims of the present invention." *Id.* Of course, even if the functionality of "improved circuit performance" were required by the claims, the functionality would be inherently taught by any reference teaching the "substantially higher" charge pump frequency. MPEP §2112.01.

In an Office Action following less than two months later, the Examiner rejected a 17 original claims (1) as lacking adequate disclosure under 35 U.S.C. §112, first paragraph because the Examiner was unclear as to what a "conventional" circuit would be for producing two output frequencies, with the high frequency being "several thousand times greater than the other," and (2) as being indefinite under 35 U.S.C. §112, second paragraph because claim 1, and hence all of the original claims, recited that a capacitor was paced "between" two nodes of a circuit. '159 FH, Paper 5. There were six references made of record by the Examiner, but none were relied upon to make rejections. *Id.* No other rejections were made against the original 17 claims. *Id.*

Three months later, in an Amendment, the inventors amended the relevant original claims (claims 1, 3 and 4) by substituting "between" with "across" in order to overcome the 35 U.S.C. §112, second paragraph rejection. '159 FH, Paper 6. The

40085-5:TJC:490706

inventors also amended the specification to clarify that the circuit was only

"substantially" conventional in order to overcome the 35 U.S.C. §112, first paragraph

rejection. *Id.* In the Remarks, the inventors argued that the "conventional" circuitry

which produced both a lower frequency signal and a substantially higher frequency signal

could be two circuits. *Id.* In the inventors' own words, "either the high frequency signal

is produced by an oscillator that is used by the circuitry in the regulator 11 which

produces the pulse width modulated [lower frequency control] signal or it is produced by

separate oscillator circuitry in the voltage regulator 11." *Id.*

Also in the Amendment, the inventors added claim 18 which is substantially

similar to claim 5 in that it requires the higher frequency to be at least one order of

magnitude greater than the lower frequency. *Id.* Two months later, all 18 claims were

allowed by the Examiner without further comment. '159 FH, Papers 7 and 8.

Therefore, so far as was reflected in the Office Action and the inventors'

Remarks, there was no prior art even suggesting the use of a high frequency charge pump

signal. However, as shown in greater detail below, this had been disclosed years earlier

in the specifications of the U.S. patents (Exhibits 1-4) that are included in this Request,

one of which was owned by the assignee Motorola. As discussed in detail below, these

four prior art references present substantial new issues of patentability for the '159 patent

by anticipating or making obvious all of the claims of the '159 patent.


## V.    SUMMARY OF THE LAW GOVERNING REEXAMINATION

Requests for Reexamination should be granted when the Examiner determines

that a "substantial new question of patentability is raised by the Request." MPEP § 2240.

40085-5:TJC:490706

A substantial new question of patentability need only be raised by the Request for one claim in order to grant the Request. *Id.* A final decision of unpatentability does not need to be made with respect to a claim in order for a substantial new question or patentability to be present for to the claim. *Id.*

A substantial new question of patentability exists whenever there is: "substantial likelihood that a reasonable examiner would consider the cited prior art patent or printed publication important deciding whether or not the claim is patentable. MPEP § 224. The prior art references in this Request raise substantial new issues of patentability such that a seasonable Examiner would consider such prior art important in deciding whether the claims are patentable or not.

In determining whether a "substantial new question of patentability" has been shown and that reexamination is therefore appropriate, "the PTO must apply the broadest reasonable meaning to the claim language, taking into account any definitions presented in the specification." *In re Bass*, 314 F.3d 5754,577, 65 U.S.P.Q. 1156 (Fed. Cir. 2002) (citing *In re Yamamoto,* 740 F.2d 1569, 1571 222 U.S. Q. 934, 936 (Fed. Cir. 1984)). This means that he word so the claim must be given their plain meaning unless applicant has provided a clear definition in the specification. *In re Zletz*, 893 F.2d 319, 321, 13 U.S.P.Q.2d 1320, 1322 (Fed. Cir. 1989); *In re Bass*, 314 F.3d at 577 (words given ordinary and accustomed meaning unless the inventor chose to be his own lexicographer in the specification); *Philips v. AWH Corp.*, 376 F.3d 1382 (Fed. Cir. 2004). The broadest reasonable interpretation of the claims must also be consistent with the interpretation that those skilled in the art would reach. *In re Cortright,* 165 F.3d 1353, 1360, 49 U.S.P.Q.2d 1464, 1468, (Fed. Cir. 1999). In a reexamination, claims should be

40085-5:TJC:490706

given the broadest reasonable interpretation, as is done in an original or reissue

examination, rather than the interpretation appropriate in an infringement suit. One

rationale for this rule is that the reexamination, unlike an infringement action, the patent

owner has the opportunity to amend the claims. *In re Yamamoto*, 740 F.2d at 1571.

Thus, in the analysis and discussion presented below, the identified claims are given their

broadest reasonable interpretation consistent with the '159 patent specification.

### VI. DISCUSSION OF THE PRIOR ART RELIED UPON TO SUPPORT REEXAMINATION

The key disclosures of the prior art relied upon to support reexamination are

discussed in this section. For each reference, there is an explanation of why it creates a

substantial new issue of patentability, either alone or in combination with other

references, with respect to the claims of the '159 patent. A Claim Chart setting out the

limitations of the 18 claims of the '159 patent, and summarizing where the pertinent

disclosures are found in the prior art, appears in Section VI of this Request.

#### 1. U.S. Patent No. 4,420,700 to Fay, "High Frequency Charge Pump," Anticipates Each of the Claims of the '159 Patent.

Fay issued in 1983 and was not cited in the '159 file history, although it was

assigned to the same assignee as the '159 patent at the time that the '159 patent was

pending. Fay teaches the use of a high frequency charge pump of the same use as

disclosed in the '159 patent, namely to drive a transistor which controls the flow of

current from a power source (i.e. a battery) to a load (i.e. a field coil controlling the

charging of a battery). As stated in Fay:

40085-5:TJC:490706

> "A typical application is in automotive or other transport electrical systems <u>wherein the power source is the battery or alternator, and the semiconductor switch</u> or regulator replaces a mechanical relay, <u>used, for example, to feed . . . alternator field windings</u>."

Fay, col. 1, ll. 40-46 (emphasis added).


As discussed below, each of the claims of the '159 patent is invalid under 35 U.S.C. § 102 as being anticipated by Fay. Because Fay was not applied in any rejection of the claims during the prosecution of the '159 patent, a substantial new question of patentability as to each claim is raised by Fay.

### A. Fay teaches the Improvements Claimed in Each of the Claims of the '159 Patent.

Fay teaches the claimed improvements of the '159 patent, namely the use of a high frequency switching signal which has a substantially higher frequency than the regulator output signal. The improvement comprises coupling and uncoupling a capacitor across a predetermined power source voltage potential in accordance with pulses of a high frequency signal (with respect to regulator output signal) to provide an output signal having the same general shape as the regulator output signal, but a peak voltage in excess of the power source voltage. This increased voltage signal is applied to the control terminal of the power switch, wherein the voltage applied to the control terminal must be higher than the supply voltage in order to fully turn on the power switch. Fay therefore describes the use of a high frequency charge pump for the same purposes as the '159 patent as follows:

> Converter 38 [i.e. the charge pump] receives oscillations from oscillator 37, converts them to unidirectional pulses, and uses, for example, *a conventional diode capacitor "doubling" network* to accumulate these unidirectional

40085-5:TJC:490706

> pulses and provide a voltage to control gate 34 which
> exceeds the value of the power source voltage appearing at
> terminal 8a, thus enabling current flow between power
> source input terminal 8a and load input terminal 9a.

Fay, Col. 6,11, 14-22 (emphasis added).

Just as is taught in the '159 patent, Fay utilizes the intrinsic gate capacitance of

the FET switch in order to reduce the capacitance of the charge pump capacitor in order

to allow for easier integration:

> "Advantage is taken of intrinsic parasitic capacitance 41 of gate
> electrode 34 of NMOS device 31 in cooperation with the pulse
> accumulation capacity of converter 38 so as to minimize the circuit
> area occupied by converter 38 in integrated form."

Fay col. 6, ll. 14-26.

Fay teaches using a high frequency for the oscillations from the oscillator 37 to

the charge pump 38. "[R]esistors 55 and 56 and capacitor 57 [which are part of the

oscillator 37] are chosen to produce an oscillation frequency in the range of 100 – 1,000

kilohertz." Fay, col. 7, ll. 49-51.  This frequency range discloses all of the frequencies

disclosed by the specification of the '159 patent for the high frequency switching signal

(200-300 kHz).  '159 patent, col. 5, ll. 62-65.

Fay teaches an arbitrary control signal which could be pulse-width modulated or

otherwise configured to control the charging of a battery.  Indeed, Fay discloses generally

controlling current from a power source (e.g., a battery) to a load (e.g., a field coil

controlling the charging of a battery) using the control signal.  Fay, col. 1, ll. 7-14.  Fay

teaches that the control signal may be created arbitrarily.  "[A]ny first predetermined

continuous [level], pulse, or pulse train of external signal applied to terminal 10 may

cause oscillator 37 to commence oscillations, and any second continuous level, pulse, or

40085-5:TJC:490706

pulse train of external signal applied to terminal 10 may cause oscillator 37 to cease

oscillations." Fay, col. 5, l. 64 - col. 6, l. 1.  Therefore, the control signal may have as

low a frequency as desired, even 1 Hz or lower, and thus the oscillation frequency

described above of 100 – 1,000 kHz is "substantially in excess" of the frequency of the

control signal.  In addition, therefore, Fay clearly discloses the limitation of claim 5 and

18 that the high frequency signal must be at least one order magnitude higher frequency

than the control signal.

Fay discloses the limitations of claim 10 through teaching "[d]iode means 63

couples the output of the diode-capacitor voltage doubler of converter means 38 [which is

capacitor 60] to control gate 34 of [power transistor] device 31." Fay, col. 7, l. 67 - col. 8,

l. 2; Fig. 4.  Fay discloses the limitation of claim 11 through teaching that the capacitor is

coupled to a predetermined voltage via another diode 62, "forming a conventional

voltage doubler." Fay, col. 7, ll. 66-67; Fig. 4.

**B.    Fay Teaches the Preamble of Each of the Claims of the '159 Patent.**

Fay employs the charge pump for the same purpose as the '159 patent, namely

driving a power transistor into a low resistance "on" state.  See generally, Fay, col. 6, l.

14-32 ("Any value exceeding the voltage of power source 8 and of an amount sufficient

to exceed the threshold voltage of device 31 and drive it to the desired variable or low

resistance state is sufficient.").  Fay teaches how using low capacitance values with the

intrinsic parasitic gate capacitance of the FET can allow the circuit to be "readily

integrated." Fay, col. 6, ll. 22-26 and col. 7, l. 46.

As discussed above, Fay teaches the limitations' of claim 2 that the regulator

output signal may be regulated as to duty cycle (i.e. pulse-width modulated) in

40085-5:TJC:490706

accordance with the comparison of the battery voltage to a reference voltage. Fay, col. 5, l. 64 – col. 6, l. 1. Fay teaches the limitation of claim 3, namely that the drive circuit means includes means, i.e. buffer 40 and oscillator 37, for selectively preventing coupling of the capacitor during certain "duty cycle portions" of the regulator output signal. Fay, col. 6, ll. 39-53. Fay teaches the limitations of claim 4 that the predetermined power potential is the same as the maximum power source voltage potential. The capacitor 60 is coupled to the output of parallel amplifying gates 58-59 that are powered by the maximum power source voltage potential 8a. When the outputs of amplifiers 58-59 are high, they will apply the maximum power source voltage potential 8a to the capacitor 60. Fay. col. 7, ll. 20-23; Fig. 4. Fay teaches the limitations of claim 17 that the predetermined voltage across the battery is the maximum power source potential. Fay, col. 5, ll. 12-20 ("During operation, it is typically desired that in response to an external signal applied to control input 10, …that the [NMOS power switch] 31 turn on so that the on-state resistance of device 31 is small and …load 9 receives substantially the full voltage of power source 8.")

Fay teaches the limitations of claims 6 and 8 that the drive circuit means includes a first switch that couples one side of the capacitor to a first voltage in response to the regulator output signal, and a second switch that couples the other side of the capacitor to a second voltage in response to the high frequency signal. The first switch in Fay is transistor 65, which couples one side of the transistor to ground in response to the regulator output signal. The second switch in Fay is the amplifier 58-59 that is turned on and off by the output of NOR gate 54 (which oscillates at the high frequency oscillator frequency). Amplifier 58-59 couples the maximum power source voltage to one side of

40085-5:TJC:490706

capacitor 60 in response to the high frequency signal from NOR gate 54. Fay, Fig. 4.

Fay teaches the limitations of claims 7 and 9 that the drive circuit means includes a third

switch device (i.e., Fay clamp 39 or Fay transistor 65). Fay, col. 6, ll. 39-54.

Fay teaches the limitation of claim 12 that the power switching device is a FET

through teaching n-channel metal oxide semiconductor (NMOS) transistors which are

part of a subset (MOS-FETs) of FET transistors. Fay, col. 4, ll. 57-62. Fay teaches the

limitations of claim 13 that the drain (32) of the FET is connected to a constant voltage

source (8a) and that the capacitance (41) of the FET is "substantially larger than that of

the capacitor." Fay, col. 6, ll. 23-27; Fig. 4. Fay teaches the limitations of claims 14 and

15, explicitly stating that "[a] typical application is in automotive or other transport

electrical systems wherein the power source is the battery...and the semiconductor

switch...[is] used, for example, to feed...alternator field windings." Fay col. 1, ll. 40-46.

Fay teaches the limitations of claim 16 as an application which would have been obvious

to one of skill in the art based on Fay's general discussion of power source and load

already described above. All generators and alternators have, by definition, stator

windings and rectifier circuits. Fay, col. 1, ll. 40-46.

2.    **U.S. Patent No. 4,603,269 to Hochstein, "Gated Solid State FET Relay," Anticipates Each of the Claims of the '159 Patent.**

Hochstein was filed on June 25, 1984, issued on July 29, 1986, and was not cited

in the '159 file history. Hochstein teaches the use of a high frequency charge pump for

the same use as disclosed in the '159 patent, namely to drive a transistor which controls

the flow of current from a power source (i.e. a battery in the '159 patent) to a load (i.e. a

field coil controlling the charging of a battery in the '159 patent). For example,

40085-5:TJC:490706

Hochstein teaches that the high frequency charge pump may be used to switch power to

"various automotive electrical loads" (col. 1, l. 12) such as "d.c. motors" (i.e. alternators)

(col. 5, l. 42) and "[i]nductive loads" (col. 6, l. 31). As discussed below, each of the

claims of the '159 patent are invalid under 35 U.S.C. § 102 as being anticipated by

Hochstein. Because Hochstein was not applied in any rejection of the claims during the

prosecution of the '159 patent, a substantial new question of patentability as to each

claim is raised by Hochstein.

**A.    Hochstein Teaches the Improvement Claimed in Each of the Claims of
       the '159 Patent.**

Hochstein teaches the claimed improvements of the '159 patent, namely the use

of a high frequency switching signal which has a substantially higher frequency than the

regulator output signal which has a substantially higher frequency than the regulator

output signal. Hochstein describes the use of a high frequency charge pump for the same

purposes as the '159 patent as follows:

> One quarter of a CMOS CD4093BE 2-input NAND
> gate 52 is connected as a gated free running square
> wave oscillator running at about 70 KHz; I.C.58 being
> configured as a buffer-inverter to drive the
> transformerless voltage multiplier [i.e. the charge
> pump] made up of C32, D28, D30, C34. This
> multiplier is normal in most respects, except that the
> power supply connection through diode D28 is derived
> through I.C.48.

Hochstein col. 4. ll. 30-38. Thus Hochstein teaches using a high frequency (70 kHz) to

drive the charge pump.

For a control signal, Hochstein teaches an arbitrary control signal which could be

pulse-width modulated or could otherwise control the charging of a battery. Indeed,

Hochstein discloses generally controlling current from a power source (e.g., a battery) to

40085-5:TJC:490706

a load (e.g., "electrical load 10 is of the type typically found in an automotive vehicle

having a 12 Volt battery, i.e., electrical supply system.") using the control signal.

Hochstein, col. 2, ll. 47-51.  Hochstein teaches that the control signal may be created

arbitrarily:

> In order for I.C.52 to oscillate and develop high
> voltage, the oscillator control input terminal 50 driven
> by I.C.48 must be high.  If the control input 18 is held
> low, the gated oscillator 52 does not run, so that no high
> voltage is delivered to the gate 26 of the MOS-FET20.
> Without gate drive the MOS-FET 20 is 'off',
> interrupting current flow to the load 10.

Hochstein, col. 4. ll. 38-44.  Therefore, the control signal may have as low a

frequency as desired, even 1 Hz or lower, and thus oscillation frequency described above

of 70 kHz is "substantially in excess" of the frequency of the control signal.  In addition,

therefore, Hochstein clearly discloses the limitations of claims 5 and 18 that the high

frequency signal must be at least one order magnitude higher frequency than the control

signal.

Hochstein discloses the limitations of claim 10 through teaching diode 30

connecting the charge pump to the MOS-FET gate.  Hochstein, col. 4, ll. 25-44; Figs. 1-3.

Hochstein discloses the limitations of claim 11 through teaching that the capacitor is

coupled to a predetermined voltage via another diode 28.  Hochstein, col. 4, ll. 36-37;

Fig. 1.

### B.    Hochstein Teaches the Preamble of Each of the Claims of the '159 Patent.

Hochstein employs the charge pump for the same purpose as the '159 patent,

namely driving a power MOS-FET transistor into a low resistance "on" state.  Hochstein

at col. 2, ll. 27-32.

40085-5:TJC:490706

As discussed above, Hochstein teaches the limitations of claim 2 that the regulator output signal applied to terminal 18 may be any signal and therefore may utilize a duty cycle (i.e. pulse-width modulated) in accordance with the comparison of battery voltage to a reference voltage. Hochstein, col. 2. ll: 57-61. Hochstein teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during certain "duty cycle portions" of the regulator output signal. Hochstein, col. 3, ll. 27-36; col. 4, ll. 3 -38. Hochstein teaches the limitations of claims 4 and 17 that the predetermined power source potential is the same as the maximum power source voltage potential  Hochstein, col. 1, ll. 50-57; Figs. 1-3.

Hochstein teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Hochstein transistor 40 and buffer inverter 58). Hochstein, col. 3, ll. 16-21; col. 4, ll. 33-35. Hochstein teaches the limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Hochstein transistor 70). Hochstein, col. 3, ll. 62-67.

Hochstein teaches the limitation of claim 12 that the power switching device is a FET through teaching n-channel metal oxide semiconductor (NMOS) transistors and MOS-FET transistors in general. Hochstein, col. 1, ll. 28-57. Hochstein teaches the limitation of claim 13 that the drain of the FET (20) is connected to a constant voltage source (16). Hochstein, col. 2, ll. 62-66; Figs. 1-3. Hochstein does not disclose specifically that the capacitance of the FET is "substantially larger that that of the capacitor," however the parasitic capacitance between gate and source in a FET is well known to those with skill in the art.  Hochstein teaches the limitations of claims 14, 15,

40085-5:TJC:490706

and 16. Hochstein specifies that his circuit is for use in automobiles (col. 1, ll. 6-8 and

20; col. 2, ll. 49-51) and that the load can be a d.c. motor (col. 5, ll. 41-42). One skilled

in the art would recognize that the d.c. motor refers to a generator or alternator and that it

is charging the battery that powers this circuit. This is how all automobile charging

systems operate.

> 3.    U.S. Patent No. 4,736,121 to Cini et al., "Charge Pump Circuit for
> Driving N-channel MOS Transistors," Anticipates Each of the Claims
> of the '159 Patent.

Cini was filed on August 18, 1986, issued on April 5, 1988, and was not cited in

the '159 file history. Cini teaches that the use of a high frequency charge pump for the

same use as disclosed in the '159 patent, namely to drive a NMOS FET transistor (in fact,

this is the title of the Cini patent) which controls the flow of current from a power source

(i.e. a field coil in the '159 patent) to a load (i.e. a field coil in the '159 patent controlling

the charging a battery), was already known. Cini Background. As discussed below, each

of the claims of the '159 patent is invalid under 35 U.S.C. § 102 as being anticipated by

Cini. Because Cini was not applied in any rejection of the claims during the prosecution

of the '159 patent, a substantial new question of patentability as to each claim is raised by

Cini.

> A.    Cini Teaches the Improvements Claimed in Each of the Claims of the
> '159 Patent.

Cini teaches the claimed improvements of the '159 patent, namely the use of high

frequency switching signal which has a substantially higher frequency than the regulator

output signal. Cini describes the use of a high frequency charge pump for the same

purposes as the '159 patent as follows:

> The charge pump circuit according to FIG. 1 operates as

40085-5:TJC:490706

> follows. In a steady state of the circuit the voltage drop on
> the capacitor 27 is maintained approximately at 12v (i.e.
> the voltage on line 29), by virtue of the capacitor 24 which,
> through the pair of switches 20 and 21 and the diode 25,
> continually charged to a 12 V voltage at a frequency of 500
> kHz.

Cini col. 2, ll. 4-47. Thus Cini teaches using a high frequency (500 kHz) to drive the

charge pump.

   For the control signal, Cini teaches an arbitrary control signal which could be

pulse-width modulated or could otherwise control the charging of a battery. Indeed, Cini

discloses generally controlling current from a power source (e.g., a battery) to a load

(e.g., a field coil controlling the charging a battery) using the control signal. Cini, col. 1,

l. 7; col. 2, ll.48-50. Cini teaches that the control signal may run the charge pump for

"adequately supplying a load in the DC mode," or, in other words with a control signal

with substantially 0 Hz. Cini, col. 1, ll. 33-36. Cini does not limit the control signal to

any frequency; it can have any frequency at all. Cini, col. 2, l. 68 to col. 3, l. 2.

Therefore, the control signal may have as low a frequency as desired, and thus the

oscillation frequency described above of 500 kHz may be "substantially in excess" of the

frequency of the control signal. In addition, therefore, Cini clearly discloses the

limitations of claims 5 and 18 that the high frequency signal must be at least one order

magnitude higher frequency that the control signal.

   Cini discloses the limitations of claim 10 through teaching diode 26 connecting

the charge pump (capacitor 24) to the MOS-FET 2 gate. Cini, Col. 2, ll. 34-40, 59-63;

Figs. 1-2. Cini discloses the limitations of claim 11 through teaching that the capacitor

40085-5:TJC:490706

24 is coupled to a predetermined voltage (the 12V supply) via another diode 25.  Cini,
col. 2, ll. 41-47; Figs. 1-2.

### B.    Cini Teaches the Preamble of Each of the Claims of the '159 Patent.

Cini employs the charge pump for the same purpose as the '159 patent, namely
driving a power MOS-FET transistor into a low resistance "on" state.  Cini Background,
and at col. 3, ll. 3-19.

As discussed above, Cini teaches the limitations of claim 2 that the control signal
when present will turn on the transistor 35 and when not present will turn off the
transistor 35 (col. 3; ll. 1-13); one skilled in the art would recognize that regulator output
signal may be generated arbitrarily such as using a duty cycle (i.e. pulse-width
modulated) in accordance with the comparison of a battery voltage to a reference voltage.
Cini teaches the limitation of claim 3, namely that the drive circuit means includes means
for selectively preventing coupling of the capacitor during certain "duty cycle portions"
of the regulator output signal.  Cini, col. 3, ll. 1-13.

Cini teaches two supply voltages, one is a 12V supply voltage (29) and one is an
arbitrary supply voltage (Vcc).  Cini, col. 2, ll. 41-68; Figs 1-2.  Cini states that an
advantage of the invention is to use the charge pump to quickly charge the MOS-FET
gate to "a higher voltage than the supply one."  Cini, col. 1, ll. 18-19, 38-41.  Therefore,
Cini teaches the limitations of claims 4 and 17 because the predetermined power source
potential may be the same as the maximum power source voltage potential and the
essence of the invention in Cini is to quickly establish through a charge pump a higher
voltage than that available by either supply line.  *Id.*

40085-5:TJC:490706

Cini teaches the limitations of claims 6 and 8 that the drive circuit means includes both first and second "switch devices" (i.e. Cini transistor 35 and switch network 20/21). Cini, col. 2, ll. 24-40; col. 2, l. 63 to col. 3, l. 2. Cini teaches the limitations of claims 7 and 9 that the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Cini transistor 35). Cini, col. 3, ll. 6-13.

Cini teaches the limitations of claim 12 that the power switching device is a FET through teaching n-channel metal oxide semiconductor (NMOS) transistors and MOS-FET transistors in general. Cini, col. 2, ll. 47-68. Cini teaches the limitations of claim 13 that the drain of the FET is connected to a constant voltage source (Vcc). Cini, col. 2, ll. 54-56; Figs. 1-2. Cini also teaches the other limitation of claim 13 that the capacitance of the FET 2 (represented by Cini capacitor 27 in Fig. 1) is "substantially larger than that of the capacitor" (Cini charge pump capacitor 24) through Cini's reference to it holding the charge pumped by the other capacitor (24). Cini, col. 2, ll. 11-18. Cini teaches the limitations of claims 14, 15, and 16 as obvious variations of using a 12 Volt system to control inductive loads. Cini, col. 3, ll. 14-19.

4. **U.S. Patent No. 4,636,706 to Bowman et al., Generator Voltage Regulating System, "Makes Obvious Each of the Claims of the '159 Patent.**

Bowman was filed on June 25, 1984, issued on June 29, 1986, and was not sited in the '159 file history. Bowman teaches that he use of a charge pump for the same use as disclosed in the '159 patent, namely to drive a FET transistor (Bowman 42) which controls the flow of current from a car battery 36 to a generator field coil 14 as the battery is being recharged. Bowman, col. 1, ll. 4-8. Bowman specifically teaches a voltage generator (Bowman 10), a control element including a field coil (Bowman 14), stator

40085-5:TJC:490706

windings (Bowman 12) and a rectifier circuit (Bowman 20). Bowman, col. 3, ll. 17-39;

Fig. 1. As discussed further below, each of the claims of the '159 patent is invalid under

35 U.S.C. § 103 as being: (1) obvious over Bowman in view of Fay, (2) obvious over

Bowman in view of Hochstein, and (3) obvious over Bowman in view of Cini. One

skilled in the art reading the four patents would have been motivated to combine the

teachings of Bowman with the teachings of each of the other three patents because they

each teach a high frequency charge pump solution to the problem of raising the control

signal voltage and Bowman teaches the use of a charge pump to raise the voltage of a

control signal for charging a car battery. Because Bowman was not applied in any

rejection of the claims during prosecution of the '159 patent, a substantial new question

of patentability as to each claim is raised by Bowman.

### A. Bowman Teaches the Application of a Charge Pump to Drive a Power FET to Control the Charging of a Battery in an Automobile.

Bowman teaches a charge pump which doubles the available voltage from a

battery in an automobile to effectively drive a FET to control the charging of that battery.

Bowman describes the charge pump as follows:

> [T]the voltage accumulated on capacitor 120 is added to the
> voltage between conductor 98 and ground with the result
> that a sufficient voltage is applied to the gate electrode of
> transistor 42 to bias it conductive. When the output voltage
> of the bridge rectifier 20 on line 94 is about 14 volts the
> voltage applied to the gate of transistor 42 will be doubled
> to about 28 volts. When only battery voltage is applied to
> conductor 94 the voltage applied to the gate of transistor 42
> will be doubled to about 24 volts.

Bowman, col. 9. ll. 37-46. Accordingly, Bowman renders obvious all the claims of the

'159 patent in view of each of the Fay, Hochstein, or Cini references.

Page 31 of 35

40085-5:TJC:490706

**B.**    **Bowman Teaches the Limitations added by Claims 2-4, and 11-17 of the '159 Patent.**

Bowman teaches the limitations of claim 2 that the regulator output signal uses pulse-width modulation or a duty cycle in accordance with the comparison of a battery voltage to a reference voltage. Bowman, col. 1, l. 1 to col. 2, l. 4. Bowman teaches the limitation of claim 3, namely that the drive circuit means includes means for selectively preventing coupling of the capacitor during certain "duty cycle portions" of the regulator output signal because the output control signal 116 generates the charge pump control signal 202. Bowman, col. 8, l. 67 to col. 9, l. 46.

Bowman teaches the limitations of claims 4 and 17 because the predetermined power source potential is the same as the maximum power source voltage potential, namely the conductor variously noted as 98, 94, and 48 which is connected to the drain of transistor 42. Bowman, col. 9, ll. 29-30; Figs. 1, 4.

Bowman discloses the limitations of claim 11 through teaching that the capacitor 120 is coupled to a predetermined voltage 98 via diode 207 (embodied as an emitter-base coupled transistor Q71). Bowman, col. 8, ll. 55-58; Figs. 1-4.

Bowman teaches the limitations of claim 12 that the power switching device is a FET through teaching the use of a n-channel metal oxide semiconductor (NMOS) transistor 42. Bowman, col. 4, ll. 14-25. Bowman teaches the limitation of claim 13 that the drain of the FET 42 is connected to a constant voltage source (Vcc). *Id*; Fig. 1. As for the other limitation in claim 13, the large parasitic capacitance between gate and source in a FET is well known to those with skill in the art.

Bowman teaches the limitations of claims 14 and 15 that the voltage control means includes a voltage generator (Bowman 10) and the control element includes a field

40085-5:TJC:490706

coil (Bowman 14). Bowman, col. 1, ll. 34-59; Fig. 1. Bowman teaches the limitation of

claim 16 that the voltage generator (Bowman 10) means includes stator windings

(Bowman 12) and a rectifier circuit (Bowman 20) means. Bowman, col. 3, ll. 40-62; Fig.

1.

**VII.    CLAIM CHART COMPARING THE CLIAMS OF THE '159 PATENT TO THE DISCLOSURES OF THE PRIOR ART INCLUDED WITH THIS REQUEST.**

For the convenience of the Examiner, attached hereto is a claim chart reciting the

limitations of the claims of the '159 patent and showing where in the included prior art

references the limitations can be found.

**VIII.    CONCLUSION**

As discussed above, the included four prior art references raise a substantial

questions of patentability with respect to the '159 patent. Each of claims 1 -18 of the

'159 patent is invalid as anticipated for the following reasons:

1.      Each of claims 1-18 of the '159 patent is anticipated by Fay under 35

U.S.C. § 102 (a), (b), and (e) because Fay teaches each of the limitations in each of the

claims, including all of the alleged novel improvements of the claims of the '159 patent.

2.      Each of the claims 1-18 of the '159 patent is anticipated by Hochstein

under 35 U.S.C. § 102 (a), (e) because Hochstein teaches each of the limitations in each

of the claims, including all of the alleged novel improvements of the claims of the '159

patent.

40085-5:TJC:490706

3.    Each of the claims 1-18 of the '159 patent is anticipated by Cini under 35 U.S.C. § 102(e) because Cini teaches each of the limitations in each of the claims, including all of the alleged novel improvements of the claims of the '159 patent.

Furthermore, each of the claims 1-18 of the '159 patent is rendered obvious by Bowman in view of Fay under 35 U.S.C. § 103(a) because Bowman teaches the application of a charge pump circuit to boost the voltage of a control signal to a transistor which controls the charging of a car battery from a car alternator or similar power source. Each of the claims 1-18 of the '159 patent is rendered obvious by Bowman in view of Hochstein under 35 U.S.C. § 103 (a) because Bowman teaches the application of a charge pump circuit to boost the voltage of a control signal to a transistor which controls the charging of a car battery from a car alternator or similar power source. Each of the claims 1-18 of the '159 patent is rendered obvious by Bowman in view of Hochstein under 35 U.S.C § 103 (a) because Bowman teaches the application of a charge pump circuit to boost the voltage of a control signal to a transistor which controls the charging of a car battery from a car alternator or similar power source.

40085-5:TJC:490706

For the reasons set forth in this Request, and based on the accompanying references, the '159 patent and file history, the undersigned respectfully requests that a Reexamination of all claims of the '159 patent be ordered and that all of the claims be determined to be invalid.

Dated: December 4, 2007

Respectfully submitted,

_____

Troy J. Cole Reg. No. 35, 102
Woodard, Emhardt, Moriarty,
McNett & Henry LLP
Chase Tower
111 Monument Circle, Suite 3700
Indianapolis, IN 46204
(317) 634-3456
(317) 637-7561 (fax)

VI.    CLAIM CHART COMPARING THE CLAIMS OF THE '159 TO THE DISCLOSURES OF THE PRIOR ART INCLUDED WITH THIS REQUEST

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| 1. A voltage regulator comprising: | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| Regulator means for receiving a sensed voltage signal and for providing, in response to the effective comparison of said sensed voltage signal with a reference signal, a regulator output signal, comprising pulses, having a predetermined frequency and a predetermined signal characteristic determined in accordance with said comparison; | See above. | See above. | See above. | See above. |
| drive circuit means coupled to said regulator means and comprising a power switching device having a control terminal effectively coupled to said regulator | See above. | See above. | See above. | See above. |

1

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| output signal and having at least two output terminals coupled in series with a control element of a voltage control means which determines said sensed voltage signal, across a maximum power source voltage potential, | | | | |
| said drive circuit means controlling said sensed voltage, via said control means, in accordance with said characteristic of said regulator output signal to maintain said sensed voltage signal at a predetermined voltage level determined by said reference signal, | See above. | See above. | See above. | See above. |
| said drive circuit means including a peak voltage increasing means for receiving said regulator output signal and effectively providing in | See above. | See above. | See above. | See above. |

2

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| response thereto a corresponding increased magnitude voltage signal generally varying as said regulator voltage output signal but varying up to a peak voltage potential in excess of said maximum power source voltage source, | | | | |
| wherein the improvement comprises | This is the transitional phrase of the Jepson-style claim. 37 C.F.R. §1.75(e)(2). | This is the transitional phrase of the Jepson-style claim. 37 C.F.R. §1.75(e)(2). | This is the transitional phrase of the Jepson-style claim. 37 C.F.R. §1.75(e)(2). | This is the transitional phrase of the Jepson-style claim. 37 C.F.R. §1.75(e)(2). |
| said peak voltage increasing means comprising a capacitor selectively series coupled and decoupled across a predetermined power source voltage potential in accordance with pulses of a high frequency signal having a pulse frequency substantially in excess of the frequency of said regulator output signal, | Capacitor 60 is selectively coupled and decoupled across a predetermined power source voltage (i.e. the output voltage of the high frequency oscillator 37) in accordance with the high frequency pulses of the oscillator 37. As described by Fay: "Converter 38 receives oscillations | Hochstein describes the use of a high frequency charge pump for the same purposes as the '159 patent as follows: "One quarter of a CMOS CD4093BE 2-input NAND gate 52 is connected as a gated free running square wave oscillator running at about 70 KHz; I.C.58 | Cini describes the use of a high frequency charge pump for the same purposes as the '159 patent as follows: "The charge pump circuit according to FIG. 1 operates as follows. In a steady state of the circuit the voltage drop on the capacitor 27 is maintained approximately at 12v | Bowman teaches a charge pump which doubles the available voltage from a battery in an automobile to effectively drive a FET to control the charging of that battery. Bowman describes the charge pump as follows: "[T]he voltage accumulated on capacitor 120 is added |

3

#490717

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | from oscillator 37, converts them to unidirectional pulses, and uses, for example, a conventional diode 'doubling' network to accumulate these unidirectional pulses and provide a voltage to control gate 34 which exceeds the value of the power source voltage appearing at terminal 8a, thus enabling current to flow between power source input terminal 8a and load input terminal 9a. Advantage is taken of intrinsic parasitic capacitance 41 of gate electrode 34 of NMOS device 31 in cooperation with the pulse accumulation capacity of converter | being configured as a buffer-inverter to drive the transformerless voltage multiplier [i.e. the charge pump] made up of C32, D28, D30, C34. This multiplier is normal in most respects, except that the power supply connection through diode D28 is derived through I.C.48." Hochstein col. 4, ll. 30-38. | (i.e. the voltage on line 29), by virtue of the capacitor 24 which, through the pair of switches 20 and 21 and the diode 25, continually charged to a 12 V voltage at a frequency of 500 kHz. Cini col. 2, ll. 4-47. Cini does not explicitly disclose that the high frequency signal 23 is "substantially higher than" the frequency of the control signal $V_{in}$, but he does say that the signal 23 may be 500 kHz. The only thing he says about the control signal is that when it is of a level to turn on the transistor 35, the charge pump is switched on (col. 3, ll. | to the voltage between conductor 98 and ground with the result that a sufficient voltage is applied to the gate electrode of transistor 42 to bias it conductive. When the output voltage of the bridge rectifier 20 on line 94 is about 14 volts the voltage applied to the gate of transistor 42 will be doubled to about 28 volts. When only battery voltage is applied to conductor 94 the voltage applied to the gate of transistor 42 will be doubled to about 24 volts." Bowman, col. 9, ll. 37-46. Accordingly, Bowman renders obvious all the claims of the '159 patent in view of each |

4

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | 38 so as to minimize the circuit area occupied by converter 38 in integrated form." col. 6, ll. 14-26. | | 6-13). Thus, it is indicated that the control signal does not have to have any frequency. | of the Fay, Hochstein, or Cini references. |
| said peak voltage increasing means, therefore, comprising a high frequency charge pump which provides said increased voltage signal, | This is a repetition of the previous limitation. | This is a repetition of the previous limitation. | This is a repetition of the previous limitation. | This is a repetition of the previous limitation. |
| said increased voltage signal having the same general waveform as said regulator output signal but increased in voltage magnitude to achieve a peak voltage potential in excess of said maximum power source voltage potential, | This is functional language inherently disclosed by the charge pump structure acting on the control signal, as described by Fay. | This is functional language inherently disclosed by the charge pump structure acting on the control signal, as described by Hochstein. | This is functional language inherently disclosed by the charge pump structure acting on the control signal, as described by Cini. | This is functional language inherently disclosed by the charge pump structure acting on the control signal, as described by Bowman. |
| the charge pump providing said increased voltage signal as an output which is coupled to said control terminal of said power switching device. | The output of converter 38 is applied directly to the gate 34 of the NMOS power switching device 31. | The output of the voltage doubler circuit is coupled to the gate of the NMOS FET. Col. 4, ll. 18-30. | The output of charge pump is coupled to the gate of the FET 2 (col. 3, ll. 3-13). | The output of the voltage doubler 200 is coupled to the gate of the NMOS FET 42 (FIG. 1 and 2). |

5

#490717

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| 2. A voltage regulator according to claim 1 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said predetermined characteristic of said regulator output signal, which characteristic which is determined in accordance with said comparison, comprises duty cycle. | The Fay circuit will work with any form of regulator output signal. "[A]ny first predetermined continuous [level], pulse, or pulse train of external signal applied to terminal 10 may cause oscillator 37 to commence oscillations, and any second continuous level, pulse, or pulse train of external signal applied to terminal 10 may cause oscillator 37 to cease oscillations." Fay, col. 5, l. 64 - col. 6, l. 1. | the regulator output signal applied to terminal 18 may be any signal and therefore may utilize a duty cycle (i.e. pulse-width modulated) in accordance with the comparison of battery voltage to a reference voltage (col. 2. ll. 57-61). | the control signal when present will turn on the transistor 35 and when not present will turn off the transistor 35 (col. 3; ll. 1-13); one skilled in the art would recognize that regulator output signal may be generated arbitrarily such as using a duty cycle (i.e. pulse-width modulated) in accordance with the comparison of a battery voltage to a reference voltage. | the regulator output signal uses pulse-width modulation or a duty cycle in accordance with the comparison of a battery voltage to a reference voltage. Bowman, col. 1, l. 1 to col. 2, l. 4. |
| 3. A voltage regulator according to claim 2 | The preamble of a Jepson-style claim is admitted prior art. 37 | The preamble of a Jepson-style claim is admitted prior art. 37 | The preamble of a Jepson-style claim is admitted prior art. 37 | The preamble of a Jepson-style claim is admitted prior art. 37 |

6

#490717

| CLAIM ELEMENT | FAY et al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et al. 4,636,706 July 1986 |
|---|---|---|---|---|
| wherein said drive circuit means includes means for selectively preventing said series coupling of said capacitor across said predetermined power source voltage potential during duty cycle portions of said regulator output signal of a predetermined polarity and permitting said series coupling during duty cycle portions of said regulator output signal of an opposite predetermined polarity. | C.F.R. §1.75(e)(1). the drive circuit means includes means, i.e. buffer 40 and oscillator 37, for selectively preventing coupling of the capacitor during certain "duty cycle portions" of the regulator output signal. Fay, col. 6, ll. 39-53. | C.F.R. §1.75(e)(1). the transistor 40 and inverter 48 act to couple the capacitor 32 between the output of inverter 48 and the output of inverter 58 when the control signal is present on terminal 18 and vice versa (FIG. 1; col. 2, ll. 57-61; col. 3, ll. 27-36; col. 4, ll. 30-44). | C.F.R. §1.75(e)(1). the transistor 35 acts to couple the capacitor 24 to the supply voltage 29 when the control signal Vin is present and to decouple the capacitor when Vin is not present (FIG. 1; col. 3, ll. 1-13). | C.F.R. §1.75(e)(1). the drive circuit means includes means for selectively preventing coupling of the capacitor during certain "duty cycle portions" of the regulator output signal because the output control signal 116 generates the charge pump control signal 202. Bowman, col. 8, l. 67 to col. 9, l. 46. |
| 4. A voltage regulator according to claim 3 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said predetermined power source voltage potential that said capacitor is selectively series coupled and decoupled across substantially comprises | The capacitor 60 is coupled to the output of parallel amplifying gates 58-59 that are powered by the maximum power source voltage | The outputs of the inventors 48 and 58 are at power source voltage when activated, as is known in the art. | Cini teaches two supply voltages, one is a 12V supply voltage (29) and one is an arbitrary supply voltage (Vcc). Cini, col. 2, ll. 41-68; Figs | the predetermined power source potential is the same as the maximum power source voltage potential, namely the conductor variously |

7

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| said maximum power source voltage potential that said power switching device and control element of said voltage control means are coupled across | potential 8a. When the outputs of amplifiers 58-59 are high, they will apply the maximum power source voltage potential 8a to the capacitor 60. Fay. col. 7, ll. 20-23; Fig. 4 | | 1-2. Cini states that an advantage of the invention is to use the charge pump to quickly charge the MOS-FET gate to "a higher voltage than the supply one." Cini, col. 1, ll. 18-19, 38-41. Therefore, Cini teaches the limitations of claim 4 because the predetermined power source potential may be the same as the maximum power source voltage potential and the essence of the invention in Cini is to quickly establish through a charge pump a higher voltage than that available by either supply line. *Id.* | noted as 98, 94, and 48 which is connected to the drain of transistor 42. Bowman, col. 9, ll. 29-30; Figs. 1, 4. |
| 5. A voltage regulator according to claim 4 | The preamble of a Jepson-style claim is admitted prior art. 37 | The preamble of a Jepson-style claim is admitted prior art. 37 | The preamble of a Jepson-style claim is admitted prior art. 37 | The preamble of a Jepson-style claim is admitted prior art. 37 |

8

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | C.F.R. §1.75(e)(1). | C.F.R. §1.75(e)(1). | C.F.R. §1.75(e)(1). | C.F.R. §1.75(e)(1). |
| Wherein the frequency of said high frequency signal pulses is at least one order of magnitude higher than the frequency of said regulator output signal. | Fay teaches that the control signal may be any signal (i.e. may have as low a frequency as desired), and that the oscillator may produce a high frequency signal in the range of 100 – 1000 kHz, which is more than one order of magnitude higher than the frequency of the control signal. Fay col. 7, ll 49-51. | Hochstein teaches that the oscillator output may be 70 kHz, which has a period of .001 msec (col. 4, ll. 30-33). He also says the switching FET may have slow turn-on and slow turn-off times of 200 msec each (col. 5, ll. 27-39). He is therefore teaching a control signal frequency with a period of more than 200 msec, so the high frequency signal is at least 20,000 times faster than the control signal. | Cini teaches a high frequency signal of 500 kHz which is more than one order of magnitude higher than the frequency of the control signal. Cini, col. 2, ll. 41-47. When the control signal is of a level to turn on the transistor 35, the charge pump is switched on (col. 3, ll. 6-13). Thus, it is indicated that the control signal does not have to have any frequency. | Obvious under Bowman in combination with any of Fay, Hochstein or Cini. |
| 6. A voltage regulator according to claim 5 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said drive circuit means includes a first | The first switch in Fay is transistor 65, which couples one side of | the drive circuit means includes both first and second "switch | Cini transistor 35 (responds to the regulator output | Obvious under Bowman in combination with any |

9

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, | the transistor to ground in response to the regulator output signal. Fay, Fig. 4. | devices" (i.e. Hochstein transistor 40 and buffer inverter 58). Hochstein, col. 3, ll. 16-21; col. 4, ll. 33-35. | signal) and switch network 20/21 (responds to the high frequency signal). Cini, col. 2, ll. 24-40; col. 2, l. 63 to col. 3, l. 2. | of Fay, Hochstein or Cini. |
| and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from first predetermined voltage, in accordance with said pulses of said high frequency signal | The second switch in Fay is the amplifier 58-59 that is turned on and off by the output of NOR gate 54 (which oscillates at the high frequency oscillator frequency). Amplifier 58-59 couples the maximum power source voltage to one side of capacitor 60 in response to the high | the drive circuit means includes both first and second "switch devices" (i.e. Hochstein transistor 40 and buffer inverter 58). Hochstein, col. 3, ll. 16-21; col. 4, ll. 33-35. | Cini transistor 35 (responds to the regulator output signal) and switch network 20/21 (responds to the high frequency signal). Cini, col. 2, ll. 24-40; col. 2, l. 63 to col. 3, l. 2. | Obvious under Bowman in combination with any of Fay, Hochstein or Cini. |

10

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | frequency signal from NOR gate 54. Fay, Fig. 4. | | | |
| 7. a voltage regulator according to claim 6 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said drive circuit means includes a first switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal. | Fay clamp 39 or Fay transistor 65. Fay, col. 6, ll. 39-54. | the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Hochstein transistor 70). Hochstein, col. 3, ll. 62-67. | the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Cini transistor 35). Cini, col. 3, ll. 6-13. | Obvious under Bowman in combination with any of Fay, Hochstein or Cini. |
| 8. A voltage regulator according to claim 1 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said drive circuit means includes a first switch device which selectively couples a first terminal of said capacitor to a first predetermined voltage in accordance with duty cycle portions of said | The first switch in Fay is transistor 65, which couples one side of the transistor to ground in response to the regulator output signal. Fay, Fig. 4. | the drive circuit means includes both first and second "switch devices" (i.e. Hochstein transistor 40 and buffer inverter 58). Hochstein, col. 3, ll. 16-21; col. 4, ll. 33- | Cini transistor 35 (responds to the regulator output signal) and switch network 20/21 (responds to the high frequency signal). Cini, col. 2, ll. 24-40; | Obvious under Bowman in combination with any of Fay, Hochstein or Cini. |

11

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| regulator output signal of a predetermined polarity and decouples said first terminal during duty cycle portions of said regulator output signal of an opposite predetermined polarity, | | 35. | col. 2, l. 63 to col. 3, l. 2. | |
| and wherein said peak voltage increasing means of said drive circuit means includes a second switch device which selectively series couples and decouples a second terminal of said capacitor to a second predetermined voltage, different from said first predetermined voltage, different from said first predetermined voltage, in accordance with said high pulses of said high frequency signal. | The second switch in Fay is the amplifier 58-59 that is turned on and off by the output of NOR gate 54 (which oscillates at the high frequency oscillator frequency). Amplifier 58-59 couples the maximum power source voltage to one side of capacitor 60 in response to the high frequency signal from NOR gate 54. Fay, Fig. 4. | the drive circuit means includes both first and second "switch devices" (i.e. Hochstein transistor 40 and buffer inverter 58). Hochstein, col. 3, ll. 16-21; col. 4, ll. 33-35. | Cini transistor 35 (responds to the regulator output signal) and switch network 20/21 (responds to the high frequency signal). Cini, col. 2, ll. 24-40; col. 2, l. 63 to col. 3, l. 2. | Obvious under Bowman in combination with any of Fay, Hochstein or Cini. |
| 9. A voltage regulator according to claim 8 | The preamble of a Jepson-style claim is admitted prior art. 37 | The preamble of a Jepson-style claim is admitted prior art. 37 | The preamble of a Jepson-style claim is admitted prior art. 37 | The preamble of a Jepson-style claim is admitted prior art. 37 |

12

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | C.F.R. §1.75(e)(1). | C.F.R. §1.75(e)(1). | C.F.R. §1.75(e)(1). | C.F.R. §1.75(e)(1). |
| wherein said drive circuit means includes a third switch device which selectively couples and decouples said one capacitor terminal to said second voltage potential in accordance with said regulator output signal. | Fay clamp 39 or Fay transistor 65. Fay, col. 6, ll. 39-54. | the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Hochstein transistor 70). Hochstein, col. 3, ll. 62-67. | the drive circuit means includes a third switch device driven by the regulator output signal (i.e., Cini transistor 35). Cini, col. 3, ll. 6-13. | Obvious under Bowman in combination with any of Fay, Hochstein or Cini. |
| 10. A voltage regulator according to claim 9 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said first capacitor terminal is coupled to said power switching device control terminal through a peak rectifying diode. | "[d]iode means 63 couples the output of the diode-capacitor voltage doubler of converter means 38 [which is capacitor 60] to control gate 34 of [power transistor] device 31." Fay, col. 7, l. 67 - col. 8, l. 2; Fig. 4. | Capacitor 32 is coupled to the switch 20 by rectifying diode 30 (FIG. 1; col.4, ll. 25-44). | Diode 26 connects the charge pump (capacitor 24) to the MOS-FET 2 gate. Cini, Col. 2, ll. 34-40, 59-63; Figs. 1-2 | Obvious under Bowman in combination with any of Fay, Hochstein or Cini. |
| 11. A voltage regulator according to claim 10 | The preamble of a Jepson-style claim is | The preamble of a Jepson-style claim is | The preamble of a Jepson-style claim is | The preamble of a Jepson-style claim is |

13

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| wherein said first predetermined voltage is coupled to said first capacitor terminal through a diode. | admitted prior art. 37 C.F.R. §1.75(e)(1). the capacitor is coupled to a predetermined voltage via another diode 62, "forming a conventional voltage doubler." Fay, col. 7, ll. 66-67; Fig. 4. | admitted prior art. 37 C.F.R. §1.75(e)(1). The first predetermined voltage (the output of inverter 48) is coupled to the capacitor 32 via a diode 28 (FIG. 1; col. 4, ll. 36-37). | admitted prior art. 37 C.F.R. §1.75(e)(1). the capacitor 24 is coupled to a predetermined voltage (the 12V supply) via diode 25. Cini, col. 2, ll. 41-47; Figs. 1-2. | admitted prior art. 37 C.F.R. §1.75(e)(1). the capacitor 120 is coupled to a predetermined voltage 98 via diode 207 (embodied as an emitter-base coupled transistor Q71). Bowman, col. 8, ll. 55-58; Figs. 1-4. |
| 12. A voltage regulator according to claim 11 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said power switching device comprises an FET having gate, drain and source electrodes corresponding to said control and output terminals, respectively. | n-channel metal oxide semiconductor (NMOS) transistor 31 is part of a subset (MOS-FETs) of FET transistors. Fay, col. 4, ll. 57-62. | the power switching device is a FET; Hochstein teaches n-channel metal oxide semiconductor (NMOS) transistors and MOS-FET transistors. Hochstein, col. 1, ll. 28-57. | Transistor 2 is a MOS-FET transistor. Cini, col. 2, ll. 47-68. | the power switching device is an n-channel metal oxide semiconductor (NMOS-FET) transistor 42. Bowman, col. 4, ll. 14-25. |
| 13. A voltage regulator according to claim 12 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |

14

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| wherein said drain electrode is coupled to a source of constant voltage potential and | Fay teaches that the drain (32) of the FET is connected to a constant voltage source (8a). Fay, col. 6, ll. 23-27; Fig. 4. | The drain of the FET 20 is coupled to the supply voltage 16 (FIG. 1). | the drain of the FET is connected to a constant voltage source (Vcc). Cini, col. 2, ll. 54-56; Figs. 1-2. | the drain of the FET 42 is connected to a constant voltage source (Vcc). Bowman, col. 4, ll. 14-25; Fig. 1. |
| wherein the effective internal capacitance of said FET between said gate and source electrodes is substantially larger than the capacitance of said capacitor. | Fay teaches that the capacitance (41) of the FET is "substantially larger than that of the capacitor." Fay, col. 6, ll. 23-27; Fig. 4. | Hochstein does not disclose specifically that the capacitance of the FET is "substantially larger than that of the capacitor," however the parasitic capacitance between gate and source in a FET is well known to those with skill in the art. | Cini also teaches the capacitance of the FET 2 (represented by Cini capacitor 27 in Fig. 1) is "substantially larger than that of the capacitor" (Cini charge pump capacitor 24) through Cini's reference to it holding the charge pumped by the other capacitor (24). Cini, col. 2, ll. 11-18 | the large parasitic capacitance between gate and source in a FET is well known to those with skill in the art. |
| 14. A voltage regulator according to claim 13 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said voltage control means comprises a voltage generator means | "[a] typical application is in automotive or other | Hochstein specifies that his circuit is for use in automobiles | Cini teaches a 12 Volt system to control inductive loads. Cini, | Bowman teaches a generator 10 having a field coil 14. |

15

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| and wherein said control element of said voltage control means comprises a field coil. | transport electrical systems wherein the power source is the battery…and the semiconductor switch…[is] used, for example, to feed…alternator field windings." Fay col. 1, ll. 40-46. | (col. 1, ll. 6-8 and 20; col. 2, ll. 49-51) and that the load can be a d.c. motor (col. 5, ll. 41-42). One skilled in the art would recognize that the d.c. motor refers to a generator or alternator and that it is charging the battery that powers this circuit. This is how all automobile charging systems operate. | col. 3, ll. 14-19. One skilled in the art would recognize that the automotive inductive load refers to the field coil of a generator or alternator and that it is charging the battery that powers this circuit. This is how all automobile charging systems operate. | Bowman, col. 1, ll. 34-59; Fig. 1. |
| 15. A voltage regulator according to claim 1 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said voltage control means comprises a voltage generator means and wherein said control element of said voltage control means comprises a field coil. | "[a] typical application is in automotive or other transport electrical systems wherein the power source is the battery…and the semiconductor switch…[is] used, for | Hochstein specifies that his circuit is for use in automobiles (col. 1, ll. 6-8 and 20; col. 2, ll. 49-51) and that the load can be a d.c. motor (col. 5, ll. 41-42). One skilled in the art would | Cini teaches a 12 Volt system to control inductive loads. Cini, col. 3, ll. 14-19. One skilled in the art would recognize that the automotive inductive load refers to the field coil of a | Bowman teaches a generator 10 having a field coil 14. Bowman, col. 1, ll. 34-59; Fig. 1. |

16

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | example, to feed...alternator field windings." Fay col. 1, ll. 40-46. | recognize that the d.c. motor refers to a generator or alternator and that it is charging the battery that powers this circuit. This is how all automobile charging systems operate. | generator or alternator and that it is charging the battery that powers this circuit. This is how all automobile charging systems operate. | |
| 16. A voltage regulator according to claim 15 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said voltage generator means includes stator windings, in addition to said field coil, and rectifier circuit means for receiving the output of said stator windings and providing a charging signal for a battery so as to maintain a predetermined battery voltage thereacross. | an application which would have been obvious to one of skill in the art based on Fay's general discussion of power source and load already described above. All generators and alternators have, by definition, stator windings and rectifier circuits. Fay, col. 1, ll. 40-46. | Hochstein specifies that his circuit is for use in automobiles (col. 1, ll. 6-8 and 20; col. 2, ll. 49-51) and that the load can be a d.c. motor (col. 5, ll. 41-42). One skilled in the art would recognize that the d.c. motor refers to a generator or alternator and that it is charging the battery that powers this circuit. This is | Cini teaches a 12 Volt system to control inductive loads. Cini, col. 3, ll. 14-19. One skilled in the art would recognize that the automotive inductive load refers to the field coil of a generator or alternator and that it is charging the battery that powers this circuit. This is how all automobile charging systems | Bowman teaches stator windings 12 and a rectifier circuit 20. Bowman, col. 3, ll. 40-62; Fig. 1. |

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | | how all automobile charging systems operate. | operate. | |
| 17. A voltage regulator according to claim 16 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein said predetermined voltage across said battery corresponds to said predetermined maximum power source voltage potential . | "During operation, it is typically desired that in response to an external signal applied to control input 10, ...that the [NMOS power switch] 31 turn on so that the on-state resistance of device 31 is small and ...load 9 receives substantially the full voltage of power source 8." Fay, col. 5, ll. 12-20. | The outputs of the invertors 48 and 58 are at power source voltage when activated, as is known in the art. | Cini teaches two supply voltages, one is a 12V supply voltage (29) and one is an arbitrary supply voltage (Vcc). Cini, col. 2, ll. 41-68; Figs 1-2. Cini states that an advantage of the invention is to use the charge pump to quickly charge the MOS-FET gate to "a higher voltage than the supply one." Cini, col. 1, ll. 18-19, 38-41. Therefore, Cini teaches the limitations of claim 17 because the predetermined power source potential | the predetermined power source potential is the same as the maximum power source voltage potential, namely the conductor variously noted as 98, 94, and 48 which is connected to the drain of transistor 42. Bowman, col. 9, ll. 29-30; Figs. 1, 4. |

18

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | | | may be the same as the maximum power source voltage potential and the essence of the invention in Cini is to quickly establish through a charge pump a higher voltage than that available by either supply line. *Id.* | |
| 18. A voltage regulator according to claim 10 | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). | The preamble of a Jepson-style claim is admitted prior art. 37 C.F.R. §1.75(e)(1). |
| wherein the frequency of said high frequency pulses is at least one order of magnitude higher than the frequency of said regulator output signal. | Fay teaches that the control signal may be any signal (i.e. may have as low a frequency as desired), and that the oscillator may produce a high frequency signal in the range of 100 – 1000 kHz, which is more than one order of magnitude higher than the frequency of the | Hochstein teaches that the oscillator output may be 70 kHz, which has a period of .001 msec (col. 4, ll. 30-33). He also says the switching FET may have slow turn-on and slow turn-off times of 200 msec each (col. 5, ll. 27-39). He is therefore teaching a control signal | Cini teaches a high frequency signal of 500 kHz which is more than one order of magnitude higher than the frequency of the control signal. Cini, col. 2, ll. 41-47. When the control signal is of a level to turn on the transistor 35, the charge pump is switched on (col. 3, ll. | Obvious under Bowman in combination with any of Fay, Hochstein or Cini. |

19

#490717

| CLAIM ELEMENT | FAY et. al. 4,420,700 Dec. 1983 | HOCHSTEIN 4,603,269 July 1986 | CINI et. al. 4,736,121 April 1988 | BOWMAN et. al. 4,636,706 July 1986 |
|---|---|---|---|---|
| | control signal. Fay col. 7, ll 49-51. | frequency with a period of more than 200 msec, so the high frequency signal is at least 20,000 times faster than the control signal. | 6-13). Thus, it is indicated that the control signal does not have to have any frequency. | |

20

#490717

# EXHIBIT D

Westlaw.

908 PLI/Pat 79                                                                Page 1
908 PLI/Pat 79
(Cite as: 908 PLI/Pat 79)


Practising Law Institute
Patents, Copyrights, Trademarks, and Literary Property Course Handbook Series
PLI Order No. 13599
August, 2007


Parallel Patent Litigation and Reexamination Proceedings 2007: Keeping Your
Case on Track

*79 EX PARTE REEXAMINATION FILING DATA--MARCH 31, 2007


Submitted by: Stephen Marcus
United States Patent and Trademark Office


Copyright (c) 2007 Practising Law Institute


UNITED STATES PATENT AND TRADEMARK

   OFFICE

-------------------------------------------------------------------------
                                          Commissioner for Patents

                       United States Patent and Trademark Office

                                                 P.O. Box 1450

                                          Alexandria, VA 22313-1450

                                                 www.uspto.gov

            *81 Ex Parte Reexamination Filing Data - March 31, 2007

   1. Total requests filed since start of ex parte reexam on 07/01/81 ................. 8570 [FN1]

a. By patent owner              3418   40%

b. By other member of public    4987   58%

c. By order of Commissioner     165    2%

   2. Number of filings by discipline

a. Chemical Operation     2599   30%

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

908 PLI/Pat 79                                                                      Page 2
908 PLI/Pat 79
(Cite as: 908 PLI/Pat 79)


b. Electrical Operation   2831   33%

c. Mechanical Operation   3140   37%

3. Annual Ex Parte Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
|---|---|---|---|---|---|---|---|
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 315 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | | |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | | |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | | |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | | |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | | |


4. Number known to be in litigation .................................    24%

   2056

5. Determinations on requests ............................................. 8252
   a. No. granted .......................................... 7549 ......... 91%

(1) By examiner              7438

(2) By Director (on petition)   111

   b. No. denied ........................................... 703 .......... 9%

(1) By examiner    668

(2) Order vacated    35

*82 6. Total examiner denials (includes denials reversed by Director) ................... 779

a. Patent owner requester   436   56%

b. Third party requester   343   44%

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

7. Overall reexamination pendency (Filing date to certificate issue date)

a. Average pendency  23.3 (mos.)

b. Median pendency   18.1 (mos.)

| 8. Reexam certificate claim analysis: | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|
| a. All claims confirmed | 23% | 29% | 13% | 26% |
| b. All claims cancelled | 7% | 12% | 21% | 10% |
| c. Claims changes | 70% | 59% | 66% | 64% |

9. Total ex parte reexamination certificates issued (1981 - present) ................ 5731

a. Certificates with all claims confirmed  1501  26%

b. Certificates with all claims canceled  590  10%

c. Certificates with claims changes  3646  64%

10. Reexam claim analysis - requester is patent owner or 3rd party; or Comm'r initiated.
    a. Certificates - PATENT OWNER REQUESTER .......................... 2478

(1) All claims confirmed  576  23%

(2) All claims canceled  179  7%

(3) Claim changes  1723  70%

   b. Certificates - 3rd PARTY REQUESTER ................................ 3110

(1) All claims confirmed  907  29%

(2) All claims canceled  381  12%

(3) Claim changes  1822  59%

   c. Certificates - COMM'R INITIATED REEXAM ........................... 143

(1) All claims confirmed  18  13%

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

908 PLI/Pat 79                                                              Page 4
908 PLI/Pat 79
(Cite as: 908 PLI/Pat 79)


```
(2) All claims canceled   30  21%

(3) Claim changes         95  66%
```

[FN1]. Of the requests received through Mar. 31, 2007, 33 requests have not yet been accorded a filing date, and preprocessing of 22 requests was terminated, for failure to comply with the requirements of 37 CFR 1.510. See Clarification of Filing Date Requirements for Ex Parte and Inter Partes Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.